1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
 2                     Richmond Division

 3
    UNITED STATES OF AMERICA        }
 4                                  }
    v.                              }    Criminal Case No.:
 5                                  }    3:10 CR 170
    JACK ROSGA                      }
 6  and                            }
    HAROLD HERNDON                  }
 7
                                        July 21, 2010
 8
              COMPLETE TRANSCRIPT OF MOTIONS
 9         BEFORE THE HONORABLE HENRY E. HUDSON
             UNITED STATES DISTRICT COURT JUDGE
10  APPEARANCES:

11  Dennis Fitzpatrick, Esquire
    Sam Kaplan, Esquire
12  OFFICE OF THE UNITED STATES ATTORNEY
    600 East Main Street
13  Suite 1800
    Richmond, Virginia  23219
14        Counsel on behalf of the United States

15  Claire G. Cardwell, Esquire
    STONE CARDWELL & DINKIN PLC
16  101 Shockoe Slip
    Suite K
17  Richmond, Virginia  23219
    and
18  Craig A. Mastantuono, Esquire
    MASTANTUONO LAW OFFICE SC
19  817 North Marshall Street
    Milwaukee, WI  53202
20        Counsel on behalf of Jack Rosga

21
    Charlotte P. Hodges, Esquire
22  B I G LEGAL SERVICES, PLLC
    Midlothian, Virginia  23112
23        Counsel on behalf of Harold Herndon

24               KRISTA M. LISCIO, RMR
                OFFICIAL COURT REPORTER
25            UNITED STATES DISTRICT COURT
```

**E X A M I N A T I O N S**

|  | **DIRECT** | **CROSS** | **REDIRECT** | **RECROSS** |
|---|---|---|---|---|
| Agent Valot | 6 | 29/68 100/ | 91 | |

1          (The proceeding commenced at 10:03 a.m.)

2      THE COURT:  Good morning.

3      MR. FITZPATRICK:  Good morning.

4      MS. CARDWELL:  Good morning.

5      MS. HODGES:  Good morning, Your Honor.

6      THE COURT:  All right, Pizzini, call our next

7  case, please.

8      THE CLERK:  Case Number 10 CR 170.  *United States*

9  *of America v. Jack Rosga and Harold Herndon.*

10     Mr. Dennis Fitzpatrick and Mr. Sam Kaplan

11 represent the United States.

12     Ms. Claire Cardwell and Mr. Craig Mastantuono

13 represent defendant Rosga.

14     Ms. Charlotte P. Hodges represents defendant

15 Herndon.

16     Are counsel ready to proceed?

17     MR. FITZPATRICK:  We are, Your Honor.

18     MS. CARDWELL:  Ready for Mr. Rosga.

19     MS. HODGES:  Mr. Herndon is ready, Your Honor.

20     THE COURT:  The matter before the Court this

21 morning are motions filed by both the defendants

22 requesting this Court to review their client's bond

23 status.  In both cases, one in the Middle District of

24 North Carolina, and one in the District Court in

25 Wisconsin, magistrate judges, after hearing the

1  evidence, determined that there were no conditions

2  which would adequately protect the community, and held

3  them without bond pending transfer to this district.

4      So before the Court are the two motions asking me

5  to review the bond status.

6      I also have a separate motion filed by you,

7  Ms. Hodges, with respect to your client's medical care.

8      MS. HODGES:  That's correct, Your Honor.

9      THE COURT:  Did you want to take that first, or

10  after the bond motion?

11      MS. HODGES:  I want to take it after the bond

12  motion.  It's actually in the alternative, Your Honor.

13      THE COURT:  All right.

14      MS. HODGES:  Thank you, sir.

15      THE COURT:  Okay.

16      Ms. Cardwell, is there anything you or Ms. Hodges

17  would like to say before the government proceeds at

18  this point?

19      MS. CARDWELL:  Judge, just that we don't have any

20  evidence.  It's our motion at this point.  We would ask

21  the Court to administer the proffer from the pretrial

22  report in argument following the testimony of the

23  agent.

24      THE COURT:  I'm sure that will be okay.

25      MS. CARDWELL:  Thank you.

1          THE COURT:  Ms. Hodges.

2          MS. HODGES:  Your Honor, likewise, I do not have

3   any evidence.  But, again, I would like to proffer

4   information to the Court as well.

5          THE COURT:  All right.  Very well.

6          MS. HODGES:  Thank you, sir.

7          THE COURT:  Mr. Fitzpatrick, go right ahead, sir.

8          MR. FITZPATRICK:  Thank you very much, Your Honor.

9          Your Honor, Special Agent Josh Valot, please.

10         THE COURT:  Okay.

11         Agent, if you would come forward sir.

12         If you would be kind enough to raise your right

13  hand, place your left hand on the Bible, and face the

14  Clerk of the Court.

15         THE CLERK:  You do solemnly swear that the

16  testimony which you are about to give, in this case,

17  before this Court, shall be the truth, the whole truth,

18  and nothing but the truth, so help you God?

19         AGENT VALOT:  I do.

20         THE COURT:  Have a seat on the witness stand, sir.

21         All right, Mr. Fitzpatrick, you may proceed.

22         MR. FITZPATRICK:  Thank you.

23         Whereupon, **Special Agent Josh Valot**, having

24  been sworn in, testifies as follows:

25                    **DIRECT EXAMINATION**

1  BY MR. FITZPATRICK:

2  Q     Good morning, sir.  Please state your full name.

3  A     Joshua Valot.

4  Q     And what is your job?

5  A     I'm a special agent with the Bureau of Alcohol,

6  Tobacco, Firearms and Explosives in Richmond, Virginia.

7  Q     How long have you been with the ATF?

8  A     I have been a special agent since February of

9  2005.

10  Q     And are you currently the lead case agent in the

11  matter of *United States v. Jack Rosga* and Harold

12  Herndon, and others?

13  A     Yes, I am.

14  Q     And how long, approximately, have you been working

15  on this investigation?

16  A     Approximately, just a little less than two years.

17  Q     And do you presently see Mr. Rosga in the

18  courtroom?

19  A     Yes, sir.

20  Q     Can you please identify him for Judge Hudson.

21  A     He's in the gray striped suit.

22       THE COURT:  The record will reflect the

23  identification of Mr. Rosga.

24       MR. FITZPATRICK:  Thank you, Your Honor.

25

DIRECT EXAMINATION OF AGENT VALOT                    7

1   Q     And do you see Mr. Herndon in the courtroom today?

2   A     Yes, I do.

3   Q     And can you please identify him.

4   A     He's in the orange suit.

5         THE COURT:  The record will reflect the

6   identification of Mr. Herndon by Agent Valot.

7         MR. FITZPATRICK:  Thank you, Your Honor.

8   Q     Agent Valot, in addition to working on this case

9   for two years, you were one of the witnesses that

10  prepared --

11        THE COURT:  Just pause a minute and let the lady

12  remove the young lady or man from the courtroom.  All

13  right, go right ahead.

14        MR. FITZPATRICK:  Thank you, Your Honor.

15  Q     You're one of the agents who presented this matter

16  before a grand jury, is that correct?

17  A     Yes, I am.

18  Q     And you fully reviewed the indictment in the

19  matter?

20  A     Yes.

21  Q     And does the indictment in the matter accurately

22  depict and describe the Outlaws' organization, the

23  structure, the hierarchy of that organization?

24  A     Yes, it does.

25  Q     And with respect to Paragraph 16 and Paragraph 17,

1   do those paragraphs accurately depict or describe the

2   purpose and objectives of the Outlaws?

3   A    Yes, it does.

4   Q    And also the means and methods of the Outlaws'

5   organization?

6   A    Yes, sir.

7   Q    Now, during this investigation, did this -- did

8   you work with undercover agents in this case?

9   A    Yes, sir, I did.

10  Q    And how long were undercover agents working within

11  the Outlaws' organization?

12  A    Since January of 2009.

13  Q    And as part of your investigation, did you learn

14  that this case had a violent nature to it?

15  A    Yes, I did.

16  Q    And with respect to your investigation, describe

17  how the Outlaws' organization operates in terms of

18  nationally or internationally.

19  A    They have a membership within the United States

20  within 23 states within the United States.  And it's

21  also an international organization that has membership

22  in 19 different countries.

23  Q    Okay.  And with respect to defendant Rosga, what

24  is his role within the Outlaws' organization?

25  A    Mr. Rosga is the national president of the

1  Outlaws.

2  Q     And since when has he been the national president

3  of the Outlaws?

4  A     Since November of 2006.

5  Q     And how have you -- have the undercover agents who

6  have been within the organization for the past 18

7  months, have they confirmed that with you?

8  A     Yes, they have.

9  Q     And have you learned that through other aspects of

10 your investigation?

11 A     Yes, I have.

12 Q     Has anything in your investigation caused you to

13 dispute the fact that Jack Rosga is the national

14 president of the Outlaws' organization?

15 A     No, sir.

16 Q     With respect to the international aspect of this

17 organization, are there members who reside outside the

18 United States within this organization?

19 A     Yes, there are.

20 Q     And during this investigation, have the undercover

21 agents encountered international members?

22 A     Yes, they have.

23 Q     And do you recall from what country?

24 A     From Germany.

25 Q     With respect to -- and we'll begin by speaking

1  about Mr. Rosga, and then we'll turn to Mr. Herndon, is

2  that okay?

3  A    Yes, sir.

4  Q    With respect to Mr. Rosga, are you familiar with

5  any international travel that he's engaged in?

6  A    Yes, I am.

7  Q    And what do you know about his international

8  travel?

9  A    Mr. Rosga has been in England and Brussels and in

10  Antigua.

11  Q    And do you recall when he made that travel?

12  A    2009.

13  Q    And do -- through your investigation and through

14  your discussions with the undercover agents, do the

15  Outlaws -- does the Outlaws' organization conduct

16  meetings or business outside of the United States?

17  A    Yes, sir.

18  Q    And do you know where?

19  A    In Antigua.

20  Q    And do you know for what purpose?

21  A    Through the investigation, there's a international

22  meeting that occurs there with members from all over

23  the world that meet in a central location in Antigua.

24      THE COURT:  Agent Valot, you testified that during

25  2009, Mr. Rosga was traveling in England, Brussels and

1   Antigua.  Does your investigation reveal that that

2   travel was related to the Outlaws Motorcycle Club, or

3   was that related to a different purpose or reason?

4        AGENT VALOT:  I have not been able to establish if

5   that was for the club.

6        THE COURT:  All right.

7        AGENT VALOT:  And I apologize.  I believe the

8   Antigua travel was in early 2010.

9        THE COURT:  All right, sir.

10        AGENT VALOT:  Not 2009.

11   Q    Would that be January 2010?

12   A    Yes, sir.

13   Q    Going back to your investigation, you testified

14   previously that this investigation has violence

15   associated with it, is that correct?

16   A    That's correct.

17   Q    And the indictment set forth numerous allegations

18   regarding violence, is that correct?

19   A    Yes, it did.

20   Q    Can you summarize for Judge Hudson just what types

21   of violence the Outlaws' organization engages in?

22   A    There's an ongoing rivalry with rival clubs,

23   specifically the Hells Angels, and any clubs that have

24   an allegiance to the Hells Angels.

25   Q    And I want to ask you some questions about a

1  meeting that occurred in July of 2009 between Jack

2  Rosga and the undercover agents.  Are you familiar with

3  that meeting?

4  A    Yes, I am.

5  Q    And have you discussed that meeting with the

6  undercover agents?

7  A    I have.

8  Q    As well as reviewed recordings of that meeting?

9  A    Yes, sir.

10  Q    What -- with respect to the rivalry with the Hells

11  Angels Motorcycle Club, can you tell Judge Hudson what

12  defendant Rosga said about that?

13  A    In discussions with the undercovers and Mr. Rosga,

14  the topic of the Hells Angels was discussed, and

15  Mr. Rosga stated that -- the undercovers explained to

16  Mr. Rosga that there were Hells Angels present in

17  Richmond.  Mr. Rosga then stated to the undercover

18  agents that to deal with them, you need to shoot them,

19  and made a gun gesture with his hand.

20      THE COURT:  All right, sir.

21  Q    And what had happened just prior to that meeting

22  with respect to the Outlaws' organization and

23  membership?

24  A    Just prior to that, the undercover agents had

25  received their full patches, and had finished their

1  perspective period of being members and received their

2  full patch at a national run that occurred in North

3  Carolina the weekend prior.

4  Q    And had Mr. Rosga traveled from North Carolina to

5  Petersburg with the undercover agents?

6  A    Yes, he did.

7  Q    And do you know what the purpose of that trip was?

8  A    Purpose of the trip was basically as a -- as a

9  reward to the undercover agents for their -- for

10  earning their full patch, for performing the

11  perspective period, for getting their patch.  And it

12  was an honor bestowed upon them to be able to ride with

13  Mr. Rosga back to Petersburg to the clubhouse.

14  Q    And when they arrived at the Petersburg clubhouse,

15  did Mr. Rosga do anything to inspect the clubhouse?

16  A    Yes, he did.

17  Q    And can you tell Judge Hudson what he did?

18  A    He -- Mr. Rosga, he looked around the clubhouse

19  and pointed out locations in which security cameras

20  should be placed, as well as locations in which guards

21  should be posted outside of the clubhouse for security

22  for protection.

23      THE COURT:  This is the Petersburg clubhouse?

24      AGENT VALOT:  That's correct.

25      THE COURT:  Okay.

1    MR. FITZPATRICK:  Thank you, Your Honor.

2  Q    During that meeting also -- strike that.  Let me

3  ask you this.

4        Do you know what a *"tax"* is within the Outlaws'

5  organization?

6  A    Yes, sir.

7  Q    And what is a tax?

8  A    A tax is any special assessment or any special

9  money that is owed by members to the organization on

10  top of the -- their typical dues that they pay every

11  month.  The tax is an additional fee levied for a

12  variety of reasons.

13  Q    And is it accurate to say that the Outlaws'

14  leadership, that the top hierarchy, are funded by their

15  respective members through taxes?

16  A    Yes, they are.

17  Q    And what, if anything, did Mr. Rosga say at that

18  July 2009 meeting about taxes?

19  A    Mr. Rosga had stated that his travel was funded by

20  the dues and by the money that comes in from the clubs.

21  And stated that if he is in need of money, that he will

22  just levy a tax against the members to raise funds.

23  Q    After -- did -- during this investigation, or at

24  that meeting or at other times, did Mr. Rosga state to

25  the agents what his goal was for the State of Virginia

1  in terms of Outlaw membership?

2  A    Was basically for the Outlaw membership to grow in

3  the State of Virginia to be able to combat the Hells

4  Angels that are operating within Virginia.

5       THE COURT:  When did he make that comment?

6       AGENT VALOT:  That was -- during the July

7  conversations is when he was talking about the

8  undercovers getting dominance in Virginia.

9       THE COURT:  All right.

10  Q    After July, are you aware of an event in September

11  of 2009 that occurred in Connecticut?

12  A    Yes, sir.

13  Q    Can you summarize what happened in Connecticut in

14  2009 as it relates to this investigation?

15  A    In Connecticut, there was a -- there was a party

16  going on in Rockton, Massachusetts.  And prior to that,

17  there was -- Outlaws were coming to the party.  There

18  was two Outlaw members from Florida that were at a gas

19  station in Connecticut getting gas, at which time they

20  were assaulted by members of the Hells Angels in which

21  they were beaten and their colors were taken from them.

22  Q    And as a result of that, was that event that

23  occurred in Connecticut against the Outlaws' members,

24  was that a topic of conversation among the Outlaws at

25  the Rockton, Massachusetts event?

1   A    Yes, it was.

2   Q    And what was -- can you just summarized what their

3   reaction was with the Outlaws' members to that event?

4        THE COURT:  Hold on just one second.

5        Agent Valot, did the conversation occur in 2009 in

6   July in Connecticut, or the incident occur in July of

7   2009?

8        AGENT VALOT:  The incident in which the Outlaws

9   were assaulted by the members of the Hells Angels, that

10  was in Connecticut in September of 2009.

11       THE COURT:  All right.  And the conversation

12  you're referring to now occurred when?

13       AGENT VALOT:  I'm sorry, the conversation that he

14  just asked me about?

15       THE COURT:  That he just asked you about.  Yes.

16       AGENT VALOT:  That was -- that was also in

17  Connecticut after the assault had happened while the

18  undercover agents were with members of the Outlaws.

19  There was conversation then.

20       THE COURT:  Okay.  I just wanted to get the time

21  frame properly.

22       Go ahead.

23       MR. FITZPATRICK:  Sorry, Your Honor.  I'll

24  clarify.

25       THE COURT:  That's okay.  Go ahead.

1          MR. FITZPATRICK:  Thank you.

2   Q    The September event in Massachusetts, was

3   Mr. Rosga at that event?

4   A    I do not believe so.

5   Q    Moving forward to October of 2009.  Was there an

6   Outlaw event in Arkansas?

7   A    There was -- it was either at the end of September

8   or early October.

9   Q    And can you tell the Court what that event was

10  within the Outlaws' organization?

11  A    That event was a regional meeting of the Outlaws,

12  also referred to as a *"Big Table Meeting."*  And what

13  those meetings entailed is that the -- the regional

14  bosses from the different regions throughout the

15  country of the Outlaws, they get together and they meet

16  along with the -- along with Mr. Rosga, and they

17  discuss issues that are going on within the

18  organization.  And it's a meeting that they have a

19  couple times a year.

20          And at that point, what's discussed there, it's

21  the regional bosses' responsibility then to take that

22  information back to their region to be disseminated

23  throughout the membership.

24  Q    And also attending that meeting, were you familiar

25  with a defendant in this case by the name of Michael

1  Pedini?

2  A    Yes, I am.

3  Q    Did Mr. Pedini attend that meeting?

4  A    Yes, he did.

5  Q    And are you aware of what Mr. Pedini's role is

6  within the Outlaws' organization back in September and

7  October of 2009?

8  A    Mr. Pedini is an enforcer.

9  Q    And based on your investigation, do you have

10  information that Mr. Rosga and Mr. Pedini had a

11  conversation?

12  A    Yes, sir.

13  Q    And with respect to the undercovers in this case,

14  did they have a conversation with a defendant by the

15  name of Thomas Benvie?

16  A    Yes, they did.

17  Q    And was Mr. Benvie the president of the Maine

18  chapter?

19  A    Yes, he was.

20  Q    And what did Mr. Benvie --

21       THE COURT:  When you say Maine, you mean State of

22  Maine?

23       MR. FITZPATRICK:  I'm sorry.  Yes, sir.

24       THE COURT:  Okay.

25  Q    In the State of Maine, Thomas Benvie is who?

1  A    He is the president.

2  Q    And what did Mr. Benvie tell the UC with respect

3  to the conversation between the defendant and

4  Mr. Pedini?

5  A    Told the undercover agent that Mr. Rosga -- that

6  Jack was all over Pedini to make things right for the

7  assault that occurred on the Outlaws in Connecticut.

8  Q    Now, shortly after the Arkansas meeting that you

9  just described, was there another meeting that involved

10  defendant Les Werth?

11  A    Yes, there was.

12  Q    And can you describe what this meeting was.

13  A    That meeting was a regional -- was a bosses

14  meeting within the copper region.

15      THE COURT:  A bosses meeting within the copper

16  region?

17      AGENT VALOT:  Yes, sir.  That included all the

18  chapters within the copper region.  The presidents of

19  each one of those chapters had a meeting with

20  Mr. Werth.

21      THE COURT:  When did that occur?

22      AGENT VALOT:  That was October 3rd of 2009.

23      THE COURT:  All right, sir.

24  A    And at that meeting, Mr. Werth relayed the

25  information that was talked about from the Arkansas

1   meeting, then to all of the bosses from the different

2   chapters within the copper region.

3   Q    And what did he state with respect to problems

4   with the Hells Angels?

5   A    Mr. Werth then stated that the Outlaws are now

6   officially at war with the Hells Angels, and that if

7   they are to see a member of the Hells Angels, that they

8   are to assault them and to take their patches and to

9   destroy them or burn them.  And not to talk about what

10  they did over the telephone, because that would be

11  considered conspiracy, and everybody could go to jail

12  for life.

13  Q    Now, are you aware of a shooting that occurred in

14  Canaan, Maine on or about October 8, 2009?

15  A    Yes, sir.

16  Q    And can you -- was Mr. Pedini, and another

17  individual by the name of Thomas Mayne, M-A-Y-N-E, who

18  is formally a defendant in this case, were they

19  involved in that shooting?

20  A    Yes, they were.

21  Q    And can you describe where that shooting occurred

22  within Canaan, Maine?

23       THE COURT:  Tell me again the date of that.

24       MR. FITZPATRICK:  Your Honor, October 8, 2009.

25       THE COURT:  Okay.  Go right ahead.  I'm sorry for

1    interrupting you.

2    A    The shooting occurred at the Hells Angels

3    clubhouse in Canaan, Maine.

4    Q    Can you describe the Hells Angels clubhouse?

5    A    The clubhouse has a -- there's a small driveway,

6    and then there's a gate, and then there's a longer

7    driveway on the other side of the gate.  And the

8    shooting occurred right outside the gate entering into

9    the clubhouse.

10   Q    And is the gate controlled electronically?  It

11   slides across?

12   A    Yes, sir.

13   Q    And was the Hells Angels' member trying to gain

14   entrance to that location on October 8th?

15   A    Yes, he was.

16   Q    And describe what your investigation revealed

17   occurred at that location.

18   A    That location, the Hells Angels' member was in his

19   car, and multiple shots were fired at the vehicle and

20   at the Hells Angels' member.  And he sustained a

21   gunshot wound to his neck.

22   Q    And do you know how many times he was fired upon?

23   A    I'm not sure how many times.  It was many times.

24   Q    And do you know who was firing upon him?

25   A    Thomas Mayne and Michael Pedini.

DIRECT EXAMINATION OF AGENT VALOT          22

1  Q     And is it accurate to say that that shooting

2  occurred within one week of the Arkansas meeting with

3  Mr. Rosga and Mr. Pedini, and also within one week of

4  the copper region meeting where Les Werth said that

5  they were at war with the Hells Angels?

6  A     Yes, sir.

7  Q     Can you describe for Judge Hudson how policies are

8  set within the Outlaws' organization and how an

9  individual member has authority to engage in violent

10 acts?  If you don't understand the questions, I can

11 restate it.

12 A     Yeah, can you?

13       MR. FITZPATRICK:  I'm sorry, Your Honor.  Can I

14 restate the question?

15       THE COURT:  Go ahead.

16 Q     Who makes orders within the Outlaws' organization?

17 A     The order, there's a hierarchy, and the orders

18 tend to come from the hierarchy down to the members.

19 Q     And is it consistent with your investigation into

20 this case, or in other gang related cases, that gang

21 leaders often set commands to go after rival gangs?

22 A     Yes, sir.

23 Q     Now, moving on to the investigation of the

24 Outlaws.  Generally, are you familiar with an

25 individual by the name of Harry Bowman?

DIRECT EXAMINATION OF AGENT VALOT          23

1    A    Yes, I am.

2    Q    And what's his nickname?

3    A    Taco.

4    Q    And who is Taco Bowman?

5    A    He is a former president of the Outlaws.

6    Q    And is he currently incarcerated?

7    A    Yes, he is.

8    Q    And was he -- prior to his incarceration, was he

9    charged in a racketeering enterprise in the Middle

10   District of Florida, I believe?

11   A    Yes, he was.

12   Q    And can you describe for the Court when law

13   enforcement was trying to locate Mr. Bowman, how long

14   he was a fugitive.

15   A    Mr. Bowman was a fugitive for 18 months.

16        THE COURT:  And when was this Florida prosecution

17   initiated, Agent Valot?

18        AGENT VALOT:  It was in the mid '90s, I believe.

19        THE COURT:  Mid '90s.  Okay.

20   Q    Are you also familiar with another individual by

21   the name of Randy Yager?

22   A    Yes, I am.

23   Q    And who is Randy Yager?

24   A    Randy Yager was a regional boss in the Midwest

25   part of the United States.

1  Q     And what is Randy Yager's current status?

2  A     Randy Yager was indicted in 1997.  And he is

3  currently a fugitive from justice right now.

4  Q     And with respect --

5       MR. FITZPATRICK:  Your Honor, at this time, if the

6  Court pleases, if I could ask some questions regarding

7  defendant Herndon?

8       THE COURT:  Sure.  Go right ahead.  I'm going to

9  consolidate both of these for purposes of this hearing,

10  so you may go right ahead.

11      MR. FITZPATRICK:  Thank you, Your Honor.

12  Q     Agent Valot, you previously described that you are

13  also the case agent with respect to defendant Harold

14  Herndon, is that correct?

15  A     That's correct.

16  Q     And you're familiar with the facts that led up to

17  his prosecution?

18  A     Yes, sir.

19  Q     Are you aware that he does have a prior

20  racketeering conviction in North Carolina?

21  A     Yes, sir.

22  Q     With respect to his role within the Outlaws'

23  organization, on or about June of 2010, within a week

24  of -- or two weeks of this indictment being returned,

25  was there a national event for the Outlaws?

1   A     Yes, sir.

2   Q     And where was that national event?

3   A     That was in Sandusky, Ohio.

4   Q     And did the undercover agents attend that event in

5   Sandusky, Ohio?

6   A     Yes, they did.

7         THE COURT:  Did you say that was two weeks after

8   the indictment was returned?

9         AGENT VALOT:  No, sir.  That was -- that was

10  actually at the same time that the indictment was

11  returned.  The weekend following the return of the

12  indictment.

13        THE COURT:  Okay, sir.

14  Q     And the undercover agents, did they encounter

15  defendant Rosga at that event?

16  A     Yes, they did.

17  Q     In addition, was defendant Herndon at that event?

18  A     Yes, he was.

19  Q     Based on your investigation, was defendant Herndon

20  a member of the Outlaws' organization in June of 2010?

21  A     Yes, he was.

22  Q     What role or leadership position, if any, did he

23  hold within the Outlaws' organization?

24  A     Mr. Herndon was the regional vice president at the

25  time.

DIRECT EXAMINATION OF AGENT VALOT          26

1  Q    With respect to the undercover agents' encounters

2  with Mr. Herndon, did they observe any drug usage by

3  Mr. Herndon during this case?

4  A    Yes, they did.

5  Q    Can you describe that?

6  A    One particular event in Lexington, North Carolina

7  in April of 2010, they observed Mr. Herndon under the

8  influence of narcotics to the point that he was having

9  trouble walking and had to have somebody assist him to

10 get into a vehicle to be able to leave.

11 Q    And at that time -- when the indictment in this

12 case was unsealed, were search warrants executed,

13 including a search warrant at Mr. Herndon's residence

14 in North Carolina?

15 A    Yes, sir.

16 Q    And can you tell the Court if any weapons were

17 found?

18 A    There was a loaded pistol in a nightstand located

19 beside a bed.

20 Q    And with respect to Mr. Herndon's arrest, after he

21 was arrested, was he --

22     THE COURT:  Let me ask you a quick question here.

23 Was Mr. Herndon residing by himself or with others at

24 the time?

25     AGENT VALOT:  At the time, he was a -- there was a

DIRECT EXAMINATION OF AGENT VALOT          27

1  female who was with him.  It was his girlfriend.  His

2  child was living there, and I believe his mother was

3  living there at the same time as well.

4       THE COURT:  Go ahead.

5       AGENT VALOT:  Or another relative.  I'm not sure

6  if it was his mother.

7       MR. FITZPATRICK:  Thank you, Your Honor.

8  Q    With respect to that, the girlfriend, did the

9  girlfriend make any statements with respect to the

10  operation of the gun?

11  A    She stated that the firearm was her gun.

12       THE COURT:  Was her gun?

13       AGENT VALOT:  Yes, sir.

14  Q    And with respect to whether or not the gun was

15  loaded, did she make any statements about that?

16  A    Not at the -- not at the time of the search

17  warrant.

18  Q    And when did she make some statements about the

19  gun?

20  A    At the -- at the detention hearing that occurred

21  in North Carolina.

22  Q    And did you hear that statement?

23  A    Yes.

24  Q    And what, if anything, did she say about the gun?

25  A    She had stated that there was ammunition in the

1  gun, but there was not a round in the chamber.

2  Q    Okay.  And when the gun was inspected by ATF, was

3  there a round in the chamber?

4  A    Yes, there was.

5  Q    With respect to defendant Herndon's post-arrest

6  statements, was he questioned after being apprized of

7  *Miranda* warnings?

8  A    Yes, he was.

9  Q    And part of the allegation against Mr. Herndon is

10 the interstate transportation of gambling devices; are

11 you aware of that?

12 A    Yes, I am.

13 Q    And did he make statements regarding those

14 gambling machines?

15 A    Yes, he did.  He made statements about the

16 gambling machines, about his knowledge of the gambling

17 machines, about the individual who supplies the

18 gambling machines, about the way the money was split

19 between the club and between the individual who

20 provided the machines, as well as facilitating the

21 machines being delivered to the undercover clubhouse in

22 Petersburg.

23     MR. FITZPATRICK:  Thank you, Agent Valot.

24     Your Honor, I have no further questions at this

25 time.

DIRECT EXAMINATION OF AGENT VALOT          29

1          THE COURT:  All right.

2          Cross-examination.  Ms. Cardwell first.

3                    **CROSS-EXAMINATION**

4    BY MS. CARDWELL:

5    Q     Good morning, Agent Valot.

6    A     Good morning.

7    Q     Agent Valot, one of the things that is mentioned

8    early in this indictment is that, *"The Outlaws is a*

9    *highly organized criminal enterprise with a defined,*

10   *multi-level chain of command."*  Is that the way you

11   would describe the hierarchy?

12   A     Yes, ma'am.

13   Q     And, sir, is it true -- first of all, where do you

14   get that information, that it's a highly organized

15   criminal enterprise and it has a defined multi-level

16   chain of command?

17   A     From -- throughout the investigation from the

18   undercovers and from analyzing prior cases on the

19   Outlaws.

20   Q     Okay.  So with regard to the group that's been

21   charged here, and Mr. Rosga, you relied on things that

22   you've heard or the agents heard while they were

23   dealing with various members, correct?

24   A     That's correct.

25   Q     There is though, in fact, no written document or

1  constitution, anything that sets out how the

2  organization runs, that you know of, is there?

3  A    Not of the positions that are -- not for the

4  positions.  Not for president, or vice president, or

5  anything like that.  There is a written constitution or

6  rule, you know, that the Outlaws have.

7  Q    And it doesn't -- that constitution doesn't set

8  forth who the officers are or what the hierarchy is of

9  officers, correct?

10  A    Correct.

11  Q    It doesn't set forth any of these means and

12  practices, like taxes and dues, or whatever you guys

13  refer to them as, none of the things that you've

14  mentioned in this detailed indictment are set forth in

15  that written constitution, are they?

16  A    I don't believe so.

17  Q    So that's all -- your conclusions about that is

18  all based upon things that you've heard from various

19  members, or your agents have heard from various

20  members, correct?

21  A    Through our investigation.  Yes, ma'am.

22  Q    And do you know how many different members have

23  talked about those particular things, the taxes, the

24  dues, who's the boss?

25  A    That's a -- all the members at some point.  I

1 mean, most of the members, that's a conversation that's

2 typically had by the members.

3 Q    My question is, how many of the members of the

4 organization have your agents in this investigation

5 talked to to reach those conclusions about the

6 hierarchy and about the practices of the club and the

7 rules of the club, how many?

8 A    I -- I don't have a specific number.  Like I said,

9 it's constantly talked about.  It's a constant theme of

10 conversation with the undercover agents and with the

11 members.

12 Q    And you can't give us a ballpark of how many

13 people have talked about it in the club?

14 A    I would ballpark probably at least every member

15 within the copper region, and as well as the other

16 members that dealt with, I would ballpark maybe 50 or

17 60.

18 Q    But you mentioned every member of the copper

19 region, correct?

20 A    I'm -- through their conversations with all the

21 members of the copper region.  I can't say specifically

22 what conversations they had with the individuals.  I'm

23 generalizing.

24 Q    Most of them in the copper region?

25 A    Yes.

CROSS-EXAMINATION OF AGENT VALOT          32

1  Q    And how many outside the copper region?

2  A    I would have a hard time coming up with that

3  number, to be honest with you.

4  Q    Well, 20?

5       MR. FITZPATRICK:  Objection, Your Honor.  Asked

6  and answered the question.

7       MS. CARDWELL:  He's on cross.

8       THE COURT:  Objection overruled.  She can

9  follow-up and ask whether or not he can think of a

10 particular number, if he can give a ballpark figure.

11      Go right ahead.  You may respond, agent.

12 Q    Would there be as many as 20 members that were

13 talked to by your agents outside the copper region

14 about the practices of the Outlaws' organization?

15 A    Yes, ma'am.

16 Q    Okay.  More than 30?

17 A    It's possible.  I know they've had numerous

18 conversations with many members outside the copper

19 region.

20 Q    Would you say it's less than 50 that are outside

21 the copper region?

22 A    Honestly, I don't feel comfortable coming up with

23 a number on that.  I mean, they've had contact with --

24      THE COURT:  I think you've exhausted your cross on

25 this point, Ms. Cardwell.

1    MS. CARDWELL:  Thank you, Your Honor.

2  Q    With regard to the regional meetings, you've

3  mentioned, or at least the indictment mentions, that

4  there are chapters, and then there are chapters that

5  are part of a region, correct?

6  A    Correct.

7  Q    And each of the regions have a color name,

8  correct?

9  A    Yes.

10  Q    And each region has what you refer to as a boss,

11  correct?

12  A    Yes, ma'am.

13  Q    And there are, according to the indictment,

14  regular meetings of the region, bosses and their

15  officers and the chapter members, correct?

16  A    That's correct.

17  Q    Sir, did your investigation reveal that Mr. Rosga

18  ever attended any regional meetings?

19  A    No, ma'am.

20  Q    And with regard to the taxes that are noted as

21  being assessed, I think you specifically said that

22  there was a representation made by Mr. Rosga to one of

23  your undercover agents that he had on occasion

24  assessed -- you refer to it as a tax.  Are you saying

25  he used the term *"tax"*?

1  A    I'm not sure exactly if he used that term or not.

2  Q    Okay.  And the reference to that money, whatever

3  it was called, was in reference to getting money for

4  gas and for travel purposes to attend things, correct?

5  A    Correct.

6  Q    And did he ever indicate that he -- did Mr. Rosga

7  ever indicate to your agents that he forcefully took

8  that money from any member or ordered that that money

9  be paid to him from anybody in the organization?

10  A    That the taxes are ordered and authorized by the

11  president.

12  Q    The question I'm asking you is, did Mr. Rosga ever

13  say to your undercover agents that he forced or ordered

14  any member to pay him money to pay for his gas or

15  travel?

16  A    No, ma'am.

17  Q    Now, with regard to the gambling -- let's stay

18  with money.  With regard to the dues, is there a set

19  amount of dues paid by every member to their respective

20  chapter?

21  A    No, the dues are decided by the particular

22  chapters.

23  Q    Okay.  So the chapters decide how much the members

24  pay, correct?

25  A    That's correct.

1  Q    And what do the region bosses have to do with that

2  amount being set?

3  A    The money from the chapters then goes to the

4  region -- a portion goes to the region, and then a

5  portion from that region then goes to the national.

6  Q    Okay.  And what evidence do you have, sir, that

7  the money that comes from the region and allegedly goes

8  to what you refer to in the indictment, or the

9  government has referred to in the indictment, as the

10 national hierarchy; what evidence do you have that that

11 money traveled to Mr. Rosga, or someone in the national

12 hierarchy?

13 A    Through doing bank records through investigations,

14 we have been able to put together a flow of money going

15 from the region.

16 Q    And is there a national repository, a bank

17 account, or something in the Outlaws' name or

18 Mr. Rosga's name that that money flows to?

19 A    Not in Mr. Rosga's name.  No.

20 Q    Okay.  Who does it flow to?

21 A    I apologize.  I can't remember the individual's

22 name right now.

23 Q    Do you know where he's located?  I understand you

24 can't remember the person's name right now, but do you

25 know where the person is located?

1   A     I believe it's in Milwaukee.

2   Q     And is the account in an individual's name?

3   A     Again, I apologize.  I do not recall at this time.

4   Q     If you recall later, like I do sometimes, will you

5   let us know?

6   A     Yes.  Definitely.

7   Q     Thank you.  And with regard to that, are there

8   regular -- have you tracked regular deposits being made

9   from all the regions to that repository?

10  A     There is a lot of money going into that from

11  throughout the country.  Yes, ma'am.

12  Q     But my question is, is it from all the regions?

13  A     I can't -- I don't know if every single region has

14  sent money up.  I know through my memory from looking

15  at the records that there are other regions outside the

16  copper region that have sent money that way.

17  Q     So when you say outside the copper region, are you

18  indicating that the majority of it's coming from the

19  copper region?

20  A     No.  From other regions, also.

21  Q     Okay.  And were you able to note any formula as to

22  the amount of money that tends to go in, whether it's

23  on a regular basis or regular amount from any of the

24  regions?

25  A     The amount that the undercover agents, from

1  talking to the treasurer in the copper region, is that

2  $5 per each member is forwarded to the national.

3  Q    On -- how often?

4  A    I believe it's -- I believe it's monthly, but I'm

5  not -- again, I don't know.

6  Q    You don't know?

7  A    I don't know.

8  Q    Okay.  Now, with regard to this account, is the

9  account in a Milwaukee bank?

10  A    Ma'am, I apologize.  I do not know.

11  Q    And with regard to the expenditures or the outflow

12  from that account, what did you note with regard to

13  what the expenditures were or the people to whom the

14  money was going out?

15  A    I don't believe that -- I believe that our records

16  deal with money going into the account.  I don't

17  believe that they're -- that we have anything with

18  money being taken out.

19  Q    So what you know is that money is coming from some

20  of the regions in amounts you're not sure of to a guy

21  whose name you hope you remember later, and you don't

22  know anything about how that money is being spent?

23  A    That's correct.

24  Q    So from that, I would deduce that you don't have

25  any record evidence that money is going to Mr. Rosga,

CROSS-EXAMINATION OF AGENT VALOT                     38

1  his friends, his family, his house, his clubhouse from

2  that fund, correct?

3  A    Like I said, I just don't remember, to be honest

4  with you.

5  Q    But do you also not remember that there's

6  nothing -- there's no evidence of any illegal payments,

7  payments for drugs, payments for -- you know, payments

8  that any club could make out of a club fund; you don't

9  know what the payments are, do you?

10 A    No, ma'am.

11 Q    The gambling device that was mentioned, I believe

12 that was mentioned in reference to the other defendant

13 present today.  Do you have any evidence from your

14 investigation to indicate that Mr. Rosga ever dealt

15 with the purchase, use, or profits of the gambling

16 devices that were found in certain clubhouses?

17 A    No, ma'am.

18 Q    Do you have any information that he, without

19 participating directly, ordered that they be used or

20 ordered that the proceeds be provided to any aspect of

21 the club?

22 A    No, ma'am.

23 Q    And how many different chapters, to your

24 knowledge, had gambling devices?

25 A    I know a few chapters.

1  Q    And what were they?

2  A    It was Lexington and the Petersburg chapter had

3  them.

4  Q    So they would both be -- well, Petersburg was the

5  fake one that was set up, right?

6  A    That's correct.

7  Q    And then Lexington would be part of the copper

8  region, correct?

9  A    Correct.

10  Q    Now, on --

11     MS. CARDWELL:  Just a moment, Your Honor.

12  Q    On Page 12 of the indictment on Paragraph 9, I

13  know you don't have it in front of you, so I'll tell

14  you, there's some talk of what the rules and punishment

15  were in the organization.  And that was what you and

16  your agents said you discovered about the organization.

17  And there's an indication that discipline is a central

18  feature of the enterprise.

19     One of the things that's mentioned in the

20  indictment is that "beat downs," or assaults, were part

21  of that punishment that were a central feature to the

22  enterprise.  And I believe it's mentioned in the

23  context of beat downs of members of the club.  Do you

24  recall that?

25  A    Yes, ma'am.

1  Q    Okay.  Sir, do you have anything from your

2  investigation indicating that Mr. Rosga ever ordered,

3  suggested, approved, or actually participated in that

4  form of punishment of a member of the club?

5  A    No, ma'am.

6  Q    Now, there's also a mention that you can be as a

7  member *out in bad standing,*" and that's a quote, or

8  you can have your tattoo *"blacked out*."  Is there any

9  evidence in your investigation that Mr. Rosga ordered,

10  suggested, approved, or took part in any way in any of

11  that form of punishment toward members?

12  A    No, ma'am.

13  Q    With regard to Page 13 on the indictment, there's

14  some mention in there that after a chapter and a

15  regional meeting, there would be a determination about

16  whether or not a member should receive some sort of

17  recognition for taking a violent act.  And if there's a

18  dispute in that regard, that the national hierarchy, as

19  referred to, would have the final say so.

20      Do you have any evidence in your investigation,

21  sir, that indicates that Mr. Rosga ever reviewed a

22  dispute over whether or not a member should be given

23  credit or recognition for committing a violent act?

24  A    No, ma'am.

25  Q    The *"SS"* patches that are mentioned on Page 13,

1  and other patches and pins are indicated in the

2  allegation that they were awarded for members who did

3  violent acts in the Outlaws, is there any evidence that

4  Mr. Rosga ever ordered or participated in any way to

5  award such patches for violent acts?

6  A    No, ma'am.

7  Q    On Page 15 of the indictment, there's an

8  indication that members routinely transferred weapons

9  among themselves without regard to whether or not that

10 transfer was legal.  Are you -- do you have any

11 evidence in your investigation that mentions that

12 Mr. Rosga ordered, approved, or participated in the

13 illegal transfer of weapons?

14 A    No, ma'am.

15 Q    And do you, sir, have any evidence that he's ever

16 been convicted of improperly possessing, using, owning

17 a weapon?

18 A    No, I do not.

19 Q    And to your knowledge, he's not under any

20 disability even today to own a weapon, or carry a

21 weapon, or have a weapon in his presence as a United

22 States citizen, is he?

23 A    That's correct.

24 Q    Now, with regard to Page 15 of the indictment,

25 there's a distribution and consumption of illegal

1  drugs.  And this is mentioned not only there, but there

2  is a great deal in the last few paragraphs, probably

3  last 10 paragraphs of the indictment, indicating

4  various times that drugs, marijuana, I think there's a

5  mention of heroin at some point, came up in terms of

6  members either using them, selling them.  I think at

7  one time there was a sale to an agent, or a couple

8  sales to an agent.  Do you have any evidence in your

9  investigation that indicated that Mr. Rosga in any way

10  solicited or approved the distribution of drugs among

11  club members?

12  A    In July of 2009, Mr. Rosga made a statement to the

13  undercover agents that he is not a drug dealer, but

14  that he will let members do their own business.

15  Q    *"Will let members do their own business.*"  That's

16  what he said?

17  A    I -- I don't know if that's the direct quote.  But

18  that he indicated that -- that he's not a drug dealer,

19  but that he does not have an issue with members dealing

20  drugs.

21  Q    Is this part of the taped conversation where the

22  agents were in Petersburg or in transit with Mr. Rosga?

23  A    I believe that was actually in transit.

24  Q    Okay.  And so do you know whether or not that was

25  taped?

1  A    I do not believe so.

2  Q    And do you know whether or not Mr. Rosga used the

3  term *"business"* with regard to drugs?

4  A    I don't remember his -- I don't -- from talking

5  with the undercover agents, I don't remember what his

6  exact words were.

7  Q    Okay.  So he said something about drugs, and that

8  he didn't use or sell them, right?

9  A    That's correct.

10  Q    And he said something about he didn't necessarily

11  get on people if they used or had a business doing it?

12  A    Correct.

13  Q    And you think he used the term *"business"* or

14  relayed something about distribution as opposed to just

15  use?

16  A    I'm not sure.  From my conversation with the

17  undercovers, the discussion was about the drugs.

18  Q    Okay.  But I'm trying to get at what he said.  Did

19  he say I don't care they use this as their business, or

20  did he say I don't care if they deal?

21  A    The indication to me is what the business would be

22  referring to the selling and using.

23  Q    Okay.  So the indication to you, you're meaning

24  what the agents told you?

25  A    That's correct.

1  Q    Now, the indictment alleges that it was part of

2  this conspiracy that each defendant agreed that a

3  coconspirator would commit at least two acts of

4  racketeering activity in the conduct of the affairs of

5  enterprise.  But what evidence do you have that there

6  was an agreement among the alleged conspirators in the

7  case, or including Mr. Rosga, that each person must

8  commit at least two racketeering activities?  What's

9  the basis for that conclusion about this organization

10 that they conspired and agreed to do that?

11 A    That the organization has membership, and the

12 members are involved in those activities.

13 Q    My question, sir, is what evidence do you have

14 that it was part of the conspiracy that the members

15 agreed that each person had to commit at least two

16 racketeering activities?  That's what the indictment

17 says.  What evidence do you have to support that,

18 including Mr. Rosga?

19     MR. FITZPATRICK:  Your Honor, objection.

20     THE COURT:  Well, the objection is sustained with

21 respect to inquiry as to the government's allegation of

22 method of proof.  And ordinarily I would sustain the

23 objection totally, but you did ask the agent if he was

24 familiar with the contents of the indictment.

25     She may explore that, but she's not to go into

1    your theory, poof, or the specific evidence that you

2    have.  The objection is sustained in part, overruled in

3    part.

4         Next question.

5         MS. CARDWELL:  Thank you, Your Honor.  I'll

6    rephrase.

7    Q    What evidence do you have, sir, that Mr. Rosga

8    participated in an agreement among Outlaw members that

9    every member should commit at least two racketeering

10   activities as a part of being in the club?

11   A    I'm sorry.  I apologize.  I'm trying to --

12        THE COURT:  Why don't you go back and rephrase the

13   question one more time.

14        MS. CARDWELL:  I'm trying to make it short.

15        AGENT VALOT:  I'm sorry.  I'm not trying to make

16   it hard.

17        MS. CARDWELL:  That's all right.

18        THE COURT:  Well, as I understand it, what

19   Ms. Cardwell is asking you is if in the indictment

20   there is an allegation that each of the members agreed

21   among themselves that they would commit two acts of

22   racketeering; her question of you is, what, if any,

23   evidence do you have that her client, Mr. Rosga, made

24   such an agreement?

25        Am I correct?

1    MS. CARDWELL:  You did it much better than I did.

2   Thank you.

3   A    It would be that Mr. Rosga is the president of the

4   Outlaws.  And that they are involved in those

5   activities as being a member, and knowing that those

6   activities are occurring.

7   Q    I guess the question, sir, though, is what

8   evidence is there that there was an agreement, and

9   Mr. Rosga participated in that agreement, that that

10  would be a requirement that there be at least two

11  activities by each member, racketeering activities?

12    MR. FITZPATRICK:  Objection.  Your Honor, I think

13  the way Ms. Cardwell respectfully is framing the

14  question, she's asking for a legal conclusion, which

15  this witness is not -- cannot do.

16    THE COURT:  I don't believe that she is, but we'll

17  clarify the fact that I think what she's trying to

18  elicit here is facts.  What facts do you have that he

19  knew that.  You're correct if she's asking for a legal

20  conclusion.  I don't interpret it that way.

21    And I instruct you that that's not the way the

22  question is being asked.  She merely wants to know if

23  there is any fact that you have that connects him to

24  such an agreement, that's all, yes or no?

25    AGENT VALOT:  No.

1    MS. CARDWELL:  Thank you.

2  Q    On Page 21 -- if you want a copy of the

3  indictment, I think we can hand you one if that will

4  help you.

5  A    That would be very helpful.

6  Q    I keep spouting page numbers at you.  I'm going to

7  turn you to Page 21, Paragraphs 22 through 24.  Let me

8  get there.  This section appears to talk about the plan

9  to expand to Virginia.  And there's some mention of a

10  venture to make a *"show of force,"* which is a quote,

11  against the rival, Hells Angels Motorcycle Club, at a

12  Cycle Expo that happened in Richmond, Virginia on

13  March the 18th.  First of all, was there any evidence

14  in your investigation that Mr. Rosga attended that Expo

15  on March the 18th of 2006?

16  A    No, ma'am.

17  Q    Is there any evidence in your investigation that

18  Mr. Rosga participated in a plan to make a *"show of

19  force"* at that Expo?

20  A    No, ma'am.

21  Q    On Page 22, Paragraph 26, here Mr. Rosga, although

22  he's noted to be the national president in the

23  beginning of the indictment, is referred to now as the

24  *"National Boss."*  And there are two allegations during

25  the time period of June 2007.  One is an allegation

1  that he *"gave the 'green light' on Renegades,"* meaning

2  they were allowed to assault and kill members of that

3  club.  Now, when the term they *"were allowed to assault*

4  *and kill"* members of that club, where does the

5  information come to support that that is what *"green*

6  *light"* means?

7  A     That that -- that is the typical -- the *"green*

8  *light"* refers to -- that is the reference to it.  I

9  know I'm not answering your question.

10        THE COURT:  Well, first of all, I think you need

11  to establish, Ms. Cardwell, whether or not that is the

12  agent's recollection, or whether or not that's the

13  scribner of the indictment's recollection.  If it's the

14  agent's recollection, you may explore it.  If not, I'm

15  not going to let you go into it.

16        MS. CARDWELL:  Yes, sir.

17  Q     Sir, do you recall that part of the allegations in

18  this case, or part of the facts that were covered in

19  the case, are that supposedly Mr. Rosga had given a

20  green light on the Renegades, meaning that -- well, I

21  won't say the meaning of it.  But that he gave the

22  green light on the Renegades, right?

23  A     Yes, ma'am.

24  Q     Okay.  And there's an indication that that means

25  they were allowed to assault and kill members of the

1  club, is that your understanding?

2  A    Yes, ma'am.

3  Q    And where does that understanding come from in

4  your investigation?

5  A    Through the investigation, the -- the explanation

6  of a *"green light"* has been explained to the undercover

7  agents.

8  Q    And was that by Mr. Rosga?

9  A    No, ma'am.

10  Q    And so who explained that to the agents?

11  A    I do not -- I do not recall.

12  Q    And what was the source of information that

13  Mr. Rosga actually said this?  Who was the source of

14  the information?

15  A    It was through a confidential source.

16  Q    So is that one of the members that was actually

17  working, or what we call a cooperating member as

18  opposed to an agent?

19  A    That's correct.

20  Q    And the second allegation in June of 2007, are you

21  familiar that part of the allegation in this case is

22  that Mr. Rosga allegedly told Mark Jason Fiel that this

23  *"was a good time to 'clean your own house"*'?

24  A    That's correct.

25  Q    Okay.  And I would assume that the source here is

1  someone saying Mark Jason Fiel said that Mr. Rosga said

2  clean house, correct?

3  A    Correct.

4  Q    And the explanation that's offered -- what do you

5  understand that to mean, the clean house?

6  A    It would be to get rid of any members that thought

7  would be cooperating with law enforcement.

8  Q    And who -- where -- what's your source of

9  information explaining what clean house means?

10  A    Through the context of, I believe, what was said

11  to the source.

12  Q    So from the context of what -- and what was that

13  context?

14  A    I do not recall what the context was.

15  Q    So you don't know if someone explained what clean

16  house means to any of your agents, or whether people

17  just assume what that means?

18  A    That's correct.

19  Q    And the only source of that statement is not from

20  the agent in the case, it's from Jason Fiel claiming

21  that Mr. Rosga said that to him, correct?

22  A    Yes, ma'am.

23  Q    And do you know whether or not Mr. Fiel told

24  anyone what that means?

25  A    I do not know.

CROSS-EXAMINATION OF AGENT VALOT                51

1   Q    Okay.  But the quote was, clean house, meaning to

2   kill anyone who might be talking to the police wasn't a

3   quote, correct?

4   A    That's correct.

5   Q    So Mr. Rosga is even alleged to have said that,

6   right?

7   A    Correct.

8   Q    Page 22 of the indictment, Paragraphs 27 through

9   46, there are a number of incidents listed in these

10  various paragraphs, and I'll try to move more quickly.

11  There is a September 21st of 2007 assault.  Is it --

12  does your investigation reveal that Mr. Rosga was

13  present during -- or I guess there were several

14  assaults in that I think it was a bar fright.  Was he

15  present then?

16  A    I'm sorry.  On which date?

17  Q    It would be 9/21/07.  Of course I didn't write the

18  paragraph number down.  But it is, I think, on Page 22.

19       THE COURT:  Does the indictment indicate where

20  that occurred?

21       MS. CARDWELL:  I didn't write that down.

22       THE COURT:  That's okay.  Take your time in

23  finding it.  I think it's important.

24       AGENT VALOT:  Paragraph 28.

25       THE COURT:  Did you say Paragraph 28?

1    AGENT VALOT:  Yes.  Paragraph 28.

2  Q    This is where it is alleged that Mr. Fiel, Jason,

3  and Jo Jo, who's Thomas Petrini, assaulted another

4  Outlaw probationary member for disrespecting.  I think

5  you've already answered that you don't have any

6  information that Mr. Rosga ever participated in

7  ordering, approving, or being a part of punishing

8  another member of the organization; so he didn't have

9  anything to do with that one, right?

10  A    Correct.

11  Q    And with regard to July the 7th, I'm backing up

12  here a little bit I think.  July the 7th, there's an

13  allegation, tell me if you're familiar with the

14  allegation, that Mark Steven Fiel ordered the northern

15  Virginia chapter *"to hunt and remove the 'Titans"'*,

16  another motorcycle club which I assume was affiliated

17  with the Hells Angels.  Do you have any information in

18  the investigation that Mr. Rosga ordered, knew, or

19  approved of Mr. Mark Steven Fiel making such an order?

20  A    No, I do not.

21  Q    Now, just to be clear, Mr. Jason Fiel is Mark

22  Fiel's son, correct?

23  A    Yes, ma'am.

24  Q    And they're both members of the copper region,

25  correct?

1  A     Correct.

2  Q     In fact, Mr. Mark Steven Fiel is a ranking member

3  of the copper region, correct?

4  A     Yes, ma'am.

5  Q     And Mr. Petrini, was he also a member of the

6  copper region?

7  A     Yes, he was.

8  Q     And with regard to -- I'm sorry.  I'm backing up a

9  little bit.  Paragraph 25 in April of 2007, are you

10 familiar with the allegation that *members of the*

11 *Outlaws threatened members of the Virginia Raiders*" who

12 were another Hells Angels support club, "*and ordered*

13 *these rival gang members to remove their patches and*

14 *discontinue their support,*" and they disbanded as a

15 result of that?  Do you have any information in your

16 investigation indicating that Mr. Rosga had anything to

17 do with that?

18 A     No, ma'am.

19 Q     Well, it doesn't even mention in the indictment

20 who of the Outlaws did that.  Did your investigation

21 reveal who did that; what members threatened the

22 Virginia Raiders?

23 A     Yes, ma'am.

24 Q     Who?

25 A     Mark Steven Fiel.

1    Q    The same one we mentioned earlier who's a member

2    of the copper region, correct?

3    A    That's correct.

4    Q    Anyone else?  His dad?

5    A    That is his dad.

6    Q    I'm sorry.  The son, Jason?

7    A    At this time, I don't recall.

8    Q    Do you know whether or not they were all members

9    of the copper region who did that?

10    A    I'm sorry.  That every member of the copper

11    region?

12    Q    The members that made that threat toward the

13    raiders and caused them to disband, do you know if all

14    the members that's, it's listed plural, if all the

15    members who did that were members of the copper region?

16    A    Yes, ma'am.

17    Q    They were?

18    A    Yes, ma'am.

19    Q    Now, with regard to 11/20/08 -- I must have been

20    getting tired last night because I didn't put my

21    references down.  That's an allegation, and I'm sure

22    you will remember this one because it had to do with a

23    civil rights' violation that's alleged.  There was an

24    alleged assault on an African-American male in a

25    Fredericksburg bar by, I believe, Jason Fiel, is that

1    correct?

2    A    Yes.  Jason Fiel and Mr. Timbers.

3    Q    Okay.  And they are both members of the copper

4    region, correct?

5    A    Correct.

6    Q    Do you have any evidence from your investigation,

7    sir, indicating that Mr. Rosga ordered, participated,

8    approved in that assault on the African-American male

9    in the bar in Fredericksburg?

10   A    No, ma'am.

11   Q    Other than the fact that Mr. Fiel -- and, well,

12   his father later in the indictment is also accused of

13   trying to get the agents to lie for him and also trying

14   to intimidate witnesses in that case, correct?

15   A    Correct.

16   Q    And that would be Mark Fiel?

17   A    They're both Mark Fiel.  That would be Mark Steven

18   Fiel.

19   Q    Okay.  So both father and son of the copper region

20   were involved in a number of counts or overt acts

21   related to that Fredericksburg assault, correct?

22   A    Correct.

23   Q    And you don't have any evidence that Mr. Rosga

24   knew of that or approved that at all?

25   A    No, ma'am.

CROSS-EXAMINATION OF AGENT VALOT                    56

1  Q    Is there any evidence in the investigation that

2  that Fredericksburg incident was club-related or

3  related to the Outlaws' alleged enterprise other than

4  the fact that those two are members?

5  A    No, ma'am.

6  Q    Now, with regard to Page 24 through 26, Paragraph

7  37 through 39, there's an allegation, and tell me if

8  you're aware of this or familiar with this, that there

9  was a planned assault on members of the Hells Angels

10 Motorcycle Club, and I think a supporting club, at the

11 Cockades Bar in Petersburg.  Do you remember that

12 allegation?

13 A    Yes, ma'am.

14      THE COURT:  What's the date on that?

15      MS. CARDWELL:  It's in Paragraph 37 through 39 on

16 Page 24.  I think it's March --

17      MS. HODGES:  March 14th.

18      MS. CARDWELL:  Yes, March 14th.

19      Thank you.

20      March 14th.  It's in Paragraph 38 that they

21 actually talk about the assault, Your Honor.

22      THE COURT:  Thank you.

23 Q    Sir, based upon -- and there's a number of things

24 that are supposed to have occurred there, a number of

25 people who are supposed to have been involved in what

1  ended up being in a bar fight, correct?

2  A    Correct.

3  Q    And there were a number of members mentioned:

4  Mr. Davey, Mariaca, McCall, Smith, Timbers, Werth.

5  They're all copper region members, aren't they?

6  A    Yes, ma'am.

7  Q    And do you have any information in your

8  investigation to indicate that Mr. Rosga ordered this

9  fight, or this sort of invited fight or assault at the

10 Cockades Bar on March 14th of 2009 in Petersburg?

11 A    No, ma'am.

12 Q    Do you have any information that he rewarded

13 anybody for having assaulted Hells Angels members, or

14 addressed it at all?

15 A    No, ma'am.

16 Q    Do you have any information that he knew about it?

17 A    No, I do not.

18 Q    Now, with regard to Page 27, Paragraph 47 of the

19 indictment, are you familiar with the fact that it is

20 alleged that Mr. Rosga instructed --

21      MS. CARDWELL:  I'll get you a date, Your Honor.

22 Q    On July 25th that he was at a -- I'm sorry, July

23 5th, that during the meeting -- let me ask about this

24 differently.

25      You indicated, I think on direct examination, that

1   Mr. Rosga, was he supposed to be present at this

2   meeting?

3   A      On July 5th?

4   Q      Uh-huh.

5   A      Yes, he was.

6   Q      And the allegation is that he said to the other --

7   this is right, this is where he said to the agents,

8   *"when dealing with"* Hells Angels *"members and their*

9   *support clubs, they should shoot them."*  That's the

10  quote, correct?

11  A      Correct.

12  Q      And that's supposed to be on the tape, is that

13  correct?

14  A      Correct.

15  Q      Okay.  And are you familiar with the context in

16  which that statement was made?

17  A      They were talking about the Hells Angels that were

18  operating in the Virginia area, and for -- and that's

19  their way for dealing with them.

20  Q      Well, correct me if I'm wrong, agent, but a common

21  theme of discussion among Outlaw members is the fact

22  that the Hells Angels are a very aggressive motorcycle

23  group, correct?

24  A      Yes.

25  Q      And the fact is that they have in fact been

CROSS-EXAMINATION OF AGENT VALOT                    59

1    attacked on any number of occasions with weapons and

2    fists and other things, correct?

3    A    Correct.

4    Q    And so do you know whether or not this statement

5    by Mr. Rosga was made in the context of reacting to

6    such aggression by Hells Angels Motorcycle Club members

7    against Outlaw members?

8    A    No, I do not know.

9    Q    So you don't know whether or not he was saying to

10   defend themselves or not?

11   A    No, ma'am.

12   Q    Mr. Rosga is also quoted as saying that he would

13   go to -- well, it's not quoted, but there's a summary

14   that he said he would go to jail for ordering hostile

15   actions.  Do you know, sir, whether those were his

16   words that he thought he might go to jail for ordering

17   hostile actions?

18   A    Yes, ma'am.

19   Q    He used those terms?

20   A    I believe so from talking with the undercovers.

21   Q    Have you listened to the tape?

22   A    Yes, ma'am, I have.

23   Q    And you heard the term *hostile actions* out of

24   his mouth?

25   A    No.  The tape, the audio on the tape, is not

1    crystal-clear.

2    Q    With regard to Page 27, Paragraph 48, this

3    mentions the copper region bosses, and I believe that

4    could include Mr. Werth at that time.  And that time

5    period is July of 2009.  Was Mr. Werth the boss of the

6    copper region at that time, or was it Mr. Lowry?

7    A    In July?

8    Q    In July of 2009.

9    A    That would be Mr. Werth.

10    Q    Les Werth?

11    A    Yes, ma'am.

12    Q    And the allegation here -- or the indication here

13    is that an outline was provided by the bosses, which I

14    assume would mean Mr. Werth based upon what you just

15    said, *detailing how a motorcycle gang is to conduct*

16    *business*."  Are you familiar with that representation

17    in the indictment?

18    A    Yes, I am.

19    Q    And are you familiar with that coming out in your

20    investigation?

21    A    Yes, ma'am.

22    Q    Okay.  Did the investigation reveal that what's

23    referred to as *"an outline"*, did your investigation

24    show that outline originated from Mr. Rosga or the

25    national leadership of the motorcycle club?

CROSS-EXAMINATION OF AGENT VALOT                61

1   A      No, ma'am.

2   Q      Was it an Outlaw outline, or just an outline?

3   A      It was just an outline about clubs and maintaining

4   dominance in particular areas.

5   Q      And it was provided by Les Werth?

6   A      Actually, it was provide by Mark Spradling.

7   Q      Okay.  He's the treasurer, right?

8   A      Correct.

9   Q      Of the copper region, right?

10  A      Correct.

11  Q      And you don't have any information tolling

12  Mr. Rosga to the creation, approval, or distribution of

13  that outline, do you?

14  A      No, ma'am.

15  Q      Now, on Page 29, Paragraph 54 of the indictment,

16  there is an allegation, and I'll ask you if you're

17  familiar with it, that Mr. Rosga had asked Mr. Pedini

18  to personally take revenge on the Hells Angels

19  Motorcycle Club for an assault that had been made on

20  Outlaw members, correct?

21  A      Correct.

22  Q      And I believe on direct examination, you testified

23  that that was supposed to be an order by Mr. Rosga to

24  have Mr. Pedini address the fact that the Connecticut

25  assaults had occurred, correct?

1  A    Correct.

2  Q    Sir, are you familiar with the fact that the

3  allegation in this case is that he was supposed to be

4  asking -- Mr. Rosga was supposed to be asking

5  Mr. Pedini to address the fact that members in Florida

6  had been attacked?

7  A    The members -- that the members that were attacked

8  in Connecticut were members that were from Florida.

9  Q    So they were Florida members?

10 A    Correct.

11 Q    And the source of this alleged request that

12 Mr. Rosga had made this request for revenge was

13 Mr. Pedini, is that correct?

14 A    I'm sorry.  Can you repeat that?

15 Q    The source of information that Mr. Rosga had made

16 this request was Mr. Pedini himself, correct?

17 A    Correct.

18 Q    He said Jack told me I had to get revenge on him,

19 right?

20 A    Correct.

21 Q    Okay.  And he's a member of the copper region,

22 correct?

23 A    Mr. Pedini?

24 Q    Yes.

25 A    No, he's not.

1  Q    Oh, that's right.  He's from up north, right?

2  A    Correct.

3  Q    Okay.  And did he provide to anyone in the

4  investigation, or did your investigation reveal when it

5  was that Mr. Rosga was supposed to have made this

6  request of Mr. Pedini?

7  A    It was at the -- at the meeting in Arkansas that

8  was just prior to this October conversation.

9  Q    Okay.  And further in that same paragraph there's

10 an indication that Thomas Benvie told an undercover

11 member, *"Jack is all over Madman about this."*  And

12 Madman is Mr. Pedini, right?

13 A    Correct.

14 Q    So the source there is Mr. -- they call him Taz, I

15 think, Thomas Benvie claiming that Jack was all over

16 Mr. Pedini, correct?

17 A    Correct.

18 Q    Okay.  And so neither of these statements, this

19 request by Mr. Rosga or Mr. Rosga not being happy, are

20 alleged to have come directly out of his mouth in the

21 presence of agents, correct?

22 A    Correct.

23 Q    It's just members claiming that Mr. Rosga asked

24 for revenge and was mad that they hadn't gotten it,

25 correct?

1  A     Correct.

2  Q     And with regard to Page 30, Paragraph 60, there's

3  reference to I think there a *"Big Table"* meeting of the

4  regional bosses.  Is it your testimony, sir -- well,

5  first of all, are you familiar with the fact that there

6  is such a reference made in the indictment?

7  A     Yes, ma'am.

8  Q     And is it your testimony, sir, that your

9  investigation revealed that Mr. Rosga attended the *"Big*

10 *Table"* meeting of the regional bosses in Arkansas on

11 that date?

12 A     Yes, ma'am.

13 Q     So your investigation -- and where did the

14 information come from that indicated that he attended

15 that meeting?

16 A     From Les Werth.  Lesley Werth.

17 Q     Les Werth said what?

18 A     That -- that Mr. Rosga was at the -- was at that

19 meeting.

20 Q     So he told agents that?

21 A     During Mr. Werth's meeting.

22 Q     Maybe I'm not being clear.  You're saying that

23 Mr. Werth told somebody that Mr. Rosga was at the Big

24 Table Meeting in Arkansas?

25 A     Correct.

1  Q    And who did he tell that to?

2  A    He stated that -- when Mr. Werth returned from the

3  Arkansas meeting, he had a bosses' meeting in which he

4  had stated that Mr. Rosga -- that the instructions that

5  he was given -- what Mr. Werth was stating the bosses

6  meeting, it came from the national meeting which

7  Mr. Rosga was present at.

8  Q    I see.  So the October 3rd meeting is the meeting

9  that actually is supposed to have occurred back in the

10 copper region headquarters, is that right?

11 A    Back in the copper region.  Yes, ma'am.

12 Q    Now, with regard to Page 30 -- I'm sorry.  So that

13 once again is a copper region member claiming that

14 Mr. Rosga had made some order, correct?

15 A    Correct.

16 Q    It's not an agent hearing Mr. Rosga make that

17 order?

18 A    Correct.

19 Q    Now, with regard to Page 34, Paragraph 34 {sic},

20 there's an allegation that on the 23rd of

21 January 2010, I guess the new boss, Mr. Lowry of the

22 copper region, indicated that he was arranging for a

23 number of members to confront Hells Angels at an

24 Easyrider Expo in Charlotte.  Are you familiar with

25 that representation in the indictment?

1   A     Yes, ma'am.

2   Q     And you're familiar with how that information was

3   obtained in the investigation?

4   A     Yes, ma'am.

5   Q     And it was in this case, this is another copper

6   region member indicating that Mr. Rosga had approved

7   something before they did it, correct?

8   A     Correct.

9   Q     What evidence do you have beyond that that

10  Mr. Rosga gave permission, or asked or approved, that

11  there be a sort of show or force or a confrontation at

12  that Expo?

13  A     Just the statements from Mr. Lowry.

14  Q     And is there any information as to how that was

15  supposed to have been conveyed to Mr. Lowry?

16  A     No, ma'am.

17  Q     With regard to -- and I may have asked this, and

18  I'm sorry if I'm repeating myself, but with regard to

19  the patches, tattoos, and engravings that are mentioned

20  in the beginning of the indictment, you're familiar

21  with the representations that are made about those

22  items, correct?

23  A     Correct.

24  Q     And some of them that are listed and described

25  actually make reference to encouragement of violent

CROSS-EXAMINATION OF AGENT VALOT                    67

1   acts and rivalry against the Hells Angels, correct?

2   A     Correct.

3   Q     Do you know, sir, whether or not Mr. Rosga has

4   sported any of those patches on his vests or jackets?

5   A     I do not know.

6   Q     And do you know, sir, whether or not he sports any

7   of those tattoos?

8   A     I do not know.

9   Q     And did your investigation reveal that?  I mean,

10  does anybody in the investigation know that?

11  A     At this time, I do not know.

12  Q     Okay.  And with regard to engravings on

13  motorcycles, are you aware of whether Mr. Rosga has any

14  of those engravings on his motorcycle or motorcycles?

15  A     At this time I do not know.

16  Q     With regard to the -- all of the indications, and

17  I think this is when I'm repeating myself, but with

18  regard to drug activity, nothing in the investigation

19  ever revealed that Mr. Rosga used, distributed, or

20  ordered such activity on the part of Outlaw members,

21  correct?

22  A     Correct.

23        MS. CARDWELL:  That's all I have, Your Honor.

24        THE COURT:  All right, Ms. Hodges.

25        Then I'll let you redirect after both ladies have

 1  completed their examination.

 2      MR. FITZPATRICK:  Thank you, Your Honor.

 3      THE COURT:  Ms. Hodges, go ahead.

 4      MS. HODGES:  Thank you, Your Honor.

 5      And, Your Honor, I will tell the Court that

 6  Ms. Cardwell was very thorough, and I will try to

 7  refrain from asking the same questions, some of the

 8  same ones that I had.

 9      THE COURT:  All right.  That would be appreciated.

10  Go right ahead.

11      MS. HODGES:  Thank you, Your Honor.

12                    **CROSS-EXAMINATION**

13  BY MS. HODGES:

14  Q    Good morning, agent.  How are you?

15  A    Good morning.  Good.

16  Q    Now, agent, I'm going to -- I'd like to start with

17  regard to your information that you provided to the

18  Court about the hierarchy, the information on each

19  individual's position.  I believe the testimony you

20  gave was that Mr. Herndon was the vice president of the

21  copper region, is that correct?

22  A    That's correct.

23  Q    And in fact, you're familiar through your

24  investigation that you have become familiar with the

25  election process and procedures of the organization?

1  A    Yes, ma'am.

2  Q    And in fact, the elections are typically held in

3  or around the 1st of October of each year, is that

4  correct?

5  A    I believe that they are held on more of an as

6  needed basis.

7  Q    Well, okay, so in 2009, the elections were

8  actually held around October the 1st, is that correct?

9  Did your investigation reveal that?

10 A    Yes, there was an election in that time frame.

11 Q    And in fact, that was the point wherein

12 Mr. Herndon became the vice president of the copper

13 region, correct?

14 A    I believe so.

15 Q    Okay.  Now, with regard to that time period, I

16 believe you testified prior that Mr. Les Werth was the

17 president of the copper region, or the big boss of the

18 copper region?

19 A    Correct.

20 Q    Sometime after the election, David Lowry became

21 the boss of the copper region, correct?

22 A    Correct.

23 Q    And then also as confirmation, and I want to get

24 these names right, Mark Jason Fiel and Mark Steven Fiel

25 were both members of the copper region, correct?

1   A     Yes, they were.

2   Q     Now, agent, I would like to turn your attention

3   back to the indictment.  I understand you are familiar

4   with it and have looked at it.  With regard to your

5   testimony on direct examination about this case, you

6   indicated that you had learned during the course of the

7   investigation that the case had a violent nature to it,

8   some of the activities and things that had gone on by

9   certain Outlaw members, correct?

10  A     Correct.

11  Q     In fact, agent, you don't have any evidence to

12  show that Mr. Herndon engaged in any violent activity

13  during the course of your investigation, do you?

14  A     No, ma'am.

15  Q     And with regard to your testimony about the

16  organization having international ties, during the

17  course of your investigation, you didn't collect any

18  investigation to show that in fact Mr. Herndon had

19  traveled internationally or had been involved with

20  anyone outside the United States, correct?

21  A     Correct.

22  Q     With regard to -- what I'd like to do, agent, is

23  I'm going to go back to some of these specific meetings

24  that Ms. Cardwell asked you about because I'd like to

25  ask you about those with regard to Mr. Herndon.  You

CROSS-EXAMINATION OF AGENT VALOT                71

1  discussed a meeting in Connecticut in September of

2  2009.  Do you recall that?  The Connecticut meeting?

3  A    Yes, ma'am.

4  Q    Okay.  You have no evidence or information to show

5  that Mr. Herndon was present at that meeting, do you?

6  A    No, I do not.

7  Q    And with regard to the October 2009 Arkansas

8  event, which I believe you said was often called the

9  regional meeting, or the big table meeting; again, you

10 have no evidence or information that shows that

11 Mr. Herndon attended that meeting, correct?

12 A    Correct.

13 Q    With regard to the shooting at the -- is it

14 Canaan, Maine?

15 A    Yes, ma'am.

16 Q    In October of 2009, the shooting of the Hells

17 Angels, again, no information or evidence to show that

18 Mr. Herndon was present at that time, correct?

19 A    Correct.

20 Q    Okay.  Now, with regard to those acts of violence

21 that we have discussed and those meetings, you have no

22 evidence or information to show that Mr. Herndon

23 actually organized, participated in, or condoned those

24 events, do you?

25 A    No, I do not.

CROSS-EXAMINATION OF AGENT VALOT          72

1   Q     Now, in the indictment --

2         MS. HODGES:  And, Your Honor, what I'll try to do

3   is locate you to the page so that it helps the agent

4   look at it.

5   Q     In the indictment, it talks about *"Outlaws' Rules*

6   *of Conduct and Punishment"* on Page 12.  And you're

7   familiar with the Outlaws' Rules of Conduct and

8   Punishment?

9   A     Yes, ma'am.

10  Q     And you're familiar with the monitoring and

11  rewarding Outlaws' members for unlawful acts?

12  A     Correct.

13  Q     Okay.  With regard to those things, agent, one of

14  the things that it talks about is the hierarchy

15  rewarded members who carry-out the enterprises,

16  objectives, and punish members who do not, correct?

17  That's been established?

18  A     Yes, ma'am.

19  Q     And are you aware that after that October 1st

20  election, October 2009, the meeting that took place on

21  October 17th of 2009, and it was a meeting referenced

22  on Page 38 of the indictment, Paragraph 92.

23  A     Okay.

24  Q     Are you familiar with, or do you have any

25  information about, that meeting that took place?

1    A    Paragraph 92?

2    Q    Well, starting at Paragraph 92.  Yes, the meeting

3    is referenced in Paragraph 91 and Paragraph 92.

4    A    Yes, I am.

5    Q    And with regard to that meeting, are you aware or

6    have information, that during that meeting it was

7    discussed by some of the members that there was a

8    possibility that Harold David Herndon, who had just

9    been elected as vice president a few weeks prior to

10   that, could possibly be a cooperating informant for the

11   government?

12   A    Yes, ma'am.

13   Q    And in fact, he was asked to step down from his

14   position, isn't that correct?

15   A    That's correct.

16   Q    Okay.  And that's approximately two weeks after he

17   was elected vice president?

18   A    Correct.

19   Q    Now, going back to something that Ms. Cardwell

20   asked you about on Page 22.  There was discussion again

21   that occurred with regard to cleaning house.  That

22   discussion occurred before October, correct, in June,

23   June of 2000 -- I'm sorry.  Wait a minute.  That was a

24   discussion that occurred in June of 2007, correct?

25   A    Correct.

1   Q    But that was a concern that was discussed in

2   October of 2009 also about cleaning house and getting

3   rid of people who were possibly government informers?

4   A    I'm not sure if that was the topic of

5   conversation.  I know that the situation you mentioned

6   about the thought that Mr. Herndon possibly was a

7   cooperator with law enforcement was brought up.  I

8   don't know if they talked about -- I don't know if they

9   actually talked about cleaning house.

10  Q    At that time?

11  A    At that time.

12  Q    Now, with regard to -- I want to take you back to

13  the incident in Lexington in April of 2010.  You were

14  asked by the government about Mr. Herndon at that event

15  needing assistance and being carried away?

16  A    Correct.

17  Q    Are you -- and I believe your response was that

18  you thought he was under the influence of narcotics.

19  With regard to your testimony, this is information you

20  were given by other agents, correct?

21  A    That's correct.

22  Q    And in fact, the agents were not sure what, if

23  anything, Mr. Herndon was under the influence of at

24  that time, correct?  Whether it was alcohol, narcotics,

25  something else?

1  A    At this time, I don't specifically remember what

2  it was that the agents told me that Mr. Herndon was

3  under the influence of.

4  Q    Okay.  And was there ever any discussion of the

5  fact that -- well, you are aware, and have received

6  information during the course of your investigation,

7  that Mr. Herndon in fact has a prosthetic, correct?

8  A    That's correct.

9  Q    And was there ever any discussion or information

10  with regard to the fact that during that meeting,

11  Mr. Herndon was having significant trouble ambulating

12  and needed assistance because of the problem with his

13  prosthetic?

14  A    No, ma'am.

15  Q    Okay.  Now, with regard to the search of

16  Mr. Herndon's residence, you indicated that there was

17  his three year old disabled daughter, his mother, and

18  his girlfriend were at the residence?

19  A    Yes.  I believe so.

20  Q    And you testified to statements made by

21  Ms. Benzini about the weapon that was found, correct?

22  A    Correct.

23  Q    Okay.  Now, with regard to these statements made,

24  you indicated that she told the officers the gun was

25  hers.  And she also said that the gun was loaded but

1  there wasn't a round in the chamber.  Those are the

2  statements you recall her making?

3  A    The statements about the firearm being hers were

4  made at the time of the search warrant.  The statements

5  about the firearm not having a round in the chamber was

6  made at the detention hearing in Winston-Salem.

7  Q    Okay.  And in fact, didn't she also make an

8  additional statement indicating that Mr. Herndon did

9  not know that that weapon was in his home?

10 A    I believe so.

11 Q    And she made statements indicating that in fact

12 Mr. Herndon had recently returned from Sandusky, and

13 because she was at his home by herself with his -- she

14 was taking care of the child with his mother, she had

15 brought the weapon to his house at that time?

16 A    Yes, ma'am.

17 Q    Now, what I'd like to do, and I'll try to do this

18 relatively quickly, as Ms. Cardwell did, is go through

19 some of these events that are listed in the indictment

20 here, and I'd like to start with regard to Page 14

21 stating at Paragraph 12 where the indictment talks

22 about *"Coordinating Outlaws' Responses to Rival Gangs,*

23 *Law Enforcement, and Others."*  You don't have any

24 information in your investigation to indicate that

25 Mr. Herndon in fact participating -- participated in,

1  organized, or condoned the coordinating of Outlaws'

2  responses to rival gangs and law enforcement as

3  discussed in this paragraph, do you?

4  A    No, I do.

5  Q    I'm sorry?

6  A    I do.

7  Q    Okay.  And what information do you have, sir?

8  A    There was a -- in January of 2010, there was an

9  Easyrider Bike Show in Charlotte, North Carolina.

10      THE COURT:  Easyrider?

11      AGENT VALOT:  Easyrider Bike Show.

12  A    In which Outlaws got information that the Hells

13  Angels were going to be in attendance at that event, at

14  which time a large number of Outlaws were amassed to go

15  to the event to deter the Hells Angels from showing up

16  at the event.  And Mr. Herndon was present at that.

17  Q    Do you have any information to indicate that

18  Mr. Herndon organized this event?

19  A    No, I do not.

20  Q    With regard to Page 21, Paragraph -- starting at

21  the top, *Efforts by the Outlaws Enterprise to Obtain a*

22  *Foothold in Virginia by Threatening and Planning Acts*

23  *of Violence Against Rival Motorcycle Gangs*" noted

24  between March 2006 and September 2008.  You don't have

25  any information, do you, to indicate -- I'm sorry.  Do

1  you have information indicating that in fact

2  Mr. Herndon organized or participated in this event to

3  obtain a foothold in Virginia by threatening and

4  planning acts of violence?

5  A    No, I do not.

6  Q    And in fact, in March of 2006 where Paragraph 23

7  talks about *"various members of the Pagans MC national*

8  *leadership, and others developed and agreed to*

9  *participate in a plan,"* does your investigation

10 indicate that in fact that that time, or around that

11 time, Mr. Herndon was in fact hospitalized, and that

12 was at the point that he had lost his leg during that

13 time period?

14 A    I'm not sure exactly when it was.  I know in 2006

15 I believe is when he did lose his leg.  But he was not

16 involved in that event.

17 Q    Okay.  With regard to Page 24, starting at

18 Paragraph 37, and the assault that's described here on

19 the Desperados' members in Petersburg, Virginia in an

20 effort to expand their territory, do you have any

21 information to indicate that Mr. Herndon organized,

22 participated in, or condoned that event?

23 A    No, ma'am.

24 Q    With regard to Page, 26 starting with Paragraph

25 40, the *"Ongoing Efforts by the Outlaws to Expand the*

1  *Organization by Encouraging, Planning, and Executing*

2  *Acts of Violence and Threats Directed at HAMC and Other*

3  *Rival Motorcycle Gangs.*" In fact, just so we have our

4  time line straight, during that time period,

5  Mr. Herndon was simply a member at this point, and was

6  not vice president from February 2009 to

7  September 2009, right?

8  A    That's correct.

9  Q    And in fact, do you have any information to

10 indicate that Mr. Herndon planned, participated in, or

11 condoned these events that occurred between February of

12 2009 through September of 2009?

13 A    Other than his membership, and being at events

14 that had been taking place, I do not have any specific

15 information about his being involved in the planning.

16 Q    Okay.  You talked a little bit about -- on Page

17 27, Paragraph 48 in response to Ms. Cardwell's

18 questions about this meeting, this copper region bosses

19 meeting that took place in Rock Hill, South Carolina,

20 Mr. Herndon wasn't present at that meeting, correct?

21 Do you recall him being present at that meeting?

22 A    I'm sorry.  What paragraph?

23 Q    Paragraph 48, Page 27.

24 A    Yes, ma'am.  I'm familiar with that.

25 Q    Okay.  And was Mr. Herndon present at that

CROSS-EXAMINATION OF AGENT VALOT          80

1   meeting?

2   A     I do not know.

3   Q     But with regard to that meeting, it's listed in

4   this indictment that the, *"Copper Region Treasurer*

5   *SPRADLING distributed an outline detailing how a*

6   *motorcycle gang is to conduct business, maintain*

7   *control over a state area, and handle confrontations*

8   *with rival motorcycle clubs and others."*  In fact,

9   wasn't the main topic of discussion how as a motorcycle

10  gang they can function under an LLC?

11  A     I'm not sure what the actual context of the

12  conversations were when that document was provided.

13  Q     Okay.  On Page 28 starting at the top paragraph,

14  it looks like on Paragraph 49 and Paragraph 50, each of

15  those paragraphs, actually, there are allegations of

16  conduct that was involved in by Outlaws' members.  Are

17  you familiar with those allegations?

18  A     Yes, ma'am.

19  Q     In fact, do you have any information to show that

20  during the course of your investigation that

21  Mr. Herndon organized, or was the organizer of, any of

22  those events?

23  A     Not that he was an organizer.  No, ma'am.

24  Q     Okay.  Any information with regard to Paragraph 50

25  -- I'm sorry, with regard to Paragraph 51 that

1  Mr. Herndon participated in, helped organize, or carry

2  out the objectives regarding the allegation in

3  Paragraph 51?

4  A    No, ma'am.

5       THE COURT:  Can you go back to Paragraph 49 and

6  50.  You mentioned, agent, that this -- you had no

7  evidence this defendant organized either of these two

8  events.  Does your investigation reveal that he was

9  present at these events, or do you know?

10      AGENT VALOT:  I do not know if he was present at

11 the events.

12      THE COURT:  Fair answer.

13      Go ahead.

14      MS. HODGES:  Thank you, Your Honor.

15 Q    And again on Paragraph 52 with regard to

16 Mr. Werth's information regarding his armed home

17 invasion of neighbors in the area, do you have any

18 information or evidence to show that Mr. Herndon was

19 involved in, participated in any way, helped to

20 organize, or condone this conduct or behavior?

21 A    No, ma'am.

22 Q    Now, with regard to September 2009 to October 2009

23 referenced right above Paragraph 53 on Page 29,

24 *"Assault of Two Outlaws from Florida,"* there was a

25 discussion that came up -- I believe you talked about a

1  discussion that came up about retaliation at the

2  Brockton, Massachusetts party, correct?

3  A    Correct.

4  Q    And in fact, do you have any information to

5  indicate that Mr. Herndon was even present at that

6  meeting?

7  A    No, I do not.

8  Q    Was not involved in any way in the discussions

9  about the retaliations?

10 A    Not in the discussions that occurred in Brockton.

11 Q    And agent, I'm going to go back again because you

12 have discussed and indicated your knowledge of the

13 hierarchy of the memberships in the indictment.

14     MS. HODGES:  And, Your Honor, I apologize because

15 I didn't make a note of the paragraph on this.

16 Q    But in the indictment, are you familiar with how

17 it is discussed how the organization runs?  It's

18 discussed that directives come down from the top and

19 they go to various regions, to the president, the vice

20 president, et cetera?

21 A    Correct.

22 Q    That sounds familiar?  You're familiar with that

23 in the indictment?

24 A    Yes, ma'am.

25 Q    In fact, during the time of most of the

CROSS-EXAMINATION OF AGENT VALOT                    83

1  allegations contained in this indictment with the

2  exception of October 1, 2009 through the October 17,

3  2009 time period, does your evidence indicate that

4  Mr. Herndon was not in a leadership position in the

5  organization?

6        THE COURT:  During what time period, Ms. Hodges?

7        MS. HODGES:  I'm sorry.  During the time period

8  discussed in the indictment with the exception of

9  October 1, 2009 through October 17, 2009.

10       THE COURT:  Okay.

11 Q    Your evidence shows that Mr. Herndon was in fact

12 not in a leadership position in this organization, is

13 that correct?

14 A    No, it's not.

15 Q    It's not correct?

16 A    No, ma'am.

17 Q    What leadership position was Mr. Herndon in

18 outside of the October 1, 2009 through October 17, 2009

19 time period?

20 A    With the accusations about Mr. Herndon being a --

21 providing investigation to law enforcement arose, and

22 Mr. Herndon stepped down from being the regional vice

23 president, another individual stepped up in his place.

24 And then once Mr. Herndon was cleared by the club of

25 the accusation of being an informant for law

CROSS-EXAMINATION OF AGENT VALOT          84

1  enforcement, he then took over the vice president

2  position again, and was the vice president through the

3  duration of the investigation.

4       THE COURT:  Hold on just one second.  Can you kind

5  of recap for me, agent, during what time frame was

6  Mr. Herndon vice president?

7       AGENT VALOT:  I don't know the exact date of which

8  he became -- when he was cleared by the club and became

9  the vice president again.  It was about a month or two

10 from October when he stepped down until he was cleared

11 from the club, and then he took over the position from

12 then, from that point on until the end of the

13 investigation.

14      THE COURT:  All right.

15 Q    Sometime around December or January?

16 A    Yes.  Sometime in that time frame.

17 Q    And the investigation pretty much culminated with

18 the arrest in June?

19 A    Correct.

20 Q    Now, turning to Page 27, Paragraph -- I'm sorry.

21 I've passed that.

22      MS. HODGES:  Excuse me, Your Honor.  Let me just

23 find where I am.  I think I passed 27.

24      THE COURT:  I think you were on Page 29

25 previously.

1        MS. HODGES:  Thank you, Your Honor.

2   Q    And with regard to Mr. Herndon's position as vice

3   president at the point where he was acting as vice

4   president, any orders that would have come down,

5   allegedly come down from on high from the big boss,

6   would have gone to the copper region president or boss

7   of that region, is that correct?

8   A    That's correct.

9   Q    Not come down directly from Mr. Herndon?

10  A    No.  The vice president position is that for some

11  reason the president is unable, or isn't around to take

12  an order or make a decision that needs to be made, then

13  it gets defaulted to the vice president.

14  Q    And in fact, during the course of your

15  investigation prior to those October 2009 elections,

16  Lesley Werth was the president, and he handled that

17  position?

18  A    Correct.

19  Q    Until the elections of October 2009 wherein David

20  Lowry became the president?

21  A    Correct.

22  Q    And he handled that position through the

23  culmination of the investigation, correct?

24  A    Yes, he did.

25  Q    Okay.  So everything would have either gone

1    through Leslie Werth during his tenure, or David Lowry

2    following Leslie Werth?

3    A    They were the president.  Yes, ma'am.

4    Q    Okay.  Now, with regard to --

5         MS. HODGES:  And, Your Honor, I tried to write

6    this question out because I think it's very important

7    to ask the same question that Ms. Cardwell asked

8    regarding Mr. Rosga for -- and this was the confusing

9    one, so I tried to make sure I wrote it so that it

10   wouldn't be confusing.

11        THE COURT:  All right.

12   Q    With regard to this conspiracy that was alleged

13   that each member had to commit the two acts -- I don't

14   remember what the paragraph was.

15        THE COURT:  First of all, why don't you ask the

16   agent whether he remembers the question.  He probably

17   does.  And that way you can just put it in the context

18   as previously asked.

19        MS. HODGES:  Yes, sir.

20   Q    Agent, do you remember the question asked by

21   Ms. Cardwell regarding the allegation that each member

22   was required to commit two acts of, was it, violence?

23        THE COURT:  Racketeering.

24   Q    Racketeering.  I'm sorry.

25   A    Yes, ma'am.

CROSS-EXAMINATION OF AGENT VALOT                87

1  Q    With regard to that, my question is almost the

2  same as Ms. Cardwell's, but I'm going to ask you with

3  regard to -- it's Paragraph 19 on Page 20 in case you

4  need to refer to that.  But I'm going to ask you with

5  regard to Mr. Herndon, do you have any information or

6  evidence or -- I'm sorry, do you have any facts or

7  evidence that Mr. Herndon agreed with others to commit

8  two acts of racketeering?

9  A    No, ma'am.

10 Q    Agent, I'm going to direct you now to Page 32, and

11 to Paragraph -- starting above Paragraph 68 where it

12 says, "*November 2009 through March 2010, Outlaws

13 Members Conspire to Expand Gambling Activities to the

14 Undercover Outlaws Chapter Clubhouse in Petersburg.*"

15 Are you familiar with statements that are attributed to

16 Mr. Herndon in these Paragraphs 68 or 69 of this

17 indictment?

18 A    Yes, ma'am.

19 Q    With regard to those statements, agent, did you

20 receive information from the other -- were you one of

21 the agents questioning Mr. Herndon at this time?

22 A    No, I was not.

23 Q    And in fact, one of the agents questioning

24 Mr. Herndon was a Agent John Rich?

25 A    That's correct.

1  Q     Okay.  And are you familiar with regard to the

2  context with which these statements were made to the

3  agents?

4  A     The statements in the indictment you mean?

5  Q     Yes, the statements attributed to Mr. Herndon in

6  the indictment.

7  A     They were while the agents were working in an

8  undercover capacity.

9  Q     This wasn't in fact after Mr. Herndon was arrested

10  and taken into custody?

11  A     That's correct.

12  Q     It was when he actually was arrested and taken

13  into custody, right?

14  A     The statement in the indictment, no, ma'am.  These

15  statements were made prior to Mr. Herndon being taken

16  into custody.

17  Q     Okay.  Well, if we can look -- and I don't know if

18  I'm misunderstanding you or you're misunderstanding me,

19  but Mr. Herndon was arrested on June 15th, correct?

20  A     Correct.

21  Q     And these statements that they're attributed to

22  him are statements that you're saying were made during

23  the course of the investigation?

24  A     Right.

25  Q     Where do these statements take place?

1  A    These statements took place -- Paragraph 68 was in

2  Lexington, North Carolina.

3  Q    And it was a discussion between Mr. Herndon and

4  agents, the undercover agent?

5  A    Yes, ma'am, between the Outlaws members in

6  Lexington and the undercover agent.

7  Q    Okay.  And I'm going to direct your attention to

8  Page 34, again with regard to the paragraph starting

9  above 75.  *"Outlaws Stepping Up Efforts Against Hells*

10  *Angels Members, Including Instructions From Outlaws*

11  *Leadership to Conduct Surveillance and Attack Hells*

12  *Angels Members."*  Do you have any information coming

13  through your investigation, or that you have

14  personally, showing that Mr. Herndon in fact was one of

15  the leadership members who gave the directive to step

16  up the efforts against the Hells Angels member?

17  A    He was in a leadership role while these

18  conversations were taking place.

19  Q    But do you have any information that Mr. Herndon

20  was one of the individuals in the leadership role that

21  gave that directive?

22  A    No, ma'am.

23  Q    Okay.  Turning to Page 36 of the indictment.  I'm

24  looking at the actions in Paragraph 81 of the

25  indictment, Paragraph 82, 83 and 84.  With regard to --

1  and I'll stop if you need to.  Are you familiar with

2  those?

3  A    Yes, I am.

4  Q    With regard to those acts, do you have any

5  information to indicate that Mr. Herndon was involved

6  with the activities of these individuals listed in each

7  of those acts, Mr. Mark Steven Fiel in Paragraph 81,

8  Mr. Smith in Paragraph 82, Mr. Mariaca in Paragraph 83,

9  Mr. Mariaca in Paragraph 84?

10 A    No, ma'am.

11 Q    With regard to Page 37, starting at Paragraph 87,

12 the *Ongoing Efforts by Regional, and Local Outlaws to*

13 *Provide Illegal Controlled Substances at the Outlaws*

14 *Clubhouse for Distribution,*" do you have any

15 information that you obtained during the course of your

16 investigation that in fact Mr. Herndon was involved in

17 the illegal distribution of narcotics with regard to

18 membership with the Outlaws?

19 A    No, ma'am.

20 Q    And in fact, are you familiar with whether or not

21 there are penalties for dealing drugs as an Outlaw

22 member?

23 A    No, I'm not.

24 Q    You're not familiar with the concept of that being

25 what's called a patch pulling offense?

1  A    Not drug dealing, from my investigation.  No,

2  ma'am.

3      MS. HODGES:  And, Your Honor, if the Court would

4  bear with me just a moment.  I'll look at my notes, and

5  I think I'm finished.

6      THE COURT:  All right.

7      MS. HODGES:  Your Honor, that's all the questions

8  I have.

9      THE COURT:  Before you redirect Agent Valot, I've

10 got quite a number of pages here of notes.  Could you

11 recap for me what specific acts of violence your

12 evidence revealed that Mr. Herndon either personally

13 participated in, was present, or directed.

14     AGENT VALOT:  Specific acts of violence?

15     THE COURT:  Yes, sir.

16     AGENT VALOT:  I did not have any evidence that he

17 was involved in specific acts of violence.

18     THE COURT:  Go ahead.

19     MR. FITZPATRICK:  Thank you, Your Honor.

20              **REDIRECT EXAMINATION**

21 BY MR. FITZPATRICK:

22 Q    Agent Valot, with respect to the January 2010

23 event in Charlotte, North Carolina, you referred to

24 that as the Easyrider event?

25 A    Correct.

1          THE COURT:  What was the date again?  I'm sorry.

2          MR. FITZPATRICK:  January of 2010.

3          THE COURT:  Go right ahead.

4    Q    And your testimony is that Mr. Herndon went to

5    that event?

6    A    That's correct.

7    Q    And through your investigation, what was the

8    purpose of the Outlaws going to that event, if you

9    know?

10   A    The purpose was to deter the Hells Angels from

11   going to the event and to get in a confrontation with

12   the Hells Angels if they were to arrive at the event.

13   Q    And why were they desiring to get into a

14   confrontation with the Hells Angels in Charlotte, North

15   Carolina?

16   A    Charlotte, North Carolina is an Outlaw city that

17   the Outlaws are the dominant club in.  The Hells Angels

18   do not have a presence in Charlotte, and they want to

19   show their dominance and keep the Hells Angels from

20   being able to expand into that area.

21   Q    And in fact, did the Hells Angels stay away from

22   that event?

23   A    Yes, they did.

24   Q    And approximately how many Outlaw members went to

25   that event?

1   A     Approximately, 100 from throughout the country.

2   Q     Now, did Mr. Rosga go to that event?

3   A     No, he did not.

4   Q     Are you aware of how it came to be that so many

5   members went to that event?

6   A     Yes, sir.

7   Q     And can you describe that?

8   A     Mr. Lowry, on finding out that the Hells Angels

9   were supposed to come to the event, contacted

10  Mr. Rosga, and Mr. Rosga gave the authorization for a

11  call to go out to other members.

12        THE COURT:  For a call?

13        AGENT VALOT:  For a call for assistant to go out

14  to other members from throughout the country to then

15  all come and converge on the one event.

16  Q     And within the copper region during your

17  investigation, the Outlaws have expanded into Rock

18  Hill, South Carolina, is that correct?

19  A     That's correct.

20  Q     And is that part of the continuing effort to

21  expand control over territory?

22  A     Yes, it is.

23  Q     And when they expand control over territory, do

24  they expand through acts of violence and intimidation

25  with the Hells Angels?

1  A    Yes, they do.

2  Q    And with respect to the number of people that

3  showed up at the January 2010 event, would that suggest

4  to you that those members are in agreement with the

5  club's purpose of gaining control over territory and

6  excluding the Hells Angels?

7  A    Yes, sir.

8  Q    Are you familiar with a May 21, 2010, Outlaws'

9  meeting or event in Knoxville, Tennessee?

10  A    Yes, sir.

11  Q    And did defendant Jack Rosga attend that event?

12  A    Yes, he did.

13  Q    And was that event a funeral for a deceased

14  Outlaws' member?

15  A    Yes, it was.

16  Q    And did the agents, undercover agents, also attend

17  that event?

18  A    Yes, they did.

19  Q    And did the agents separately engage Mr. Rosga in

20  conversations?

21  A    Yes, they did.

22  Q    Do you recall Mr. Rosga making statements to one

23  of the undercover agents regarding his control over the

24  State of Wisconsin?

25  A    Yes, sir.

1  Q    And if you need, and with the Court's permission,

2  if you do need it, I can show you your report to

3  refresh your recollection.  If you know it from your

4  memory, please tell us.  What did Mr. Rosga state to

5  the agents regarding his control of the State of

6  Wisconsin?

7  A    Mr. Rosga stated that the Outlaws are the only

8  one-percenter club that operates in the State of

9  Wisconsin.  And that any other clubs that are going to

10  be traveling through the State of Wisconsin have to,

11  what you refer to, saddle their colors.  Meaning that

12  if they are going to enter the State of Wisconsin, even

13  as the passenger, they have to take off their colors,

14  put them in the saddle bags on their motorcycles until

15  they leave the State of Wisconsin.

16  Q    And with respect to the agents' conversations with

17  Mr. Rosga regarding what was occurring in Virginia, and

18  the control of Virginia and the presence of Hells

19  Angels, what was Mr. Rosga communicating to the agents

20  about Virginia?

21      MS. CARDWELL:  Judge, I'm not going to object at

22  this point to new territory, but I am going to ask for

23  and opportunity to cross-examine as to the new

24  territory when the time comes.

25      THE COURT:  The only thing that's been raised that

1  I think is new ground is the conversation at the

2  funeral.  I don't know that this raises new ground.  I

3  think both you -- I think him on direct and you on

4  cross explored the gaining of control in Virginia, at

5  least at this point.  I may be convinced later that

6  it's new ground, but the only thing I've heard is the

7  comment about Wisconsin.

8        MS. CARDWELL:  Yes, sir.

9        THE COURT:  Go ahead.

10        MR. FITZPATRICK:  Thank you.

11  Q    Agent Valot, do you understand the question, or do

12  you need me to repeat it?

13  A    If you can repeat it, please.

14  Q    What did the agents discuss with Mr. Rosga about

15  what was occurring in Virginia at the Knoxville

16  meeting?

17  A    They discussed with Mr. Rosga the fact that the

18  Hells Angels' members in Virginia, that there are

19  becoming more members in Virginia.  More members are

20  getting patches.  And about the expansion of the Hells

21  Angels in Virginia.

22  Q    Also at that Knoxville event in May of 2010, did

23  Mr. Rosga state to the agents the Outlaws' relationship

24  with the Pagans Motorcycle Club?

25  A    Yes, he did.

1  Q    And what, if anything, did he say about the

2  relationship with Pagans?

3  A    He stated that the relationship with the Pagans is

4  now a good relationship, and that they are -- that they

5  are now friendly clubs.

6  Q    Going back to the July 5, 2009, meeting with the

7  agents and Mr. Rosga right after the agents were

8  patched into the Outlaws; do you recall that?

9  A    Yes, sir.

10 Q    And do you recall that they were traveling back

11 from North Carolina to Petersburg, is that correct?

12 A    That's correct.

13 Q    And did they stop outside Durham, North Carolina

14 and have lunch together?

15 A    Yes, they did.

16 Q    Did they engage in conversation over lunch?

17 A    Yes, they did.

18 Q    And do you recall, and I believe Ms. Cardwell

19 asked you a bit about this, that Mr. Rosga stated that

20 he could accept going to jail for ordering a hostile

21 action against a rival motorcycle club, do you recall

22 that?

23 A    Yes, sir.

24 Q    In the context of that conversation, is Mr. Rosga

25 stating that as the boss of the Outlaws' organization?

1  A    Yes, he is.

2  Q    For point of clarification, is the term *"boss"*

3  within the Outlaws' organization, and the term

4  *"president,"* are those terms interchangeable?

5  A    Yes, they are.

6  Q    Do they mean the same thing?

7  A    Yes, they do.

8  Q    Going to counsel's questions regarding club

9  discipline.  Are you familiar with an event regarding

10  Mark Steven Fiel, also known as Snuff, and Mark Jason

11  Fiel, in which they were assaulted or beaten within the

12  club; do you recall that?

13  A    Yes, sir.

14  Q    With respect to Snuff, Mark Steven Fiel, do you

15  recall who assaulted him?

16  A    I don't recall who -- I don't remember who

17  specifically assaulted him.  No, sir.

18  Q    Was Mr. Rosga aware of those assaults on Mark

19  Steven Fiel and Mark Jason Fiel?

20  A    Yes, he was.

21  Q    And were those events related to club discipline,

22  if you know?

23  A    I -- I don't fully recall the situation.

24      MR. FITZPATRICK:  Your Honor, Court's indulgence?

25      THE COURT:  Yes, sir.  Take your time.

1          MR. FITZPATRICK:  Your Honor, that's all the

2   questions that the government has at the moment.

3          THE COURT:  Very well.

4          Ms. Cardwell, I'm going to allow you to recross

5   only on the issue of the Knoxville funeral.

6          And you can redirect on that point.  You did raise

7   that new point.  I'll let her go into that.  I'll let

8   you redirect on that.

9          But be as brief as you can.

10         And of course you too, Ms. Hodges.

11         MS. HODGES:  Your Honor, I don't want to disrupt

12  the flow of things, but Mr. Herndon is in a lot of pain

13  right now, and wanted to know if we could take a brief

14  recess.  He's got to get up.

15         THE COURT:  Sure.  I'll take a short recess.

16  Here's how we're going to proceed.

17         I'm going to give you just a few minutes on that

18  point, Ms. Cardwell.  I'll hear from you on that.

19         I'll hear final argument, then I'll take a 15

20  recess, and then I'll make a decision in the case.

21  We'll take about a 10 minute recess to allow

22  Mr. Herndon to adjust himself, all right.

23         MS. HODGES:  Thank you, Your Honor.

24         THE COURT:  We'll stand in recess 10 minutes.

25                     (Recess taken.)

CROSS-EXAMINATION OF AGENT VALOT                 100

1          THE COURT:  All right, Ms. Cardwell, you may cross

2    on that very narrow issue.

3          MS. HODGES:  Thank you, Your Honor.

4                      **CROSS-EXAMINATION**

5    BY MS. CARDWELL:

6    Q    Agent Valot, with regard to this conversation that

7    you previously testified to in Nashville when agents

8    were present and Mr. Rosga was present, we discussed

9    the fact -- or you mentioned the fact that there was

10   some reference to, or some discussion, I think is the

11   term you used, of expansion into Virginia between

12   Mr. Rosga and the agents, is that correct?

13   A    That's correct.

14   Q    And in fact, did Mr. Rosga suggest to the agents

15   that the house shouldn't be opened in Petersburg?

16   A    Are you referring to the clubhouse?

17   Q    Yes.

18   A    I believe there was a conversation about the

19   undercover agents -- about the clubhouse being closed.

20   The undercover agents had stated to Mr. Rosga, I

21   believe, that they had been evicted and that Mr. Rosga

22   was talking to them about the clubhouse.

23   Q    But what I'm asking you is, with respect to the

24   location in Petersburg, Virginia, did Mr. Rosga ever

25   suggest to them that they should open a house in

CROSS-EXAMINATION OF AGENT VALOT          101

1   Petersburg, Virginia?

2   A     Oh, not that I'm aware of.

3   Q     So who was it that raised the idea of expansion in

4   Virginia; the agents or Mr. Rosga?

5   A     You're referring to in Knoxville?

6   Q     Yes.

7   A     I'm not sure exactly who it was that initiated the

8   conversation.

9   Q     Well, who ultimately selected Petersburg, Virginia

10  as a location for the Petersburg chapter?  Who selected

11  Petersburg?

12      MR. FITZPATRICK:  Your Honor, objection.  If I

13  could, please.  The objection is scope.  I think the

14  question is confusing.  I don't think the opening of

15  the Petersburg clubhouse was discussed in Knoxville in

16  May of 2010.  The clubhouse had already been opened for

17  close to a year at that point.

18      THE COURT:  Well, the issue here is whether or not

19  it was the agent or Mr. Rosga, or someone else, who

20  opened up the area of expansion to this conversation.

21      And I'm going to limit it to that, Ms. Cardwell.

22  So if you will go back and rephrase your question.

23  It's a legitimate line of inquiry, but just don't stray

24  out of bounds here.

25      MS. CARDWELL:  Yes.

CROSS–EXAMINATION OF AGENT VALOT        102

1   Q    Agent Valot, was it the agents or Mr. Rosga who

2   raised the discussion of expansion in Virginia in that

3   meeting at the national?

4   A    I believe that the agents had discussed that with

5   Mr. Rosga.

6   Q    So they brought it up, right, not him?

7   A    I believe so, from reading the report.

8   Q    And at that point, the Petersburg clubhouse had

9   already been opened, correct?

10  A    Yes, it had.

11  Q    And do you have any evidence or information that

12  Mr. Rosga had anything to do with selecting or setting

13  up the Petersburg clubhouse?

14  A    No, I do not.

15  Q    Or location of Petersburg, Virginia?

16  A    The location of the Richmond/Petersburg area has

17  been a place that the Outlaws have wanted to open a

18  clubhouse for a while.  There's no specific evidence

19  that Mr. Rosga told the undercover agents to open the

20  clubhouse in Petersburg.

21  Q    And when you say the Outlaws have generally wanted

22  to, what Outlaws?

23  A    Just the Outlaws.  The Outlaws in general.

24  Specifically, from the undercovers dealing with the

25  members of the copper region.

CROSS-EXAMINATION OF AGENT VALOT                    103

1  Q    So the copper region said that they wanted to

2  expand in Virginia?

3  A    Yes.

4  Q    And in fact, they are Virginia members, correct,

5  because they're in Manassas, correct?

6  A    Just Shenandoah.  Yes, ma'am.

7  Q    And with regard to this territory discussion

8  wherein you indicated Mr. Rosga was setting out the

9  rules about the territories and indicating that

10  Wisconsin was sort of free of other clubs, he also

11  talked in that taped conversation about politics,

12  correct?

13  A    I believe so.

14  Q    And in reference to politics, one of the things he

15  mentioned is that lines were drawn between the

16  different clubs, and if they cross into your area,

17  you're supposed to call, isn't that correct?

18  A    That's correct.

19  Q    And he made a further reference in that discussion

20  that when there was some issue whether the Vagos would

21  expand eastward, which is another club or a different

22  club from the Outlaws, that they were going to have to

23  build a rapport first.  Do you remember that Mr. Rosga

24  used the term that they needed to build a rapport?

25  A    I believe so.

1  Q    And of course you understand that a rapport is

2  sort of a level of a relationship where we all get

3  along or know each other or are familiar with each

4  other, correct?

5  A    Yes, ma'am.

6  Q    And that's what he said would be a prerequisite to

7  another club moving into an area where the Outlaws

8  were, correct?

9  A    Yes, ma'am.

10 Q    Okay.  He also mentions that with regard to the

11 Richmond area that the agents, who he believed to be

12 Outlaw members, should be very careful in the Richmond

13 area because the Hells Angels were looking for patches

14 in that area, correct?

15      THE COURT:  Look for what?

16      MS. CARDWELL:  Looking for patches.

17 Q    Looking for patches, correct?

18 A    Correct.

19 Q    And looking for patches, you understood from the

20 investigation, would mean that the Hells Angels were

21 looking to get the patches, beat them, shoot them,

22 whatever they had to do, of Outlaw members in the

23 Richmond area, correct?

24 A    That's correct.

25 Q    Okay.  So he was expressing concern of the

1  aggression the Hells Angels were showing, or might show

2  toward Outlaws in the area?

3  A    Included in that conversation, he was referring to

4  that as being a retaliatory instance for a time in

5  which Outlaw members had taken patches from Hells

6  Angels' members in Minnesota.

7  Q    Well, do you remember him saying that you need to

8  watch yourself over there?  There's Hells Angels

9  looking for patches, did he say that?

10  A    Yes, ma'am.

11  Q    And that it was actually the agent in this case in

12  this conversation on tape that told Mr. Rosga about the

13  green light on Outlaws by the Hells Angels, correct, he

14  brought that up?

15  A    That's correct.

16  Q    He said, you know, Mr. National President, that

17  the Hells Angels have a green light on us, the Outlaws,

18  don't you?

19  A    That's correct.

20  Q    And Mr. Rosga's response was something to the

21  effect of, Well, I don't have to tell you?

22  A    Correct.

23  Q    So he's acknowledging that there's a problem with

24  the Hells Angels being a threat, correct?

25  A    Yes, ma'am.

1        MS. CARDWELL:  That's all I have.  Thank you.

2        THE COURT:  Do you want to redirect on that,

3  Mr. Fitzpatrick?

4        MR. FITZPATRICK:  No, Your Honor.

5        THE COURT:  Very well.

6        Ms. Hodges, your client wasn't mentioned during

7  that Nashville conversation, so I'm not going to allow

8  you to recross.

9        MS. HODGES:  Thank you, Your Honor.

10        THE COURT:  You may step down, Agent.

11                    **WITNESS STOOD ASIDE**

12        THE COURT:  All right, I'll hear arguments.  I

13  guess, technically, Ms. Cardwell, you're the movant,

14  you and Ms. Hodges.  You go ahead, then I'll let

15  Mr. Fitzpatrick respond.

16        MS. CARDWELL:  Mr. Mastantuono is going to do

17  that.

18        THE COURT:  Yes, sir.  Nice to have you here.

19        MR. MASTANTUONO:  Thank you, Your Honor.

20        Your Honor, as the main points that the defense

21  believes authorizes this Court to order pretrial

22  release are outlined in our written motion, I won't

23  belabor that motion.  In light of today's hearing, the

24  Court has received a lot of evidence.

25        THE COURT:  Well, I guess the major concern that

1    the Court has, and I'm sure it's going to be the

2    centerpiece of the government's argument, is that your

3    client allegedly is the apex of this organization, and

4    that his directives kind of control the Outlaws.  And

5    the Outlaws are a violent organization by reputation

6    and by isolated deed here.  So kind of weave that into

7    your argument, because that's going to be important.

8        MR. MASTANTUONO:  I will, Your Honor.  And I thank

9    you for pointing that out.  Because as I think as you

10   know from the prior detention hearing, and I think even

11   the pretrial services addendum that was submitted

12   today, it's not presumed that there aren't factors

13   indicating that he's a flight risk.  And so the

14   combination of factors that would be required to ensure

15   the safety of the community, I appreciate is probably

16   the government's argument and the Court's concern.

17       THE COURT:  Yes, sir.

18       MR. MASTANTUONO:  On that with regard to the case

19   that we have explored I think in much further detail

20   here as a result of the testimony, I feel confident in

21   stating that both as to the organized activity deriving

22   from Mr. Rosga's alleged leadership role in this

23   investigation, and as to his participation, or alleged

24   participation in criminal enterprise or activity, I

25   think that the information that this Court has

1  supporting detention is not strong in that regard.

2      It appears that we have no direct evidence of

3  Mr. Rosga committing criminal acts, certainly that are

4  outlined as overt acts.  And also that the context of

5  this is that both the investigation and the alleged

6  activity derives from statements attributed to

7  Mr. Rosga by either indicted coconspirators, and now

8  codefendants in this, but for, it appears one instance

9  in July of 2009 where agents who are acting in an

10  undercover capacity themselves state that they

11  attributed to Mr. Rosga.  And now -- I'm sorry, Judge,

12  and now we have Knoxville, Tennessee January 2010 where

13  agents themselves are attributing statements to

14  Mr. Rosga.

15      I would say that before I speak to those two

16  instances, the context of this also appears that the

17  majority of this activity, or alleged activity, but for

18  the Maine alleged assault on a Hells Angels member, and

19  I mean the State of Maine in 2005, but for that

20  incident, and the incident involving the alleged civil

21  rights violation, most of it appears to stem from

22  allegations that the copper region, or the already

23  existing Virginia region, of the Outlaws wanted or

24  desired to expand further into other areas of Virginia.

25      And it appears that that's where the investigation

1  focused, and that the undercover agents, and apparently

2  undercover -- or confidential informant, participated

3  in and around those activities.  And we've heard the

4  lead agent state that there's really no evidence to

5  believe that that was ordered by, coordinated by, or

6  participated in by Mr. Rosga.

7       THE COURT:  Well, I don't think his testimony was

8  that Mr. Rosga did not organize, participate, or

9  direct.  The evidence was, candidly, he didn't have any

10 direct information of that.

11      MR. MASTANTUONO:  That correct.

12      THE COURT:  And that his assumption was that

13 because Mr. Rosga was in charge of the operation,

14 logically he had knowledge of it.  That's going to be

15 the government's position.

16      MR. MASTANTUONO:  I think that's right, Judge.  I

17 think that it was his conclusion in testimony that that

18 indeed was the case, but that conclusion was not

19 supported in his own admission by any direct evidence

20 to believe that that was occurring.

21      And in context of the other responses on

22 cross-examination to inquiries about Mr. Rosga's

23 activities related to the conclusions that the agent

24 and the government makes regarding the organization,

25 and I'll speak just as an example, beat downs, patch

1    removals, blacking out of patches, the responses to all

2    of those questions as to whether Mr. Rosga participated

3    in or ordered, is there any direct evidence of that.

4    The responses were all in the negative.  And there was

5    a much longer list, and I know the Court recalls it.

6        And so I think that though the conclusion is made

7    and the assertion is made for the Court, it is

8    important to consider the direct evidence supporting

9    that conclusion.  And I think that as stated here

10   today, the government's case in that regard is weak.

11   With regard to the July 2009 alleged meeting between

12   Mr. Rosga an agents, essentially the Maine statement

13   attributed to Mr. Rosga is what's characterized I think

14   as a directive is that when dealing with Hells Angels

15   members, that Outlaws should shoot them.

16       But I think it's enlightening that upon

17   cross-examination, the agent admitted that he did not

18   know or was unsure of whether the context of that

19   conversation between undercover agents and Mr. Rosga

20   was related to a defense of Outlaw members against

21   violence by Hells Angels, whether that related to a

22   response to hostile activity by Hells Angels, even

23   though the agent noted that he was familiar with the

24   background of Hells Angels' members being hostile

25   toward Outlaws, and prior activity in that regard.

1    And then it's further admission that the audio is

2  I think not *"crystal-clear"* as the agent put it.  And

3  so I think that just as important for the government to

4  take an excerpt of a statement attributed to a

5  defendant for purposes of detaining him, and indeed

6  ultimately trying him in criminal cases, the context is

7  important.  And I would expect, and it's unfortunate

8  that that wasn't explored further for the Court - I'm

9  sure it may be in the future - but that's the

10  limitation of the information that you have at this

11  point.

12    The -- I would make the same statement with regard

13  to the statement -- and this was attributed to

14  Mr. Rosga by a coconspirator, and now codefendant,

15  agents heard the coconspirator state that he made this

16  green light statement.  But I don't think that the

17  government has made the case that this was the verbiage

18  that was exactly used by Mr. Rosga, under what context

19  it was made.  And really with regard to these

20  statements attributed to Mr. Rosga by other members,

21  they are other members that are indicted by the

22  government and having committed acts themselves.  And

23  they -- the context when the conversations occurred, in

24  our written motion attacks the foundations for the case

25  that the government makes against Mr. Rosga.  And I

1   think that attack is not weakened by the testimony that

2   we've heard today.

3         Now, in light of the Court's examination of the

4   evidence itself, I also think that the context outside

5   of the accusations is indeed important to draw

6   conclusions, Your Honor.  And were Mr. Rosga somebody

7   who presents as having prior convictions, prior

8   findings in courts supporting that he is a violent

9   person or that he's committed violent acts in the past,

10  I think that benefits of doubt tend to weigh against

11  somebody with a record like that.

12        Here we have the opposite, of course.  We have

13  somebody with no convictions, no formal prosecutions

14  prior to today.  And that was borne out both in the

15  Wisconsin report and the addendum here.

16        With regard to ties, I won't belabor them, but I

17  would take issue with a couple of things.  The

18  report -- the addendum to the report completed here

19  rejects Joseph Rosga, Mr. Rosga's son, as a person with

20  whom Mr. Rosga could reside, though Mr. Joseph Rosga's,

21  the son, residence, employment, lack of inability to

22  have Mr. Rosga or unwillingness to have Mr. Rosga, his

23  father at his place, that was all verified.  And so the

24  report rejected Joseph Rosga simply as it was stated,

25  because of the family relationship.

1        And I don't think that that's an appropriate

2   ground for rejecting Mr. Rosga residing with his son in

3   his son's home subject to conditions that were proposed

4   by the defense that I think not only residence should

5   be verified by Mr. Rosga.  Indeed, even house arrest or

6   electronic monitoring at that residence could be

7   accomplished.  And there's no reason from either report

8   to think that wouldn't be the case that occurs in the

9   Eastern District of Wisconsin and as monitored by the

10  same pretrial services department that we have here in

11  Virginia.

12        And so I think sometimes we hold it against

13  defendants when they have a lack of family

14  relationships or people coming forward to say my son or

15  daughter or husband can reside with me.  I don't think

16  it should work both ways, and so I'm confused as to the

17  rejection given the verification of the other

18  circumstances of Mr. Rosga.

19        We expected that as we asserted had his

20  employment, and that was outlined in the pretrial

21  services report in Wisconsin that was originally done

22  just shortly after Mr. Rosga's arrest, we expected it

23  would be verified in today's report.  The employer was

24  listed, but Mr. Rosga has been self-employed and

25  working as a contractor.  The addendum to the report

 1   does indeed note --

 2        THE COURT:  Mr. Rosga, he runs a trucking company,

 3   does he not?

 4        MR. MASTANTUONO:  Yes, sir.  He subcontracts for

 5   Allied Vans.  And Coakley Brothers, Incorporated is the

 6   local agent in Milwaukee.  And he's been so employed

 7   since 1973.  And we had expected that that was

 8   verified.

 9        I understand it wasn't verified in the original

10   pretrial report because the detention hearing was held

11   just hours after Mr. Rosga's arrest in Wisconsin before

12   Magistrate Judge Goren.  But we would have provided

13   1099 information in the subcontractor fashion to

14   support that.  Pretrial services here certainly

15   verified through Joseph Rosga, the son, that that is

16   his working arrangement.  It's not been disputed or

17   refuted, and we'd ask the Court to accept that.  It

18   does fit with his overall record, his ties to the

19   community, and I should say.  Lack of a criminal

20   record.

21        One thing I found interesting, Your Honor, is that

22   we do know that Mr. Rosga is not presumed detained on

23   the basis of either prior convictions or the nature of

24   this offense charged.  He was ordered detained out of

25   Wisconsin upon the conclusion that a combination of

1  factors would not reasonably assure safety of the

2  community.  The order itself, which was attached to the

3  defendant's motion in this case, is a form order.  And

4  I found it a bit confusing in that the order seems to

5  allude that there's a presumption that since he's

6  charged with a crime of carrying a penalty of ten years

7  or more --

8       THE COURT:  I saw that yesterday myself, and I had

9  the same question you did.  I don't know what exactly

10  the judge is referring to there.

11       MR. MASTANTUONO:  I don't either, Judge.  The

12  defense position is that the government must establish

13  by clear and convincing evidence under these

14  circumstances as they present under the charge of the

15  indictment that no combination of factors would

16  reasonably assure the safety of the community or that

17  he could be a flight risk.  And of course, we assert

18  that the government has not -- or does not make that

19  case by clear and convincing evidence.

20       For the reasons characterizing the testimony, his

21  ties to the community and lack of a prior record, his

22  obvious ability to address these matters in Virginia,

23  and really as a person who I think is -- I think the

24  government argues is uniquely situated because of his

25  leadership role.

1       I think it can just as well be argued in that it

2   can be asserted credibly that as much information

3   brought out today, and in the indictment, seems to

4   indicate lack of coordination as a result of that

5   leadership role, or lack of direct evidence that there

6   are strings being pulled here, and much of it just

7   being due to a characterization that the leader is

8   responsible for the activities of the organization.

9       THE COURT:  I would not have commented if you had

10  not brought it up.  There is characteristic of criminal

11  enterprises that the leader often, he or she, does not

12  direct specifically the activity.  Sets policies, sets

13  course, delegates responsibility.  I'm not going to try

14  to stereotype this case, but I just note that in

15  passing based upon your comment.

16      MR. MASTANTUONO:  May I respond just briefly to

17  that, Judge?

18      THE COURT:  You may.  Sure.

19      MR. MASTANTUONO:  I think it is characteristic of

20  organizations sometimes that leadership isn't

21  responsible for activities of individual members or

22  individual chapters, as it will.  And I'll just give

23  you one example from this case.

24      The alleged civil rights violation.  The agent's

25  testimony was that there's really no reason to believe

1    it was connected to the organization activity but for

2    the individual membership of the alleged actors in that

3    case.  And so --

4        THE COURT:  I guess it will be a question for the

5    trier of fact in this case.

6        MR. MASTANTUONO:  Yes, it will, Your Honor.  Thank

7    you.

8        THE COURT:  Yes, sir.  Thank you very much.

9        All right, do you want to respond to each of them

10   individually, or do you want to wait until after

11   Ms. Hodges?  Why don't you wait until both have spoken.

12       MR. FITZPATRICK:  All right, Your Honor.

13       THE COURT:  All right.

14       Ms. Hodges.

15       MS. HODGES:  Thank you, Your Honor.

16       Your Honor, with regard to Mr. Herndon, obviously

17   the biggest concern I have, particularly based on the

18   evidence of the agent here is one question, or several

19   questions that I had asked that the Court was able to

20   sum up with one question, and the fact remains that

21   Mr. Herndon did not participate or direct any specific

22   acts of violence in this enterprise.

23       THE COURT:  Let me tell you the things that bother

24   me in the case so you'll know exactly where I'm coming

25   from, and you can address them.

1    Number one, Mr. Herndon was an officer in the

2 organization.   Number two, I think it is established

3 that it is an organization with a reputation for

4 violence.   And in the most favorable light to the

5 defense, has demonstrated isolated acts of violence.

6    And lastly, and perhaps most importantly in your

7 client's case, he does have a prior racketeering

8 conviction.   So touch on all those during the course of

9 your presentation.   I know there are other things you

10 want to mention to me, but those are significant in my

11 mind.

12    MS. HODGES:   Yes, sir.   And, Your Honor, I'll

13 start with him being an officer, and then I'll go back

14 to the established organization with acts of violence.

15    With regard to him being an officer, Your Honor

16 the problem with that was Mr. Herndon was an officer

17 per se very briefly.   As the agent testified, there was

18 an election in October -- on October 1st of 2009.   On

19 October 17th, allegations were made as to his

20 allegiance to the organization based on that prior

21 racketeering charge, is what it was, Your Honor,

22 because he eventually ended up pleading guilty to

23 possession and distribution of illegal narcotics.

24    THE COURT:   Well, his record shows he pled guilty

25 on an ITAR, did he not?

1    MS. HODGES:  I don't believe that that is correct,

2  Your Honor.

3    THE COURT:  Okay.  If I'm wrong, correct me on

4  that.

5    MS. HODGES:  Unless I have the wrong information,

6  it's showing that he was charged with that, and that is

7  correct, but he, and others, pled guilty to illegal

8  distribution of narcotics.

9    MR. FITZPATRICK:  He has a racketeering conviction

10  as well as the distribution of narcotics.

11    THE COURT:  That's what I thought.

12    MS. HODGES:  Okay, Your Honor.  I don't have

13  anything other than this and my conversations with

14  Mr. Herndon to dispute that.  But before I go on to

15  that, I will say to the Court this:  The problem with

16  him being an officer is I believe that while he had the

17  title, he was not an officer of this organization,

18  particularly during the time of this conspiracy.  Your

19  Honor, the time of this conspiracy, as noted -- or the

20  time of the investigation noted in this conspiracy runs

21  from March 2006 up through June of 2010.

22    The problem here is you have Mr. Herndon who is

23  vice president for approximately 16 days before his

24  allegiance to the organization is questioned and he's

25  asked to step down.  And for the most part, Mr. Herndon

1  steps away from the organization.

2      THE COURT:  Well, that's not what I heard from the

3  agent.  And you correct me if I'm wrong, because I

4  could be, but Agent Valot said that for a period of

5  about a month, he stepped down as vice president.  And

6  once he was exonerated from the allegation of being an

7  informant, he was reinstated.  Am I wrong?

8      MS. HODGES:  He said he stepped down for about two

9  months.  And I think when I questioned him he said he

10 returned somewhere around December or January, is my

11 recollection of what the agent testified to.

12     THE COURT:  All right.

13     MS. HODGES:  So the Court in that respect is

14 correct that he then came back, but what I am

15 suggesting to the Court by way of the agent's testimony

16 and by way of proffer, is that even though coming back

17 and being reinstated as the vice president, he still

18 did not actively participate in a lot of these alleged

19 events that we're talking about.  And this is what I'm

20 suggesting to the Court.

21     In addition, he didn't direct these events, Your

22 Honor, as testified to by the agent.  With regard to

23 that respect, he's, for all intensive purposes, a

24 member.  He's not directing anything, he's not

25 organizing.

1    And with regard to the agent's testimony about the

2 hierarchy and how it's run, the vice president is

3 simply present in the event that something happens to

4 the president or the boss who receives information from

5 higher ups.  And in this instance, there was never any

6 indication, evidence, or anything during the

7 investigation to allude to the fact that Mr. Herndon

8 had taken over the running and directing of the

9 activities of the copper region.  He had not, Your

10 Honor.  And in fact, rarely participated in events that

11 were -- that were alleged in the allegation -- in the

12 indictment here, Your Honor.  So with regard to his

13 participation, I'd say it was very minimal.

14    And with regard to the acts of violence that are

15 alleged, no evidence to indicate that Mr. Herndon was

16 involved in those.  I understand the Court's concern

17 that when you have an established organization like

18 this, there is a reputation for violence.  But taking

19 into consideration the evidence that's been presented

20 by the government, those acts of violence cannot be

21 directly or even indirectly attributed to Mr. Herndon,

22 and he didn't participate in any of those acts of

23 violence, Your Honor.

24    And I think that that is one of the things that

25 has to be taken into consideration when we look at

1  whether or not there is a combination of conditions

2  that would allow for him to be released.

3       There are also, as I understand the Court,

4  concerns with regard to Mr. Herndon's prior criminal

5  record as evidenced by the report that was provided by

6  pretrial services.  Mr. Herndon does have a criminal

7  history, Your Honor.  I will point out to the Court,

8  though, that there are circumstances and situations

9  that had changed for Mr. Herndon even prior to the end

10  of this investigation with the government wherein he

11  was arrested.

12       And, Your Honor, when you look at the prior

13  racketeering charges, I understand, and, again, I have

14  nothing on paper other than what I have been provided

15  by pretrial and my lengthy conversations in going

16  through documentation with Mr. Herndon to indicate that

17  he was charged in a racketeering conspiracy in -- in

18  1999 he was initially charged.  In 2001 I believe was

19  the disposition.  Mr. Herndon's belief, and I'm looking

20  as evidenced by his sentence, that he actually pled

21  guilty to a lesser charge with a distribution of drugs.

22  But once again, I don't have anything else to show

23  different from that, Your Honor.  And that's what his

24  belief was in that, and it had more to do with the drug

25  distribution than in a racketeering enterprise.

1    He served his time, as the report indicates.  He

2    participated successfully while he was incarcerated,

3    Your Honor.

4    And with regard to his record, and I understand

5    that that may be one of the things that the government

6    is going to argue that Mr. Herndon does have a record

7    and somewhat of a -- issues regarding charges of a

8    violent nature.  And the reason I point that out to the

9    Court is because I thinks it also falls in line with

10   regard to Mr. Herndon's status and whether or not he

11   would be a danger to the community.

12   THE COURT:  Let me clarify that I will not base

13   detention on charges.  You and I have both been state

14   prosecutors.  You know how easy it is to get a warrant

15   for somebody.

16   MS. HODGES:  Absolutely, Your Honor.

17   THE COURT:  I look at the other things which are

18   disturbing collectively, but I don't look at the

19   charges that have been nol-prossed.

20   MS. HODGES:  Thank you, Your Honor.  Then I won't

21   waste the Court's time with discussing that, but I did

22   want to make sure that that was covered.

23   Your Honor, the bottom line to what you have with

24   regard to Mr. Herndon when you look at whether or not

25   there are factors, or a combination of factors that

1  would allow for his release, here's where we are and

2  here's what -- here's what I believe where we are.

3  When you look at the nature and circumstances of the

4  offenses charged, when one looks through this

5  indictment, it's extremely voluminous and intimidating.

6  And in fact, when you look at this 50-page indictment,

7  you can believe that something is afoot here and

8  something happened.

9      The problem is with the testimony provided today

10 by the government's agent, I believe that they have not

11 provided clear and convincing evidence that Mr. Herndon

12 has participated in a lot of these activities.

13     THE COURT:  I don't know that they need to do

14 that.  The strength of the government's case is only

15 one factor to be considered.  His criminal history and

16 other information about his background and past are of

17 equal weight in this analysis.  Correct me if I'm

18 wrong, but what's the way I read the Fourth Circuit

19 cases.

20     MS. HODGES:  You're correct, Your Honor.  But the

21 argument I'm making, and I may be a little off base,

22 but I think it's important to note, when you talk about

23 the weight of the evidence that's been presented with

24 regard to the actions of Mr. Herndon, I would suggest

25 that it's not as weighty as this 50-page indictment

1    would have one believe if one went on the strength of

2    this indictment.   That's the argument I'm making with

3    regard to that.

4        Your Honor, with regard to the history and

5    characteristics of Mr. Herndon I've discussed, I think

6    what is relevant is with regard to his criminal history

7    record.   Mr. Herndon is disabled at this point, Your

8    Honor.   As of March of 2006, he lost his left leg below

9    the knee, and part of the -- what I was alluding to

10   when I talked about his criminal history and the change

11   in his circumstances, Mr. Herndon is now an individual

12   who cares for his disabled 3-year old daughter.   She

13   has cerebral palsy.   He's been caring for her since

14   2007.

15       That, to a certain extent, has changed a lot of

16   his behavior and his involvement in the organization,

17   which is why I made the direct questions to the agent

18   about whether or not Mr. Herndon was present, directed,

19   or involved in a lot of these activities because he

20   wasn't, Your Honor.   And that's a proffer.   And

21   obviously the agent testified that he wasn't there in a

22   lot of these instances.

23       But the proffer to the Court is, that is the

24   reason why he's not, because his life is such that he

25   is caring for his ill mother, as well as his 3-year old

1  daughter who has cerebral palsy who is completely

2  dependent upon him, but with the assistance sometimes

3  of his current fiancee, Your Honor, who is in the

4  courtroom today who has come to show her support.

5        You have that to show that I don't believe that

6  Mr. Herndon being released pretrial would be a danger

7  to the community because of his concerns and taking

8  care of his daughter, and his own health issues, which

9  he's suffering from tremendously, which I will be happy

10 to argue more once the Court deals with this.

11       THE COURT:  We'll talk about that.

12       MS. HODGES:  Yes, sir.  And because of those

13 issues, I'm suggesting to the Court that there is no

14 danger to the community from Mr. Herndon should he be

15 released and put on home incarceration because he's got

16 a lot of other personal matters that he's dealing with

17 at this time, and in fact has backed off a lot in

18 dealing with the Outlaws, and the organization, based

19 on those health issues and concerns of his daughter.

20       Your Honor, he, as the report suggests, the

21 pretrial report suggests, in fact his sister who could

22 not be here today would be willing to be a third-party

23 custodian if need be.  And in fact, I can proffer to

24 the Court that she has currently moved into

25 Mr. Herndon's home, one, to help maintain the home to

1  take care of his mother because he's absent at this

2  time.  And, two, to help take care of his disabled

3  daughter.  So the sister has already evidenced by her

4  behavior that she's willing to do what she needs to do

5  to assist her brother.

6      And, Your Honor, with regard to supervision by the

7  Court, again, there is, according to the report, and we

8  believe there's no evidence or risk of nonappearance by

9  Mr. Herndon, and Mr. Herndon would be willing to

10 participate in whatever pretrial services that are put

11 upon him with regard to traveling back and forth, or

12 whatever he needs to do, Your Honor.  I don't think the

13 Court will have any problem with that with regard to

14 Mr. Herndon.

15     And I think, again, when the Court weighs the

16 evidence, we have to respectfully disagree with the

17 decision of the judge in the Middle District of North

18 Carolina that there were no combination of conditions

19 that would allow for his release, because we believe

20 that based on the testimony here today, and the

21 arguments made, that in fact Mr. Herndon could be

22 released, and should be released, on pretrial.

23     Thank you, Your Honor.

24     THE COURT:  Thank you, Ms. Hodges.

25     Mr. Fitzpatrick.

1          MR. FITZPATRICK:  Thank you, Your Honor.

2          Your Honor, if the Court pleases.  With the outset

3    with respect to the Wisconsin magistrate judge's

4    determination in the order which says it was a

5    presumption case, we spent a lot of time trying to

6    figure out that magistrate judge's order.

7          THE COURT:  I think it was just an error on their

8    part.

9          MR. FITZPATRICK:  We agree, Your Honor.  We agree

10   with counsel and with the Court, this is not a

11   presumption case.  I just want to make the government's

12   position on that clear.  There seemed to be a little

13   confusion about that.

14         With respect to the evidence in the case, Your

15   Honor, and with the government's burden we also set

16   out, Your Honor, we do think that our burden is by a

17   clear and convincing evidence that Mr. Rosga and

18   Mr. Herndon are dangers to the community, or by a

19   preponderance of the evidence, that they pose a risk of

20   flight.  The government submits we're not required to

21   prove both.  One or either will suffice to order

22   detention in this matter.

23         With respect to Mr. Rosga, Your Honor, I think it

24   is clear from the testimony today and from the

25   allegations returned by the grand jury, that Mr. Rosga

1  is the president of a national criminal organization.

2  I respectfully submit that that finding was not

3  rebutted in any way today.  I submit to the Court that

4  a trial in this matter will prove beyond a reasonable

5  doubt at least that Mr. Rosga was the president of this

6  national organization.

7      As the court referenced in your questions, the

8  dialogue with counsel, that's a significant factor.

9  That's an important position.  The cases, there are

10  several cases in the books, Your Honor, regarding the

11  Outlaws.  This is a thorough investigation by law

12  enforcement, and particularly the ATF.

13      You heard a lot of testimony today about the

14  structure of this organization.  Holding the position

15  of president is a significant position.  It commands a

16  lot of power.  He has a lot of influence.  There's a

17  lot of respect within the membership for him.  That is

18  -- that respect is earned when you become the

19  president.

20      It will become clear at trial, and you saw some of

21  it today, that the membership looks to the leadership

22  for direction, and in return the membership gives

23  leadership respect.  Part of that, Your Honor, falls

24  into this taxing issue that you heard.  Members do

25  present dues to the leadership.

1    In addition, on occasion the leadership taxes its

2    members.  I reference that, Your Honor, because I

3    submit to the Court that this organization does have

4    means.  Mr. Rosga will have the ability to get funds.

5    He can use those funds, frankly, to flee.  That does

6    happen.  It's happened in the past.  It has happened in

7    the present time.

8        THE COURT:  It's not happened in the past with

9    respect to Mr. Rosga?  I see nothing in the record with

10   that.

11       MR. FITZPATRICK:  I stand corrected, Your Honor.

12   Yes, sir.  With respect to past presidents.  I was

13   referring to you heard testimony today regarding past

14   president, Mr. Bowman.

15       THE COURT:  Who is still a fugitive?

16       MR. FITZPATRICK:  Mr. Bowman, Your Honor, is now

17   incarcerated.  Prior to his incarceration, he was a

18   fugitive for 18 months.

19       Randy Yager, past regional boss in the midwest,

20   testimony was he is wanted.  He's been a fugitive for

21   approximately 12 or 13 years.

22       On the issue of flight, Your Honor, you have

23   evidence that Mr. Rosga has traveled internationally.

24   He does know how to do that.  He has international

25   contacts.  You heard evidence in this hearing that the

1    organization does have an international presence.

2         Your Honor, I would submit that segues with the

3    government's position that the membership has respect

4    for the leadership.  If Mr. Rosga wants to, he can find

5    members who will harbor him, who will give him aid to

6    avoid these charges.  That, along with the prior

7    history of the organization -- and I want to be clear,

8    I'm not trying to taint necessarily Mr. Rosga with the

9    acts of Mr. Bowman and Mr. Yager, but it is, Your Honor

10   conduct of the organization that is significant, and

11   the organization does have a history of people avoiding

12   law enforcement and helping the leadership.  I

13   reference that for the Court.  And, please, I do want

14   the Court to put that into context of it's the

15   organization I'm talking about, and Mr. Rosga's current

16   role in the leadership.

17        So, Your Honor, I would ask the Court to consider

18   the flight risk here.  I think they are -- I

19   respectfully submit, I think they are significant, and

20   I'd asked the Court to consider that.

21        With respect to a danger to the community, Your

22   Honor, the government fully intends to prove at a trial

23   in this matter, and you heard some of the evidence

24   today, that Mr. Rosga conspired with others, and

25   ordered another member to kill a Hells Angels member.

1    Whether we do that directly, or circumstantially, or in

2    a combination of both, the government -- we plan on

3    proving beyond a reasonable doubt in this matter that

4    in July of 2009, Mr. Rosga told undercover agents that

5    they should engage in violence against the Hells

6    Angels.  In September --

7         THE COURT:  Well, let's put it in context.  In

8    self-defense.

9         MR. FITZPATRICK:  Yes, Your Honor.

10        THE COURT:  Okay.

11        MR. FITZPATRICK:  Yes, sir.

12        THE COURT:  I just want to make sure the record is

13   fair here.  Go ahead.

14        MR. FITZPATRICK:  Yes.  This is a battle between

15   two criminal organizations.  There's no doubt about

16   that.

17        That occurred, and then, Your Honor, in September

18   of 2009 there was an event against the Outlaws.  The

19   Hells Angels assaulted violently two Outlaw members.

20   Shortly after that in October, early October of 2009,

21   the defendant was at a national club event in Arkansas,

22   and the government intends to prove that the defendant

23   set forth an order to Mr. Pedini to get back at the

24   Hells Angels in retaliation for the September event.

25        In addition, we would submit that that event --

1    and then of course, Your Honor, on October 8th within a

2    week, a Hells Angels member was fired upon several

3    times in Maine, getting shot in the neck.  He did not

4    die, but the government will submit that they were

5    intending to kill him.

6        That event is part of the overall effort by the

7    Hells -- by the Outlaws to expand their influence, gain

8    control over territory, and exclude other biker gangs,

9    in particular Hells Angels, from territory.  That

10   effort goes back to 2006.  And clearly with this

11   defendant, he has bought into that effort, and in fact,

12   encouraged it, since he became the president in

13   November of 2006.

14       And all of that being said, Your Honor, that is

15   very dangerous conduct.  And I think this defendant is

16   cloaked in that dangerous conduct given his role, Your

17   Honor.  I would submit that if released, he does

18   present a danger to the community.  There is no

19   suggestion that this battle between these gangs is in

20   any way ceasing.  If he gets out, he can continue in

21   secret, obviously, but he can continue more easily to

22   promote that violence between these two gangs.

23       I submit that if he's incarcerated, he is far less

24   likely to have the ability to promote that violence

25   between the gangs.  Further, Your Honor, if he is out,

1  he can more readily engage in threatening witnesses or

2  perhaps even law enforcement.  Again, from his position

3  as the president, with the loyalty of the membership,

4  that goes along with having that role as president.

5       I suggest, Your Honor, that those are real

6  concerns in this case.  I certainly think that the

7  evidence you've heard that those are reasonable

8  inferences that can be drawn that those dangers exist.

9  I submit that they're not simply fabrications of the

10  government.  They are certainly there.

11       With respect to standards that the Court has to

12  look at, I acknowledge that Mr. Rosga has no prior

13  criminal history; however, if you look at the nature

14  and circumstances of the offense charged we talked

15  about extensively this morning, that factor weighs very

16  heavily against Mr. Rosga, Your Honor.  And I would

17  submit everything that you have heard today on that

18  factor, and also, Your Honor, the history and

19  characteristics of the person, the fact that he is the

20  president of this national violent organization, as we

21  submit that the evidence suggests.

22       That, along with the weight of the government's

23  evidence, the fact that there are undercover law

24  enforcement agent who engaged Mr. Rosga in

25  conversations, the government submits that's going to

1  be weighty evidence against the defendant.

2      All of those factors that are set forth in the

3  statute suggest, Your Honor, that we have met our

4  burden of clear and convincing evidence that he

5  presents a danger to the community based on his role

6  and the violent nature of the organization.

7      THE COURT:  Okay.

8      MR. FITZPATRICK:  And in addition, Your Honor, the

9  flight issue.

10      With respect to Mr. Herndon, Your Honor, very

11  briefly.  He does have a criminal history.  We was

12  previously convicted of a racketeering offense.

13      THE COURT:  And you have confirmed that?  There

14  seems to be some question about it.  That's my

15  impression that he does have an ITAR conviction, but

16  you say you and your agents have confirmed that?

17      MR. FITZPATRICK:  We have talked about that in the

18  past.  And if I can get the agent's notes on that.

19      THE COURT:  If that's what your investigation

20  reveals, I take it at face value.

21      MR. FITZPATRICK:  Yes.

22      THE COURT:  Okay.  That's fine.

23      MR. FITZPATRICK:  And if for some reason that's

24  incorrect, I'll let the Court know.

25      THE COURT:  Please let both me and Ms. Hodges

 1  know.

 2       MR. FITZPATRICK:  Absolutely.

 3       Your Honor, with respect to that, a couple other

 4  points on Mr. Herndon.  I would note in the pretrial

 5  report, he noted to the officer that he was -- that he

 6  left the club, the organization in January of 2010.

 7  You have testimony today that in June of 2010 within a

 8  week of the indictment returned, he's at a national

 9  event in Sandusky, Ohio.  Your Honor, I would submit

10  that that event clouds the argument that he has family

11  considerations to consider.  I'm respectful of

12  everyone's family considerations, however, he did

13  attend the national event in Sandusky, Ohio.  That is a

14  weighty factor against Mr. Herndon.

15       Also, Your Honor, he's not being -- respectfully,

16  he's not being truthful to pretrial when he says he

17  left the club in January.  The evidence is just

18  directly contrary to that.  So, Your Honor, I would

19  submit the fact that Mr. Herndon appears not to be

20  truthful to pretrial.  That does not bode well if he's

21  given release.

22       And I would also submit that he's a danger to the

23  community.  I would note for the Court that he did

24  arrive -- he did take part in the January 2010 event in

25  Charlotte, North Carolina.

1        And, Your Honor, one final point, if the Court

2   please.  With respect to that event, I would submit to

3   you that the testimony in this case is that 100 members

4   of the Outlaws arrived at that event.  The testimony in

5   this hearing is that David Lowry, the regional

6   president, spoke with Jack Rosga about that event.  Got

7   his permission.

8        I would submit to the Court that there's no way

9   that 100 members of the Outlaws from around the country

10  are going to come to one location without the national

11  president setting out that directive.  A regional

12  person is not going to get 100 people.  I submit that

13  the evidence is that Jack Rosga sent those people to

14  Charlotte, North Carolina, and that shows his danger to

15  the community.

16       THE COURT:  All right, sir.

17       Ms. Cardwell or Ms. Hodges, any brief rebuttal on

18  that?  You are the movants, so I'll give you a chance

19  to rebut quickly.

20       I'm sorry, Mr. Mastantuono.

21       MR. MASTANTUONO:  Just briefly.

22       THE COURT:  I'll give you a minute or two.  Go

23  right ahead.

24       MR. MASTANTUONO:  Having heard on behalf of

25  Mr. Rosga the government's acknowledgment, I think we

1    all have the appropriate standards and burdens that

2    have to be met.  I would simply submit, the government

3    certainly goes through and details the alligations

4    against Mr. Rosga, because it really is the only factor

5    weighing in favor of detention as it relates to his

6    circumstances.

7        The Court is correct that the other factors count

8    equally with regard to background, prior record,

9    factors under the bail statutes, ties to the

10   community -- excuse me, under the Bail Reform Act.  And

11   those as stated I think in our written motion very

12   carefully and organized, all favor release but for

13   consideration of the allegations at this point that

14   Mr. Rosga still enjoys his presumption until a finding.

15       That's all I have.  Thank you.

16       THE COURT:  Ms. Hodges, any further comments,

17   ma'am?

18       MS. HODGES:  Just very briefly, Your Honor.

19       THE COURT:  Yes, ma'am.  You go right ahead.

20       MS. HODGES:  Your Honor, with regard to the

21   questions the government raised about Mr. Herndon's

22   truthfulness to pretrial, I would suggest to the Court

23   that I think they're making a huge leap going from

24   Mr. Herndon saying I'm not participating any longer in

25   January and going to one event in June.  And, again,

1 I'm going to talk about the agent's testimony that
2 Mr. Herndon was not present at events and was not
3 participating, but he did go on a trip in June.  And to
4 make the leap from him being a participating member
5 who's not truthful to -- with pretrial services to --
6 based on that information, I suggest to the Court is a
7 leap that just can't be made, Your Honor.

8      THE COURT:  Thank you, Ms. Hodges.

9      With respect to both defendants, specifically --
10 or generally now, and then I'll go to each one
11 specifically, there is no question from the evidence
12 that I've heard that the Outlaws is a well-established
13 organization.  That there are acts of violence
14 committed by the members.  They have a reputation for
15 violence.  And that those who are members, are aware of
16 the violent representation and often show up at events
17 where there is violence planned.  Whether or not they
18 participate is another issue.

19      Both the defendants in this case are longtime
20 members of the organization.  Both of them are
21 officers.  Mr. Rosga served as president, and
22 Mr. Herndon as the vice president for the copper
23 region.

24      The evidence has shown a number of incidences of
25 violence that Mr. Rosga was aware of.  There have been

1   a number of statements made through confidential

2   informants and undercover agents that Mr. Rosga

3   condoned or in some way directed violent activities.

4   Whether or not these collectively constitute an act of

5   racketeering will ultimately be an issue for the jury

6   to resolve.

7       Now turning to each individually.  Although there

8   are no specific acts here showing that Mr. Rosga

9   committed the violent acts with his own hands, I think

10  there is evidence clearly and convincingly that

11  Mr. Rosga either directed, condoned, instructed, or

12  fomented other people to commit acts of violence.

13      He is not a resident of Virginia.  And I believe

14  that based upon his participation in the organization

15  over a long-term basis, the direction that he gave,

16  position that he held, that the evidence shows clearly

17  and convincingly that he poses a continuing threat, and

18  he will be detained.  However, I'm going to have more

19  to say about that in a moment.

20      With respect to Mr. Herndon, I have to comment

21  that the evidence against him is thin with respect to

22  the facts of this case, but nonetheless, he is a

23  regional vice president.  He was present at one of the

24  events in which there were over 100 members of Outlaws

25  there.  Clearly, violence was contemplated.  The

1  massive number that attended is further evidence of

2  that.

3      He has a prior conviction for racketeering I

4  believe, as far as the representations are concerned,

5  and a prior felony conviction for I think possession

6  with the intent to distribute crystal methamphetamine.

7      He has a number of prior arrests in his background

8  which I'm discounting because he was not convicted.  He

9  has a number of other convictions for misdemeanors, all

10 of which are in the past.  But the collective picture

11 of Mr. Herndon is that he is someone that has a

12 long-term affiliation with a violent organization.  He

13 is an officer in that.  He's present at some of the

14 events in which there is violence.  But, again, there

15 are no violent acts he committed with his own hands.

16     I believe that collectively the evidence does show

17 clearly and convincingly that he posses a continuing

18 threat to the community, and he will also be detained.

19     I'm a bit disturbed from some of the evidence I've

20 heard in this case today.  It is a collection of

21 patchwork quilts of comments, remarks, and statements

22 by folks.  Whether or not collectively it's going to be

23 sufficient to get a conviction, that really at this

24 point is a decision that the Commonwealth -- excuse me,

25 the United States is going to have to make.  It could

1 very well show to a trier of fact a pattern of

2 racketeering activity.  On the other hand, it could

3 show an organization in where there are isolated acts

4 of violence unconnected with the organization.  That's

5 for the trier of fact in the case, and not necessary

6 for this Court to opine on it.  I just note from what

7 I've heard today shows varying degrees of culpability

8 with respect to this organization.

9      Also, because of that, I'm going to tell counsel

10 that in the course of your discovery in this case, and

11 other evidence that you come into contact with, if it

12 appears that anything I have based my decision on today

13 is incorrect, or there is other evidence to the

14 contrary, the door remains ajar for you to come back

15 and renew your motion.  But based on what I've heard

16 today, I find by clear and convincing evidence that

17 both Mr. Rosga and Mr. Herndon pose a continuing threat

18 to the community, and I so find.

19      Now, Ms. Hodges, you wanted to be heard on the

20 medical issue.  Let me just say that I've conferred

21 with the Supervisory Deputy Marshal, Mr. Nelson, and

22 Deputy Nelson and I talked about it this morning.  I've

23 asked the Marshal Service, and they're going to do it,

24 he's going to be transferred to the Northern Neck.

25 Northern Neck has a very well-qualified physician's

1  assistant there who can examine him and provide him

2  with better care then he's receiving in the other

3  facility.  And Marshal Nelson is right on top of that,

4  and he will take care of that.

5       MS. HODGES:  Your Honor, may I ask a question?

6       THE COURT:  Come on up.  Yes, ma'am.  Sure.

7       MS. HODGES:  Your Honor, with regard to Northern

8  Neck, the biggest issue with Piedmont is that they are

9  not handicap equipped at all to the extent that he has

10  to -- Mr. Herndon has to step up on a platform to take

11  a shower, and they have to provide him with a chair and

12  crutches, which they haven't been doing.  Is Northern

13  Neck, Your Honor, a facility that actually is handicap

14  equipped?

15       THE COURT:  I can't warrant to you that it is.  I

16  don't know.  But Marshal Nelson is aware of all these

17  issues.  He was on top of this before you even filed

18  this motion.

19       MS. HODGES:  Yes, sir.

20       THE COURT:  He takes great pride in how people

21  that are placed in his custody are treated.  And he has

22  promised me this morning that he'll look into this.  If

23  for some reason it's not resolved to your satisfaction,

24  let me know.

25       Now, I cannot order him to Butner for a number of

144

1   reasons.  Butner is an F.C.I. and an M.C.I.  It is a

2   medical correctional facility and it is a federal

3   correctional institute.  They cannot accept, and the

4   warden will not allow in the gate, a pretrial detainee

5   unless there is an order for a psychological

6   examination.

7        MS. HODGES:  I understand.  And, Your Honor, I

8   will tell the Court if I may, and I don't want to take

9   up any additional time, but my hope is that it won't

10  get to that, but I will tell you based on my motion --

11  and I've already proffered this to the government, part

12  of the issues are with regard to Mr. Herndon's

13  handicap, the other part are with regard to his

14  obsessive compulsive disorder.

15       And, Your Honor, I actually met with a nurse who

16  was the supervisor at Piedmont, the medical supervisor

17  at Piedmont, who indicates that in fact she met with

18  him and he has severe OCD.  And the problem with that

19  is his environment was causing him so much anxiety to

20  the extent in five hours of meeting with him, I was not

21  able to do a lot with his case because of his anxiety

22  over dealing with the germs.

23       THE COURT:  Hopefully he'll find the Northern Neck

24  Regional Jail to be a more favorable climate.

25       MS. HODGES:  Okay.

145

1          THE COURT:  But if you have problems, I'd ask you

2   to first go to Supervisory Deputy Marshal Nelson and

3   discuss them with him.  And I think you will find him

4   very accommodating and very approachable.  If for some

5   reason you can't resolve it, you need to bring it to my

6   attention.  But I think if you go see Mr. Nelson,

7   you'll find that he'll do what he can to help you.

8          MS. HODGES:  Yes, sir, Your Honor.  Thank you very

9   much.

10         THE COURT:  Anything further today?

11         MR. FITZPATRICK:  No, sir.

12         MS. CARDWELL:  No, Your Honor.

13         MS. HODGES:  Not with regard to Mr. Herndon, Your

14  Honor.

15         THE COURT:  All right.  Thank you very much.  Very

16  well presented on both sides.

17         And this Court will stand in recess.

18          (The proceeding concluded at 1:15 p.m.)
                    REPORTER'S CERTIFICATE
19          I, Krista M. Liscio, OCR, RMR, Notary
    Public in and for the Commonwealth of Virginia at
20  large, and whose commission expires March 31, 2012,
    Notary Registration Number 149462, do hereby certify
21  that the pages contained herein accurately reflect
    the notes taken by me, to the best of my ability, in
22  the above-styled action.
            Given under my hand this 13th day of August, 2010.
23

24              _____
                    Krista M. Liscio, RMR
                    Official Court Reporter
25