IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division

FILED
IN OPEN COURT

SEP : 5 2010

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 3:10CR170 |
| | ) | |
| v. | ) | |
| | ) | |
| 1. JACK ROSGA, | ) | Count 1: |
| a/k/a "Milwaukee Jack," | ) | 18 U.S.C. § 1962(d) |
| (Counts 1 and 2), | ) | Conspiracy to Violate R.I.C.O. |
| | ) | |
| 2. THOMAS BENVIE, | ) | Count 2: |
| a/k/a "Taz" | ) | 18 U.S.C. § 1959(a)(6) |
| (Counts 1 and 2) | ) | Conspiracy to Commit Violence |
| | ) | In Aid of Racketeering |
| 3. WILLIAM DAVEY | ) | |
| a/k/a "Rebel" | ) | Count 3: |
| (Counts 1-4) | ) | 18 U.S.C. §§ 1959 and 2 |
| | ) | Violence in Aid of Racketeering |
| 4. MARK JASON FIEL | ) | |
| a/k/a "Jason" | ) | Count 4: |
| (Counts 1,2 and 5) | ) | 18 U.S.C. §§ 924(c) and 2 |
| | ) | Possession of Firearms in Furtherance |
| 5. MARK STEVEN FIEL | ) | of Crime of Violence |
| a/k/a "Snuff," | ) | |
| (Counts 1, 2 and 6), | ) | Count 5: |
| | ) | 18 U.S.C. § 245(b)(2)(F) |
| 6. HAROLD HERNDON, | ) | Civil Rights Violation |
| a/k/a "Lil' Dave" | ) | |
| (Counts 1 and 2), | ) | Count 6: |
| | ) | 18 U.S.C. § 1512(b)(3) |
| 7. HARRY RHYNE MCCALL | ) | Witness Tampering |
| (Counts 1-4) | ) | |
| | ) | Count 7: |
| 8. THOMAS PETRINI | ) | 18 U.S.C. § 922(g)(1) and (3) |
| a/k/a "Jo Jo" | ) | Possession of Firearm by Felon and |
| (Counts 1 and 2) | ) | Unlawful User of Controlled Substances |
| | ) | |
| 9. MARK SPRADLING | ) | |
| a/k/a "Lytnin'," | ) | |
| (Counts 1 and 2) | ) | |

10. CHRISTOPHER TIMBERS )
    a/k/a "Alibi" )
    (Counts 1-5 and 7), )
    )
11. JAMIE TOWNSEND )
    a/k/a "Vern" )
    (Counts 1 and 2) )
    )
12. LESLIE WERTH )
    a/k/a "Les" )
    (Counts 1-4) )
    )
13. WILLIAM POWELL )
    a/k/a "Torch" )
    (Count 3) )
    )
14. DENNIS HALDERMANN, )
    a/k/a "Chew Chew" )
    (Count 3) )
    )
    )
        *Defendants.* )
_____ )

## SUPERSEDING INDICTMENT

SEPTEMBER 2010 TERM — at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

## COUNT ONE
(Racketeering Conspiracy)

### The Outlaws Enterprise

At all times relevant to this Superseding Indictment:

1.      The defendants JACK ROSGA, a/k/a "Milwaukee Jack," THOMAS BENVIE,

a/k/a "Taz," WILLIAM DAVEY, a/k/a "Rebel," MARK JASON FIEL, a/k/a "Jason," MARK

STEVEN FIEL, a/k/a "Snuff," HAROLD HERNDON, a/k/a "Lil' Dave," HARRY RHYNE

MCCALL, THOMAS PETRINI, a/k/a "Jo Jo," MARK SPRADLING, a/k/a "Lytnin,"

CHRISTOPHER TIMBERS, a/k/a "Alibi," JAMIE TOWNSEND, a/k/a "Vern," and LESLIE

WERTH, a/k/a "Les," and others known and unknown to the Grand Jury, including but not

limited to Joseph Allman, John Banthem a/k/a "Bull," Chris Gagner, Mark Lester a/k/a "Ivan,"

Brett Longendyke, David Lowry a/k/a "Little David," Michael Mariaca a/k/a "M&M," Thomas

Mayne a/k/a "Tomcat," Michael Pedini a/k/a "Madman," and Michael Smith, were members and

associates of the American Outlaw Association, better known as, and hereinafter referred to as,

the "Outlaws." The Outlaws was a criminal organization whose members and associates

engaged in criminal acts, involving murder, attempted murders, robberies, assaults, extortion,

arson, witness intimidation, narcotics violations, illegal gambling, and weapons violations, and

which operated in the Eastern District of Virginia and elsewhere.

2.      The "Outlaws," including its leadership, members and associates, constituted

an "Enterprise" as defined by Title 18, United States Code, Section 1961(4) (hereinafter "the

Enterprise"), that is, a group of individuals associated in fact. At all times relevant and as

described in greater detail below, the Outlaws officers, members, prospects and/or probate

members, and associates participated in the operation and management of the Outlaws' affairs. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the Enterprise. This Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

    3.    **Outlaws Structure and Hierarchy** - The Outlaws is a highly organized criminal enterprise with a defined, multi-level chain of command.

        a.    Within the United States, the Outlaws is composed of individual chapters located throughout the country. All members of the Outlaws belong to a specific chapter, and answer to the officers of that chapter. Each chapter has a president, vice-president, treasurer and enforcer, as well as general members.

        b.    The various chapters are grouped into color-coded regions headed by a regional "boss" and several additional regional officers. The regions, and each chapter thereof, ultimately fall under the authority of the national president. Since on or about November 4, 2006, JACK ROSGA, a/k/a "Milwaukee Jack," served as the Outlaws National President.

        c.    The national president is elected by all members of the Outlaws and wields considerable influence in the ongoing operations of the organization.

        d.    Each region is headed by an executive body whose members are elected from the members within that region. Those regional "bosses," in turn, answer to the Outlaws National President, JACK ROSGA, a/k/a "Milwaukee Jack." These regional groups hold regular meetings, usually in a secure location to avoid law enforcement infiltration. An officer of each chapter within the region is required to be in attendance as the chapter representative. It is the policy of the Outlaws organization that only the Chapter presidents are advised when these

-4-

meetings are scheduled, and they are prohibited from informing anyone about these regional meetings.

        e.    The Copper Region covers North Carolina, South Carolina, and Virginia, and is comprised of seven (7) chapters. Within the Copper Region, Chapter meetings are held regularly and are referred to as "church." Only full, patched, members are allowed to attend "church."

    4.    **Outlaws Membership Requirements and Procedures -** Outlaws Members must be male, over the age of twenty-one, and are required to own an American-made motorcycle. Probationary or prospective members (hereinafter referred to as probationary members) are brought into chapters through a lengthy, phased process designed to measure a potential member's commitment to the Outlaws and to guard against law enforcement infiltration. After associating with the Outlaws for a period of time, an individual may be identified as an "Official Hangaround" and may do menial tasks and other duties to gain the respect of the members. Generally, after a period of several months or as long as one year, an Official Hangaround may be sponsored by an Outlaws member and may become a probationary member for that chapter. While probating, a probationary member must follow the orders of full-patched members and run various errands. This can include participation in legal and illegal activities. After a minimum of six months, if the probationary member receives the unanimous vote of all chapter members, he is allowed to become a full member of the Outlaws.

    5.    **Charged Defendants' and Co-Conspirators Positions Within the Enterprise -** Leading up to and including June 15, 2010, the defendants and co-conspirators in Count One maintained the following roles within the Outlaws Enterprise:

a.      JACK ROSGA, a/k/a "Milwaukee Jack," serves as the National Boss of the Outlaws organization and is also a member of the Gold Region, Milwaukee, Wisconsin Chapter.

b.      Joseph Allman is an Outlaws member in the Red Region and held a position in the Maine Chapter, previously serving as President and Enforcer.

c.      John Banthem, a/k/a "Bull," is an Outlaws member in Montana and is the president of a new prospective chapter in Montana.

d.      THOMAS BENVIE, a/k/a "Taz" is an Outlaws member in the Red region and currently serves as President of the Maine Chapter.

e.      WILLIAM DAVEY, a/k/a "Rebel," was an Outlaws member in the Copper Region until 2010 in the Asheville, North Carolina Chapter, and he was formerly the Chapter Enforcer in Asheville, North Carolina.

f.      MARK JASON FIEL, a.k.a "Jason," is a former Outlaws member in the Copper Region (formerly Region Vice president) and a former leader in the Manassas/Shenandoah Valley Chapter.

g.      MARK STEVEN FIEL, a/k/a "Snuff," is an Outlaws member in the Copper Region and serves as President of the Manassas/Shenandoah Valley Chapter.

h.      Chris Gagner is an Outlaws member in the Copper Region and serves as the President and Treasurer of the Asheville, North Carolina Chapter.

i.      HAROLD HERNDON, a/k/a "Lil' Dave," is an Outlaws member and is currently the Copper Region Vice-President and a member of the Lexington, North Carolina Chapter.

j.     Mark Lester, a/k/a "Ivan," is an Outlaws member in the Knoxville, Tennessee Chapter and served as the Boss of the Grey Region until early 2010.

k.     Brett Longendyke is an Outlaws member in the Copper Region and serves as the Manassas/Shenandoah Valley Chapter Enforcer.

l.     David Lowry, a/k/a "Little David," is an Outlaws member in the Charlotte, North Carolina Chapter and was the Copper Region Boss.

m.     Michael Mariaca, a/k/a "M & M," is an Outlaws member and serves as the President of the Rock Hill, South Carolina Chapter and Copper Region Enforcer.

n.     Thomas Mayne, a/k/a "Tomcat," was an Outlaws member in the Red Region and served as the Regional Treasurer. Mayne formerly served as the Red Region Enforcer.

o.     HARRY RHYNE MCCALL is an Outlaws member in the Copper Region, Lexington, North Carolina Chapter.

p.     Michael Pedini, a/k/a "Madman," is an Outlaws member in the Red Region and a former Enforcer in the Northern Maine Chapter.

q.     THOMAS PETRINI, a/k/a "Jo Jo," is a former Outlaws member in the Copper Region, Manassas/Shenandoah Valley Chapter.

r.     Michael Smith is an Outlaws member in the Copper Region and serves as the President of the Hickory, North Carolina Chapter.

s.     MARK SPRADLING, a/k/a "Lytnin," is an Outlaws member in the Hickory, North Carolina Chapter and serves as Treasurer of the Copper Region.

-7-

-8-

t.     CHRISTOPHER TIMBERS, a/k/a "Alibi," is an Outlaws member in the

Manassas/Shenandoah Valley Chapter of the Copper Region.

u.     JAMIE TOWNSEND, a/k/a "Vern," is an Outlaws member and President

of the Lexington, North Carolina Chapter.

v.     LESLIE WERTH, a/k/a "Les," is an Outlaws member and currently is the

Enforcer and Treasurer of the Rock Hill, South Carolina Chapter. WERTH served as the Copper

Region Boss until October 17, 2009.

6.     **Representation of Outlaws Membership** - Members, probationary members,

official hangarounds, and others affiliated with the Outlaws enterprise represent their

membership to each other, rival gangs, and the community through a variety of methods. These

methods include:

a.     *Outlaws Members* – Members mainly represent their membership through

distinctive markings on a leather or denim vest. The vestments or "colors" of full club

membership include the leather or denim vest with a back patch consisting of the club emblem

(skull with crossed pistons), surrounded by a top "rocker" with the word Outlaws and a bottom

"rocker" identifying the city or state where the chapter is claiming territory (e.g. "Virginia"). The

vests also display other symbols such as "MC" (motorcycle club), "A.O.A." ("American Outlaws

Association), and a "One Percenter" diamond. This "1%er" designation was in response to a

proclamation issued in the 1940's by the American Motorcycle Association that ninety-nine

percent of persons in motorcycle clubs were law-abiding citizens. The "One Percent" patch

signifies that the Outlaws member is in the other one percent, that is, not a law-abiding citizen. It

is a badge of honor for the Outlaws member. Outlaws members also display other patches and

tattoos on their person, and engravings on their motorcycles, related to membership in the Enterprise, including:

(1)     The "Snitches Are A Dying Breed" patch signifies the Outlaws' commitment to identify, expel, and, if necessary, murder individuals associated with the motorcycle club who cooperate with law enforcement;

(2)     The AHAMD tattoo or engraving signifies "All Hell's Angels Must Die";

(3)     The "ADIOS" tattoo or engraving signifies "Angels Die In Outlaw States," in reference to the Hell's Angels MC;

(4)     The "GFOD" patch signifies "God Forgives, Outlaws Don't," which references an event where several Outlaws members were murdered in Charlotte, North Carolina. The patch now references a revenge philosophy of the Outlaws Enterprise; and,

(5)     The "North By God Carolina" engraving that includes the "By God" saying referencing "Bring Your Gun Or Die."

b.     ***Outlaws Probationary Members and Official Hangarounds*** – Outlaws probationary members and official hangarounds wear vests displaying patches identifying their status and affiliation with the Outlaws Enterprise.

c.     ***Females Associated with Outlaws*** – Females, though excluded from membership, may wear vests with patches reading "Property of Outlaws." Females associated with members, pledges or associates are referred to as "Old Ladies."

7.     **Funding the Outlaws' Operation Through Dues, Taxes, and Gambling Devices** - A key component to the regional and national operation of the Outlaws is the payment

-10-

of dues and taxes by members. Dues are paid in monthly installments at a rate set by individual chapters, generally $100 per member. A portion of these dues are then forwarded by a designated treasurer to a regional level treasurer, who then forwards a portion of the dues to the national leadership. Taxes are assessed on individual members at various times, with the proceeds also being funneled up the Outlaws chain to the national leadership. The dues and taxes payment system is a significant part of funding the continued operation of the Enterprise and is used for a variety of purposes, including the payment of expenses to the regional and national bosses, covering funeral expenses of members, contributing to a legal defense fund for members, and paying costs associated with planned trips or "runs." Another component to funding the continued operation of the Outlaws Chapters is proceeds generated through illegal gambling activities. Various Chapters within the Copper Region and elsewhere use gambling devices that are transported across state lines to Chapters as a means of securing additional revenue for the Outlaws Enterprise.

8.      **Maintaining the Outlaws' Control Over Specific Areas -** At all times relevant to this superseding indictment, the Outlaws organization was focused on achieving and maintaining control of the specific Region and Chapter areas occupied by the Enterprise. This control was achieved by asserting control over a particular area by directing the members, probationary members, and official hangarounds to engage in acts of violence against other competing motorcycle gangs, including the Hells Angels Motorcycle Club (HAMC), Desperados Motorcycle Club (Desperados M/C), Renegades M/C, and the Diablos M/C. The directives for specific acts of violence often originate from the national leadership and the directives are communicated to the Regional and Chapter level. Aside from acts of violence, members,

probationary members, and official hangarounds were encouraged to maintain recruitment efforts aimed at strengthening the individual Chapters and furthering the Outlaws' goal of achieving superiority as an organization in specific areas and, in turn, to infuse more funds into the coffers used to fund the operation of the Outlaws enterprise. In pursuing this organizational goal, members, probationary members, and official hangarounds of the Outlaws Enterprise engaged in criminal acts, involving murder, attempted murder, assault, robbery, extortion, arson, and witness intimidation, such acts aimed at expanding their areas of control or "turf," and enhancing the status of the Outlaws enterprise in the community.

9.      **Outlaws' Rules of Conduct and Punishment** - Members, probationary members, and official hangarounds associated with the Outlaws are expected to abide by rules and codes of conduct, both written and unwritten. Accordingly, discipline of members is a central feature of the Enterprise. The Outlaws punish its members for acting contrary to the rules or codes of the Enterprise, including discipline for missing meetings, not paying dues in a timely manner, being disrespectful to other "Patched" members, failure to attend organized trips (referred to as "runs"), and other violations. The punishment ranges from monetary fines, being returned to probate status, "beat downs" (assaults), and, ultimately, loss of a member's "patch" and being kicked out of the club. For egregious violations, a member or probationary member can be declared "out in bad standing" and subjected to a beating which is intended to cause serious physical injury or death. A member who is declared "out in bad standing" also will have any club-related tattoo covered by a method known as being "blacked out."

10.      **Outlaws' "Calls for Assistance"** - One of the more serious offenses that would result in severe punishment is a member's failure to respond to a "call for assistance." When a

member, probationary member, or official hangaround receives a "call for assistance," that member is expected to respond regardless of the nature of the request, which could include intimidation, assault, and even murder on behalf of or at the direction of the Enterprise. Outlaws members, probates, and official hangarounds are required to respond to "calls for assistance" in order to maintain or increase their position in the Outlaws Enterprise.

11.     **Monitoring and Rewarding Outlaws Members' Unlawful Acts** - The Outlaws Enterprise monitors, advertises, and rewards members, probationary members, and official hangarounds' responses to "calls for assistance," acts in threatening others, and other violent acts performed on behalf of the gang. This process revolves around enhancing or reducing specific member's status within the Enterprise in the following general fashion:

a.      Violent actions by members, probationary members, and official hangarounds are discussed between members at Chapter and Regional meetings to determine whether those individuals should receive recognition and appreciation for their violent acts in support of another member of the Outlaws Enterprise. In the event of a dispute about whether an Outlaws' member should receive such an award or recognition, the matter will be reviewed by the Outlaws national hierarchy.

b.      When it is determined that members, probationary members, or official hangarounds responded to "calls for assistance" and/or engaged in violent acts in support of the organization, those individuals receive recognition and enhance their position within the Outlaws enterprise. Such recognition includes receiving additional patches with "SS", and other patches and pins as designated by OMG leadership, which signifies having done violent acts on behalf of the "Outlaws."

-12-

c.      When members, probationary members, or official hangarounds fail to respond to "calls for assistance" or to engage in violent acts on behalf of the Outlaws Enterprise, those individuals are often punished by the Outlaws enterprise.  The punishment includes a member's return to probate status, the loss of a "One Percenter" patch, or an assault by other Outlaws members.

12.      **Coordinating Outlaws' Responses to Rival Gangs, Law Enforcement, and Others** - The members, probationary members, and official hangarounds also coordinate their responses to actions by rival motorcycle gangs, law enforcement, or others that may affect the operation of the Outlaws Enterprise.  The Outlaws Chapter and Regional meetings serve as a forum to discuss possible responses with the goal of furthering the Outlaws Enterprise and supporting the standing of its members.   These coordinated responses and support include: (i) retaliating against rival motorcycle gangs; (ii) refusing to cooperate with law enforcement in the investigation of violent acts by members, probationary members, and official hangarounds; (iii) developing and organizing agreed stories, alibis, or statements concerning violent acts by members, probationary members, and official hangarounds; (iv) intimidating witnesses of violent acts by members, probates, and official hangarounds; and (v) collecting fees from members to pay for legal representation of members, probationary members, and official hangarounds investigated or charged with a violent act.

13.      **Using Firearms to Protect the Security of the Enterprise** - Firearms and other dangerous weapons are regularly used by members, probationary members, and official hangarounds to further and protect the interests of the Outlaws Enterprise, and used and possessed in connection with the Outlaws' assaults and attacks on rival gang members and

-13-

others.  Outlaws events or functions are routinely guarded by armed members.  To facilitate the possession of and access to the firearms, members communicate among themselves concerning the acquisition, transfer, and maintenance of firearms for the Outlaws enterprise.  The members also routinely transfer and possess firearms without regard to the lawfulness of a specific member's possession of the firearms.  Further, many of the Outlaws Chapters established procedures to allow prohibited persons full access to firearms at many of the clubhouses, while still allowing those prohibited persons to deny any unlawful possession of the firearms in the event of law enforcement detection.

14.    **Distributing, Concealing, and Using Controlled Substances in Connection With the Enterprise –** Illegal drugs are regularly distributed among Outlaws either for personal consumption or for distribution to others.  Members periodically refer to illegal drugs as "party favors" and Outlaws events or functions are routinely supplied with illegal drugs by members.  Membership in the Outlaws enterprise facilitates the distribution of illegal drugs by providing known sources for drugs and safe locations for distributing, storing, and using drugs.  The members communicate when new drug distribution opportunities arise.  They also offer other members "at cost" prices for illegal drugs, including cocaine, pills, marijuana and other illegal substances.

15.    **Coordinating With Ally Motorcycle Clubs -** At various times and to further the goals of the Outlaws Enterprise, members formed an alliance with other "1%er" motorcycle clubs and/or their associates to fight a common enemy, such as the HAMC.  The Pagans MC, the Untamed MC, the Devils Grip MC, and others are all included within these alliances.

-14-

## Purposes and Objectives of the Outlaws Enterprise

16.     The purposes of the Outlaws Enterprise included the following:

a.      Enriching, preserving, expanding, and protecting the power, territory, and prestige of the Outlaws Enterprise through the use of intimidation, violence, and threats of violence involving murder, attempted murder, assault, robbery, arson, narcotics distribution and weapons violations.

b.      Funding the operation of the Outlaws Enterprise through the collection of dues from members and probationary members, and by employing other funding methods, including gambling, and the imposing of "taxes."

c.      Keeping intended rivals and victims in fear of the Outlaws Enterprise and in fear of its members and associates through the use of intimidation, violence, and threats of violence.

d.      Encouraging and facilitating an atmosphere of violence within the Outlaws Enterprise by giving status to those members who commit violent acts for the Enterprise.

e.      Hampering law enforcement's ability to respond to, prevent, and effectively investigate the Outlaws Enterprise's unlawful conduct through obstruction of justice, fabricating alibis and stories, and intimidating witnesses.

f.      Maintaining the security of the Outlaws Enterprise and avoiding law enforcement scrutiny by engaging in illegal drug trafficking among the members of the Outlaws Enterprise.

## Means and Methods of the Outlaws Enterprise

17.     As part of the ongoing affairs of the Outlaws Enterprise the defendants and their associates, in conducting, participating, and achieving the purposes of the Enterprise and racketeering conspiracy, would:

a.     Fund the operation of the Outlaws Enterprise through the collection of dues from members and probationary members and a variety of other methods, including the imposition of "taxes," gambling, and others.

b.     Expand the Outlaws Enterprise through the recruitment of potential members for the Outlaws and engage in a vetting process designed to identify potential members who would enhance the strength and illegal activities of the enterprise while ferreting out infiltration by law enforcement or other undercover operatives.

c.     Use intimidation, violence, and threats of violence against suspected members of rival gangs and others to preserve, enhance, and protect the Enterprise's territory and activities in the community.

d.     Encourage violent and unlawful acts by members of the Enterprise by disseminating orders of violence through the Outlaws hierarchy, communicating with one another about unlawful acts, rewarding members for unlawful acts that further the Enterprise and its members, and punishing members who fail to engage in such acts when given the opportunity.

e.     Use  intimidation, violence and threats of violence against potential witnesses to thwart law enforcement efforts to successfully prosecute members of the Outlaws Enterprise for their criminal activities.

    f.  Coordinate responses, stories, and statements concerning violent acts by

members in an effort to hamper law enforcement investigations and collect fees from members to

pay for legal representation of members being investigated or charged with violent acts.

    g.  Maintain the security of the Enterprise and avoid law enforcement scrutiny

by engaging in illegal drug trafficking among the members of the Enterprise.

<strong><u>The Outlaws Racketeering Conspiracy</u></strong>

  18.  Beginning in or about 2005, the exact date being unknown to the Grand Jury, and

continuing thereafter up to and including June 15, 2010, in Richmond, Virginia, in the Eastern

District of Virginia, and elsewhere within the jurisdiction of the Court, the defendants JACK

ROSGA, a/k/a "Milwaukee Jack," THOMAS BENVIE, a/k/a "Taz," WILLIAM DAVEY, a/k/a

"Rebel," MARK JASON FIEL, a/k/a "Jason," MARK STEVEN FIEL, a/k/a "Snuff," HAROLD

HERNDON, a/k/a "Lil' Dave," HARRY RHYNE MCCALL, THOMAS PETRINI, a/k/a "Jo Jo,"

MARK SPRADLING, a/k/a "Lytnin," CHRISTOPHER TIMBERS, a/k/a "Alibi," JAMIE

TOWNSEND, a/k/a "Vern," and LESLIE WERTH, a/k/a "Les," being persons employed by and

associated with the Enterprise known as the "Outlaws," as described in Paragraphs 1 through 17,

which was an Enterprise engaged in, and the activities of which affected, interstate and foreign

commerce, did unlawfully, knowingly and intentionally combine, conspire, confederate and agree

with each other and with other persons, known and unknown to the Grand Jury, including but not

limited to Joseph Allman, John Banthem a/k/a "Bull," Chris Gagner, Mark Lester a/k/a "Ivan,"

Brett Longendyke, David Lowry a/k/a "Little David," Michael Mariaca a/k/a "M&M," Thomas

Mayne a/k/a "Tomcat," Michael Pedini a/k/a "Madman," and Michael Smith, to violate Title 18,

United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in

-17-

the conduct of the affairs of that Enterprise through a pattern of racketeering activity, consisting

of multiple acts indictable under the following provisions of federal law:

A.    Title 18, United States Code, Section 1512(b)(3) (Witness Tampering);

B.    Title 18, United States Code, Section 1952(a) (Interstate Travel in Aid of Racketeering Enterprise);

C.    Title 18, United States Code, Section 1955 (Illegal Gambling Business);

D.    Title 18, United States Code, Section 1951(a) (Hobbs Act Extortion);

and multiple acts involving violations of the following provisions of state law:

A.    Murder in violation of:

Va. Code Ann. §§ 18.2-18; 18.2- 22; 18.2-26; 18.2-32;

17-A Maine Rev. Stat. Ann. §§ 151; 201;

N.C. Gen. Stat. § 14-2.4; 14-17.

B.    Arson in violation of:

Va. Code §§ 18.2-80; 18.2-22

N.C. Gen. Stat. §§ 14-62; 14-2.4

S.C. Code §§ 16-11-110; 16-17-410

C.    Kidnapping in violation of Tenn. Code Ann. § 39-13-303.

D.    Robbery in violation of:

Va. Code §§ 18.2-58; 18.2-22;

N.C. Gen. Stat. §§ 14-87.1.; 14-2.4;

S.C. Code §§ 16-11-325; 16-17-410

Conn. Code § 53a-133, 53a-48;

-18-

17-A Maine Rev. Stat. Ann. § 651;

Minn. Stat. § 609.24

E.      Extortion in violation of Va. Code §§ 18.2-59; 18.2-22;

and multiple acts involving the receiving, concealing, buying, selling, and otherwise dealing in controlled substances in violation of Title 21, United States Code, Sections 841(a)(1), 846, and 856(a)(2).

19.     It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

### Overt Acts

In furtherance of the racketeering conspiracy and to effect the purposes of the Enterprise, the following overt acts, among others not listed herein, were committed by the defendants and other conspirators in the Eastern District of Virginia and elsewhere:

**June 2005:** **Attempted Murder of Diablos MC Member in Maine and Stealing the Victim's Vest While He Was Unconscious.**

20.     On or about June 22, 2005, Joseph Allman and other Outlaws members struck Diablos MC (a HAMC support club) member H.T. with their vehicle as the victim was riding his motorcycle in Standish, Maine near his home in Ossipee, New Hampshire.  As a result of the attack, H.T. wrecked his motorcycle and was rendered unconscious.  Allman and another Outlaws member removed H.T.'s Diablos MC vest and left the victim on the side of the road.

21.     On or about October 5, 2009, and on or about October 9, 2009, while at the Petersburg Outlaws clubhouse, Allman described an attack that he and other Outlaws members had executed in 2005, where they struck a Diablos MC member with their vehicle, causing him

-19-

to wreck his motorcycle and suffer serious injury. As a result, Allman acquired a Diablos MC patch.

**March 2006 - September 2008: Efforts by the Outlaws Enterprise to Obtain a Foothold in Virginia by Threatening and Planning Acts of Violence Against Rival Motorcycle Gangs.**

22.     In or about March 2006, defendants MARK STEVEN FIEL, a/k/a "Snuff," David Lowry, a/k/a "Little David," and Mark Lester, a/k/a "Ivan," organized an Outlaws Chapter in Manassas, Virginia under the supervision of Lester, who was in charge of the Gray Region which sought to establish a presence in the Commonwealth of Virginia at that time. Before this effort, the Outlaws did not have a chapter in the Commonwealth of Virginia. This effort originated with an agreement reached in the Spring of 2006 with the Pagans MC to allow the Outlaws to establish Chapters in Virginia.

23.     At some point prior to March 18, 2006, the exact date being unknown, Outlaws Gray Region Boss Lester, MARK STEVEN FIEL, a/k/a "Snuff," Michael Mariaca, a/k/a "M & M," LESLIE WERTH, a/k/a "Les," various members of the Pagans MC national leadership, and others developed and agreed to participate in a plan to expand the Outlaws enterprise into the Commonwealth of Virginia. The plan involved a joint venture with the Pagans MC to enter the "Cycle Expo" taking place in Richmond, Virginia. The purpose of this venture was to make a show of force by the Outlaws members, to engage and force rival HAMC members out of the area, and to facilitate the expansion of the Outlaws Enterprise.

24.     On or about March 18, 2006, Lester, Mariaca, WERTH, and others traveled to the Cycle Expo in Richmond, Virginia. Other Outlaws members had already infiltrated the Cycle Expo and were awaiting arrival of Lester and the others to begin the violent engagement of the

HAMC. Minutes before their arrival at the Cycle Expo, several law enforcement officers identified the threat and refused to allow the identified hoard of Outlaws and Pagans entry into the event. Escorted by police officers, Lester was allowed to enter the Cycle Expo and escort the implanted gang members away from the event.

25.     In or about April 2007, members of the Outlaws threatened members of the Virginia Raiders, an HAMC support club, and ordered these rival gang members to remove their patches and discontinue their support of the HAMC. In response to these threats, the Virginia Raiders MC disbanded.

26.     In or about June 2007, following the shooting death of Outlaws member F.V. by a Renegades MC member (associated with the HAMC) at the Crazy Horse Strip Club in Forest Park, Georgia, Outlaws National Boss JACK ROSGA, a/k/a "Milwaukee Jack," gave the "green light" on Renegades MC, meaning that Outlaws members were allowed to assault and kill Renegade MC members. ROSGA further told Manassas Outlaw member MARK JASON FIEL, a/k/a "Jason," that now was a good time to "clean your own house," that is, to kill anyone that they thought might be cooperating with law enforcement, stating that it could be blamed on the Renegades MC.

27.     In or about July 2007, defendant MARK STEVEN FIEL, a/k/a "Snuff," ordered the Northern Virginia Chapter of the Black Pistons to hunt and remove the "Titans MC" patches. The Titans MC was affiliated with the HAMC and posed a threat to the Outlaws expansion into the Richmond, Virginia area.

28.     On or about September 21, 2007, defendants Brett Longendyke, MARK JASON FIEL, a.k.a "Jason,"and THOMAS PETRINI, a/k/a "Jo Jo," assaulted another Outlaws probationary member for disrespecting a "patched" Outlaw member.

29.     On or about December 11, 2007, defendant Brett Longendyke stated to other Outlaws members that he would kill anyone who he believed was "snitching" on the Outlaws. Longendyke went on to say that he would take a life sentence for committing that act.

30.     On or about September 20, 2008, defendant MARK STEVEN FIEL, a/k/a "Snuff," and a Pagans member requested undercover agents affiliated with the Mongols MC to assist in a show of force at the Dinwiddie race track to confront HAMC members and members of the newly-formed Merciless Souls MC, an HAMC support club in the Richmond, Virginia area.

31.     On or about September 20, 2008, in excess of 50 members from the Outlaws and Pagans Motorcycle Clubs confronted the HAMC and Merciless Souls MC members in Dinwiddie, Virginia. A standoff occurred, but no assault took place due to an overwhelming presence of law enforcement officers.

**November 2008 - May 2009: Outlaws Members' Assault of a Black Male in Fredericksburg, Virginia and Attempted Obstruction of Justice Actions Aimed at Hampering Law Enforcement Investigation of Assault.**

32.     On or about November 20, 2008, Manassas Outlaws members MARK JASON FIEL, a/k/a "Jason," and CHRISTOPHER TIMBERS, a/k/a "Alibi," assaulted a black male at a local bar called the "Hard Times Café" located in Fredericksburg, Virginia. MARK JASON FIEL, a/k/a "Jason," called the victim over to his table to request a light for his cigarette. When the victim complied, MARK JASON FIEL, a/k/a "Jason," struck him in the face with his fist. As the victim attempted to get up off the floor, TIMBERS struck the victim again in the face. The

-22-

victim suffered a broken nose and a fractured eye socket, requiring surgery. MARK JASON FIEL, a/k/a "Jason," explained the reason for the initial assault by stating words to the effect of "I wasn't going to get laid tonight, so I might as well hit a nigger."

33.     On or about November 20, 2008, MARK STEVEN FIEL, a/k/a "Snuff," intimidated witnesses of the assault to lie to law enforcement about the assault they had witnessed in Fredericksburg, Virginia.

34.     On or about December 14, 2008, at Bubba's in Richmond, Virginia, MARK STEVEN FIEL, a/k/a "Snuff," MARK JASON FIEL, a/k/a "Jason," and TIMBERS discussed the November 20, 2008 assault with undercover agents. During the conversation, MARK STEVEN FIEL, a/k/a "Snuff," asked the undercover agents to lie in court for TIMBERS by incorrectly stating that the black male had started the fight. MARK JASON FIEL, a/k/a "Jason," asked an undercover agent if he had "hit any niggers" lately?

35.     On or about January 17, 2009, at the Outlaws Lexington, North Carolina Clubhouse, MARK STEVEN FIEL, a/k/a "Snuff," directed undercover agents to testify falsely in court regarding the Fredericksburg assault, so TIMBERS could falsely claim self defense.

36.     On or about March 9, 2009, during a telephone conversation, TIMBERS asked an undercover agent to lie to his lawyer when he calls to talk to the undercover about being a witness to the assault.

**March 2009 - October 2009: Outlaws Members Involved in Assault of Desperados MC Members in Petersburg, Virginia in an Effort to Expand Outlaws' Territory and Drive Away a Competing Gang.**

37.     Leading up to and including March 14, 2009, WILLIAM DAVEY, a/k/a "Rebel," Michael Mariaca, a/k/a "M & M," HARRY MCCALL, Michael Smith, CHRISTOPHER

-23-

-24-

TIMBERS, a/k/a "Alibi," LESLIE WERTH, a/k/a "Les," and other Outlaws members from North Carolina and Virginia planned an assault on Desperados MC members to take place at the Cockades Bar in Petersburg, Virginia. As described below, the conspirators planned the assault beforehand and devised steps to be taken to lure HAMC members and associates (including members of the Desperados MC) into a violent confrontation:

a. Three "Outlaws" members were designated to enter the bar wearing their "colors." These members were chosen because they were smaller than the other members and were more likely to lure rival gang members into a fight.

b. At the same time, Outlaw members WERTH, Mariaca, and MCCALL would enter the bar "slick back," meaning that they would not be wearing their "colors." These members would be armed.

c. Another member, Smith, was chosen to stand in plain sight outside near the front of the bar wearing his colors, in an attempt to lure rival members into the bar.

d. Multiple Outlaws members, including TIMBERS and undercover agents, were chosen to be strategically placed outside of the Cockades Bar to help keep the rival gang members trapped inside the Bar once the plan was executed.

38.     On or about March 14, 2009, at the Cockades Bar in Petersburg, Virginia, numerous members of the Outlaw organization traveled within and across state lines to the area to seek out and assault any HAMC members or any support groups, including the Desperados MC. DAVEY, Mariaca, MCCALL, Smith, TIMBERS, WERTH, and other Outlaws members executed the plan as described above. The plan resulted in multiple Desperados MC members

being lured into the Cockades Bar where they were assaulted by Outlaws members and their associates.

39.     On or about March 14, 2009, the confrontation moved outside the Cockades Bar. As the rival members faced each other in the parking lot, WERTH and Mariaca, accompanied by other Outlaws members and assisted by Pagans MC members, drew their firearms and threatened members of the rival gang members, who were also armed. Before any more violence occurred, local police arrived at the scene and the standoff ended. Local law enforcement seized a knife and "brass knuckles" from DAVEY inside the bar.

**February 2009 - September 2009: Ongoing Efforts by the Outlaws to Expand the Organization By Encouraging, Planning, and Executing Acts of Violence and Threats Directed at HAMC and Other Rival Motorcycle Gangs.**

40.     On or about February 28, 2009, Outlaws Copper Region Boss LESLIE WERTH, a/k/a "Les," organized an effort to locate and assault HAMC members at local bars. Participants included Copper Region Treasurer MARK SPRADLING, a/k/a "Lytnin," probationary and undercover Outlaws members. WERTH directed the participants that when confronting the HAMC members to not just assault them, but to kill them.

41.     On or about March 1, 2009, Outlaws Copper Region Boss WERTH told an undercover Outlaws member that beatings and assaults on the HAMC members was not enough; rather, "they" were planning on killing the HAMC members.

42.     On or about March 6, 2009, while at Daytona Bike Week, Outlaws Copper Region Boss WERTH, Copper Region Enforcer Michael Mariaca, a/k/a "M & M," and others organized a group to locate and assault HAMC members that were located on Main Street.

43.     On or about April 5, 2009, while in Waterbury Connecticut on a mandatory "run"
to attend a funeral, undercover Outlaws members were ordered to join with other Outlaws
members to search for HAMC members at local bars in order to assault them.

44.     On or about May 9, 2009, Outlaws Copper Region Boss WERTH and Copper
Region Enforcer Martinez, assisted by other Outlaws members, planned and executed an assault
of a HAMC Prospect outside of a bar in Rock Hill, South Carolina, located near the Outlaws'
Clubhouse.  During the assault, WERTH was armed with a firearm, which was recovered by law
enforcement following his arrest.

45.     On or about May 16, 2009, MARK STEVEN FIEL, a/k/a "Snuff," directed
undercover Outlaws members to assault HAMC and Merciless Souls Motorcycle Club members.
FIEL specifically instructed the undercover Outlaws members to assault HAMC member S.B.
and to take his HAMC colors.

46.     On or about June 7, 2009, while at the Outlaws Clubhouse in Hickory, North
Carolina, a Copper Region Enforcer directed undercover Outlaws members to assault HAMC
members.

47.     On or about July 5, 2009, during a meeting at the Outlaws Clubhouse in
Petersburg, Virginia, Outlaws National Boss JACK ROSGA, a/k/a "Milwaukee Jack," instructed
undercover Outlaws members that, when dealing with HAMC members and their support clubs,
they should shoot them.  During the same discussion, ROSGA stated that he will go to jail one
day for ordering hostile actions against rival motorcycle clubs and/or something to be done on
behalf of the Outlaws.

48.     On or about July 25, 2009, at the Copper Region Bosses Meeting in Rock Hill,

South Carolina, Outlaws' Copper Region Treasurer SPRADLING distributed an outline detailing

how a motorcycle gang is to conduct business, maintain control over a state area, and handle

confrontations with rival motorcycle clubs and others.

49.     On or about August 8, 2009, during a meeting at the Outlaws Clubhouse in

Petersburg, Virginia, Copper Region Boss WERTH confronted the Copper Region Vice-

President about not assaulting HAMC members that he had come into contact with during a trip

to Petersburg, Virginia earlier that day. WERTH threatened to take that member's 1%-er

Diamond patch.

50.     On or about August 29, 2009, at the Copper Region Bosses Meeting in Charlotte,

North Carolina, Copper Region Boss WERTH stated that Outlaws are at "war" with HAMC and

the standing order is to assault them on sight. WERTH further directed that if an Outlaw does

not assault a HAMC member when he has the opportunity to do so, he will lose his "1%-er."

Diamond. WERTH further stated that he knows he will go to prison for committing assaults that

he is involved in as a member of the Outlaws.

51.     On or about September 17, 2009, Copper Region Outlaw David Lowry, a/k/a

"Little David," discussed with undercover Outlaws members how to deal with HAMC problem

in Richmond, Virginia. Lowry was, at this time, soliciting support for his upcoming election as

Copper Region President.

52.     On or about September 19, 2009, at the Copper Region Open Air Meeting in

Hickory, North Carolina, Copper Region Boss WERTH described his involvement in armed

home invasions on neighbors near the Outlaws Clubhouse in Hickory, North Carolina. WERTH

-27-

also discussed his involvement in the armed assault of a HAMC prospect in Rock Hill, South

Carolina. During the meeting, the Outlaws members also discussed the conflict with the HAMC

and WERTH indicated that there would be "no more free travel passes," meaning rival gangs

would no longer be allowed to travel through an Outlaw controlled area without being attacked.

**September 2009 - October 2009: HAMC Members' Assault of Two Outlaws from Florida, and Events Leading to Conspiracy and Attempt to Murder Rival HAMC Member in Maine.**

53.    On or about September 10, 2009, in New Haven, Connecticut, two Florida

Outlaws members were assaulted by HAMC Members at a gas station, resulting in the two

Outlaws members going to a hospital for treatment. The assaulted Outlaws members' patches

were taken by the HAMC members. A member of the Florida Outlaws Chapter was present and

coordinated with the local Outlaws Regional Boss, and others from the Red Region, to arrange

for an act of revenge against the HAMC for the assaults.

54.    On or about October 4, 2009, the exact date being unknown, ROSGA asked

Michael Pedini, a/k/a "Madman," to personally take revenge on the HAMC for the assault of the

two Florida Outlaws members. THOMAS BENVIE, a/k/a "Taz," told an undercover Outlaws

member that "Jack is all over Madman about this!"

55.    On or about October 5, 2009, at the Outlaws Clubhouse in Petersburg, Virginia,

Joseph Allman discussed prior assaults of HAMC and related HAMC support clubs. Allman

told an undercover Outlaws member that he is waiting on other members of the Outlaws to finish

"taking care of business" in Maine and then will meet up with him at the Outlaws Clubhouse in

Petersburg, Virginia.

56.     On or about October 8, 2009, Maine Outlaws member Thomas Mayne, a/k/a "Tomcat," and Pedini surveilled, confronted, and shot HAMC member G.W. outside of the HAMC Clubhouse in Canaan, Maine.  As a result, G.W. was hospitalized for treatment of numerous gunshot wounds and suffered serious injury.

57.     On or about October 9, 2009, Allman told an undercover Outlaws member about the shooting in Canaan, Maine.  Allman indicated that he is the former Outlaws Boss in Maine and had been involved in ordering the HAMC assault.

58.     On or about October 12, 2009, during telephone calls to an undercover Outlaws member in Petersburg, Virginia, Pedini stated that he may have to leave town in a hurry and is wondering if he could stay at the Petersburg Clubhouse.  Pedini further stated that he did not like all of the attention up in Maine and that he did not want to talk about the HAMC assault over the telephone.

59.     At some point prior to November 23, 2009, the exact date being unknown, Pedini and Mayne added new "SS" patches to their Outlaws patch, signifying their involvement in the Canaan, Maine shooting of the HAMC victim.

**October 2009: Continued Directives from Outlaws Leadership Regarding Assaults on Competing Gang Members.**

60.     On or about October 3, 2009, at the Copper Region Bosses Meeting, Copper Region Boss LESLIE WERTH, a/k/a "Les," stated that Outlaws National Boss ROSGA declared "war" on the HAMC.  WERTH further explained that this decision was decided by the "Big Table," comprised of all Outlaws Regional Bosses.  During the meeting, Outlaws members

-29-

discussed the beating of HAMC members, taking HAMC patches, and the burning or destroying of HAMC patches.

61.    On or about October 17, 2009, at the Outlaws Clubhouse in Petersburg, Virginia, MARK STEVEN FIEL, a/k/a "Snuff," instructed undercover Outlaws members to assault local HAMC members, but not to kill them.

62.    On or about October 31, 2009, during a conversation with an undercover Outlaws member, Copper Region Enforcer Michael Mariaca, a/k/a "M & M," discussed planning future assaults on the HAMC, including the use of firearms and explosives. Mariaca talked about the "war" with the HAMC being issued by Outlaws National Boss ROSGA. Mariaca stated that Copper Region Boss Lowry will support any assaults committed by Outlaws in the Copper Region and he will take away the "1%-er" patch from any Outlaw that does not assault a HAMC member when given the opportunity to do so. During the same conversation, Mariaca talked with a Colorado Outlaw member about how to assault the HAMC and the HAMC Clubhouse in the Rock Hill, South Carolina area.

63.    On or about November 14, 2009, at the Copper Region Bosses Meeting in Charlotte, North Carolina, Copper Region Boss Lowry stated that there will be no new clubs allowed in open areas where there are Outlaw Chapters unless they wear an Outlaw Support Patch. If a club is already in existence and refused to put on the Outlaws Support Patch, they would be shut down by the Outlaws.

64.    On or about November 21, 2009, while at the Asheville, North Carolina Toy Run, Asheville Outlaws Boss Chris Gagner told the President of the Southern Patriots Motorcycle

Club that if they continued to support the HAMC, the Outlaws will come to town and shut the club down.

65.     In or about November 2009, Outlaws Rock Hill Vice President WERTH, Mariaca, and other members approached and confronted HAMC members near a HAMC affiliated bar in Rock Hill, South Carolina.  During the confrontation, the Outlaws members were armed with dangerous weapons.  During a conversation with an undercover Outlaws member, WERTH described the confrontation.

66.     On or about December 10, 2009, Manassas Outlaw member MARK STEVEN FIEL, a/k/a "Snuff," described an assault he had just committed on an individual wearing an "81" support shirt.  "81" refers to the eighth and first letters of the alphabet, H and A.

67.     On or about December 13, 2009, Mariaca, Smith, WERTH, and a number of other Outlaws Copper Region members were involved in a dispute in Rock Hill, South Carolina with members of the local HAMC.  As a result, the Rock Hill, South Carolina Toy Run was shut down by law enforcement because of potential violence.  Following the confrontation, one of the Outlaws members was arrested in possession of "brass knuckles."

**November 2009 - March 2010: Outlaws Members Conspire to Expand Gambling Activities to the Undercover Outlaws Chapter Clubhouse in Petersburg, Virginia.**

68.     On or about November 20, 2009, at the Lexington, North Carolina Chapter clubhouse, Outlaws members discussed the use of illegal gambling machines inside their clubhouse, and that the proceeds are used to pay chapter dues and cover all clubhouse bills.

69.     On or about January 16, 2010, Outlaws Copper Region Vice President HAROLD HERNDON, a/k/a "Little Dave," told undercover Outlaws members that the Lexington Chapter

had made approximately $24,000 profit from the use of illegal gambling machines since April 2009. Outlaws Lexington Chapter Boss JAMES TOWNSEND, a/k/a "Vern," HERNDON, and other members agreed to facilitate the delivery of additional illegal gambling machines to the undercover clubhouse. They also discussed that the chapter must make a 60%-40% split of the gambling proceeds with the person who owns the machines.

70. On or about February 6, 2010, at the direction of HERNDON and TOWNSEND, two illegal gambling machines were transported from North Carolina to Virginia and delivered to the undercover Outlaws Clubhouse in Petersburg, Virginia. When the machines were delivered, Outlaws associate D.S. discussed with undercover Outlaws members how the machines operated and the 60%-40% split of the gambling proceeds.

71. On or about March 12, 2010, TOWNSEND called an undercover Outlaws member and asked the undercover to contact D.S. to arrange for the pickup of proceeds from the illegal gambling machines in Petersburg, Virginia.

72. On or about March 23, 2010, two individuals arrived at the undercover Outlaws Clubhouse in Petersburg, Virginia to collect profits from the illegal gambling machines. These individuals retrieved $580 in cash to return to D.S.

**December 23, 2009: Outlaws Member Mark Lester, a/k/a "Ivan," Kidnaps and Threatens an Undercover Knoxville, Tennessee Sheriff.**

73. On or about December 23, 2009, Mark Lester, a/k/a "Ivan," kidnapped and held an undercover Knoxville, Tennessee Sheriff against his will and accused him of working for law enforcement. Leading up to and at the time of the abduction, the sheriff was posing as an Outlaws member acting in an undercover capacity. Lester, who was armed at the time,

-32-

threatened to injure the victim and refused to allow him to leave the room where he was being held. Lester also took the victim's patched vest or "colors."

74.     On or about April 10, 2010, David Lowry, a/k/a "Little David," informed Outlaws members in the Copper Region that every Outlaws member would be "taxed" approximately $75 to contribute to the legal defense fund for Lester, who was charged with robbery and kidnapping in Knoxville, Tennessee.

**January 2010 - April 2010: Outlaws Stepping Up Efforts Against HAMC Members, Including Instructions From Outlaws Leadership to Conduct Surveillance and Attack HAMC Members.**

75.     On or about January 1, 2010, Michael Smith told undercover Outlaws members how to make an explosive device for use in attacking HAMC members. Copper Region Boss LESLIE WERTH, a/k/a "Les," and MARK STEVEN FIEL, a/k/a "Snuff," were present during this conversation.

76.     Leading up to and including January 23, 2010, Outlaws Copper Region Boss David Lowry, a/k/a "Little David," with the approval from National President ROSGA, made arrangements for the assembly of approximately 100 Outlaws members from different regions in the United States to travel to Charlotte, North Carolina in order to confront HAMC members, who Lowry believed would attend the Easyrider Bike Expo.

77.     On or about January 23, 2010, Outlaws members and others from Tennessee were stopped by law enforcement following their departure from the Charlotte, North Carolina Easy Rider Expo. These Outlaws members were found in possession of six firearms.

78.     On or about February 2, 2010, MARK SPRADLING, a/k/a "Lytnin," directed payment of $450 from the Copper Region's dues fund to post a bail bond for the Outlaws

member who was arrested for firearms charges following the EasyRider Bike Expo in Charlotte, North Carolina (referenced in the previous paragraph).

79.     On or about February 13, 2010, Copper Region Enforcer Michael Mariaca, a/k/a "M & M," discussed plans with the undercover Outlaws members to use an explosive device to destroy a tattoo shop owned by S.B., a HAMC member in Richmond, Virginia.  Mariaca told the undercover Outlaws members that if they executed the plan on behalf of the Outlaws, they would earn their "SS" bolts.

80.     On or about February 27, 2010, at the Copper Region Open Air Meeting, the Outlaws members and Leadership for the Copper Region met in Charlotte, North Carolina to discuss regional issues concerning the Copper Region, as well as matters the members wish to be brought to the attention of the Outlaws National Leadership during a subsequent national meeting.  All members of the Copper Region, except for one person, were present for this meeting.  Prior to and during this meeting:

a.     All members (including undercover agents) were subjected to a strip search conducted by Copper Region Enforcer Mariaca.  Lowry explained that this search was conducted because the Tennessee Outlaws Chapter had been infiltrated by an undercover officer for the past 2 years.

b.     Lowry and others discussed the HAMC's suspected murder of Outlaws member "Hojo" in Connecticut on February 9, 2010.

c.     Outlaws members discussed conducting surveillance on HAMC members and executing violent assaults on HAMC members.

-34-

    d.  Outlaws members discussed how to earn the "SS" patch for acts of extreme violence against rival clubs.

    e.  Lowry also discussed the need to destroy and/or burn houses around the Charlotte, North Carolina Clubhouse because they could serve as locations from which HAMC members could launch attacks against the Outlaws.

    f.  One of the Outlaws Enforcers for the Hickory, North Carolina Outlaws Chapter instructed those present to be careful about what was discussed in such an open forum about retaliating against HAMC because it would be considered conspiracy.

  81.  On or about February 27, 2010, MARK STEVEN FIEL, a/k/a "Snuff," told undercover Outlaws members that it was time to attack HAMC member S.B. FIEL described how to use a high powered rifle from the bed of a pickup truck to shoot S.B., while he smoked a cigarette on the porch of his tattoo shop in the Richmond, Virginia area.

  82.  On or about March 26, 2010, Smith told undercover Outlaws members how to make several different types of explosives for use in killing HAMC members in the Richmond, Virginia area.

  83.  On or about March 27, 2010, Copper Region Enforcer Mariaca discussed the plan to use explosives to attack HAMC member S.B. with an undercover Outlaws member. Mariaca agreed with the plan and told the undercover agent to wait and see if Mariaca could obtain "professional grade explosives." Mariaca also discussed an alibi plan with the undercover agent to use for the day of the bombing.

  84.  On or about April 10, 2010, Copper Region Enforcer Mariaca informed the undercover Outlaws member that he had made contacts to locate explosives for the planned

operation, as well as for his own use, but had not succeeded yet.  Mariaca informed the undercover agent that he would continue to work on the project.

85.    On or about April 10, 2010, at the Copper Region Bosses Meeting in Lexington, North Carolina, Copper Region Treasurer SPRADLING directed Outlaws members to conduct more surveillance on the HAMC in order to facilitate assaulting them.  All of the Copper Region Chapter Bosses were present and participated in the discussions.

86.    On or about April 10, 2010, at the Copper Region Bosses Meeting in Lexington, North Carolina, Gagner, in response to SPRADLING'S statements, produced a map which highlighted the locations of the HAMC's clubhouses and homes.

87.    On or about April 17, 2010, in Minneiska, Minnesota, Outlaws members engaged in a violent confrontation with members of the HAMC and the Outlaws members stole HAMC "colors" or patches during the confrontation.

88.    In or about May, 2010, Outlaws National President ROSGA made statements that he possessed HAMC patches that were obtained by force by the Outlaws.

89.    On June 15, 2010, ROSGA possessed HAMC patches within his residence within the Outlaws Clubhouse in Milwaukee, Wisconsin.

**March 2008 - May 2010: Ongoing Efforts by Regional and Local Outlaws to Provide Illegal Controlled Substances at the Outlaws Clubhouses for Distribution and Use by Outlaws Members.**

90.    In or about April 2008, THOMAS PETRINI, a/k/a "Jo Jo," maintained his residence at the Outlaws Manassas Clubhouse, and possessed firearms in that clubhouse for the protection of the Outlaws organization.  PETRINI routinely used and sometimes distributed illegal controlled substances inside the Manassas clubhouse to other members.

-36-

91.    On or about March 20, 2009, Brett Longendyke directed an undercover agent, who at that time was a probationary member of the Outlaws, to purchase cocaine for Longendyke and another Outlaws member.  Longendyke provided money to the undercover member to purchase approximately one gram of cocaine, and the undercover member witnessed Longendyke then consume the cocaine.

92.    On or about May 23, 2009, while at an event sponsored by members of the Pagans MC, Brett Longendyke provided cocaine to several other Outlaw and Pagans MC members, and directed an undercover Outlaws member, who was a probationary member at the time, to distribute the cocaine to the other members.

93.    On or about September 12, 2009, THOMAS BENVIE, a/k/a "Taz," informed an undercover agent that Pedini had recently acquired three ounces of cocaine in Boston and transported the cocaine to Maine.  The undercover agent engaged Pedini in a conversation about purchasing a small quantity of cocaine, and observed Pedini with a bag containing approximately three ounces of cocaine.  Pedini later distributed approximately one gram of cocaine from the larger bag to the undercover agent for $75.00.  Later that same day, Pedini distributed approximately one-half ounce of cocaine to Joseph Allman.

94.    On or about October 17, 2009, Chris Gagner distributed approximately 66 Oxycodone pills and 6 "muscle relaxers" to an undercover agent at an Enterprise function in Petersburg, Virginia.

95.    On or about October 17, 2009, while at an Outlaws' function in Petersburg, Virginia, MARK STEVEN FIEL, a/k/a "Snuff," directed an undercover agent to purchase approximately 3.5 grams of cocaine from an associate outlaw motorcycle gang member.  The

-37-

undercover agent purchased the cocaine as directed by FIEL, who immediately consumed some of the cocaine. Throughout the function, FIEL distributed small quantities of cocaine to other Outlaws members, and instructed the undercover agents to distribute small quantities as well.

96.     On or about November 13, 2009, Gagner distributed approximately 20 pills to the undercover agent at the Charlotte, North Carolina Enterprise clubhouse.

97.     On February 20, 2010, undercover agents met Outlaws prospective member John Banthem, a/k/a "Bull," from the Montana Outlaws chapter at an Enterprise function in Waterbury, Connecticut. Banthem described his acquisition of marijuana, his history of distributing marijuana, and his plan to establish a large marijuana distribution network from Montana to Maryland. Banthem stated that he would be in the Virginia area soon and offered to sell the undercover Outlaws members a pound of high grade marijuana.

98.     On or about March 29, 2010, Banthem distributed approximately 2.85 pounds of marijuana to an undercover Outlaws member in Petersburg, Virginia for an agreed price of $13,680.00. The undercover agent made a partial payment for the marijuana at the time of the distribution with a promise to pay the remainder at a later date. On or about April 12, 2010, the undercover agent wire transferred approximately $2,500.00 to Banthem as partial payment for the marijuana.

99.     On April 10, 2010, Bosses within the Copper Region of the Outlaws met in Lexington, North Carolina to discuss official Outlaws business. During this meeting, Copper Region Boss Lowry discussed an upcoming Outlaws function in Bozeman, Montana, and described how every member of the Montana Chapter has a medical marijuana card and access to high grade marijuana.

-38-

100.   On June 8, 2010, Banthem was stopped by law enforcement in Iowa *en route* to Virginia from Montana.  Banthem possessed approximately five (5 ) pounds of marijuana and two firearms.  Banthem had previously arranged to distribute the marijuana to an undercover Outlaws member for $25,000.00.

(In violation of Title 18, United States Code, Section 1962(d)).

THE GRAND JURY FURTHER CHARGES THAT:

## COUNT TWO
### (Conspiracy to Commit Violence in Aid of Racketeering)

1.      At all times relevant to this Superseding Indictment, the Outlaws, as more fully

described in Paragraphs One through Seventeen of Count One of this Superseding Indictment,

which are realleged and incorporated by reference as though set forth fully herein, constituted an

Enterprise as defined in Title 18, United States Code, Section 1959(b)(2), namely the Outlaws,

that is, a group of individuals associated in fact which was engaged in, and the activities of which

affected, interstate and foreign commerce.  The Enterprise constituted an ongoing organization

whose members functioned as a continuing unit for a common purpose of achieving the

objectives of the Enterprise.

2.      At all times relevant to this Superseding Indictment, the above-described

Enterprise, through its members and associates, engaged in racketeering activity as defined in

Title 18, United States Code, Section 1959(b)(1) and 1961(1), namely, acts involving murder,

robbery, and extortion, in violation of Title 18, United States Code, Section 1951(a) and the laws

of the Commonwealth of Virginia, and the states of Maine, Minnesota, North Carolina, and

South Carolina, as well as narcotics trafficking violations in violation of Title 21, United States

Code, Sections 841(a), 846, and 856(a)(2).

3.      Beginning in or about March 2006, the exact date being unknown to the Grand

Jury, and continuing thereafter up to and including June 15, 2010, in Richmond, Virginia, in the

Eastern District of Virginia, and elsewhere, for the purpose of gaining entrance to and

maintaining and increasing position in an Enterprise engaged in racketeering activity, namely, the

-40-

Outlaws, the defendants JACK ROSGA, a/k/a "Milwaukee Jack," THOMAS BENVIE, a/k/a "Taz," WILLIAM DAVEY, a/k/a "Rebel," MARK JASON FIEL, a/k/a "Jason," MARK STEVEN FIEL, a/k/a "Snuff," HAROLD HERNDON, a/k/a "Lil' Dave," HARRY RHYNE MCCALL, THOMAS PETRINI, a/k/a "Jo Jo," MARK SPRADLING, a/k/a "Lynini," CHRISTOPHER TIMBERS, a/k/a "Alibi," JAMIE TOWNSEND, a/k/a "Vem," and LESLIE WERTH, a/k/a "Les," did knowingly and unlawfully conspire with one another, and with others known and unknown to the Grand Jury, including but not limited to Joseph Allman, Chris Gagner, Mark Lester, a/k/a "Ivan," Brett Longendyke, David Lowry, a/k/a "Little David," Michael Maranca, Thomas Mayne, a/k/a "Tomcat," Michael Pedini, a/k/a "Madman", and Michael Smith, to commit assault with a dangerous weapon and assault resulting in serious bodily injury to rival motorcycle gang members, in violation of the laws of the Commonwealth of Virginia, and the states of North Carolina, South Carolina, Maine, Minnesota, specifically, Va. Code § 18.2-51, N.C. Gen. Stat. § 14-32, S.C. Code § 16-3-610, 17-A Maine Rev. Stat. Ann. § 208, and Minn. Stat. § 609.223.

4.    As Overt Acts of this conspiracy, the Grand Jury realleges and incorporates by reference the following Overt Acts from Count One:

a.    Overt Acts 20-21: Attempted murder of Diablos MC member in Standish, Maine.

b.    Overt Acts 22-24: Planned attack on HAMC members at the Richmond Cycle Expo in March 2006.

-41-

    c.       Overt Acts 30 and 31:  Planned attack on members of the newly-formed Merciless Souls MC, an HAMC support club, at Dinwiddie, Virginia on September 20, 2008.

    d.       Overt Acts 37-39:  Attack on members of Desperados MC members at the Cockades Bar in Petersburg, Virginia on March 14, 2009.

    e.       Overt Act 44:  Attack on an HAMC Prospect outside of a bar in Rock Hill, South Carolina on May 9, 2009.

    f.       Overt Acts 53-59:  Shooting of HAMC member in Canaan, Maine.

    g.       Over Acts 76-77:  Planned attack on HAMC members at the Charlotte, North Carolina Easy Rider Expo in January 2010.

    h.       Overt Acts 75, 79, 81-84:  Planned murder of HAMC member in Richmond, Virginia by using a firearm and/or explosives in early 2010.

    i.       Overt Acts 40-43, 45-47, 49-52, 60-62, 80, and 85-89: Joint efforts and directives to assault rival gang members in 2009 and 2010.

    j.       Overt Acts 28-29: Assaults and threats of violence to intimidate others.

(In violation of Title 18, United States Code, Section 1959(a)(6)).

THE GRAND JURY FURTHER CHARGES THAT:

## COUNT THREE
(Violence in Aid of Racketeering)

1.      The Grand Jury realleges and incorporates by reference the allegations contained above in Paragraphs 1 through 2 of Count Two, as if fully set forth herein.

2.      On or about March 14, 2009, in the Eastern District of Virginia and elsewhere within the jurisdiction of this Court, the defendants WILLIAM DAVEY, a/k/a "Rebel," HARRY RHYNE MCCALL, CHRISTOPHER TIMBERS, a/k/a "Alibi," LESLIE WERTH, a/k/a "Les," WILLIAM POWELL, a/k/a "Torch," and DENNIS HALDERMANN, a/k/a "Chew Chew," aided and abetted by each other and by Michael Mariaca, a/k/a "M&M," Michael Smith, Charles Love, a/k/a "Chuck," a/k/a "Rebar," Charles Barlow, a/k/a "Chuck," and for the purpose of gaining entrance to, and maintaining and increasing position in, an enterprise engaged in racketeering activity, namely, the Outlaws, did commit assault with a dangerous weapon against certain members of the Desperados Motorcycle Club in violation of the laws of Virginia, specifically, Va. Code Ann. §§ 18.2-22, 18.2-51, and 18.2-282.

(In violation of Title 18, United States Code, Sections 1959(a)(3) and Section 2).

THE GRAND JURY FURTHER CHARGES THAT:

## COUNT FOUR
(Possession of Firearms in Furtherance of Crime of Violence)

On or about March 14, 2009,  in the Eastern District of Virginia and elsewhere within the jurisdiction of this Court, the defendants WILLIAM DAVEY, a/k/a "Rebel," HARRY RHYNE MCCALL, CHRISTOPHER TIMBERS, a/k/a "Alibi," and LESLIE WERTH, a/k/a "Les," aided and abetted by each other and by Michael Mariaca, a/k/a "M&M" and Michael Smith, in

furtherance of a crime of violence for which they may be prosecuted in a court of the United

States, to wit: violence in aid of racketeering, as charged in Count Three of this Indictment,

which count is incorporated herein by reference, did knowingly and unlawfully possess firearms.

(In violation of Title 18, United States Code, Sections 924(c) and 2).

THE GRAND JURY FURTHER CHARGES THAT:

## COUNT FIVE
(Civil Rights Violation)

On or about November 20, 2008, in the Eastern District of Virginia, defendants

CHRISTOPHER TIMBERS, a/k/a "Alibi," and MARK JASON FIEL, a.k.a "Jason," did

unlawfully, willfully, and knowingly by force and threat of force, injure, intimidate, and interfere

with C.D. by striking him because of his race and because he was enjoying the goods, services,

facilities, privileges, advantages, and accommodations of a facility which served the public and

which was principally engaged in selling food or beverages for consumption on the premises, and

as a result did cause bodily injury to C.D.

(In violation of Title 18, United States Code, Section 245(b)(2)(f)).

THE GRAND JURY FURTHER CHARGES THAT:

## COUNT SIX
(Witness Tampering)

On or about November 20, 2008, in the Eastern District of Virginia, defendant MARK

STEVEN FIEL, a/k/a "Snuff," did knowingly, intentionally, and unlawfully corruptly persuade

another person, and did engage in misleading conduct toward another person, with the intent to

hinder, delay and prevent the communication to a law enforcement officer of information relating

-44-

to the commission or possible commission of a Federal offense, namely the offense alleged in Count Five of this Indictment.

(In violation of Title 18, United States Code, Section 1512(b)(3)).

THE GRAND JURY FURTHER CHARGES THAT:

## COUNT SEVEN
(Possession of Firearm By Convicted Felon and Unlawful User of Controlled Substances)

On or about April 5, 2009, in the Eastern District of Virginia and within the jurisdiction of this Court, the defendant, CHRISTOPHER TIMBERS, a/k/a "Alibi," who had been previously convicted of a crime punishable by imprisonment for a term exceeding one year, and being an unlawful user of controlled substances, did knowingly and unlawfully possess a firearm, to wit: **one Jennings, .380 caliber firearm,** in and affecting interstate and foreign commerce.

(In violation of Title 18, United States Code, Sections 922(g)(1) and (3)).

-46-

## FORFEITURE ALLEGATION

1.  The allegations contained in Count One of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963.

Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence, in accordance with Title 18, United States Code, Section 1963, in the event of any defendant's conviction under Count One of this Superseding Indictment.

2.  The defendants, JACK ROSGA, JOSEPH ALLMAN, JOHN BANTHEM, THOMAS BENVIE, WILLIAM DAVEY, MARK JASON FIEL, MARK STEVEN FIEL, CHRIS GAGNER, HAROLD HERNDON, MARK LESTER, BRETT LONGENDYKE, DAVID LOWRY, MICHAEL MARIACA, THOMAS MAYNE, HARRY RHYNE MCCALL, MICHAEL PEDINI, THOMAS PETRINI, MICHAEL SMITH, MARK SPRADLING, CHRISTOPHER TIMBERS, JAMIE TOWNSEND, and LESLIE WERTH:

a.  have acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

b.  have an interest in, security of, claims against, and property and contractual rights which afford a source of influence over, the enterprise named and described herein which the defendants established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and

rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a)(2); and

c. have property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

3. The interests of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2), and (a)(3), include but are not limited to:

a. a 1990 HD FLHTC MC, VIN No. 1HD1DPL16LY508807;

b. a 1967 HARLEY MC, VIN No. 67FLH1032;

c. a 2005 HD MC, VIN No. 1HD1FVW125Y629735;

d. a 1991 HD MC, VIN No. 1HD1EAL11MY130648;

e. a 2006 HD FXSTBI MC, VIN No. 1HD1JAB166Y059219;

f. a 2006 HD FLHT MC, VIN No. 1HD1DDV106Y619322;

g. a 2006 HD FLTR MC, VIN No. 1HD1FSW116Y683253;

h. a 2003 HD FLHT CLASS MC, VIN No. 1HD1DJV113Y642697;

i. a 1999 HD MC, VIN No. 1HD1BHL1XXY060301;

j. a 2005 HD FLHT MC, VIN No. 1HD1DDV145Y644674;

k. a 2005 HD FLHTCI MC, VIN No. 1HD1FFW145Y631797;

l. a 2005 HD FLHPI (FI) MC, VIN No. 1HD1FHW135Y622827;

m. a 2006 HD FLXHI MC, VIN No. 1HD1KBW186Y610246;

n. a 2004 HD FLHR MC, VIN No. 1HD1FDV174Y728626;

o.    a 2006 HD FLHXI MC,  VIN No. 1HD1KBW126Y703697;

p.    a 2006 HD FLHTCU MC, VIN No. 1HD1FCW136Y676245;

q.    a 2004 HD FXDI MC, VIN No. 1HD1GMW154K306742;

r.    a 2003 HD FLHT MC, VIN No. 1HD1FCW133Y607664;

s.    Real Property and improvements known as 328 Houston Street, Charlotte, North
       Carolina 28214; and

t.    Real Property and improvements known as 14420 Lord Fairfax Highway, White
       Post, Virginia 22663.

4.    Pursuant to Title 18, United States Code, Section 1963(m), the defendants shall forfeit substitute property up to the value of the property described in the previous paragraph if that property, as a result of any act or omission of the defendant:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without
        difficulty.

If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(In accordance with Title 18, United States Code, Sections 1963(a) and 1963(m), and Title 21, United States Code, Section 853(a)(2).)

-48-

A TRUE BILL:



NEIL H. MACBRIDE
UNITED STATES ATTORNEY

By:

Dennis M. Fitzpatrick
Peter S. Duffey
Assistant United States Attorneys

-49-