```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
 2                       Richmond Division

 3


 4  UNITED STATES OF AMERICA        }
                                    }
 5  v.                              }    Criminal Case No.:
                                    }    3:10 CR 170
 6  JACK ROSGA, ET AL.              }

 7                                       October 22, 2010

 8          COMPLETE TRANSCRIPT OF TESTIMONY OF
                  SPECIAL AGENT GRABMAN – DAY 2
 9          BEFORE THE HONORABLE HENRY E. HUDSON
                 UNITED STATES DISTRICT COURT JUDGE
10  APPEARANCES:

11  Peter Duffey, Esquire
    Stephen Miller, Esquire
12  Sam Kaplan, Esquire
    Theryn Gibbons, Esquire
13  OFFICE OF THE UNITED STATES ATTORNEY
    600 East Main Street
14  Suite 1800
    Richmond, Virginia  23219
15       Counsel on behalf of the United States

16  Claire Cardwell, Esquire
    Craig Mastantuono, Esquire
17       Counsel on behalf of Jack Rosga

18  Horace Hunter, Esquire
         Counsel on behalf of William Davey
19
    Reginald Barley, Esquire
20       Counsel on behalf of Mark Spradling

21  Thomas Collins, Esquire
         Counsel on behalf of Leslie Werth
22


23


24                KRISTA M. LISCIO, RMR
                   OFFICIAL COURT REPORTER
25              UNITED STATES DISTRICT COURT
```

1                    **E X A M I N A T I O N S**

2                    **DIRECT   CROSS   REDIRECT   RECROSS**

3   Agent Grabman              4/41/83

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The proceeding commenced at 9:20 a.m.)

2     THE COURT:  Ready for the jury?

3     MR. DUFFEY:  Yes, sir.

4     MR. HUNTER:  Yes, sir.

5     THE COURT:  Marshal, bring the jury in.

6      (The jury is now present in the courtroom.)

7     THE COURT:  Ladies and gentlemen, I'm sorry for

8  the delayed start this morning.  I had one matter I had

9  to attend to before we resumed the case, so I'm sorry

10 for trespassing on your time.

11     All right, we're in the middle of

12 cross-examination.

13     Ms. Cardwell, you may proceed.

14     MS. CARDWELL:  Thank you, Your Honor.

15          **CROSS-EXAMINATION** (Continued)

16 BY MS. CARDWELL:

17 Q    Good morning.

18 A    Good morning.

19 Q    Agent Grabman, yesterday when you testified on

20 direct you talked a little bit about the punishment

21 that was used within the organization against members

22 when they violated some sort of rule in the

23 organization, do you remember that?

24 A    I remember speaking of that, yes, ma'am.

25 Q    And I believe one of the specific things you said

1  is that when a member violates a rule of the club, the

2  options would be getting a black eye, returning to

3  probate status, or you might even be kicked out

4  altogether, is that correct?

5  A    Those are some of the options that I experienced

6  and saw, yes, ma'am.

7  Q    And the black eye would mean literally getting

8  punched and getting a black eye?

9  A    Yes, ma'am.

10  Q    And would you characterize that as sort of a

11  standard form that you noticed in the organization; was

12  that something that was done regularly?

13  A    I saw it happen.  Yes, ma'am.

14  Q    Well, do you think it just happened where you

15  were, or do you think it happened club-wide?

16  A    I don't know, ma'am.

17  Q    Are you familiar with a written set of bylaws

18  maintained by the American Outlaw Association?

19  A    I'm familiar that there are several different

20  versions, yes, ma'am.

21  Q    And have you reviewed all of them?

22  A    I have seen all of them but the original 13, which

23  is the one they're currently using.

24  Q    The original 13 as in the 13 pages?

25  A    I mean 13 different steps.  I was never provided a

1 copy of that, but that's what we were told they were up

2 to.  The 2005 constitution was the last version that we

3 were told that that's no longer in play, and that's no

4 good anymore.

5 Q    So you've mentioned at least two written documents

6 that set forth standards of conduct and rules and the

7 way the organization ran, and that at sometime were

8 used by the American Outlaw Association, correct?

9 A    Those are documents that they used as guidance.

10 Q    And you in fact seized one set of each of those

11 somewhere in each of the clubhouses, correct?

12 A    I'm not sure exactly all the items seized, ma'am.

13 I've only reviewed certain pieces of evidence.

14 Q    So you don't know whether you saw these documents

15 while you were undercover or as a result of seizures

16 made from the club?

17 A    I know I've seen the 2005 while I was in role.

18 Q    And that's entitled *Constitution,*" correct?

19 A    I believe it is.

20 Q    But it's fair to say, those are the only two

21 written documents you've seen that set forth things

22 like standard of conduct, how the organization runs

23 relating to the American Outlaws club, correct?

24 A    Yeah.  The way it was explained to me is it was a

25 guideline for them to follow.

1  Q    Okay.  And in reviewing those, did you ever come

2  across anything in either of those documents that

3  reflected that these type of punishment, getting a

4  black eye, or returning to probate status, were

5  actually club approved penalties?

6  A    I don't think the constitution or the bylaws, my

7  understanding, were meant to encompass everything.  It

8  also doesn't include that the club has an enforcer

9  position which, in fact, I know they have an enforcer

10 position.  I was told I had to elect one for my

11 chapter, and there's enforcer positions all the way up

12 to the national level.

13 Q    And you're saying that an enforcer is not

14 mentioned anywhere in the documents?

15 A    I know in one of them I saw it was not mentioned.

16 Q    Let's go back for a moment to the fact that you

17 don't think that the rules were set forth in writing.

18 Is that what you said, all the rules are not set forth

19 in writing?

20 A    It is a guideline.  Yes, ma'am.

21 Q    Okay.  And are you aware, sir, that there was a

22 rather lengthy search warrant affidavit done in this

23 matter where the clubhouses and the residences were

24 searched?

25 A    Yes, ma'am.

1 Q    And it's probably over -- it's about 100 pages

2 long, is that correct?

3 A    I'm not exactly sure of the exact length, ma'am.

4 Q    But just to be clear, a search warrant affidavit

5 is what's filed by the law enforcement agency in order

6 to convince a magistrate or a judge that there's

7 probable cause to go into private places, correct?

8 A    Yes, ma'am.

9 Q    And it's sworn to by the agent that prepares it,

10 correct?

11 A    Yes, ma'am.

12 Q    And one of the things that has to be established

13 in the affidavit is that the things that you want to

14 look for are likely to be in that place, correct?

15 A    Yes, ma'am.

16 Q    Okay.  And as you said, there was a search warrant

17 prepared in this case.  Are you familiar with the fact

18 that in the search warrant prepared in this case to

19 search these private places, it was sworn to that the

20 Outlaws maintained a written set of bylaws and other

21 written documents that set forth the rules of

22 membership, and a code of conduct for the organization,

23 as well as penalties for noncompliance with the rules

24 of the organization?  Are you familiar with the fact

25 that that was what was represented under oath to the

magistrate or judge that issued the search warrants in
this matter?

A    I don't know the final version of what was done.

Q    I want to talk for a moment about these patching
in ceremonies that we've heard you describe, okay?

A    Yes, ma'am.

Q    I believe you said -- well, first of all, when a
fellow, a guy undergoes this probationary status, they
do so, like you did, because you want to, correct?

A    Yes, ma'am.

Q    And they go through the six month period.  And
it's not easy, right?

A    It's not.

Q    You have to work all night long at bars, and wait
hand and foot on people, but the people that do it do
it because they want to be in the club, correct?

A    Yes, ma'am.

Q    Okay.  And no one forced you to patch in other
than your supervisor, right?

A    No one forced me.  Again, I did it as a voluntary
assignment.

Q    And this tradition in the ceremony of the members
attempting to take the vest off of the person is a
tradition in the club, correct?

A    It's a tradition that I've observed in places.  I

1   don't know how it's done exactly in every single place.

2   Those are some of the things that I've observed.

3   Q    The way you observed it, it looked like it

4   happened several times in front of you and it happened

5   to you, correct?

6   A    Well, I've also heard of others where it wasn't to

7   where they ended up ripping it off the person and it

8   wasn't as aggressive as it was in those instances.

9   Q    Okay.  But either way, aggressive or laughing,

10  it's a tradition of the club?

11  A    I know it was told to me that this is the way that

12  they do it.

13  Q    And ones that you observed, after this incident

14  went on or after this tradition went on, there was a

15  lot of congratulations and partying and jovialness

16  after it happened, correct?

17  A    Yes, ma'am.

18  Q    And I want to move on for a little bit to talk

19  about some of the patches that you've talked about that

20  are club patches.  First, with regard to support

21  patches.  At one point in your testimony yesterday, you

22  talked about clubs moving into areas and people being

23  forced, you used the word *forced,"* to wear support

24  patches.

25  A    Yes, ma'am.

1  Q    And you don't mean to suggest that all of the

2  support patches that are being worn out there for the

3  Outlaws Motorcycle Club, or any other large motorcycle

4  club, the people are being forced to wear them?

5  A    In some instances that does occur.

6  Q    And in fact, most, if not all, of the support

7  patches for major motorcycle clubs are for sale on the

8  Internet?

9  A    Yes, there's a large number of them on the

10  Internet for sale.  Yes, ma'am.

11  Q    And they're even sold to the general public at a

12  lot of these motorcycle functions, like the Dinwiddie

13  race, correct?

14  A    Yes, ma'am.

15  Q    And are you aware that one of the largest annual

16  outdoor festivals, the summer fest, are you aware that

17  the American Outlaw Association actually sells their

18  support patches to citizens of Milwaukee every year at

19  one of the largest festivals in the country?

20  A    I sold support patches to citizens as well, ma'am.

21  Q    If you see support patches, it's not somebody

22  who's been enslaved and forced to wear a patch

23  necessarily, correct?

24  A    Not on every occasion.

25  Q    Now, let's talk about the GFOD patch that you

1  described yesterday.  God Forgives, Outlaws Don't.  You

2  explained in your testimony yesterday that this is a

3  phrase that originated after three members of the

4  Outlaws Motorcycle Club were murdered inside of their

5  clubhouse, is that correct?

6  A    I believe maybe two were inside, one on the front

7  porch.

8  Q    But all at the clubhouse, correct?

9  A    Yes, ma'am.

10 Q    And they were all murdered?

11 A    That's my understanding.

12 Q    And that crime was never solved?

13 A    Yes, ma'am.

14 Q    And are you aware, sir, exactly where that phrase

15 came from?

16 A    It was explained to me by Les Werth on the day

17 that I was told that I began my prospecting period that

18 that is where it came from.

19 Q    Are you aware, sir, that it actually came -- I

20 think you mentioned something about the funeral?  Did

21 you know anything about the funeral and where that

22 phrase came from?

23 A    I don't know which funeral you're referencing,

24 ma'am.

25 Q    Well, the funeral for the three murdered Outlaw

1  members.

2  A    I wasn't at that funeral.

3  Q    Are you aware that at that funeral, after the

4  minister got up and spoke of forgiveness, one of the

5  Outlaw members actually got up and used this phrase

6  that, "*God Forgives, Outlaws Don't*"?

7  A    I wasn't there, ma'am.  I can't testify as to what

8  was said there.  I can testify as to what Les Werth

9  told me on the day I began prospecting.

10 Q    And you also don't know what demeanor of that

11 Outlaw member was as he spoke those words at that

12 funeral?

13 A    Again, ma'am, I was not there.

14 Q    And you have testified previously that funerals

15 are actually very sacred in the Outlaws Motorcycle

16 Club, correct?

17 A    Yes.  The ceremony itself, yes, is sacred to them.

18 Q    And it's very, very -- anyone, any member's

19 funeral, is very well attended because it's considered

20 to be sacred, correct?

21 A    It's made to be a mandatory run.  Each chapter is

22 forced -- to make sure there are members there, but

23 most of the time they all want to go.

24 Q    You don't mean to say everybody is forced to go

25 there, do you?

1   A    Well, there is a mandatory requirement to go, but

2   people do go.  They want to go.

3   Q    Okay.  And it's a fair statement that they are

4   usually well attended, correct?

5   A    Yes, ma'am.

6   Q    And there's certainly reasons to think that a

7   funeral which involved a murder of three members would

8   be well attended, correct?

9   A    I don't know what went on in 1979 at that funeral,

10  ma'am.

11  Q    Now, with regard to the *"property of"*, I don't

12  know if they are patches, labels, or shirts that the

13  females wear that are associated with the club.  You

14  indicated that that didn't necessarily mean when a

15  female was wearing that that they were providing sexual

16  services or became the slaves to the club members,

17  right?

18  A    It doesn't.  They are definitely not providing

19  sexual services based on that patch.  No, ma'am.

20  Q    You did say, however, that the women that wore

21  them were I guess kind of treated like probates in that

22  any menial task that any member asked them to do, which

23  sounds like being a wife to me, but anything that they

24  asked them to do they had to do, right?

25  A    Yes.  They're told if they wear that patch, or

1  instructed -- I mean, I don't want to use foul language
2  in what they're referred to, but they are told that
3  this is what they're supposed to be doing, using the C
4  word.  That's the type of work they do, and that's the
5  type of work they do.  And if they mouth off, I've seen
6  them get punished.
7  Q    And the women that wear these labels, or shirts,
8  or whatever, that say *"property of"* the club are almost
9  always either a girlfriend or a wife of a member,
10 correct?
11 A    Yes, ma'am.
12 Q    Okay.  And you don't mean to say that these
13 girlfriends and wives are being forced to wear these
14 *"property of"* shirts, do you?
15 A    I don't know what their personal relationship is
16 with their spouses.  I know that some wear them, some
17 don't.  I know Les Werth would not have his wife wear
18 them because he didn't want her forced to be doing that
19 type of stuff.
20 Q    But the answer to the question is, you don't know
21 whether or not these women are being forced or whether
22 they just enjoy being around the club and don't mind
23 having that role?
24 A    I don't know their personal relationship, ma'am,
25 with their husbands and why they're wearing it.

1  Q    Fair enough.

2       Let's move on to the *"Snitches are a dying breed"*

3  patch.  Now, when you testified about this yesterday,

4  you didn't mean to suggest to the ladies and gentlemen

5  of the jury that the phrase *"Snitches are a dying*

6  *breed"* was actually a phrase that was created by the

7  Outlaws Motorcycle Club, did you?

8  A    No, I did not mean that.  That patch is actually

9  -- my understanding from what I was told is that patch

10 was created by Harry Bowman, a former -- or it

11 represents something with Harry Bowman, former national

12 boss of the Outlaws, Taco, who is in prison for

13 R.I.C.O. charges.  And a portion of that patch goes

14 back to his defense fund.

15 Q    So you're not saying the Outlaws made this phrase

16 up, are you?

17 A    I don't know where the phrase came from.  I know

18 they use that phrase, or something similar, at this

19 point in time.

20 Q    I don't know if you answered the question.  My

21 question is, are you saying that the Outlaws Motorcycle

22 Club created or made up this saying?  That they are the

23 ones that originated this saying, *"Snitches are a dying*

24 *breed."*

25 A    I'm saying I do not know the origin of that

1  statement, ma'am.

2  Q    So you don't know whether or not they created it?

3  A    I don't know the origin of it.

4  Q    Are you aware, sir, that in the affidavit prepared

5  in this case to search all the homes and clubhouses in

6  this case that it was indicated by the agent under oath

7  that it was the Outlaws who coined or created this

8  saying, *"Snitches are a dying breed"*?

9  A    I don't know who says it was coined or created.  I

10  don't know, ma'am.  I know that they use it.

11  Q    Now, I want to move on to drug use.  You testified

12  yesterday that you witnessed drug use in every

13  clubhouse that you visited, correct?

14  A    Yes.  I think I said about every clubhouse I

15  visited.

16  Q    You said about every clubhouse?

17  A    I don't recall if I said, *"about."*  But there was

18  drug use rampant in all the clubhouses.  Marijuana was

19  used openly all the time, and I observed cocaine used

20  in other clubhouses.

21  Q    What is the accurate statement?  Did you see it in

22  every clubhouse or almost every clubhouse that you

23  visited?

24  A    Give me a second and I'll think about it for a

25  minutes.

1    Q    Sure.

2    A    Yes, every clubhouse I've visited either inside

3    the building or outside on the parameter I saw drug

4    use.

5    Q    And the clubhouses that you visited, the large

6    majority of them were clubhouses that were either

7    located in the copper region or the red region,

8    correct?

9    A    There were clubhouses I went to in the orange

10   region down in Florida.  There were clubhouses in, I

11   believe, the black region in Savannah.  There were

12   clubhouses in Indianapolis.  There were clubhouses in

13   the red region.  There were clubhouses in the gray

14   region, as well as the blue region.

15   Q    I understand that you saw them in other regions.

16   My question is this, sir.  Were the large majority of

17   the clubhouses that you visited in the copper region

18   and the red region?

19   A    I wouldn't say the large majority because we only

20   had a total of six clubhouses in the copper region.

21   And the other clubhouses are strung out.  So there's

22   probably an equal number of clubhouses if you compare

23   the total number of clubhouses.  But the most time I

24   spent was in the copper region.

25   Q    But you're saying that you visited an equal number

1  of clubhouses outside of the copper and red region as

2  you did inside the copper and red region, is that your

3  testimony?

4  A    It's pretty close.

5  Q    Which one was more?

6  A    Well, we only have six clubhouses, again, in this

7  region.  And I was in Waterbury; I was in Brockton,

8  Massachusetts; I was in Maine.  So probably like a --

9  probably a six to five ratio, maybe.  It's very close.

10  Q    And in terms of the amount of time that you spent

11  in clubhouses, the number of times you visited those

12  clubhouses, certainly the large majority of visits to

13  clubhouses were in the copper region, correct?

14  A    Yes, ma'am.

15  Q    Now, have you investigated whether or not Jack --

16  let me back up.  I think you said yesterday that one of

17  the things that the copper region -- not the copper

18  region, but the club was being investigated for were

19  firearm violations, correct?

20  A    Yes, ma'am.

21  Q    That was one of the things that instigated this

22  investigation of the club, correct?

23  A    Well, it was the combination.  We had started off

24  as Mongols.  We were recruited by the Outlaws.  As we

25  were in the point of recruitment, you know, there were

1  drug violations, firearm violations, acts of violence.

2  Q    But your testimony on cross-examination yesterday,

3  sir, that the investigation initiated as to the club

4  regarding the narcotics violations and firearms

5  violations; wasn't that your testimony yesterday?

6  A    I believe you asked me how the investigation

7  initiated, which this investigation encompassed the

8  Outlaws, the Pagans, the Mongols.  It was a rather

9  large investigation, mostly dealing with drugs and

10 guns.  As it went into the Outlaws, it became involved

11 with violence as well.

12 Q    So it was your testimony today that it was based

13 on drugs and firearms?  Now you're saying that it was

14 also based on violence?

15 A    I'm saying that it was based on drugs and on

16 firearms, and on other issues.  But it was based on

17 firearms and drugs.  You're correct.

18 Q    Okay.  And with regard to firearms violations,

19 have you had occasion to investigate whether or not

20 Jack Rosga possessed a concealed weapons permit?

21 A    I believe he does.

22 Q    In fact, you know for a fact that because he has

23 no criminal record he's not a prohibited party.  He's a

24 citizen who can carry as many weapons as he wants as

25 long as they're legal in and of themselves, correct?

1   A     Yes.  I believe he is a permitted person.

2   Q     In investigating Mr. Rosga, did you have occasion

3   to discover that he in fact enjoys a security clearance

4   for the Office of Homeland Security for purposes of his

5   trucking company?

6   A     I have heard that he does have the clearance.

7   Q     And with regard to his finances, did -- at any

8   time was any agent assigned, including you, to do some

9   sort of forensic evaluation of Mr. Rosga's financial

10  status?

11  A     I personally was involved in the undercover phase.

12  I don't know.  I know there was auditors doing

13  different financial workups on all different aspects of

14  the case.  I don't know exactly what was done on the

15  financial realm.

16  Q     So you wouldn't know whether or not they checked

17  the fact that he filed tax returns for the last few

18  years, or many years?

19  A     I don't know if they checked that or not, ma'am.

20  Q     You don't even know what Mr. Rosga's income is, do

21  you?

22  A     No, I do not.

23  Q     And to your knowledge, were any of his bank

24  accounts analyzed?

25  A     I don't know, ma'am.

1   Q    Do you know that Mr. Rosga's full-time job for

2 over the last 34 years has been working for a moving

3 company, correct?

4   A    Yes.

5   Q    And you know that for in excess of 20 years, he's

6 been -- had his own truck service and moving with large

7 tractor-trailer trucks, correct?

8   A    I know that he owns his own trucking company.

9 Yes, ma'am.  I don't know the specifics of how long,

10 and all that.

11   Q    Sir, do you have any knowledge whether in this

12 investigation whether anyone ever checked his trucking

13 logs to determine his whereabouts at given times during

14 the course of your investigation?

15   A    I don't know, ma'am.

16   Q    And you are aware that truckers, people that

17 driver tractor-trailers on the highways of this

18 country, are regularly tested for drugs and alcohol?

19   A    I'm aware they do testing.  Yes, ma'am.

20   Q    Has anybody ever taken a look at whether or not

21 Mr. Rosga ever showed any alcohol or drugs in his

22 system the many times he was tested in all these years?

23   A    I don't know if he was ever tested, ma'am.

24   Q    My question is did anybody in the investigation,

25 to your knowledge, check?

1  A    Not to my knowledge.  I don't know, ma'am, that

2  part.

3  Q    Are you aware, sir, that Mr. Rosga has had the

4  same cell phone for the past 15 years?

5  A    No, ma'am.  I know that Mr. Rosga called me on the

6  same cell phone during the case.  I know that there

7  were numerous cell phones recovered from his residence

8  inside the clubhouse.

9  Q    But he always called you on the same number,

10 correct?

11 A    Well, I think I had two conversations with him on

12 that number.

13 Q    So you had that number, right?

14 A    Yes.  He gave it to me on July 5th.

15 Q    To your knowledge, did anyone in this

16 investigation ever obtain by search warrant or subpoena

17 his cell phone records?

18 A    I know that there was a block of time that they

19 got them to, but I don't know the exact time frame of

20 when that was.

21 Q    A block of time that they got Mr. Rosga's cell

22 phone records?

23 A    Yes, ma'am.

24 Q    And, sir, to your knowledge, did anyone ever look

25 into any specific time in this investigation where

1  Mr. -- let me back up.  You've been in law enforcement

2  for 20 years?

3  A    Yes, ma'am.

4  Q    Almost as old as me.  And you are aware that with

5  cell phone records they have this really cool thing

6  they do now where they track what tower the phone is

7  pinging off of.  And in that way they can at least

8  track, not the person necessarily, but where the cell

9  phone is and how it's moving according to which tower

10  it's using, correct?

11  A    At times they are able to do that.  Sometimes it

12  works, sometimes it doesn't.  Probably about 50% of the

13  time they are actually able to capture the signal.

14  Q    Did anybody ever try to get that?  I mean, try,

15  whether you got it, whether it was successful or not,

16  did anybody ever try in this investigation to figure

17  out at any given time in this investigation where

18  Mr. Rosga was traveling or where his phone was moving?

19  A    Yes.  I believe the U.S. Marshals were doing it at

20  the time of the takedown so they could place him under

21  arrest if he was on the road.

22  Q    But only the time that he was to be arrested, not

23  to track him during any of the other events that have

24  been testified to in this investigation?

25  A    No, ma'am.

1 Q    Now, I assume that in your 20 years as an ATF

2 agent you've also been a party to, and participated in,

3 the execution of numerous search warrants, correct?

4 A    Yes, ma'am.

5 Q    And it's a very common thing, especially these

6 days, when a search warrant is executed to make

7 collecting computers and electronic equipment part of

8 what is seized, correct?

9 A    It's done on some of the sites.

10 Q    Okay.  Well, on this occasion, part of this

11 100-page affidavit included the desire on the part of

12 your agency to collect any computers that were found in

13 any of these many, many places that were searched,

14 correct?

15 A    I know that there were computers taken.  I haven't

16 seen the final version of the Milwaukee warrant.  Each

17 additional district took one warrant and they went

18 different places with different warrants, so I haven't

19 seen the final version in each district.

20 Q    Okay.  My question is about the affidavit, sir.

21 The affidavit was the same affidavit used for every

22 single search, correct?

23 A    No, it wasn't, ma'am.

24 Q    It wasn't?

25 A    I don't think so.  I believe the affidavit was

1  actually changed.  Different judicial districts did

2  their own affidavits.  I think there was different

3  judicial districts.

4  Q    Well, are you aware of the fact that in order to

5  search Mr. Rosga's residence where he lived at the

6  clubhouse, that it was mentioned that computers were to

7  be seized if they were there?

8  A    Again, I have not seen the Milwaukee search

9  warrant.  I have not seen the affidavit for that.

10 Q    So do you even know whether any computer or

11 electronic equipment was seized from his clubhouse?

12 A    No, ma'am, I do not.

13 Q    And you don't know whether or not anybody took the

14 time to what they call *"mirror image"* whatever is in

15 his computer to figure out if you can look at

16 communications, old e-mails, anything that might tell

17 you something about who he's talking to and what he's

18 saying?

19 A    Again, ma'am, I do not know if that was taken in

20 Milwaukee.

21 Q    Was it your understanding, Agent Grabman, that

22 Jack Rosga had to approve each and every member who

23 joined this club?

24 A    No, ma'am.

25 Q    So the answer is, no, he did not have to approve

1  every member?

2  A     No, ma'am.

3  Q     And I want to move for a moment to where I was

4  going to go last night before we all went home so

5  tired, and that is to the events leading up to the

6  shooting of the Hells Angels in Canaan, Maine.

7  A     Yes, ma'am.

8  Q     On September 10th of 2009, which I think is about

9  almost exactly a month before that Hells Angel was

10 shot.  And he didn't die, but he was shot and seriously

11 injured, correct?

12 A     Yes, he's in very bad shape.

13 Q     And about a month before that on September the

14 10th, you and Agent Ozbolt actually were traveling up

15 in the New England area visiting various clubhouses,

16 correct?

17 A     Myself, Agent Ozbolt, Agent Anderson, and the

18 confidential source, we were accompanied by Robert

19 Chisuano.

20 Q     And that's the guy they call Ox?

21 A     Yes, ma'am.

22 Q     So you were traveling, and your trip started on

23 September the 10th, '09?

24 A     I believe.  I think he showed up at our clubhouse

25 on the 9th and I think we left on the 10th.  Our first

1  stop was Waterbury, and then we went to Brockton for

2  two days, and up to Maine, and then returned back to

3  Virginia, I believe, on the 12th.

4  Q    Let's go back to the beginning of that.  So you

5  left the Petersburg clubhouse and you got to

6  Connecticut first, correct?

7  A    Yes, ma'am.

8  Q    When you first got to Connecticut -- or actually

9  on the way up to Connecticut is when you got the call

10 from the lead agent in this case, Valot?

11 A    I got a call from the cover team.  Yes.

12 Q    About this attack on two Outlaw members up in

13 Connecticut, correct?

14 A    Yes, ma'am.

15 Q    And you continued to go up to Connecticut, right?

16 A    Yes, ma'am.

17 Q    And once you got there, it became very clear that

18 the folks up there knew about it, right?

19 A    Yes, ma'am.

20 Q    And in fact, at some point Ox pulled you aside and

21 was talking about taking care of business that night,

22 right?

23 A    Yes, ma'am.

24 Q    And you felt pretty clear that something might

25 happen that night, right?

```
1   A     Yeah, I informed my other guys that I was with
2   that I thought something could happen.
3   Q     Nothing did happen that night though, right?
4   A     Yes, ma'am.  Not to my knowledge.
5   Q     And you continued your tour of the New England
6   clubhouses by moving on to Massachusetts, correct?
7   A     To Brockton, yes, ma'am.
8   Q     Once you got in Brockton, you spoke on the phone
9   with Madman, correct?
10  A     At some point I did.
11  Q     So you're not sure where you were, but it was
12  after you first got there and learned of the assaults?
13  A     Yeah, I believe it was after I learned of the
14  assaults.
15  Q     And you spoke to him on the phone, right?
16  A     I spoke on the phone.  It would have been -- I
17  think when we got up there, I know I saw him in
18  Brockton.  I know he and I had conversations while in
19  Brockton on the phone because he was going to travel up
20  to Maine with us when we left on Sunday morning, and at
21  one point he said that he would just go up and drive on
22  his own.  So I did speak to him on the phone during the
23  course of that weekend.
24  Q     And when we say Madman, that's his nickname.  But
25  his real name is Michael Pedini, correct?
```

1   A    Michael Pedini is his name.  He got the name

2   Madman because he used to be a professional wrestler.

3   Q    Are you sure he was actually a professional

4   wrestler?

5   A    He was on the circuit wrestling, yes, ma'am.

6   Q    So you looked into that to see whether he was

7   telling the truth about that?

8   A    No, I didn't.  That's what he had told me, ma'am.

9   Q    And you just bought that?

10  A    That's what he told me.  I'm saying that's what he

11  stated.

12  Q    So you talked to him, and I think you said you had

13  several conversations with him and he was going to end

14  up meeting with you in Maine?

15  A    Yes, ma'am.

16  Q    So you ended up going to Maine, correct?

17  A    Yes, ma'am.

18  Q    And just to be clear, these places that we named,

19  Connecticut, Massachusetts, and Maine, are all in the

20  red region, right?

21  A    Yes, they are.

22  Q    And when you get to Maine, you see Taz, who is

23  Thomas Benvie, correct?

24  A    Yes, ma'am.

25  Q    And he's the president of the Maine chapter,

1  correct?

2  A    Yes, ma'am.

3  Q    And you see Joseph Allman, correct?

4  A    Yes, ma'am.

5  Q    And he's, I believe, the former chapter president

6  of Maine?

7  A    Yeah, they switched around several times.  But I

8  believe he held the position at one point.

9  Q    And you also encountered Tomcat, correct?

10  A    Yes.  Thomas Mayne.

11  Q    And that's Thomas Mayne, right?

12  A    Yes, ma'am.

13  Q    And he's the one that ended up being in the

14  shooting of the Hells Angel with Madman, right?

15  A    He's the one that did that and got in the shooting

16  with ATF at the end of the case.

17  Q    That's not what I asked.  He's the one that ended

18  up being involved in shooting the Hells Angel, right?

19  A    Yes, ma'am.

20  Q    So he and Madman got together and did that

21  shooting, right?

22  A    Thomas Mayne and Michael Pedini did that is our

23  evidence.  Yes, ma'am.

24  Q    And Pedini's named Madman, right?

25  A    That's right.

1  Q    So we've got Tomcat and Madman who shoot this

2  Hells Angel, right?

3  A    Yes, ma'am.

4  Q    But that's a little later down the road, right?

5  A    Yes, ma'am.

6  Q    You just got to Maine.  You see Taz, you see

7  Joseph Allman, you see Tomcat, and you also see Madman

8  now, right?

9  A    Yes.  He shows up.

10 Q    And when he shows up, that's when he has the

11 baseball size quantity of cocaine, correct?

12 A    It was a very large about 8-Ball size quantity of

13 cocaine.

14 Q    Now, yesterday I think you also testified that as

15 you traveled through these clubs when the U.S. Attorney

16 asked you about, you know, were people talking about

17 the fact that two of the Outlaw members had been

18 attacked, you said that was *"the"* topic in these

19 places, correct?

20 A    Yeah, that was a big topic that everybody was

21 talking about.

22 Q    Okay.  Now, Mr. Pedini, or Madman, had been in the

23 club for less than two years, did you know that?

24 A    Yeah, I believe it was two to three years he had

25 been in the club.

1  Q    And Joseph Allman, who is one of these people that

2  you encountered when you got to Maine, had previously

3  been Mr. Pedini's sponsor in the Maine chapter, did you

4  know that?

5  A    No, I didn't know he was a sponsor.

6  Q    Did you know that Mr. Pedini referred to

7  Mr. Allman as *"Pops"*?

8  A    No, ma'am.

9  Q    Do you know what it means when somebody refers to

10  another member as *"Pops"* in the club?

11  A    I've heard your dad in the club means the person

12  that brought you in.

13  Q    And a person that brought you in is what we would

14  think of as a sponsor, right?

15  A    Yes.

16  Q    Somebody that looks after you and gives you advice

17  and helps you through the process?

18  A    Right.

19  Q    Do you know whether or not Mr. Allman was Madman

20  or Mr. Pedini's sponsor; you don't know that?

21  A    No, I don't know if he was.

22  Q    Now, about two weeks later after you were in

23  Maine, you and Taz -- and Taz is this guy that has this

24  overwhelming fondness for the F word, you talked with

25  him a lot on the telephone, right?

A    I talked over the course of the investigation,
yes, ma'am.

Q    And we heard from the recording that was played
yesterday where Taz was making the statement that
something about Jack is all over Madman, and I'll leave
the F word out.  Jack is all over Madman about this,
right?

A    I believe that was the October 4th conversation.

Q    Okay.  That was one of the things we heard
yesterday, right, when Taz was talking?

A    Yes, ma'am.

Q    And it was clear that while Taz relayed this to
you that Madman was being, you know, really pressured
by Jack to do this, that the source of that information
was Madman, right?

A    He stated it was from Michael Pedini.  Yes, ma'am.

Q    So just to be clear, this was not something that
Taz was telling you that he had witnessed that he had
seen Jack like really giving Madman a hard time about
taking retaliation up in Maine, right?

A    You're correct, ma'am.

Q    And what that means is that Taz told you that
Madman told him that Jack told him to do something
about this, right?

A    It means -- it means that Taz stated that Michael

1    Pedini came to him and talked to him, and Michael

2    Pedini had been told that by Jack Rosga.

3    Q    And is that a yes?

4    A    I think you may have included one more him in

5    there, but that was the scenario.

6    Q    In October, a few weeks later, that's when Madman,

7    Tomcat, shot the Hells Angel at the Hells Angels

8    clubhouse, right?

9    A    I believe it was October 8th.

10   Q    And the next day, October 9th, you were back in

11   Petersburg, right?

12   A    Yes, ma'am.

13   Q    And at that time, Joseph Allman was visiting the

14   Petersburg clubhouse, right?

15   A    Yes, ma'am.

16   Q    And Agent Ozbolt was there?

17   A    Yes, ma'am.

18   Q    And you were there?

19   A    Yes, ma'am.

20   Q    And you were with Joseph Allman, right?

21   A    Yes, ma'am.

22   Q    Now, Joseph Allman is the guy that used to be the

23   president of the Maine chapter, right?

24   A    He was for a time.

25   Q    And you don't know whether or not Madman called

1  him Pops when he was Madman's sponsor, right?

2  A    Yeah, I don't know that.

3  Q    Now, while Mr. Allman was visiting you the day

4  after this shooting, he actually said --

5       MR. DUFFEY:  Judge, I'm going to object to hearsay

6  at this point.

7       MS. CARDWELL:  Well, it's the same reason they've

8  all been coming in, Your Honor.

9       THE COURT:  Let me hear the question, and then

10 I'll decide whether to sustain or overrule the

11 objection.

12      MS. CARDWELL:  I'll set a foundation.

13      THE COURT:  Okay.  Go right ahead.

14 Q    At this time, you were still working an undercover

15 operation, correct?

16 A    Yes, ma'am.

17 Q    So Allman would have every reason to believe that

18 you were still a real member of the club, right?

19 A    Yes, ma'am.

20 Q    And if he made any statements about something some

21 club members had done, including himself, it would be

22 similar to all these other statements we've heard in

23 this case where guys were telling each other about what

24 they did or what somebody else did, right?

25 A    I had conversations with Allman.  I don't know

1    about his time frame.  He thought I was an Outlaw.

2    Q    And did Mr. Allman on that occasion say -- he

3    thought Agent Ozbolt was an Outlaw, too, right?

4    A    Yes, ma'am.

5    Q    On that occasion, did Mr. Allman say to you that

6    he was a very inpatient man?

7         MR. DUFFEY:  Judge, I'll object to hearsay.  These

8    are statements.

9         THE COURT:  The objection is overruled.  And

10   correct me if I'm wrong on this, but isn't this a

11   statement by a co-conspirator within the scope of the

12   conspiracy, very much like quite a bit of the evidence

13   that you've introduced, Mr. Duffey?

14        MR. DUFFEY:  Judge, I understand that.  But my

15   position is that the exception is that it's for a party

16   opponent.  I don't think she's laid the foundation that

17   Joseph Allman is a party opponent.

18        THE COURT:  That's a different hearsay rule.  The

19   exception to the hearsay rule is for any -- once you

20   demonstrate that a conspiracy exists, or conditional

21   admissibility, any statement made by a co-conspirator

22   is admissible against the others as substantive

23   evidence.  This appears to meet that criteria.

24        If you've got authority to the contrary, I'll be

25   delighted to look at it; otherwise, the objection is

1 overruled.

2     MS. CARDWELL:  Thank you, Your Honor.

3     MR. DUFFEY:  Yes, sir.

4 Q    So my question is, did Mr. Allman explain to you

5 and Agent Ozbolt that he was a very inpatient man?

6 A    Yes, he did make that statement.

7 Q    And the next thing he said to you was that he had

8 ordered Madman to do this shooting, isn't that correct,

9 sir?

10 A    I know that -- I don't know the exact wording

11 you're saying.  But I know there was talk about that.

12 I don't know if it was the very next thing or if he

13 used the word, but he did say he was involved in the

14 process of deciding to shoot him.

15 Q    He was *involved in the process,* is that the way

16 he put it?

17 A    I don't have the document in front of me and --

18 Q    You have --

19     COURT REPORTER:  I can't take both of you talking

20 at the same time.

21     MS. CARDWELL:  I'm sorry.  It's my fault.

22     THE COURT:  And also to help me, because I lost

23 track there for a second, when you use the pronoun

24 *he,* who are you referring to, Ms. Cardwell?

25     MS. CARDWELL:  Mr. Allman.

1    THE COURT:  Go ahead.  And you do need to slow

2  down.

3    MS. CARDWELL:  I really think I'm going slowly.

4    THE COURT:  I think my court reporter disagrees

5  with you.

6    MS. CARDWELL:  She's giving me that evil look, so

7  I know I'm not.  And I know her well enough not to be

8  offended.

9  Q    There is a recording of this conversation?

10  A    There is, ma'am.

11  Q    So if we ever hear it and the jury can judge

12  whether or not he said he was involved in it or he did

13  it, he ordered it, correct?

14  A    Yes.  I listened to the recording.

15  Q    After this shooting occurred, I believe somewhere

16  in your report it's reflected that Madman and Tomcat

17  awarded themselves SS bolts after this shooting, is

18  that right?

19  A    I don't know if it says *awarded* themselves, but

20  I know they did in fact have SS bolts.

21  Q    So you don't know if your report says they gave

22  them to themselves?

23  A    I don't know the exact wording in the report,

24  ma'am.

25  Q    Well, what was your understanding of what did

1  happen?

2  A    That they ended up talking and they felt like they

3  deserved them.  Allegedly, he -- Madman already had his

4  SS bolts from another incident, allegedly, where he had

5  a confrontation with a Hells Angel, a verbal

6  altercation.  He said he already had them.  I don't

7  know what conversations they had with other people.  I

8  know in our regions that we have to go to someone that

9  can actually verify what happened, and then it's

10 approved.

11 Q    What I'm asking is if these two fellows, those two

12 fellows, was it your understanding that they gave

13 themselves patches or tattoos, or something, after they

14 did this shooting?

15 A    You would in fact put the patches on yourself.

16 Yes, ma'am.

17 Q    So are you saying that you have some indication

18 that someone else in the club awarded or gave these

19 patches to these two in recognition of their violent

20 act?

21 A    Well, it goes back to like what we were talking

22 about with Ox.  He put on SS bolts to try to take

23 credit for them when in fact he didn't.  So if a member

24 in the club were to put them on and he didn't earn them

25 or didn't deserve them, they weren't able to say that,

1 then they would be subject to having them removed or an

2 investigation into that as to what happened.

3 Q     My question is do you have any evidence that

4 anyone in this club other than the two of them awarded,

5 gave, or determined that they should get those SS

6 bolts?

7 A     The only evidence I would have is Thomas Benvie

8 being upset because he wanted to get the correct credit

9 for the shooting.

10 Q     Did he talk about SS bolts?

11 A     Pardon me?

12 Q     Did he talk about SS bolts?

13 A     He did.

14 Q     And when did he do that?

15 A     During our conversation he was talking about

16 wearing them around.

17 Q     But you don't know that Thomas Benvie had anything

18 to do with them getting them, right?

19 A     I don't know.  I know he tried to make sure they

20 got the credit for it.

21     MS. CARDWELL:  That's all I have.  Thank you.

22     THE COURT:  Mr. Hunter.

23     MR. HUNTER:  Yes, Your Honor.  Thank you.

24                    **CROSS-EXAMINATION**

25 BY MR. HUNTER:

1  Q    Good morning, agent.  It's Grabman, correct?

2  A    Yes, sir.  Good morning.

3  Q    First of all, William Davey did not have a

4  position in the American Outlaw Association, did he?

5  A    My understanding is that he was the chapter

6  enforcer for Asheville.

7  Q    It was stated in the opening by Mr. Duffey that

8  William Davey was a rank and file member of the

9  American Outlaw Association, is that your

10 understanding?

11 A    I don't recall what Mr. Duffey said in his

12 opening.

13 Q    Okay.  But that would not be your recollection?

14 A    My understanding was he was the enforcer for that

15 chapter.

16 Q    In fact, there have to be five members in a

17 chapter for there to actually be officers, correct?

18 A    No, sir, it's not correct.

19 Q    Okay.  How many members do you have to have

20 officers?

21 A    You can have two members and have officers.  The

22 chapters are supposed to have five members.  That's

23 what they said.  There were numerous chapters that

24 didn't have five members.  Actually, in the last

25 bosses' meeting, we were just talking about that and

1  saying that chapters didn't have -- Jack Rosga was

2  actually upset and had a conversation with David Lowry

3  saying that Asheville would either need to get the

4  membership or they would be shut down.  But they're

5  supposed to have five members, but the chapters are

6  allowed to exist without them.  My chapter only had

7  four when we finished the case.

8  Q    But in order to get the chapter started, you had

9  to have five?

10  A    That's what was told to me.

11  Q    And five members is the minimum generally required

12  for there to be a chapter, isn't that correct?

13  A    That is the requirement they say that you're

14  supposed to abide by, but it isn't.

15  Q    At the time of the alleged event at the Cockades

16  Bar and Grill, William Davey had been a member of the

17  American Outlaws Association for approximately two

18  months, correct?

19  A    That's correct, sir.

20  Q    And he was part of the chapter in Asheville, North

21  Carolina that only had two members?

22  A    That's correct, sir.

23  Q    So how then would he have been elected an

24  enforcer?  Would he have just been given the position,

25  or would there have been an election?

1   A     Probably appointed.  I don't know how he ended up

2   with the position.  I was always told that if you don't

3   have enough people, the most important positions are

4   the chapter president and the enforcer.  And then it

5   becomes the next important position would be the

6   treasurer, and then the next position would be the vice

7   president.

8   Q     And the position of an enforcer at that time would

9   have been like a sergeant of arms, to enforce

10  discipline within the chapter?

11  A     Well, it would be to maintain security at

12  functions, to do different things like that.  If you

13  had a party, it's hard to maintain punishment for an

14  enforcer if there are only two people with him and the

15  president.

16  Q     Which is why he would not have been an enforcer?

17  A     Yes, he still would have held that position.

18  Q     And how did you learn that he was an enforcer?

19  A     Talking to Chris Gagner.

20        THE COURT:  I couldn't hear your answer, agent.

21        AGENT GRABMAN:  Talking to Chris Gagner, the

22  Asheville president.

23  Q     When did Chris Gagner tell you that William Davey

24  was the enforcer for the chapter?

25  A     We had a conversation about it during the course

1  of the investigation.

2  Q    Before we get into what happened at the Cockades

3  Bar and Grill, did -- it's safe to say that you had to

4  prepare for your testimony today, correct?

5  A    Yes, ma'am.  Yes, sir.

6  Q    The incident happened about a year and a half --

7  more than a year and a half ago?

8  A    Yes, sir.  March of 2009.

9  Q    And this investigation that you were on covered a

10 span of more than two years?

11 A    Yes, sir.

12 Q    You wrote over 300 reports of investigation?

13 A    I was involved in -- the undercover phase was

14 probably more than 300.

15 Q    And a lot of things happened during the course of

16 your time as an undercover agent infiltrating the

17 American Outlaw Association, correct?

18 A    Yes, sir.

19 Q    So it's safe to say, some of the details about

20 what actually happened at the Cockades Bar and Grill

21 you may not recollect exactly as they happened?

22 A    I remember how the events happened.

23 Q    And you remember every detail of how it happened?

24 A    I remember the things I observed.  Yes, sir.

25 Q    When you prepared for your testimony today, did

1  you discuss what it would be with respect -- did you

2  discuss it with Peter Duffey, or one of the other U.S.

3  Attorneys?

4  A    Oh, yes, we went over my testimony.

5  Q    How long did you actually have to prepare for your

6  testimony in this case?

7  A    I prepare all the time reading the documents and

8  going over things.

9  Q    While you prepared for your testimony, do you talk

10 about specific defendants?

11 A    We talk about -- we go through the different

12 events that happened.

13 Q    Do you talk about the importance of certain

14 testimony as it relates to certain defendants?

15 A    No.  No testimony is more important than the

16 other.  It's just the facts of what happened.

17 Q    So there would not have been an occasion to say,

18 okay, William Davey is on trial for this.  Make sure we

19 highlight certain things about what happened on March

20 14th?

21 A    There are certain things during the course of the

22 investigation that are attributed or have taken place

23 where Mr. Davey was present that was reviewed.

24 Q    When William Davey, along with the other

25 individuals, came up to the Petersburg chapter on March

1  the 14th, it was for the purpose of having a regional

2  meeting, correct?

3  A    It was a dual purpose.  It was for the regional

4  meeting, and then going out into the town.

5  Q    And in terms of going out into the town, the

6  majority of the members were there to party and have a

7  good time, correct?

8  A    I don't know what was in their mind frame.  I know

9  when they arrived at the house, Les Werth was talking

10 about what we would do, and Mr. Davey was present from

11 the very onset.

12 Q    But the majority of the conversation was talking

13 about going out, going bar hopping.  In fact, the plan

14 is to go to about two or three bars?

15 A    The plan at the house was to go to that bar where

16 the Desperados were.

17 Q    So if other individuals testified that on the

18 night of March the 14th --

19      MR. DUFFEY:  Judge, I'm going to object.

20      THE COURT:  Objection is sustained.  He can't

21 testify as to other witness's testimony.

22 Q    But it's not your recollection that the members

23 were there to have a good time and to go out to several

24 bars?

25 A    I don't know what was in their mind frame.  No,

1  sir.  I know when he came to the house, one of the

2  immediate discussions was the strength of the HAs, and

3  their support clubs, and where we could go to find

4  them.

5  Q    When you're at the house, that discussion about

6  where to find members of the Hells Angels and their

7  support clubs takes about two minutes, correct?

8  A    I -- I don't know the exact time, but we did talk

9  about it.  I don't know the exact time.

10  Q    But there's more of an hour of audio and video of

11  everyone talking about other things.

12  A    Yes, we were there for approximately an hour.

13  Q    So it's safe to say that for more than an hour,

14  other things other than Hells Angels was discussed?

15  A    Yes, sir.

16  Q    So it can't then be said that this Hells Angels

17  business was the primary topic of conversation?

18       MR. DUFFEY:  Judge, that's just argument, and I

19  object to it.

20       THE COURT:  Objection is overruled.

21       You may answer, agent.

22  A    It was one of the topics of conversation.

23  Q    It was the least topic of conversation, was it

24  not, Agent Grabman?

25  A    I would say it was probably the most significant

1  portion of the conversation in the content because the

2  rest was sitting around talking, and we were talking

3  about going out and committing an actual assault.

4  Q    And for the purposes of your testimony in

5  preparing for trial, that is what was most important to

6  you, correct?

7  A    That's one of the things that was covered, yes,

8  sir.

9  Q    But that was not necessarily what was most

10 important to the members of the Outlaws?

11 A    I don't know.  I can't tell you.

12      THE COURT:  Objection sustained.  That calls for

13 him to speculate as to what may have been in their

14 minds, so the objection is sustained.  You may rephrase

15 the question if you wish.

16 Q    Again, the majority of the conversation of the

17 members of the American Outlaw Association who were

18 actually there that night at your residence was about

19 things completely different -- let me rephrase that,

20 Judge.  That was a bad question.

21      The majority of the conversation had nothing to do

22 with Desperados or Hells Angels?

23      MR. DUFFEY:  Asked and answered, Judge.

24      THE COURT:  I'm going to let him answer it one

25 more time to clarify, and that's going to be the last

1    time that question will be asked.

2          You may answer, agent.

3    A    There was additional conversation that spanned

4    that hour period of time.

5    Q    Whose idea was it to go to the Cockades Bar and

6    Grill?

7    A    Les Werth.

8    Q    Have you --

9          MR. HUNTER:  Just a moment, Your Honor.

10         THE COURT:  Yes, sir.

11   Q    Have you reviewed Report Number 116?

12   A    I've reviewed a lot of reports.  If you can give

13   me a copy, or if I can refer to it.

14   Q    Sure.

15   A    I probably have it here.

16   Q    Take your time.

17         THE COURT:  Do you have that, agent, or do you

18   need a copy produced for you?  What's the number on

19   that again?

20         MR. HUNTER:  It's 116.

21         AGENT GRABMAN:  I do not have a copy of 116.

22         THE COURT:  Do you have an additional copy that he

23   can review?

24         MR. DUFFEY:  Yes, sir.  We can find it.

25         THE COURT:  The Marshal will give a copy to the

1 agent to review.

2      MR. DUFFEY:  Judge, we would ask for one minute.

3 We just need to find another copy if he's going to

4 testify from it.

5      THE COURT:  Okay.  Sure.  It will take a moment,

6 I'm sure, for the agent to refresh his recollection, so

7 you go right ahead.

8      MR. MILLER:  Your Honor, that's the only copy we

9 have here.  We would like to have a copy to review it.

10      THE COURT:  Here is what I'll do.  Once the agent

11 refreshes his recollection, I assume he will not need

12 to refer to it further, I'll have it returned to you,

13 Mr. Miller.  Is that okay?

14      MR. MILLER:  Yes, sir.

15      THE COURT:  All right.

16 A    Yes, sir.

17 Q    Okay.

18      THE COURT:  Hold on one second.

19      Marshal, if you would return to it Mr. Miller or

20 Mr. Duffey.

21      All right, Mr. Hunter, you may inquire.

22 Q    Agent Grabman, you mentioned in the report that

23 Les Werth wanted to go to the Cockades Bar and Grill,

24 correct?

25 A    Yes, sir.

1   Q     And you mentioned that once he said that's where

2   he wanted to go, you tried to talk him out of it or

3   convince him to go somewhere else?

4   A     Yes.  Beforehand we gave him several different

5   options talking about the Southern Star Bar, the Jolly

6   Rogers, and Livewire where we had seen the Hells

7   Angels, or heard that they had been in these bars.  He

8   asked where the Desperados hang, and I told him, *"The*

9   *only bar where we know they hang is a bar down in*

10  *Petersburg called the Cockades."*

11        And he says, *"That's where we're going."*

12  Q     Well, when did you try to talk him out of it?

13  A     We had additional conversations with him.  When we

14  were at the bosses' meeting, we talked about it again

15  and talked about, well, is this the place you want to

16  go?  Agent Ozbolt also suggested the three other

17  suggestions of where to go.

18  Q     Are any of those conversations recorded?

19  A     I know in the very first part of the tape that we

20  played yesterday it shows on there where we gave the

21  three other options saying that's where the Hells

22  Angels have been.

23        MR. HUNTER:  Judge, at this point, I'd like to see

24  if we can review that portion of the tape that was

25  placed into evidence yesterday.

1        THE COURT:  What do you mean by review?

2        MR. HUNTER:  If we could play it.

3        THE COURT:  All right.  Without a transcript, I

4  don't -- well, do you have that?

5        MR. MILLER:  What exhibit number is that?

6        MR. HUNTER:  Judge, I'm not sure of the exhibit

7  number.  The government introduced it as evidence

8  yesterday.

9        THE COURT:  Is this the conversation, agent, that

10  proceeded the trip to the Cockades bar, is that right,

11  sir?

12        AGENT GRABMAN:  Yes.  I believe it's ATF

13  Electronics Exhibit 88.

14        THE COURT:  Exhibit 88.  ATF 88.

15        MR. DUFFEY:  Judge, it's Government's Exhibit 51.

16        THE COURT:  All right.  Fine.

17        MR. HUNTER:  Can we republish the transcript to

18  the jury?

19        THE COURT:  Does the transcript cover this?

20        MR. HUNTER:  Yes.

21        MR. DUFFEY:  It covers Exhibit 51.  Judge, I also

22  introduced a tape of the entire meeting.

23        THE COURT:  I realize that.  I'm trying to

24  highlight the portion that is relevant.

25        And it's the portion that they played, you want

1  that portion played again, is that right, Mr. Hunter?

2       MR. HUNTER:  Yes, Your Honor.

3       THE COURT:  All right.  Okay.  We can do that.

4       Do you have the transcripts on that, Mr. Duffey or

5  Mr. Miller?

6       MR. DUFFEY:  I'm sure we can find them.

7       THE COURT:  Okay.  The transcript is Exhibit 52.

8       MR. DUFFEY:  Yes, sir.  We're finding it.  They

9  were just out of order, sir.

10      THE COURT:  I understand.  That's fine.

11      If necessary, the jury may have to share copies.

12 I apologize to you, but that's the way it is.

13      Okay, they say they're in good shape, so go ahead.

14 Play the tape.

15      MR. HUNTER:  And, Judge, before we play the tape,

16 I'm going to want to stop it at some point, so can I

17 just say stop?

18      THE COURT:  Sure.

19      MR. HUNTER:  And I trust that it will be stopped.

20      THE COURT:  Okay.

21         (The tape is being played at this time)

22      MR. HUNTER:  Stop.  Thank you.

23      THE COURT:  Is that all you want played?

24      MR. HUNTER:  No.  For right now.

25      THE COURT:  All right.

1      MR. HUNTER:  For right now.

2      THE COURT:  Okay.

3  Q    Now, the subject of this -- or the context of this

4  conversation is they're asking you generally where the

5  Hells Angels hang out, correct?

6  A    The Hells Angels and their support clubs.

7  Q    Right.  At this point, they haven't told you where

8  they want to hang out.  They're just asking generally

9  about the Hells Angels and the Desperados, and asking

10  where they hang out generally.

11  A    I'm not sure what part of the tape that this is

12  actually a clip from.  As you said, it was an hour long

13  conversation.  I know that there were additional

14  conversations talking about the strength and numbers of

15  the Hells Angels and their support clubs in the areas.

16  I believe maybe that was before this part of the clip,

17  but I don't know exactly where this was coming from,

18  sir.

19  Q    And your response is not suggesting where they

20  should go, you're telling them where the Hells Angels

21  or their support clubs hang out?

22  A    Correct.  I'm telling them where they've been seen

23  and where they hang out.  Yes, sir.

24  Q    And at that time, you tell them, among other

25  places, that they hang out at the Cockades Bar and

1  Grill?

2  A     Yes, sir.

3        MR. HUNTER:  If you can play it?

4          (The tape is being played at this time.)

5        MR. HUNTER:  Stop.

6  Q    At this point, Agent Grabman, you don't try to

7  talk Les Werth out of going to the Cockades?

8  A     No.  We had given three options of more friendly

9  bars where we didn't think we were going to meet

10 anybody.  He made the decision of Cockades is where we

11 would be going.  I was a perspective member, he was a

12 regional boss, I go where I'm told.

13 Q    When did you suggest the other places to go to?

14 A     Right there at the beginning of the tape you just

15 played, sir.

16 Q    But in the -- reading that and listening to that,

17 that was again in response to you asking where the

18 Hells Angels hang out, correct?

19 A     To be honest, they don't normally hang out at

20 those three places.  They had gone there before, but

21 those were places where we hang out.  And I thought the

22 reason I suggested those was because they're more

23 friendly bars to us, and we wouldn't run into a problem

24 there.

25 Q    And you stated, *"They were in here in Hopewell,*

1   *and they went to Livewire."  "They"* meant the Hells

2   Angels or Desperados?

3   A     Correct, sir.

4   Q     *"They went to Jolly Rogers."*

5   A     Yes, sir.

6   Q     Again, Hells Angels or Desperados?

7   A     Yes, sir.

8   Q     *"And they also maybe went to Southern Star."*

9   A     I actually said, if you listen to the tape, it

10  said about two weeks ago they went to that bar, that

11  bar, and that bar, referring to when they went there

12  two weeks ago.

13  Q     Okay.

14  A     Those are all the bars that we normally hung out

15  at in the tri-city area.

16  Q     And then you bring up to Les Werth that they hang

17  out all the time at a place called the Cockades?

18  A     Yes, I said they hang out at a bar called Cockades

19  down in Petersburg.  I think I said Cockades.  I didn't

20  know the bar for sure.

21  Q     Why did you tell them that?

22  A     Well, because Mr. Werth, along with Mark Steven

23  Fiel, Snuff, had communication with the Pagans

24  Motorcycle Club, or guys from that area.  If I would

25  have told him somewhere as a lie, they could have

1  easily made that call.  Or during conversation if one

2  of these other people found out, and found out that I

3  had lied, I would have been disciplined for lying.

4       MR. HUNTER:  Okay, we can play it again.

5       THE COURT:  Pardon me?  You want to play the

6  balance of the tape?

7       MR. HUNTER:  Yes.

8       THE COURT:  Okay play the balance of that tape.

9          (The tape is being played at this time.)

10      MR. HUNTER:  Stop.

11 Q    So Agent Grabman, that's you talking at that

12 point, correct?

13 A    It is sir.

14 Q    You're describing the bar?

15 A    I actually described a bar.  It was actually the

16 opposite because I'd never been there, but that's what

17 I'd been told.

18 Q    And it appears from the video that you are, I

19 guess, helping plan this with Les Werth?

20 A    I'm telling him when we go into the bar, and also

21 that way I can let Agent Anderson know, who's also in

22 the picture right here, what we're walking into in the

23 bar.

24 Q    William Davey isn't saying anything.  He's just

25 listening?

1  A    Correct.  He's sitting there taking it in.

2  Q    As a matter of fact, during the course of the

3  entire evening, the entire hour that you-all are there

4  at the restaurant, William Davey doesn't talk a lot,

5  does he?

6  A    William Davey doesn't talk a lot anyway.

7  Q    He's a quiet guy?

8  A    He is.

9  Q    As a matter of fact, he might have said two words

10  the entire hour he was there?

11  A    I don't know how many words he spoke, sir.

12  Q    So you have just described to Les Werth the

13  outline of the bar and how it is that you-all might

14  possibly get trapped in there if you're not careful?

15  A    Yeah, I told him what I'd been told before.  Yes,

16  sir.

17  Q    And part of this is I guess this strategy that

18  you're using with Les Werth in terms of, you know, what

19  to look out for, be careful of, and so forth.

20  A    No, I didn't want to see myself, Les Werth, or any

21  of the other people with us get hurt when we went in

22  there.

23       MR. HUNTER:  Go ahead and play it.

24          (The tape is being played at this time.)

25       MR. HUNTER:  Judge, just a moment.

1  Q    Now, prior to the Outlaws coming up from North

2  Carolina for this regional meeting, had there been any

3  problems between you and the Desperados?

4  A    No, we hadn't had any issues with the Desperados

5  other than on September 20th when the Outlaws came up

6  for the Dinwiddie drag on September 20th of 2008.  We

7  hadn't had any other problems with the Desperados.

8  Q    So there was no tension between the Outlaws and

9  the Desperados?

10 A    No, sir.  It was all based on territory.

11 Q    But there wasn't any reason to expect that there

12 was going to be a confrontation between you and the

13 Desperados generally, correct?

14 A    That's incorrect, sir.

15 Q    So there was an expectation that there would

16 generally be violence between the two of you?

17 A    There would be a problem that we as Outlaws went

18 into their established territory or their established

19 bar or area, especially with their affiliation with the

20 Hells Angels, if we impeached or went into that, yes,

21 there would be trouble.

22 Q    But there hadn't been previously?

23 A    We had not really been -- we had never really run

24 into those guys.

25 Q    And the guys coming up from North Carolina didn't

1   think that there were necessarily going to be any

2   problems, or that there had been any existing problems

3   between you-all and the Desperados, correct?

4   A     That would be incorrect based on what happened in

5   Dinwiddie in September of 2008 where the Outlaws and

6   Pagans surrounded them when we were still Mongols and

7   they pretty much forced them to leave the function.

8   Q     And it's your testimony today that there was

9   residual bad feelings between the Outlaws and the

10  Desperados?

11  A     Before or after which event?

12  Q     After Dinwiddie in 2008.

13  A     Oh, I believe so because it was within two weeks

14  of that when the Hells Angels came to our house and put

15  the sticker on our mailbox.

16  Q     So that was before the Cockades incident?

17  A     It was the March -- I believe that was March 22nd

18  and 23rd.  The Cockades incident was march 1st.

19  Q     Right.  So again, prior to the Cockades incident,

20  there's no reason to expect that if you see a

21  Desperado, or a Desperado sees you, that there's going

22  to be a physical altercation?

23  A     That's incorrect, sir.  I've explained that the --

24  the society and the culture where these clubs exist.

25  They're not existing in the same territory with them

1  being associated with the Hells Angels.  It would be an

2  immediate tense situation.

3  Q     Had you run into the Desperados?

4  A     No, sir.

5        THE COURT:  I think you've been over this,

6  Mr. Hunter, with all due respect.  I think he's

7  answered that line of questioning.  Why don't you move

8  on.

9        MR. HUNTER:  All right.

10 Q     In going to the Cockades that evening, the purpose

11 of the Outlaws from North Carolina, they wanted to

12 check out the Desperados, correct?

13 A     They wanted to establish the dominance for the

14 Outlaws in the Virginia area.

15 Q     But they certainly weren't going in there with the

16 intent to assault people?

17 A     Oh, yes, they were.

18 Q     The idea was to go into the bar and see what the

19 Desperados might do, correct?

20 A     Sir, when you go, as I explained, into their area,

21 there is -- that's exactly what happened.  I think

22 there was even a conversation at some point with Mike

23 Smith asking Les Werth, *Let me get this straight.*

24 *When we go in there, what are we going to do?"*

25       And the answer was, "*Fuck 'em up.*"

1  Q     Yet when they first encountered the Desperados,

2  they don't assault the Desperados, do they?

3  A     The plan was to try and trap them in the bar.  If

4  you listen to the tape, they say on there they may be

5  tracking the wrong people because they thought the

6  Desperados would think that they were trapping the

7  Outlaws in the bar, when in fact it would be the

8  opposite.

9  Q     Exactly.  The plan was that the Outlaws would go

10 in and the Desperados might try to assault them and

11 might try to trap them?

12 A     That is what they thought the plan would be for

13 them in their minds to come in, and that's why they had

14 the Outlaws on the outside to draw them in and trap

15 them so they could assault them.

16 Q     And again, the idea was that the Desperados might

17 assault the Outlaws just simply for being there?

18 A     No, they thought the Desperados would show up and

19 the Outlaws would assault them.

20       MR. HUNTER:  Judge, I need just a moment.

21       THE COURT:  Yes, sir.  Do you have any further

22 questions, Mr. Hunter?

23       MR. HUNTER:  Yes, Judge.  I'm just looking for one

24 document.

25       THE COURT:  All right.  Go ahead.  When this is

1  concluded, we'll take a short recess.

2  Q    Agent Grabman, I'd like for you to refer again to

3  Report 116.

4  A    I don't have that.

5       THE COURT:  All right.  Well, he doesn't have

6  that, so the Marshal is going --

7       AGENT GRABMAN:  I'm sorry.  It was out of order in

8  the book.  I apologize to the Court.

9       THE COURT:  Go right ahead, sir.

10 A    Yes, sir.

11 Q    You stated in that report --

12 A    Which paragraph are you referring to?

13 Q    Paragraph 9, the very last sentence.  You stated

14 that the -- or you reported that the idea was to send

15 three Outlaw members inside and see what happens, and

16 the rest can come in behind if something does.

17 A    Correct.  *"See what happens"* was referring to the

18 Desperados coming in.

19 Q    So, again, if the Desperados come in and buy a

20 round of beers for the Outlaws, there are not going to

21 be any problems is there?

22 A    That would have never happened, sir.

23      MR. HUNTER:  Calls for speculation, Judge.

24      THE COURT:  Don't comment on the answer.  No, sir.

25 We don't allow that.  You know that, Mr. Hunter.  Go

1  ahead.  Next question.

2      MR. HUNTER:  Your Honor, I'd like to play another

3  segment of tape.

4      THE COURT:  All right.  What I'm going to do, I'm

5  going to take a short recess to accommodate counsel

6  here, and I'll give the prosecutors a chance to get

7  that organized and we'll play it right after the

8  recess.

9      Ladies and gentlemen, we'll take about a five

10  minute recess and we'll come back and hear the tape.

11   (The jury is no longer present in the courtroom.)

12      THE COURT:  Agent Grabman, if you want to step

13  down for a moment, you may.

14      AGENT GRABMAN:  Thank you, Your Honor.

15      THE COURT:  Court will stand in recess for about

16  five minutes.

17                    (Recess taken.)

18      THE COURT:  Let me ask defense counsel if they

19  would be kind enough to if you intend to ask the

20  government to play portions of any of these tapes, try

21  to give them some notice in advance so they can have

22  them prepared and we can have the transcripts

23  available.

24      All right, ready for the ladies and gentlemen?

25      MR. MILLER:  Yes, Your Honor.

1      THE COURT:  Marshal, bring the jury in.

2          (The jury is present in the courtroom.)

3      THE COURT:  What tape did you want played,

4  Mr. Hunter?

5      MR. HUNTER:  Government's Exhibit 54.

6      THE COURT:  Exhibit 54.  All right.  And the

7  transcripts have been passed out.

8      MR. HUNTER:  Exhibit 53 is the tape, and 54 is the

9  transcript.

10     THE COURT:  All right.  I think the jurors are

11 getting the transcript right now.

12     All jurors now have a copy of the transcript?

13     All right, go ahead and proceed with playing the

14 tape.

15     MR. HUNTER:  Judge, before we play it.  Stop.

16     THE COURT:  Yes, sir.

17 Q    Just so we know -- or just so we're clear, this

18 tape is made at the restaurant, correct?

19 A    This is made, I believe, as we walked out of the

20 restaurant.  We had sat and ate dinner in a couple

21 different booths, and we walked out of the restaurant.

22 I believe this is when Special Agent Ozbolt turned on

23 the recorder and was able to capture part of the

24 conversation.

25 Q    So you were not wearing the recorder at the time?

1    A       No.  This was Special Agent Ozbolt.

2    Q       And the recorder was not on during any portion of

3    any conversation at the restaurant?

4    A       I don't believe it was.  No, sir.

5    Q       Any particular reason why not?

6    A       You will have to ask Special Agent Ozbolt that,

7    sir.

8    Q       Would that be standard protocol not to record

9    that, or do you just select which portions you feel are

10   worthy to be recorded?

11   A       Well, the problem is the recorders we use have a

12   limited amount of both battery time and recording time.

13   So in effect what you're asking is if we would turn on

14   the recorder and let it play.  The recorders we carry

15   only had a six hour window.  If that had been the

16   point, we would have had it on and it would have run

17   out early that evening.  So we do have to select and

18   record when we can.

19          And we don't have -- they're covert in nature, so

20   it isn't like I can just say, you know, excuse me, sir,

21   can you stop talking, let me turn on the recorder.  I

22   have to be able to do it covertly where they don't see

23   us turning it on.

24   Q       And you generally turn it on when you feel like

25   there's going to be information or evidence gathered

1  that's important?

2  A     Yes.

3        MR. HUNTER:  Let's go ahead and play the tape,

4  Your Honor.

5        THE COURT:  All right.  Very well.

6         (The tape is being played at this time.)

7  Q     So, again, it's at that point that you suggest

8  again that they go to the Cockades?

9  A     What Les had told me at that point was to get

10  ahold of Rebar, who is the president of the Pagans, and

11  speak to him on the phone and see if they'd heard of

12  them out and about.  He was standing there when I

13  called Rebar.  And during the course of the

14  conversation, Rebar said they hadn't been down to the

15  Southern Star.

16        So when I got off the phone, I told him that I

17  think Cockades is the place they might be because

18  they're not down at any of the rest.  And he said,

19  *We'll go down to where they think they'll be.*  If I

20  had lied to him -- he asked me where I think they'll

21  be, and if I would have lied to him, we were going to

22  hopefully run into Rebar later that night, if he would

23  have spoken to Rebar and Rebar said, well, I told him

24  to go to the Cockades, then I took him over to some

25  other unknown bar, I'd of been in a lot of trouble.

1  Q     So, again, you suggested that they go to the

2  Cockades?

3  A     Yes, sir.

4      MR. DUFFEY:  Judge, I think at this point the tape

5  speaks for itself.

6      THE COURT:  Yes, objection is sustained.  You've

7  got your answer.  Go head.  Play the rest of the tape.

8          (The tape is being played at this time.)

9      MR. HUNTER:  Stop it.

10 Q     Now, you are talking to one of the other Outlaws

11 and you're describing the setup at the Cockades,

12 correct?

13 A     Yes.  We're all standing outside the bar.  It's

14 Mr. Davey, Mike Smith, Les Werth, Mariaca, and

15 everybody.

16 Q     And you're essentially telling them that once you

17 get past a certain area in the bar, they've got you

18 trapped?

19 A     Correct.  The way it was described to me is when

20 you go in the bar, I thought it was near the right, but

21 when you go in it's an area to the left, and they have

22 you trapped.  That part of the plan didn't work very

23 well because it was someone that came from that area

24 that smashed me in the face.

25 Q     But that -- *they* that you're referring to,

1  they've got you trapped, you're refer to the

2  Desperados, correct?

3  A    Correct.  Yes, sir.

4  Q    And then after that, Les Werth essentially says

5  let's send three in and see happens?

6  A    In -- yes, he did here.  And then we pull off and

7  have another meeting after that.

8        MR. HUNTER:  That's all with the tape, Your Honor.

9        THE COURT:  All right.

10        Any further questions?

11        MR. HUNTER:  Yes.

12        THE COURT:  All right.

13        MR. HUNTER:  Does the Court want to take a recess?

14        THE COURT:  No.  Go ahead.

15  Q    So once you actually get to the Cockades, William

16  Davey goes in, Lowry goes in.  Lowry doesn't go in?

17  A    Lowry wasn't even off parole at that time, sir.

18  He wasn't there.

19  Q    Okay.  Well, then who goes into the Cockades

20  initially?

21  A    Agent Anderson, who was a prospective member; the

22  CI, who was a prospective member; and William Davey,

23  who was the full patched member.

24  Q    And what happens when William Davey goes into the

25  bar?

1  A    Sir, I was outside in the car.

2  Q    But you don't know of anything happening, correct?

3  A    I know that the Desperados then showed up.

4  Q    And the two Desperados that showed up actually

5  showed up with two women, correct?

6  A    Correct.  They were outside the building and

7  turned them back.

8  Q    Once they saw that there was an Outlaw outside the

9  bar?

10  A    I can't tell you why they turned them back.  I saw

11  them turn them back, sir.

12  Q    And it was your testimony yesterday that Mike

13  Smith was outside the bar in an effort to lure

14  Desperados there, is that correct?

15  A    Yes, sir.

16  Q    Explain how standing outside a bar was going to

17  lure Desperados in there.

18  A    Because we were standing right outside their bar.

19  The plan was for him to be outside.  The others were

20  inside.  His plan was for him to go in, they follow him

21  in.  We then come behind, and at this point they're

22  trapped in the bar.

23  Q    Well, if it's a Desperados' bar, aren't they going

24  to be there anyway?

25  A    Well, apparently not because they showed up.

1    Q    Right.  Because it's their bar.  And they showed

2    up with two dates, correct?

3    A    No, it's -- it was a bar that they were known to

4    frequent was the intelligence that we had.

5    Q    And again, the two Desperados that you saw showed

6    up with dates?

7    A    I can't tell you if they were dates or not, sir.

8    Q    They were two women with two guys?

9    A    There were two women that showed up with the two

10   guys, and they sent them back.

11   Q    And they only sent them back once they saw Michael

12   Smith outside the bar, correct?

13   A    I don't know what the whole reasoning was for them

14   sending them back.  I know I physically saw them on the

15   side of the building, and then they left.

16   Q    And is it a safe assumption to say that the reason

17   they sent the women back was because the Desperados

18   were going to try to confront the Outlaws?

19   A    I'm guessing, yeah, they probably thought it was

20   going to become a violent encounter.

21        THE COURT:  Well, I don't went you to guess.

22        AGENT GRABMAN:  I'm sorry, Your Honor.

23   A    I don't know what was in their minds.

24        THE COURT:  Next question.

25   Q    Have you spoken to the two bartenders, Heather

1  Elliott and Katie Loughren, who were present at the

2  Cockades that night?

3  A    I have not.

4  Q    Okay.  Were you aware that members of the American

5  Outlaw Association are welcome in that bar by the

6  ownership of the bar?

7  A    I don't know what the ownership thinks.  Are you

8  talking about this point in time or that point in time?

9  Q    That point in time.

10  A    I don't know at that point in time if they were or

11  not.

12  Q    You don't know if they were welcomed by the

13  ownership or not?

14  A    I do not.

15  Q    Certainly they weren't asked to leave?

16  A    I don't know, sir.  I wasn't inside the bar.

17  Q    Would it surprise you --

18       THE COURT:  Objection sustained.  Whether he is

19  surprised or not is irrelevant.

20  Q    The Desperados don't own the bar, do they?

21  A    I don't know who owns the bar, sir.

22  Q    To the best of your knowledge, do the Desperados

23  own the bar?

24  A    Again, sir, I don't know.  I would have to be

25  guessing.  I don't know.  I would guess they don't, but

 1  I can't say an answer.

 2  Q    And to the best of your knowledge, the Desperados

 3  can't say who comes in and who doesn't?

 4       MR. DUFFEY:  Judge, it's all speculation.  I would

 5  object.

 6       MR. HUNTER:  Well, Judge, he's testified

 7  essentially that the Outlaws --

 8       THE COURT:  How could he possibly know what the

 9  owners of the bar -- objection sustained.  I don't want

10  to debate this with you.  Why don't you move on to the

11  next question, Mr. Hunter.

12  Q    Once the two -- first of all, prior to those two

13  Desperados showing up, to the best of your knowledge,

14  were there any Desperados already inside the bar?

15  A    From the time I pulled up in my vehicle, I did not

16  see any other Desperados enter the bar.

17  Q    And you had not gone into the bar so you don't

18  know if there was a Desperado already there?

19  A    Correct, sir.

20  Q    So it's possible that there was a Desperado in

21  there along with William Davey?

22  A    Again, I don't know who was in the bar.  I was out

23  in the vehicle.

24  Q    But there was certainly no confrontation between

25  William Davey and a Desperado who may have been in

1   there upon William Davey's entry into the bar, correct?

2       MR. DUFFEY:  Judge, he's testified he wasn't in

3   the bar when Davey went in.

4       THE COURT:  I don't think he was there.  I don't

5   think he knew.

6       MR. HUNTER:  Well, Judge, I think he would know if

7   there was an altercation.  I think that would have been

8   part of the report if there was a physical fight

9   between the two.

10      THE COURT:  I'll let him answer the question.

11  A    There was no physical fight.

12      THE COURT:  No physical fight.  Okay.  Very well.

13  Q    So the two Desperados walk up to the bar with

14  their dates and they see Michael Smith, correct?

15  A    The two Desperados walked up with two females and

16  told them to go back.

17  Q    And immediately upon telling the two females to go

18  back, they walk over to Mike Smith, correct?

19  A    They walked to the opposite side of the street and

20  engaged in a heated conversation, yes, sir.

21  Q    And who starts that heated conversation?

22  A    I don't recall.  I believe the Desperados were the

23  ones that started talking first.

24  Q    Did Mike Smith hit the Desperado at that time?

25  A    No, he did not.  Not until later.

1  Q     It was just a verbal exchange?

2  A     Yes, sir.

3  Q     And after that verbal exchange, initiated by the

4  Desperados, the Desperados go into the bar?

5  A     Yes, sir.

6  Q     What happened?  You're still outside so you don't

7  know?

8  A     Correct, sir.

9  Q     At what point do you enter the bar?

10 A     After Mike Smith and the Desperados are gone, we

11 were in that parking lot so it took us a short time to

12 get out of our cars and then walk in.

13 Q     So what happens when you walk into the bar?

14 A     When I walked into the bar, I observed the two --

15 I had come up to the bar, I placed my back against the

16 bar so I can sort of see what's going on.  I have

17 Special Agent Anderson to my left.  The Desperados come

18 out of the bathroom.  Two Desperados were up in the

19 bathroom.  They come out, they start walking down, and

20 there's a conversation between Mike Smith and them that

21 became heated.  And Mike Smith then began punching one

22 of the Desperados in the face.

23 Q     All right, let's back up a little bit.  You don't

24 actually see the two Desperados go into the bathroom

25 together?

1   A     No, sir.

2   Q     You just see them come out together?

3   A     Correct, sir.

4   Q     And immediately upon coming out, they walk up to

5   Mike Smith, correct?

6   A     You have to walk past him to exit the bar.

7   Q     And one of the Desperados asked Mike Smith, *What*

8   *are you guys doing here?*

9   A     I don't know what their conversation was, sir.

10  Q     You couldn't hear any of it?

11  A     No.

12  Q     And none of it was recorded?

13  A     No.  Well, I don't know.  It is not on this

14  transcript.  I don't believe it's recorded.

15  Q     Was one of the other officers part of that verbal

16  interaction between Michael Smith and the Desperados?

17  A     Not to my knowledge.

18  Q     So you don't remember?

19  A     I've spoken to the other officers and they said

20  they weren't involved in any of that.  It was strictly

21  between Mike Smith and the other guys, to the best of

22  my knowledge.

23  Q     So it's not true then that when the Desperado

24  asked Mike Smith what we was doing there, the other

25  undercover agent said --

1    THE COURT:  He said he didn't know.

2    MR. HUNTER:  But it's the other -- Judge, I'll

3  move on.

4  Q    You didn't hear him say anything?

5  A    No, sir.

6  Q    How far away were you?

7  A    Probably about from me to you.

8  Q    And you couldn't hear the words that were spoken

9  between the two of them?

10  A    No, sir.  It's a bar.  Music is playing.  No, I

11  couldn't hear.

12  Q    And certainly they weren't yelling at each other

13  then?

14  A    It was a heated discussion.  It got to that point.

15  Q    But, again, not so heated that you could hear from

16  the distance from where we are?

17  A    I can hear Mike Smith and the other guy going back

18  and forth.

19  Q    Did you ever see the Desperado push Mike Smith?

20  A    No.

21  Q    And in fact, Mike Smith only hit that Desperado

22  one time?

23  A    I don't know, sir.  I turned -- I turned to see

24  the commotion.  As I turned to see the commotion, I

25  looked back around, at that point I got smashed across

1  the face, so I don't know what happened there.  My

2  attention was diverted to the man who just hit me.

3  Q    Because yesterday you said he punched him a bunch

4  of times.

5  A    I turned and saw him hit the guy.  I turned and

6  went like this.

7  Q    At that point you're hit?

8  A    Yes, sir.

9  Q    So your attention now was obviously on other

10 things?

11 A    Yes, sir.

12 Q    William Davey is in the bar, correct?

13 A    Yes, sir.

14 Q    He doesn't hit anybody?

15 A    Again, my attention is over here.  I don't know if

16 he hit anybody.  I don't know if he had words with

17 anyone.  I turned to the man who smashed the beer

18 bottle across my face.  So I don't know what happened

19 on that end.

20 Q    And after that happened, everybody left the bar,

21 correct?

22 A    No.  I left the bar with Special Agent Ozbolt and

23 went over to my vehicle and was trying to get the

24 bleeding stopped on my face.  Agent Ozbolt and I, once

25 we did that, we were able to call the cover team and

1  let them know what had happened.  And then as we walked

2  back up to the bar, as we entered the bar, people were

3  starting to leave.  So there was an amount of time

4  there where we were trying to get the bleeding to stop.

5  Q    And in fact, the Desperados left the bar prior to

6  the Outlaws, correct?

7  A    I don't know, sir, because I -- the one Desperado

8  that hit me, or the guy associated with the Desperados,

9  I don't know if he's a member or not, he left the bar

10 because he ran out.

11 Q    And he certainly wasn't trapped in there by the

12 Outlaws, was he?

13 A    He was on my right-hand side.  He was in that area

14 that I warned everybody to be careful of.

15 Q    Eventually, all of the Outlaws, with the exception

16 of William Davey, leave the bar, correct?

17 A    Correct.  William Davey was placed under arrest.

18 We leave and go down around the corner.

19 Q    And he was arrested for possession of contraband,

20 not any of the events surrounding this event, correct?

21 A    He was arrested for having brass knuckles and a

22 knife in the bar.

23 Q    Right.  But he wasn't charged with assault?

24 A    I don't believe so, sir.

25 Q    And in fact, the Desperado who was hit in the face

1  never pressed charges?

2  A     No, he did not.

3  Q     Do you know his name?

4  A     I know his nickname is Rambo.  I'm aware of who he

5  is, but I don't recall his exact name.

6  Q     And in one of the reports you have him listed as

7  the enforcer for the Desperados, but in fact at the

8  time he was the president, wasn't he?

9  A     Our information was he was the enforcer.  It was

10  told to us.  We weren't really investigating the

11  Desperados.  They were just a rival club in the area.

12  Q     So when the individuals, the Outlaws and

13  Desperados, leave the bar, the argument and the tension

14  kind of spills out into the parking lot, correct?

15  A     No.  They leave the bar.  Things are calmed down.

16  We walk out of the bar, walk down the street to the

17  right, sort of square the block.  I don't know where

18  the Desperados went.  I just know we saw them when we

19  turned the corner.

20  Q     And eventually you meet up with the Desperados

21  again in the parking lot?

22  A     Correct.

23  Q     William Davey was not in that parking lot?

24  A     He was not, sir.

25  Q     William Davey did not carry a firearm?

1   A    He did not have one on his person that I'm aware

2   of.

3        MR. HUNTER:  Judge, can we publish Exhibit 46?

4        THE COURT:  Government's Exhibit 46?

5        MR. HUNTER:  Yes.

6        THE COURT:  Sure.  Yes, sir.

7   Q    And is this the parking lot where the individuals

8   who had firearms again started to yell at one another?

9   A    This is a picture of several parking lots.  But

10  the actual altercation occurred over in this area.

11  Q    And again, that is right beside the Petersburg

12  Police Department?

13  A    Correct.  Over in this area.

14  Q    And all of those cars are Petersburg police

15  officer vehicles?

16  A    I have no idea what all those cars are, sir.

17  Q    Well, there was never any indication to you that

18  any of these individuals were going to shoot each

19  other, correct?

20  A    I was scared to death.  I've been in a shooting,

21  sir.  I was scared to death that that was going to

22  happen that evening.

23  Q    But as a law enforcement officer, you would agree

24  that you have a higher duty than just gathering

25  evidence and investigating the Outlaws, correct?

1  A     Yes, sir.

2  Q     In other words, you're not going to let anybody

3  get shot?

4  A     I'm going to try not to.

5  Q     And you're not going to let anybody get seriously

6  assaulted if you can avoid it?

7  A     If the time and place occurs that you can prevent

8  that, yes, sir.

9  Q     And if you felt that there would have been a

10  serious chance of a shooting occurring in that parking

11  lot, you would have called in the back-up team to get

12  law enforcement there immediately?

13  A     Well, we were in the confrontation.  There was no

14  way of saying hold on a minute and call on the phone.

15  There was no way of doing that.  As a law enforcement

16  officer, especially operating in an undercover

17  capacity, you know, I was there not just with the

18  people from this investigation, I was also there with

19  the members from the Desperados.  So I don't know how

20  as a law enforcement officer I would be able to

21  determine if I yell out *police*," I have several armed

22  people there, more armed people possibly than what we

23  have, and so it isn't a safe situation trying to do

24  that.  You have to protect yourself, and that's what we

25  did.

1    Q    But you would have tried to prevent a killing from

2    happening?

3    A    I would have tried to protect myself in that

4    situation.  I was outnumbered.  I was outgunned.  And

5    there's no way that we could have prevented the

6    situation from exploding.  Coming out of role wouldn't

7    have done you any good there, sir.

8    Q    But obviously no one was shot?

9    A    No, sir, no one was shot.

10   Q    They just yelled back and forth at each other?

11   A    The police came, and that stopped the altercation.

12   Q    And in fact, most of the time when the Hells

13   Angels and the Outlaws meet face-to-face, or the

14   Desperados, there's more talking going on than any

15   physical violence, correct?

16   A    Yes, sir.  A lot of times where it's a lot of

17   bantering, luckily law enforcement a lot of times is in

18   the area and they are able to quell it.

19        MR. HUNTER:  Judge, I don't have any further

20   questions.

21        THE COURT:  All right.  Thank you, sir.

22        Mr. Barley, any cross-examination, sir.

23        MR. BARLEY:  Yes, sir.

24                    **CROSS-EXAMINATION**

25   BY MR. BARLEY:

1    Q    Good morning, sir.

2    A    Good morning, sir.

3    Q    Now, you attended college, didn't you, sir?

4    A    Yes, sir.

5    Q    A fraternity man?

6    A    No, sir.  No, no fraternities.

7    Q    Okay.  Now, in your first day of testimony, you

8    described the organization of the Outlaws, correct?

9    A    We had a lot of talk about it.  I'm not sure

10   exactly what you're referencing.

11   Q    Over -- the overall hierarchy of them, there's a

12   national, correct?

13   A    Yes, sir.

14   Q    And then there are the different regions?

15   A    Yes, sir.

16   Q    Now, let's specifically talk about the copper

17   region.

18   A    Yes, sir.

19   Q    In the copper region, they have officers as it's

20   organized, is that not correct?

21   A    Yes, sir.

22   Q    There is the president who is also known as the

23   boss, right?

24   A    Yes, sir.

25   Q    And there is a secretary?

1   A     Yes, sir. Well --

2   Q     A secretary/treasurer?

3   A     It's a --

4         THE COURT:  One person speaking at a time.  Let

5   him answer, then you may follow-up.

6   A     It's a secretary/treasurer position.

7   Q     But it's more of a treasurer.  Collecting monies,

8   and things like that?

9   A     Yes, sir.

10  Q     And those are funds that are collected and funds

11  in the form of dues, correct?

12  A     That's one way, yes, sir.

13  Q     And there might be a special tax or assessment for

14  a specific event, correct?

15  A     That's another way, sir.

16  Q     Okay.  And the treasurer has the responsibility

17  for collecting all of those funds?

18  A     He is in the process of collecting those funds.

19  They come from the chapters and then they get sent to

20  him.  He doesn't physically go to each member.

21  Q     Okay.  And as far as the copper region goes, they

22  were organized as a limited liability corporation,

23  weren't they?

24  A     Yes, I belief they had a corporation.  We had

25  conversations during the case that they thought that

1 was a way of protecting themselves against law

2 enforcement.

3 Q    Not only that, but they were organized as a

4 not-for-profit L.L.C., weren't they?

5 A    Some of them were, yes, sir.

6 Q    Do you know any which was not?

7 A    I know that we didn't until the very, very end.

8 The ones in Virginia didn't have a corporation or a

9 nonprofit.

10 Q    But as far as you knew, the ones in North

11 Carolina, which were organized prior to you forming the

12 one in Petersburg, were L.L.C. nonprofits?

13 A    I know they had a corporation.  I don't know the

14 exact terminology or the classification of it.

15 Q    And the dues and the assessments that were

16 collected were paying for things like maintaining

17 facilities, correct?

18 A    Some of them, yes, sir.

19 Q    And utilities for the facilities?

20 A    Well, those are the individual chapter dues.

21 Q    Right.  And then they would have parties, wouldn't

22 they?

23 A    Yes, sir.

24 Q    And they'd have funerals, right?

25 A    Yes, sir.

1  Q     And then they would also use those dues when the

2  officers would attend some of the national functions,

3  right?

4  A     Yes.  When they travel to go attend national or

5  club business, they would use those funds to finance

6  the club business.

7  Q     And the treasurer would receive those funds, and

8  upon receiving those funds they was deposited into the

9  bank account, right?

10  A     Yes, he did deposit them into a bank account is my

11  understanding.

12  Q     And specifically Mr. Spradling did those kinds of

13  things, did he not?

14  A     He was the regional treasurer of our region.

15  Q     As a matter of fact, sir, if we could look at

16  Government's Exhibit Number 396.

17      THE COURT:  Is that already in evidence

18  Mr. Barley?

19      MR. BARLEY:  Yes, sir.  It's the ledger book.

20  Q     And that's the book that was obtained from the

21  belongings of Mr. Spradling.  Is that not the ledger

22  book?

23  A     The photocopy you're talking about that was shown

24  to me earlier I believe is from the search warrant of

25  his residence.

1  Q    And that includes all the entries and the

2  disbursements, correct?  You've reviewed it, haven't

3  you?

4  A    I looked at the document.  I can't say it contains

5  everything.  I know that it contains a ledger of

6  different amounts for different things.

7  Q    What came in and went out?

8  A    Yes, it shows in and out.

9       MR. BARLEY:  That's Exhibit 85.  I'm sorry.

10      THE COURT:  Okay.

11      MR. BARLEY:  Specifically.

12      Could we have that book, please.

13      THE COURT:  The ledger book?

14      MR. BARLEY:  Your Exhibit 85.

15      THE CLERK:  It's 315-A.

16 A    Thank you, sir.

17 Q    Is that a copy or in fact the copy of the ledger

18 book that was obtained from the home of Mr. Spradling?

19 A    It's my understanding this is the form in which it

20 was recovered.

21 Q    My question is, is that in fact the document that

22 was recovered?

23 A    It is the document that was recovered.

24      MR. BARLEY:  Could we publish that to the jury,

25 please.

1          THE COURT:  It's already been published, but you

2     certainly may publish it again.

3          MR. BARLEY:  It was not published to the jury, and

4     that's why we're asking that it be done.  If you will

5     recall, Your Honor, you asked if they wanted it to be

6     published.

7          THE COURT:  I stand corrected.  Fine.  We'll

8     publish it to the jury.

9          MR. DUFFEY:  Judge, it's not scanned in.

10         THE COURT:  I only have -- I think you only have

11    one copy.  Tell you what we can do, can they just pass

12    it?

13         MR. BARLEY:  Yes.  That's what I was asking the

14    Court to do.

15         THE COURT:  Marshal Wray, let the jurors have a

16    look at it.  Pass it on down the line.

17         You can, if you wish, go ahead and ask questions

18    while they're reviewing it.

19    Q    And as a matter of fact, sir, you testified that

20    during the July --

21    A    I believe you're referencing the July 25th bosses'

22    meeting?

23    Q    Yes, sir.

24    A    Yes, sir.

25    Q    At which time you paid all the dues -- and you

1   made reference to all the dues that you had paid?

2   A     No.  We pay dues every month.

3   Q     Every month?

4   A     Yes, sir.

5   Q     And did you by chance after you received that

6   book, check to see if all of those dues were paid into

7   that account?

8   A     They had a financial guy doing that part of the

9   case.  I wasn't involved in that, sir.

10  Q     Now, you made mention of a September 2008 meeting.

11  That was a meeting on which Mr. Spradling attended, is

12  that not correct?

13  A     No, Mr. Spradling -- on September 20th?  Are you

14  talking about the Dinwiddie drags?  Yes, sir, he was at

15  the Dinwiddie drags in 2008.

16  Q     Okay.  And then you also made mention of the fact

17  that you saw him again on January 17, 2009, at the

18  Lexington clubhouse, which was a bosses' meeting?

19  A     Yes, I believe so.  I can refer to the report, but

20  I believe so.

21  Q     That was an official meeting of all the officers

22  in the area, wasn't it?

23  A     On January 17th of what year?

24  Q     2009.  The meeting in which Mr. Davey was patched.

25  A     No, that was -- I was -- that was the first day I

1  started prospecting, sir.  That wasn't a meeting.  That

2  was a party where he was patched in.

3  Q    It was a party in which he was patched in?

4  A    It was a party.  And it was not for that, but he

5  was patched in during that event.

6  Q    It was also during that party, sir, that you were

7  patched in as a prospect or prospective?

8  A    Yes, we were voted on by the region.

9  Q    And it was Mr. Spradling who gave you your

10 prospective patch?

11 A    Not that day.  About a week later.

12 Q    And you had previously paid Snuff the $500 for the

13 prospect fee, isn't that what you testified about

14 before?

15 A    Correct.  We were told we had to pay Snuff, he

16 would then forward the money in and keep the portion of

17 the money that he was utilizing to do a background

18 investigation.

19 Q    And if we could move then to February 28, 2009.

20 Do you recall that meeting at the Charlotte clubhouse?

21 A    Yes, sir, that's the night we went out with Les

22 Werth and Mark Spradling, and others.  Yes, sir.

23 Q    And it was during the course of that meeting that

24 you had discussed the Hells Angels in that area,

25 correct?

1  A    I'm not sure what context you're talking about,

2  sir.

3  Q    The February 28th --

4  A    Yes, I know the date and the event that we went

5  to, but I'm not sure what you're talking about with the

6  conversation about the Hells Angels.

7  Q    Well, that was the meeting in which on February

8  28th you testified that you went to the Charlotte

9  clubhouse with Mr. Werth, correct?

10  A    February 28th?  We were at the Charlotte

11  clubhouse.  There was an event, and then we ended up

12  going out to three different little strip clubs in

13  town.  We went out looking for members of the Hells

14  Angels.

15  Q    That was a meeting in which there was Agent

16  Grabman, the CIs and Mr. Anderson, correct?

17  A    No.  I'm not sure where you're using the term

18  *"meeting*."  There was no meeting that I attended there,

19  sir.  It was a party.

20  Q    It was a party.  Okay.  And that was a meeting at

21  which Mr. Spradling was in attendance also, was he not?

22  A    He was there that day, yes, sir.

23  Q    And Mr. Werth was upset because of some incident

24  that had occurred earlier at the FUBAR, isn't that

25  correct?

1  A     No.  At that point, the incident at the FUBAR

2  would have occurred in May of 2009.  You're referencing

3  February of 2009.  I'm not sure what you're talking

4  about there, sir.

5  Q     Well, the night that ya'll were at the Charlotte

6  bar, ya'll later went out, is that not correct?

7  A     That is correct, sir.

8  Q     Okay.  And you-all went to different gentlemen's

9  clubs, is that not correct?

10  A     Yes, sir.

11  Q     And ya'll went there because you thought Hells

12  Angels may have been there?

13  A     That's what we were told by Les Werth.

14  Q     And you all went in different vehicles?

15  A     I believe two different vehicles, sir.

16  Q     Now, Mr. Spradling was not with you?

17  A     He was not.  He was in a vehicle with Harry McCall

18  and a probate by the name of Johnny Lee.

19  Q     Are you sure he was not in a third vehicle?

20  A     I don't believe so.  I thought he rode with them,

21  sir.  I was in the vehicle with Mr. Werth, and Special

22  Agent Ozbolt, along with the CI.

23  Q     And when you-all reached the clubs that you-all

24  thought the Hells Angels were hanging out in, you

25  didn't see anyone, did you?

1  A    We did not run into anyone that evening.

2  Q    And so you-all return to Charlotte?

3  A    Yes, sir.

4  Q    A couple days -- or a couple days later was the

5  Daytona run, is that not correct?

6  A    That was February 28th or 29th.  I left for

7  Daytona I believe on March 1st.  I think something like

8  that, in or around.

9  Q    February only carries 29 days.

10 A    Well, it was the 28th.  We left around March 1st.

11 It was very soon thereafter we left.

12 Q    Now, when you-all went to Charlotte -- you went to

13 Daytona Beach, Mr. Spradling went also, did he not?

14 A    I don't recall.

15 Q    You don't recall whether he went or not?

16 A    I do not recall, sir.

17 Q    Do you recall the July 25, 2009, Rock Hill bosses'

18 meeting?

19 A    Yes, sir.

20 Q    And Mr. Werth was still running the show, is that

21 not correct?

22 A    He was.

23 Q    He was reporting on the chapters?

24 A    Pardon me?

25 Q    He reported on the increasing size of the

1  chapters, is that not correct?

2  A    He came back and talked about what was talked

3  about at national, about the whole nation and the

4  different chapters that has been formed.  Yes, sir.

5  Q    And he mentioned that some of the Outlaws were

6  arrested in Indiana and they took pleas, is that not

7  correct?

8  A    Yes, I believe that came up that they'd been

9  arrested.  It was an earlier event, and they'd been

10  arrested and they took pleas and didn't know if they

11  were cooperating or not.

12  Q    And so he indicated they wanted to raise some

13  attorney fees, is that not correct?

14  A    I don't know if it was that one.  I'd have to

15  refer to the ROI.

16  Q    Okay.

17      THE COURT:  Did you want the agent to refer to his

18  notes on that?

19      MR. BARLEY:  No, sir.  I'll move own.

20      THE COURT:  Okay.

21  Q    If we can direct your attention again to

22  November 14, 2009.  That was when there was the swap

23  meet.

24  A    Yes, sir.

25  Q    And that was an event for raising charitable

1  funds, is that not correct?

2  A    It was an organization there that Mark Spradling

3  belonged to that ran it every year.  I don't know what

4  they did with the money.

5  Q    He was not at that function in the capacity as an

6  Outlaw, was he?

7  A    I would have to say he was functioning as both

8  because he called us from the front gate to let us know

9  when people with Outlaws -- or excuse me, with possible

10 HA affiliated gear on.  So he wasn't wearing his Outlaw

11 patch, but he was performing both functions.

12 Q    He didn't have any of his Outlaw gear or indicia

13 appearing on him, did he?

14 A    No, sir.

15 Q    And he was selling tickets for people to come in?

16 A    I don't know if he was selling tickets or just

17 maintaining the front gate.

18 Q    And there came a time, sir, is that not correct,

19 that a Hells Angel wanted to -- or one of their support

20 groups wanted to gain admission, is that not correct?

21 A    I know that that occurred on -- we went to

22 approximately I think four different swap meets at that

23 venue.  One of the occasions I know he talked about

24 turning someone away at the front gate that was wearing

25 Hells Angels clothing or associated.

1  Q    And he told him if they come in there, there might

2  be trouble?

3  A    I don't exactly what he told him, but he told me

4  he turned him away and wouldn't allow him entry is what

5  he came back and told us.

6  Q    Well, that saved him from getting beat up, didn't

7  it?

8  A    I wasn't present there.  I don't know what the

9  exchange was.

10  Q    Okay.  If I can direct your attention now then,

11  sir, to the January 23, 2010, Easyrider Expo in

12  Charlotte.  Do you remember that?

13  A    Yes, sir, I do.

14  Q    And Mr. Spradling was there, was he not?

15  A    I don't recall if Mr. Spradling was there or not.

16  Q    You don't know?

17  A    No.

18  Q    There was a February 27, 2010, Charlotte open air

19  meeting, is that not correct?

20  A    Yes, sir.

21  Q    That's the one in which you-all had to strip down?

22  A    Yes, sir.

23  Q    So you have a very clear recollection of that?

24  A    Yes, sir.

25  Q    And Mr. Spradling did attend that meeting, did he

1  not, sir?

2  A     I don't if he was there or not.

3  Q     You don't recall?

4  A     There were a couple of members that didn't attend.

5  Q     You don't recall testifying earlier in this case

6  that Cranor discussed setting up the Hells Angels and

7  then Mr. Spradling was there, along with Mr. Werth; you

8  don't remember saying that earlier?

9  A     I remember that there was one or two members that

10 didn't come.  If I had to say I would believe

11 Mr. Spradling would have been there, but I believe -- I

12 don't know.

13 Q     If you said on direct examination he was there,

14 you wouldn't --

15 A     If I testified to that, then I believe he was

16 there, yes, to my memory.

17 Q     Now, let's direct your attention to April 10,

18 2010.  It was a Lexington bosses' meeting, is that not

19 correct?

20 A     Yes, sir.

21 Q     And that was attended by Mr. Spradling, was it

22 not?

23 A     Yes, sir.

24 Q     And that's the meeting in which Mr. Spradling said

25 we need to conduct some intel on the Hells Angels, is

1  that not correct?

2  A    Yes.  He wanted us to be more proactive.

3  Q    Well, his -- let's -- that's your conclusion,

4  isn't it?

5  A    Based on the statement he made.

6  Q    His statement was we need to obtain some intel and

7  surveillances on the Hells Angels so that there would

8  not be a recurrence to them of what happened in

9  Connecticut, isn't that the context in which he made

10 it?

11 A    No, the context in which he made it was we need to

12 have intel like the Angels did when they laid in wait

13 for Ho-Jo when he walked out of the tattoo shop and

14 they ended up assassinating him.

15 Q    All right.  And he said that, and then Mr. Gagner?

16 A    Gagner.  Yes, sir.

17 Q    Okay.  He produced a map?

18 A    During that meeting.  And during the course of

19 that conversation, he did produce a series of

20 photocopied maps that were highlighted.

21 Q    And those photocopies maps included both the

22 Warlocks and the Hells Angels?

23 A    Yes, I believe they had the Warlocks and Hells

24 Angels on it.  Yes, sir.

25 Q    Now, right after that meeting, you-all went to a

1  gentleman's club again, correct, afterwards?

2  A     After that meeting?

3  Q     Yes, sir.

4  A     I don't believe so.

5  Q     Oh, you didn't?

6  A     I don't believe so.  I believe we went back to

7  Rock Hill and went to their clubhouse.

8  Q     You-all did not go anywhere chasing down any Hells

9  Angels then?

10 A     Not to my memory, sir.

11 Q     And as far as your memory goes based on the

12 statements made by Mr. Spradling, and the maps that

13 were produced, you-all -- or none of the Outlaws went

14 out chasing down Hells Angels at any of those

15 locations, did they?

16 A     No.  Those were -- the locations that were shown

17 were locations over a multiple state area.

18 Q     And so my question to you, sir, is that you-all

19 never did chase down or go looking for any Hells Angels

20 or any of their support groups that were included on

21 those maps?

22 A     That evening?

23 Q     Anytime after April 10, 2010.

24 A     I don't -- I did not personally.  No.

25 Q     Okay.  And you don't have information of any other

1  Outlaws doing it either, do you?

2  A    I don't know what all they did, sir.

3  Q    Thank you.  Now, you also testified, sir, that

4  Mr. Spradling brought to one of the meetings a group of

5  -- a document, which included rules for motor clubs, is

6  that not correct?

7  A    He provided a document concerning motorcycle

8  clubs.

9       MR. BARLEY:  Could I have him take a look at this?

10      MR. DUFFEY:  Could we have an exhibit number?

11      MR. BARLEY:  Exhibit 82.

12      THE COURT:  You say it's Exhibit 82, Mr. Barley?

13      MR. BARLEY:  Yes.

14  Q    Do you recognize that document?

15      MR. MILLER:  Your Honor, Exhibit 82 is an audio

16  recording.

17      THE COURT:  That's why I'm a little bit perplexed.

18      MR. BARLEY:  I'm just looking at the top of there

19  that says Government's Exhibit 82.

20      It's 361.

21      THE COURT:  Exhibit 361.

22  Q    Do you recognize that document?

23  A    You took the document, sir.  I don't have it.

24  Q    I'm sorry.

25  A    Thank you.  Yes, sir, I recognize the document.

1  Q     And that's more of a generic outline of how a

2  motorcycle club should organize and govern themselves,

3  is that not correct?

4  A     It was a document provided to us by Mark

5  Spradling.  He said he didn't know the author of it.

6  It was looked at.  He provided copies, and it was a

7  decision made by the regional bosses there that this

8  would a document that they would use to go by, or

9  people coming into the club, and for members.

10 Q     That document deals with respect for fellow club

11 members, does it not?

12 A     For fellow club members?

13 Q     Yes, sir.

14 A     It may.  I mean, it's a --

15 Q     It refers to them as a brotherhood, and how they

16 are to refer to themselves as brothers, is that not

17 correct?

18 A     That's a common term that we used, yes, sir.

19        MR. BARLEY:  If I could see that, please.  That's

20 my only copy.

21 Q     If you can look at Page 5.  And in the end, it

22 refers to what they call a *"Golden Rule"* for motorcycle

23 members, is that not correct?

24 A     It says, *"In closing, you should be aware of the*

25 *Golden Rule."*

1   Q     Would you please read that to the ladies and

2   gentlemen of the jury.

3         THE COURT:  It's not in evidence.  Do you want to

4   put the document in evidence before you publish it?

5         MR. BARLEY:  Yes, sir.

6         THE COURT:  Any objection?

7         MR. DUFFEY:  No, objection, Judge.

8         THE COURT:  Government's Exhibit 361 will be

9   received.  You may recite that, agent.

10  A     It says, *"If you give respect, you will get*

11  *respect.  If you act like an asshole, you will be*

12  *treated like an asshole."*

13        MR. BARLEY:  Thank you.

14        THE COURT:  Mr. Collins, you may inquire.

15                    **CROSS-EXAMINATION**

16  BY MR. COLLINS:

17  Q     Good morning, Agent Grabman.

18  A     Good morning, sir.

19  Q     I represent Mr. Werth.  Now, when did you first

20  meet Mr. Werth?

21  A     I believe the first time I met Mr. Werth would

22  have been September 20th of 2008 at the Dinwiddie

23  drags.

24  Q     Okay.  And I assume from there on you had a fair

25  amount of contact with Mr. Werth?

1  A    After the -- after the New Year's Eve meeting in

2  Indianapolis I did.  Before that, between that

3  September 20th and New Years, I don't think I really

4  had much contact with him.

5  Q    During your contact with Mr. Werth, did you ever

6  see him use any illegal drugs?

7  A    Absolutely not.

8  Q    During your contact with him, did you ever see him

9  distribute any illegal drugs?

10 A    No, sir.

11 Q    Would it be a fair statement that he didn't

12 approve of the use of illegal drugs?

13 A    He didn't want them sold in the clubhouse.  People

14 used them around him, but he didn't want them sold in

15 the clubhouse.

16 Q    During the period of time that you knew him, do

17 you know if he was married?

18 A    I don't know if he and Wanda were married, but he

19 had a significant other.

20 Q    Did you meet his significant other?

21 A    Yes.  I met Wanda.

22 Q    On many occasions?

23 A    On many occasions.

24 Q    And you met his children and grandchildren?

25 A    Yes, sir.

1   Q    And you had dinner, lunch, at their house?

2   A    Yes.  We were friends.

3   Q    Okay.  During the time that you knew Mr. Werth,

4   was he continually employed as far as you knew?

5   A    He had gotten laid off at one point.  He had a

6   trucking company, and the business he couldn't keep up

7   with, it went under, and then he ended up working for a

8   cement company, or something like that.

9   Q    Was it a company that he'd worked for in the past,

10  or do you even know?

11  A    I don't know, sir.

12  Q    But he tried to maintain employment throughout?

13  A    Yes, sir.

14  Q    Do you know whether he had a valid concealed

15  weapon permit?

16  A    I believe he did.

17  Q    From North Carolina?

18  A    Yes, sir, I believe so.

19  Q    And obviously you know that he possessed firearms,

20  I guess?

21  A    Yes, sir.

22  Q    And is it -- to have a valid concealed weapon

23  permit, obviously you can't be a prohibited person.  In

24  other words, you can't be a convicted felon.

25  A    There's a list of prohibited people.  Yes, you

1   cannot be a prohibited person.

2   Q    Would it be a fair statement to say that

3   obviously -- you indicated that you went undercover for

4   a bunch of various motorcycle clubs, is that correct?

5   A    Yes, sir.

6   Q    And I believe you said one was the Hells Angels?

7   A    We were associated with the Hells Angels when we

8   did the Warlocks case.  We had contact with them, and

9   arrested members of the North Beach, Maryland chapter.

10  And when I was doing the Aryan Brotherhood case in

11  Ohio, we had contact with HAs up there when we were

12  targeting members of the Aryan Brotherhood.

13  Q    But would it be fair to state that the Hells

14  Angels don't like the Outlaws?

15  A    That would be a fair statement.

16  Q    And vice versa?

17  A    Yes, sir, that would be a fair statement.

18  Q    Okay.  And did you ever, during the course of your

19  personal contact with Mr. Werth, see him physically

20  assault anybody?  And I'm not talking about the

21  ceremony of the patch in the clubhouse.

22  A    I did not physically see him assault anybody.

23  Q    Okay.  Are you aware of in your investigation, do

24  you know whether Mr. Werth ever received any money from

25  illegal transactions, et cetera?

1   A    I'm not aware of that.

2   Q    Okay.  There's one thing I want to clear up

3   because I'm not sure it's been made clear.  The

4   Petersburg clubhouse obviously was formed, and somehow

5   became an Outlaws clubhouse, is that correct?

6   A    Once we became -- once we became perspective

7   Outlaws, we obtained the clubhouse to be used.  It was

8   used throughout the investigation.

9   Q    Well, it would help me because I've obviously read

10  a whole lot, and they don't use your name in all these

11  reports, or whatever, but obviously you were Gringo?

12  A    Yes, sir.

13  Q    And I assume another member was JD?

14  A    Yes, sir.

15  Q    Is that agent?

16  A    Ozbolt.

17  Q    Okay.  And Bobby?

18  A    Special Agent Anderson.

19  Q    And there were two confidential paid sources, is

20  that correct?

21  A    Yes, sir.

22  Q    And one was Chef?

23  A    That's what we called him, sir.

24  Q    And what was the name of the other?

25  A    Chris.

1  Q    Prior to going to the Cockades in Petersburg, are

2  you aware if Mr. Werth had ever been to that bar?

3  A    I hadn't been to the bar.  I don't know if

4  Mr. Werth had been to the bar.

5  Q    How did you get directions?

6  A    Speaking to a member of the Pagans.

7  Q    Where was -- when the altercation inside the bar

8  started, where was Chris?  That is Special Agent

9  Anderson, I guess?

10 A    No.  Chris was the CI.

11 Q    Was he in the bar?

12 A    Yes, he was.

13 Q    Okay.  And did you see him participate in it?

14 A    He did not.

15 Q    Obviously Mr. Werth was in the bar?

16 A    Correct.

17 Q    And he was sitting the back, I before you said?

18 A    They positioned themselves, Mr. Werth and

19 Mr. Mariaca and Mr. McCall, positioned themselves at

20 the table seated in the back part of the bar.

21 Q    Okay.  As far as the -- for lack of a better -- a

22 bar fight broke out between either Mr. Smith and a

23 Desperado, is that correct?

24 A    There was an assault that happened, yes, sir.

25 Q    Did Mr. Werth participate, or did you observe him

1  participate, in that bar fight?

2  A    I did not observe him participate in the bar

3  fight.

4  Q    And obviously you were assaulted with a beer

5  bottle, is that correct?

6  A    Yes, sir.

7  Q    And I assume in self-defense, you indicated you

8  took out your baton and disarmed the Desperado that had

9  the beer bottle?

10  A    Yes, sir, I did.

11  Q    Okay.  And was that the only person you struck in

12  the bar?

13  A    Yes, sir.

14  Q    Now, you indicated you saw two Desperados go in.

15  Do you know if there was more Desperados in the bar

16  before you saw the two go in?

17  A    I never entered --

18  Q    Before you went --

19       THE COURT:  One persons speaking at a time.  Let

20  him answer the question, then you may follow-up.

21  A    When I entered the bar, I had not seen any others

22  other than those two enter the bar.  I never entered

23  the bar prior to that.

24  Q    Other than the two Desperados that came out of the

25  bathroom -- did you observe that?

1  A    I saw them come out of the bathroom.  Yes, sir.

2  Q    Did you see any other Desperados inside the bar?

3  A    I saw the -- I don't know if he was a member or an

4  associate.  He had on some type of Desperado shirt that

5  struck me.  I don't recall seeing any others in the

6  bar, but we -- I was in the bar for maybe literally

7  when I walked in, I had enough time basically to put my

8  back against the bar, the two walked out.  Mr. Smith

9  ended up getting in the altercation and I was smashed.

10 I mean, it all happened within a matter of minutes.

11 Q    And did -- at what point did law enforcement

12 respond to the bar?

13 A    I don't recall.  It had to have been the time

14 period when I was out trying to get my head to stop

15 bleeding when I was inside my government vehicle.

16 Q    Okay.  When you came back in the bar, was law

17 enforcement in there?

18 A    I don't recall them being there.

19 Q    Did you observe Mr. Davey being arrested inside

20 the bar?

21 A    No, sir, I did not.

22 Q    Obviously, everyone but Mr. Davey, every one of

23 the Outlaws, I guess, but Mr. Davey left the bar and

24 exited the bar at some point?

25 A    At the point when I returned back from my vehicle,

1   Agent Ozbolt and myself had gone up to the bar -- had

2   gone up to entrance to the bar, started to go in, and

3   people were coming out.

4   Q    Okay.  And then you just all walked around the

5   corner?

6   A    Correct.  We walked out of the bar and took a

7   right-hand turn and went down and sort of squared the

8   block going down and around the block.

9   Q    Okay.  And you just wanted to get away from the

10  bar before law enforcement got there?

11  A    Law enforcement had evidently already been there

12  because they locked up William Davey in between the

13  time I was in my vehicle.

14  Q    But you just wanted to stay together and get away

15  from the scene, I assume?

16  A    I don't know.  We just started following Les Werth

17  walking down the road.

18  Q    And you made a square around going -- your car

19  was -- if you kept going, made another right I guess

20  before you saw the Desperados, you were then back to

21  your car, is that correct?

22  A    That's correct, sir.

23  Q    Did you physically see a woman hand a firearm to a

24  Desperado?

25  A    I did.

1  Q     Okay.  And how far were you, or the group I guess,

2  from where this occurred?

3  A     We saw that as we were crossing the street to the

4  parking lot to confront them, so we were walking across

5  the street right by the parking lot.

6  Q     Okay.  And did the Desperado actually have a gun

7  in his hand?

8  A     Yes, sir.

9  Q     You indicated there was another Desperado with a

10 knife visible.

11 A     There was one that pulled a knife, yes, sir.

12 Q     Was there one, or more than one?

13 A     That pulled a knife?  Are you asking me how many

14 Desperados were there?

15 Q     All right, you say you saw one armed with a

16 firearm and one armed with a knife.  Did you see any

17 other Desperados armed?

18 A     There were approximately four individuals there.

19 I believe the one that had the gun, and the one that

20 the female handed him the gun.  You had the one that

21 had the knife.  You had another that had a knife.  I

22 believe it looked like another one had a knife.  And I

23 believe it looked like another one maybe had a gun in a

24 holster but never displayed it.  I believe there were

25 four of them walking around the vehicle.

1  Q    Okay.  And at that point, did Mr. Mariati {sic}

2  pull out his firearm?

3  A    Mr. Mariaca?

4  Q    Yes.

5  A    At some point, Mr. Mariaca pulled his firearm, and

6  Mr. Werth pulled back his jacket to brandish his.

7  Q    To show that he had a firearm like that?

8  A    I don't know why he was doing it.  I was watching

9  the guy in front of me.  I know he pulled it back.  We

10  went back to the house later and discussed it, and he

11  talked about whether he had *"put it back in"* was his

12  quote, I believe, on the tape.  So I believe he

13  probably started to draw it.

14  Q    So you couldn't see -- but you didn't see a

15  firearm in Mr. Werth's hand?

16  A    No.

17  Q    Now, obviously we have heard some tapes of

18  Mr. Werth says beat up, and do this to Hells Angels, et

19  cetera, et cetera.  But what does *"no free ride"* mean

20  to you?

21  A    You're talking about no free travel pass?

22  Q    No free travel pass.

23  A    It means that if there was a free travel pass,

24  you're allowed to travel up and down the interstate to

25  get where you're going off, pull off for gas and get

1    something to eat, and get right back on.  No free

2    travel pass means basically what it means - assault on

3    sight.  You're not allowed to actually give that grace

4    period to a person getting on and off in a motor club.

5    Q    And the assault on the members of the Outlaws

6    would indicate that the Hells Angels weren't allowing

7    free travel anymore, free travel passes, is that what

8    that would mean?

9    A    I don't know what their policy was.  I know they

10   attacked two members of the Outlaws.

11   Q    In Rock Hill, do the Hells Angels have a

12   clubhouse?

13   A    I believe they do now.

14   Q    They do now.  But did they then?

15   A    They were -- my understanding is they were using a

16   clubhouse owned by I think it was The God's Few

17   Motorcycle Club who later became perspectives and

18   patched over and became Hells Angels.

19   Q    Let me get to the subject of funerals.  Obviously,

20   it's been touched upon, and Outlaws funerals were a big

21   deal to the organization, is that correct?

22   A    Correct, sir.

23   Q    Would they oftentimes collect money for the widow?

24   A    There were funeral taxes that were paid to help

25   fund -- I don't know exactly where all the money went,

1  but I know it helped fund like food, and things like

2  that, for the funeral.

3  Q    Okay.  And was any money ever collected for like

4  children, that you're aware of?

5  A    I don't know about that.

6  Q    Now, during your time as a undercover Outlaw, did

7  you do any charity work?

8  A    Did I do any charity work?

9  Q    Toy runs?

10  A    I went to one toy run down in Asheville, but we

11  didn't take any toys.  We went there to make sure the

12  Hells Angels didn't show up.

13  Q    Okay.  You didn't participate in any other toy

14  runs, or anything like that?

15  A    No, sir.

16  Q    To be an Outlaw, did you have to use illegal

17  drugs?

18  A    No, sir.

19  Q    So that wasn't a requirement?

20  A    No, sir.

21  Q    How many Outlaws would you estimate you met during

22  your investigation?

23  A    Come in contact with, probably at least 300.

24  Q    We have the bar fight where you got assaulted and

25  the Desperado got beat up.

1   A    Yes, sir.

2   Q    But can you tell us any other violent acts that

3   you personally witnessed during your investigation?

4   A    I didn't witness any other personal -- actually

5   personally witness anymore.

6   Q    You didn't witness any other violent acts

7   committed?

8   A    By members of the Outlaws, no, sir.

9   Q    Okay.  It a common theme at these meetings that it

10  seems like that everybody likes to say how much they

11  didn't like the Hells Angels.

12  A    It was a common subject.  Yes.

13  Q    Okay.  And did there appear to be almost like a

14  competition type of thing like we're badder than they

15  are, or something like that?

16  A    I'd say it was an adversarial rivalry.

17  Q    Okay.  As far as punishment, you've mentioned

18  some.  Were there ever fines?  Are you aware of anybody

19  ever being fined for breaking a rule, so to speak?

20  A    I know there were some members fined for missing a

21  meeting.  I'd seen people get probated.  Things like

22  that.

23  Q    Now, when you went to Maine on that trip, or up to

24  Brockton and Waterbury, or anything, was Mr. Werth

25  anywhere on that trip?

1  A     No, sir.

2       THE COURT:  Hold on just one second, Mr. Collins.

3       Mr. Collins, could you speak a little more loudly.

4  Some of the jurors can't hear you.

5       MR. COLLINS:  I'm sorry.

6       THE COURT:  All right.

7  Q     The Dinwiddie run, I guess that's where you first

8  met Mr. Werth?

9  A     Yes, sir.  In Dinwiddie in 2008.

10 Q     Were you aware if the Outlaws had been there the

11 year before?

12 A     I know that they had tried to attend some events.

13 I don't know if they did the year before or not.  There

14 was a series of times I was not with them before that

15 that they had gone to events in Richmond.

16 Q     And the clubhouses you visited, are they set up

17 kind of like there's a bar and bunk beds I assume for

18 bikers to stay as they travel from one place to

19 another?

20 A     Yes, sir.

21 Q     And is that common with most large motorcycle

22 clubs?

23 A     Yes.  Some have them, some don't.  Pagans

24 historically do not have clubhouses.  Hells Angels and

25 Outlaws historically do.

1   Q    Of your personal knowledge, other than you, were

2   any non-motorcycle club people assaulted during this

3   investigation?

4   A    Pardon me?

5   Q    Were any non-motorcycle affiliated people

6   assaulted or --

7   A    Well, it would be hard for me to know about

8   whether or not someone was associated with any

9   particular motorcycle clubs.

10  Q    Well, of your own personal knowledge.  I mean, did

11  you ever see what we -- we're hearing about Hells

12  Angels or Outlaws or Desperados; did you ever see

13  someone that's not a member of a motorcycle club

14  assaulted?

15  A    Yes.

16  Q    Whom?

17  A    There was an incident in March of 2009 when we

18  were in Florida.  We were at the Sonic hamburger stand

19  eating.  While we were there, an individual came up to

20  one of the CIs, Chris, and made a comment to him, *"Fuck

21  the Outlaws."*  This was relayed to Les Werth, who

22  responded, *"Let's go fuck him up."*  There were Les

23  Werth, Colorado Dave, which is David Adams known as The

24  Devil, and two other Colorado Outlaws there, myself,

25  Special Agent Anderson and Ozbolt.

1    The CI -- everybody got up and walked up towards

2  the individual.  There were words exchanged again.  The

3  CI hit the individual, the individual went down.  We

4  went over and acted like we were throwing punches, got

5  him up, and got him out of there.

6  Q    Okay.  Now during this investigation, did you

7  carry a weapon?

8  A    Sometimes.

9  Q    A gun?

10  A    Sometimes I carried a gun, sometimes I carried a

11  baton, sometimes a knife, sometimes pepper spray.

12    MR. COLLINS:  I don't have any further questions.

13  Thank you.

14    THE COURT:  All right.

15    Mr. Duffey, redirect, sir.

16    MR. DUFFEY:  Yes, sir.

17               **REDIRECT EXAMINATION**

18  BY MR. DUFFEY:

19  Q    Special Agent Grabman, you were asked about John

20  Banthem, who is Bull, is that correct, sir?

21  A    Yes, sir.  From the Montana perspective chapter.

22  Q    At any time during the course of your dealings

23  with Banthem regarding the marijuana, was the issue of

24  marijuana ever brought up at a regional meeting, or any

25  kind of official Outlaw function?

1  A     Yes.  At -- in April of 2010 at the bosses'

2  meeting I attended in Lexington, North Carolina, it was

3  brought up.  David Lowry said that it what discussed at

4  the national meeting that the Montana chapter of the

5  Outlaws had access to high-grade marijuana, and could

6  supply members with it at a party they had anticipated

7  throwing.

8  Q     All right.  So the discussion was about a party

9  coming up in the future?

10  A     Yes, sir.

11  Q     And Lowry announced that to the meeting?

12  A     Yes.  He stated that had been talked about at the

13  big table meeting.

14  Q     When Ms. Cardwell asked you about I guess the

15  goals of your investigation --

16  A     Yes, sir.

17  Q     -- was it ever part of your investigation to

18  investigate whether or not the leaders of this

19  organization were seeking personal riches?

20  A     No, it wasn't.

21  Q     So was it ever part of your investigation that

22  they were seeking personal gain as opposed to moving

23  forward the Outlaws organization?

24  A     No, sir, we were not investigating any personal

25  gains.

1  Q     They talked to you a little bit about the Cockades

2  event again.  When Mr. Davey went into the bar, I think

3  you've testified that two other people went in with

4  him, right?

5  A     Special Agent Anderson and one of the CIs, who

6  were both prospects.

7  Q     And at that time, Mr. Davey was a full patched

8  member?

9  A     Yes, sir.

10 Q     Was he wearing his full patches?

11 A     Yes, he was.

12 Q     And part of your investigation, and your knowledge

13 of the Outlaws, when those three are separated off of

14 the group, who was the leader of that small group at

15 that time?

16 A     Mr. Davey would have been in charge.

17 Q     Mr. Smith, Michael Smith, is out front when you're

18 still out in your car, is that correct?

19 A     That's correct, sir.

20 Q     Was he wearing his full patches?

21 A     Yes, sir.

22 Q     Could you see that from your vantage point where

23 you were?

24 A     Yes, sir.

25 Q     There are two females.  You were asked about two

1   females inside the bar.  Before the fighting took

2   place, did you notice whether or not they were doing

3   anything that you found suspicious?

4   A    I personally did not, no.

5   Q    The dates, as Mr. Hunter called them, the females

6   that were with the Desperados -- let me back up.

7   Strike that.

8        How do you know they were Desperados coming up

9   beside the building?

10  A    They were wearing their patches.

11  Q    The two females that were with them that turned

12  around, did you see them later in the incident?

13  A    I believe one of the females was one of them that

14  handed the gun out the window.

15  Q    In the parking lot standoff?

16  A    Yes, sir.

17  Q    That took place later?

18  A    Yes, sir.

19  Q    Now, as far as whether or not you could defuse the

20  situation, when -- when you had your head injured, you

21  and Agent Ozbolt went back to your car, is that

22  correct?

23  A    Correct.  We got some rags to try and stop the

24  bleeding.

25  Q    And did you do anything at that point once you

1  were back in the car?

2  A    We called the cover team and told them what had

3  happened.

4  Q    And to your knowledge, did they call the police?

5  A    My understanding is I believe they did.

6  Q    In response to assaults personally you witnessed,

7  you testified yesterday about an incident up in

8  Connecticut regarding the Black Pistons.  Did you

9  witness that assault?

10 A    Yes, I did, sir.

11 Q    And who committed that assault?

12 A    Kevin Wakely, an individual known by Animal in

13 Wellsboro, PA chapter, Americano, Timex, the sergeant

14 of arms or the enforcer of the Waterbury, Connecticut

15 chapter.

16 Q    Were they both full patched members of the

17 Outlaws?

18 A    Yes.

19 Q    Les Werth discussed with you on numerous occasions

20 assaults that he'd committed, did he not?

21 A    He did.

22 Q    You were asked about *"property of"* vests that were

23 worn by some of the women in the Outlaws organizations.

24 A    Yes, sir.

25 Q    Did you ever see -- did you ever witness women who

1  were wearing these vests be abused in any way?

2  A    I did.

3  Q    And what did you witness?

4  A    At the Hickory national in July, I witnessed an

5  Outlaw from New York by the name of Pete, strike his

6  significant other in the face and gave her a black eye.

7  Later I saw her come back in.  A little while later,

8  she had two black eyes.  I heard another Outlaw asking

9  what happened, and the statement was, "*She didn't*

10 *listen the first time.*"

11 Q    Do you know why he struck her the first time?

12 A    It was something to do with a verbal altercation.

13 Q    You were asked whether or not you carried any

14 weapons.  Why would you carry a weapon?

15 A    Because we were always in fear of being assaulted.

16      MR. DUFFEY:  Thank you.

17      THE COURT:  Agent Grabman, you may step down.

18 Thank you, sir, for your testimony.

19      AGENT GRABMAN:  Thank you, Your Honor.

20                  **WITNESS STOOD ASIDE**

21

22

23

24

25

## REPORTER'S CERTIFICATE

I, Krista M. Liscio, OCR, RMR, Notary Public in and for the Commonwealth of Virginia at large, and whose commission expires March 31, 2012, Notary Registration Number 149462, do hereby certify that the pages contained herein accurately reflect the notes taken by me, to the best of my ability, in the above-styled action.

under given my hand this 1st day of December, 2010.


_____
Krista M. Liscio, RMR
Official Court Reporter