IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal Case No. 3:10-cr-170-001 |
| v. | ) | |
| | ) | The Honorable Henry E. Hudson |
| JACK ROSGA, | ) | |
| a/k/a "Milwaukee Jack" | ) | |
| Defendant | ) | Sentencing Date: April 8, 2011 |
| | ) | (9:30 a.m.) |

**GOVERNMENT'S POSITION ON SENTENCING**

The United States hereby submits its position on the sentencing of defendant JACK ROSGA, a/k/a "Milwaukee Jack." Pursuant to the factors set forth in Title 18, United States Code, Section 3553(a), the United States submits that a sentence of 276 months is reasonable and appropriate and sufficient but not greater than necessary to comply with the purposes of sentencing established by Congress.

**I.    INTRODUCTION**

    **1.**    *Offenses of Conviction and Maximum and Minimum Penalties*

A jury found the defendant guilty of Counts One and Two of the superseding indictment charging him with conspiracy to violate the Racketeering Influenced and Corrupt Organization Act (R.I.C.O.), pursuant to Title 18, United States Code, Section 1962(d), and conspiracy to Commit Violent Acts in Aid of Racketeering, pursuant to Title 18, United States Code, 1959. On Count One, the maximum term of imprisonment is 20 years (with no mandatory minimum term of imprisonment). The defendant is subject to 3 years of supervised release, a mandatory

$100.00 special assessment, and a fine of up to $250,000.00. On Count Two, the defendant is subject to 3 years in prison, up to one year of supervised release, a $250,000 fine and a $100.00 special assessment.

 2. *Summary of the Government's Position on Sentencing*

A 276 month sentence for this defendant is supported by the factors set forth in Title 18 United States Code, section 3553(a). After careful consideration of the offense and offender circumstances, the seriousness of the offense, the promotion of respect for the law, deterrence, and the sentencing guidelines, the government respectfully submits that a 276 month sentence is reasonable and appropriate under the statutory factors. Further, although the government seeks a sentence for this defendant that will likely exceed every other sentence in this prosecution, this sentence does not create an unwarranted disparity because of the defendant's central role in the conspiracy and because a vast majority of the defendants in this case pled guilty. *See United States v. Labonte*, 520 U.S. 751, 761-762 (1997)(disparities arising from exercise of prosecutorial discretion not unwarranted). The defendant's guidelines are properly calculated at level 41 criminal history category I which recommends a sentence between 324 to 405 months incarceration. The Guidelines are driven by U.S.S.G. §2A1.1 for Mr. Rosga because it was reasonably foreseeable to him that someone in his organization would kill or attempt to kill a rival gang member. Additionally, the shooting of the Hells Angels member in Maine was also a central feature of the extortion conspiracy in this case and the murder cross reference from U.S.S.G. §2B3.2 applies.

The government agrees that the sentence for Mr. Rosga is restricted at the statutory maximum of 276 months.

II. **PRESENTENCE INVESTIGATION REPORT AND THE UNITED STATES SENTENCING COMMISSION GUIDELINES**

  1. **Pre-sentence Investigation**

In accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, *Guidelines Manual,* § 6A1.2, the government does not dispute any of the sentencing factors set forth in the Pre-Sentence Report or the U.S. Probation Office's calculation of the recommended guidelines range. After two lengthy trials, numerous pre-trial hearings, and hundreds of court submissions, the Court, counsel for the defense and the probation officer are exceedingly familiar with the facts of this case. Only certain facts are summarized below.

  2. **U.S.S.G. §2A2.1: Assault with the Intent to Commit Murder; Attempted Murder**

The United States agrees with the probation officer that the defendant's conduct and involvement in the Racketeering conspiracy warrants application of the attempted murder guidelines in U.S.S.G. §2A2.1. The government submits that the attempted murder guidelines are applied as both relevant conduct and as a cross reference from U.S.S.G. §2B3.2., although the application of this guideline is also appropriate solely as relevant conduct as the probation officer notes in her report.

The evidence in this matter established that the Outlaws motorcycle gang has engaged in a long-standing violent rivalry with the Hells Angels. The control of "turf", or geographic areas of the country, is at the core of the rivalry. The competing gangs engage in violent acts against each other to assume or maintain control of turf to the exclusion of the rival gang. Once turf is controlled, affiliate Outlaw clubs, and sometimes even law-abiding motorcycle clubs, must seek the permission of the controlling club to engage in activities in a particular area.

In Waterbury, Connecticut, in September 2009, two Outlaws members were violently assaulted and robbed of their "patches" by members of the Hells Angels. On or about the weekend of September 27, 2009, defendant Rosga met with Maine Outlaws member Michael Pedini at a national Outlaws event in Arkansas. At the conclusion of the meeting Rosga ordered Michael Pedini that he wanted "two vests or a body" to counter the Hells Angels attack on the Outlaws in Connecticut. Mr. Rosga also convened a meeting of the national Outlaws leadership, including regional leadership, who were gathered in Arkansas on that same weekend.

At the conclusion of the Arkansas weekend, co-conspirator Les Werth (who was a Copper region leader) called ATF undercover agent Grabman. In the recorded phone conversation, Werth informed Grabman that he needed to speak with him soon about information obtained at the national meeting in Arkansas. UC Grabman met with Werth and other Outlaws members on or about the weekend of October 4, 2009. At this meeting, Werth informed the copper region leadership that the Outlaws were officially "at war" with the Hells Angels, emphasizing that there were "no ifs, ands or buts about it." The evidence at trial established that Werth was relaying this information from his attendance at the national meeting led by Mr. Rosga. At about this same time, Maine Outlaws member Benvie spoke with UC Grabman in a recorded call and stated, "Jack is all over Madman (Pedini's nickname)" about the event in Connecticut.

On or about October 8, 2009, Pedini recruited another Maine Outlaws member, Thomas Mayne, to follow through on the command from Mr. Rosga. Pedini and Mayne ambushed Hells Angel member Gary Watson at the gate to the Hells Angels clubhouse in Canaan, Maine. Several shots were fired at Watson, who was critically wounded after being shot in the shoulder

4

and neck region.

At trial, the defendant was convicted of engaging in the racketeering conspiracy from 2005 to on or about June 15, 2010. The jury was then asked to determine, on a reasonable doubt standard, specific racketeering activity attributable to this defendant. The jury specifically found multiple acts of extortion, ITAR, and a single act of maintaining a drug-involved premises attributable to Mr. Rosga. The jury did not specifically find murder racketeering activity, among others, specifically attributable to defendant Rosga.

Assuming for the sake of argument that Rosga was "acquitted" of the murder racketeering act, this does not foreclose application of the attempted murder guidelines at a sentencing hearing in this matter. In *United States v. Watts*, 519 U.S. 148 (1997), the Supreme Court held that a sentencing court may consider acquitted conduct "if the government establishes that conduct by a preponderance of the evidence" and the final sentence is within the statutory range. *Watts* 519 U.S. at 149. See *U.S. v. Montgomery*, 262 F.3d 233, 249 (4th Cir.); *U.S. v. Romulus*, 949 F.2d 713, 716-17 (4th Cir 1991); *U.S. v. Isom*, 86 F.2d 736, 738 (4th Cir. 1989).

The evidence overwhelmingly supports the application of the attempted murder enhancement for defendant Rosga under a preponderance of the evidence standard. At trial, it was established beyond any doubt that members of the Outlaws shot and critically wounded a Hells Angels member in Maine as part of this on going battle over turf. The contention by Mr. Rosga at trial was that the act of shooting the Hells Angels was committed independently by Outlaws members Pedini and Mayne with the advice and urging of co-conspirator Joseph Allman. This contention is belied by the credible evidence in the case. The government's contention remains that the evidence conclusively established that Rosga ordered the Maine

action. Notwithstanding the government's contention, and assuming for the sake of argument that the defendant's theory was correct (*i.e.*, that the Maine Outlaws members took it upon themselves to plan and commit the HA shooting), because this shooting was a central feature of the racketeering conspiracy that Mr. Rosga was convicted of, the attempted murder guideline is properly applied to him as relevant conduct. It was reasonably foreseeable to Mr. Rosga that someone in his organization would kill or attempt to kill a rival gang member.

### a. *The Maine Shooting as Relevant Conduct under U.S.S.G. §1B1.3.*

The evidence supporting Mr. Rosga's knowledge of the violent rivalry between the Outlaws and the Hells Angels is overwhelming. U.S.S.G. § 1B1.3(a)(1)(b) requires in cases involving "jointly undertaken criminal activity" that "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" shall drive the base offense level for the conduct engaged in during the conspiracy. As the established national leader of this organization, Mr. Rosga is fully versed in the acts his organization engages in against the Hells Angels. Further, on July 5, 2009, three months prior to the Maine shooting, Mr. Rosga had explicit conversations with the UC agents about on-going issues with the Hells Angels. Evidence in the form of pictures and other paraphernalia taken from Mr. Rosga's clubhouse in Milwaukee demonstrated his animosity towards the Hells Angels. In addition to the conversations the UCs had with Mr. Rosga, nearly every Outlaws member the undercover agents encountered in this investigation spoke of the violent circumstances of the rivalry with the Hells Angels. For these reasons and others, the evidence at trial established that it was "reasonably foreseeable" to Mr. Rosga that during the course of this conspiracy a Hells Angels member would be shot by someone in his membership. *See U.S. v. Montgomery*, 262 F.3d 233, 249 (4th

Cir. 2001)(Co-conspirators Jones and Holland are acquitted of a murder related to a drug trafficking conspiracy but convicted of the drug trafficking conspiracy. The Court held that the murder cross reference was properly applied to both defendants. The enhancement was applied to Jones even though he was not an active participant in the shooting, but as the Enforcer within the conspiracy, the murder was foreseeable to him and U.S.S.G. § 2A1.1 was properly applied.) *Id.*

      **b.** ***The Maine Shooting is also properly cross-referenced under USCG 2B3.2.***

The jury in this matter found, among other acts, that multiple acts of extortion were attributable to Mr. Rosga during this conspiracy. U.S.S.G. §2B3.2(c)(2)("Extortion by Force or Threat of Injury or Serious Damage") states that "if the offense was tantamount to attempted murder, apply §2A2.1 ... if the resulting offense level is greater than that determined above." As demonstrated by the evidence at trial, the shooting in Maine was an act consistent with the extortion scheme in this case, i.e, the Outlaws use force against the rival gangs in order to maintain or increase their authority over turf to the exclusion of the rival gang. Accordingly, the attempted murder cross reference from 2B3.2 is appropriate as well.

      **3.**    **Victim Injury under U.S.S.G. § 2A2.1(b)(1)(A)**.

Gary Watson's medical doctor testified at trial to the extent of the injuries Mr. Watson sustained as a result of being shot in the neck region of the body by the Outlaws members. In addition, the medical records of Mr Watson were introduced at trial which detail the extent of his injuries and the nature of the lasting effects of the injuries. As a result of the shooting in this case, Mr Watson is largely incapacitated and remained in an assisted living facility for several months after the shooting. Accordingly, the government submits that the 4 level enhancement

for permanent or life-threatening bodily injury is appropriate.

### 4.      Leadership under U.S.S.G. § 3B1.1.

Witness upon witness in this case, including testifying co-conspirator witnesses, undercover agents, and other law enforcement testified about the defendant's standing as the national leader of the Outlaws organization since November 2006. The issue of the defendant's leadership of this organization was never seriously disputed in this case. Accordingly, a 4-level enhancement under U.S.S.G. §3b1.1(a) is properly applied in this case against Mr. Rosga. Mr. Rosga leads an organization that claims hundreds of members in many states. Among other things, Mr. Rosga exerts decision making authority over the direction and membership of the organization.

### 5.      Paragraph 194 of the PSR (Vulnerable – Official – Restrained victim).

While the government is <u>not</u> advancing an argument in support of the application of either the official victim enhancement under U.S.S.G. § 3A1.2, or the vulnerable victim enhancement under 3A1.1, for any of the defendants convicted in this prosecution (including Mr. Rosga), we request that the PSR reflect that there is <u>some</u> information (as opposed to "no information to suggest") in the record addressing these enhancements. Specifically, the following evidence was adduced at trial:

####       a.  *The shooting of ATF SA Curtiss Marshall on June 15, 2010.*

ATF SA Curtiss Marshall was shot in the protective gear covering his torso by Outlaws member Thomas Mayne on June 15, 2010, as SA Marshall and others were attempting to serve arrest and search warrants on Mayne. SA Marshall was hit approximately one inch above the bottom of his protective gear covering his torso by shots fired from Mayne. U.S.S.G § 3A1.2(c)

states that if the defendant or a person for whose conduct the defendant is otherwise accountable creates a substantial risk of serious bodily injury knowing or having reasonable cause to believe that a person was a law enforcement officer, then a 6 level guidelines enhancement applies. Again, the government is not advancing an argument in support of this guidelines enhancement, but we note the government's belief that the PSR should state that there is <u>some</u> information in the record suggesting facts consistent with the official victim enhancement. Arguably, Mr. Rosga is accountable for the conduct of Thomas Mayne in this conspiracy.

The government asks the Court to consider this conduct under the factors set forth in 18 U.S.C. § 3553(a) in fashioning the appropriate sentence.

### b. *The assault with injury to Clifford Diggs at the Hard Times Café in Fredericksburg, Virginia.*

The United States also does <u>not</u> advance an argument in support of the hate crime motivation or vulnerable victim enhancement under U.S.S.G § 3A1.1. As is more fully explained below, we are precluded from seeking the 3-level hate crime enhancement under 3A1.1(a). Further, application note 3 to 3A1.1 suggests that a 2-level enhancement for vulnerable victim should not apply in this case. Nonetheless, we request that the PSR reflect the conduct in this matter and that there is <u>some</u> evidence suggesting a vulnerable victim in this case.

As the record in this case shows, defendants Fiel and Timbers were charged with civil rights crimes in addition to the RICO conspiracy charges returned against them. The civil rights charges arose from the assault of Clifford Diggs in the Fredericksburg, VA Hard Times Café on November 20, 2008. Fiel and Timbers both struck Mr. Diggs in the face causing him to suffer a broken nose and fractured eye socket among other injuries. After the assault, Fiel used racial

9

slurs to explain why he committed the assault. Prior to trial, the civil rights count was severed from the RICO trial in this matter upon the motion of the defendants. The Court properly severed the civil rights count but found that the matter was <u>properly joined</u> in the indictment with the remaining counts. Subsequently, Mr. Diggs and the undercover agents testified at trial concerning the events leading up to the assault on Mr. Diggs and the events after the assault. The racial slurs were properly excluded from the trial.

Given the fact that the victim testified at the RICO trial, and in consideration that the court had heard two trials consuming nearly a month of the Court's trial calendar on one matter, as well as numerous motions, the United States moved to dismiss the severed count rather than subject the victim to another trial and to place essentially the same facts before the Court for a <u>third</u> trial. However, for the U.S.S.G. § 3A1.1. enhancement to apply in this case, there must have been a finding of guilt at trial, or a guilty plea, of the racially based aspect of the assault. Accordingly, we are precluded from seeking either enhancement under 3A1.1.

However, we ask the Court to consider the crimes committed against Mr. Diggs under the applicable 18 U.S.C. § 3553(a) factors in fashioning the appropriate sentences, especially for defendants Fiel and Timbers.

  **III.**  **ARGUMENT: A 23 year sentence (276 months) for Mr. Rosga is reasonable and appropriate and supported by the factors set forth in 18 USC 3553(a).**

    **1.**  **Sentencing Procedures and the Law.**

Although the Supreme Court rendered the federal Sentencing Guidelines "effectively advisory" in *United States v. Booker*, 543 U.S. 220, 245 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United*

10

*States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264). The Supreme Court has directed that district courts "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). While the sentencing Court may not presume that the guidelines are reasonable, the "Guidelines should be the starting point and the initial benchmark," and the sentencing Court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. *Id.; see also Clark*, 434 F.3d at 685.[1] Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

The factors in 3553(a) are purposefully broad and the sentencing court may consider a sweeping array of evidence in fashioning the appropriate sentence. *See Pepper v. United States*, 131 S.Ct. 1229 (2011) *Citing 18 U.S.C. § 3661* ("[n]o limitation [is] placed on the information concerning the background, character, and conduct" of a defendant that a district court may "receive and consider for the purpose of imposing an appropriate sentence."). The government submits that the weight of the aggravating factors in this case supports a sentence of 276 months.

      2.      **Offense and Offender Characteristics – 18 U.S.C. §3553(a)(1).**

After two trials consuming nearly a month of the Court's schedule, numerous pre-trial hearings, and several sentencing hearings, the Court is extraordinarily familiar with the Outlaws criminal organization. The organization celebrates its criminal lifestyle through its "1%er" motto, which encompasses anti-social ideals for living outside of mainstream society and that

---

[1] Pursuant to § 3553(a), the district court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims of the offense.

they will not abide by the rules of a law-abiding, peace-seeking society.  Members fulfill the organization's goals through acts of violence and continuous efforts to expand their control of territory through unlawful means, among other criminal acts.

The defendant is a committed member of the criminal way of life.  For several decades the defendant has been a member of the Outlaws motorcycle gang, rising to the national leader post in November 2006.  Under the defendant's leadership, the gang has maintained its criminal operations and sought to expand its control over territory by criminal means.  The Outlaws gang is violent at its core.  This violence was demonstrated repeatedly by the evidence in this case.  From the potentially violent confrontation with the Hells Angels at the Richmond Expo in 2006, to the beating of Clifford Diggs in Fredericksburg in 2008, to the Cockades event in Petersburg in March 2009, to the shooting of Gary Watson in October 2009, to the assault and robbery of the Hells Angels member in Minnieska, Minnesota, in April 2010, to the shooting of SA Marshall in June 2010, among other events, this organization has shown its desire to assert itself through violence.  Not only did the national leader do nothing to stem the violence in this organization, he actively sought to promote violence through his advice to members and orders to members to commit violence.

The Outlaws do not hide their contempt for others or for those who challenge their violent system.  "Snitches are a dying breed" is a consistent theme promoted by the Outlaws.  In fact, numerous unused patches with "snitches are a dying breed" were seized from Mr. Rosga's clubhouse.  Mr. Rosga's contempt for "snitches", as he calls them, was starkly demonstrated in the recorded call played at the second trial of statements made by Mr. Rosga after the first trial: Mr. Rosga angrily characterized one of the testifying witnesses as a "rat" and exclaimed "some

Outlaw he turned out to be." The Outlaws violence is committed in the shadow of the Nazi symbol worn on Mr. Rosga's lapel pin and maintained at numerous Outlaws clubhouses across the country.

The harm caused by the Outlaws is not confined to the Outlaws Motorcycle gang ("OMG") sub-culture. If ordinary citizens such as Clifford Diggs, or the 17 year-old High School student in New Hampshire who was shot when he was caught in the midst of a Outlaws-Hells Angels conflict, get in the way of this violent gang then the safety of law-abiding citizens are directly impacted.

    **3.**    **General Purposes of Sentencing – 18 U.S.C. §3553(a)(2)**

        **a.**    *Just Punishment (retribution, seriousness of the offense, promote respect for the law)*

A 276 month sentence appropriately reflects the seriousness of the defendant's actions. Likewise, a 276 month sentence is sufficient but not greater than necessary to accomplish the goals of sentencing. This sentence properly punishes the defendant for his crimes, and also appropriately reflects the seriousness of the offense. The defendant leads a national organization that prides itself on its "1%er" lifestyle and living outside basic standards of society. Indeed, a witness called by the defense as an expert in the Outlaws way of life, acknowledged on cross-examination that he considered himself to be a "1%er" before he considers himself a citizen.

        **b.**    *deterrence (general and specific)*

A 276 month sentence sends the appropriate message to the community at large that forming criminal enterprises, and engaging in their activities, is intolerable and has no useful purpose in law-abiding communities. While it is certainly possible that the defendant can remain

closely affiliated with the Outlaws and even maintain influence within the organization, the ability of the defendant to direct the club is curtailed if he is incarcerated.

    **4.    The Sentences Legally Available – 18 U.S.C. §3553(a)(3)**.

The government submits that incarceration is an appropriate sentence in this matter and that no alternative sentences are appropriate.

    **5.    The Sentencing Guidelines – 18 U.S.C. §3553(a)(4)**.

As noted above, the guidelines are properly calculated at a range of 324 to 405 months incarceration. With a restriction at the statutory maximum sentence of 23 years (276 months). The government seeks a sentence of 276 months incarceration.

    **6.    Avoiding Unwarranted Disparities in Sentencing – 18 U.S.C. §3553(a)(6)**

The government submits that a 276 month sentence does not create any unwarranted disparity in sentencing with any other defendants in this prosecution. The government seeks a sentence for this defendant that will undoubtedly be the longest sentence imposed in this prosecution to date, but it is warranted for several reasons. As noted above, the defendant is the national leader of the organization and he is responsible for the violent nature of the organization. Also, a large majority of the convictions in this prosecution have been the result of guilty pleas with plea agreements with the government. The Supreme Court recently noted in *Pepper* that sentencing disparities based on those defendants who go to trial, and those who plead guilty, does not create an unwarranted disparity. *Pepper v. United States*, 131 S.Ct. 1229; 2011 U.S. LEXIS 1902, *48. The Supreme Court stressed that Congress could not have been concerned with disparities resulting from the normal trial and sentencing process. *Id*. In fact, the Court cited to

14

*United States v. Labonte*, 520 U.S. 751, 761-762 (1997), to reiterate that sentencing disparities arising from the exercise of prosecutorial discretion does not create "unwarranted" disparities. *See Also, United States v. Mendoza-Ramirez*, 326 Fed. Appx. 705 (4th Cir. 2009); *United States v. Browning*, 109 Fed. Appx. 542 (4th Cir 2004); *United States v. Moody*, 30 Fed Appx 58 (4th Cir. 2002).

## IV. CONCLUSION

For the foregoing reasons and for those reasons stated in open court, the government submits that a sentence of 276 months is a reasonable and appropriate sentence for this defendant's criminal conduct.

Respectfully Submitted,

NEIL H. MACBRIDE
United States Attorney

By: _____/s/_____
Dennis M. Fitzpatrick
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299 3981
Email: dennis.fitzpatrick@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 27th day of March, 2011, I electronically filed the foregoing Government's Position on Sentencing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Claire Cardwell, Esq.
Attorney for Jack Rosga

By:     /s/
Dennis M. Fitzpatrick
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299 3981
Email: dennis.fitzpatrick@usdoj.gov