UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:10CR170 |
| | ) | |
| JACK ROSGA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S POSITION ON SENTENCING**

COMES NOW the defendant, Jack Rosga, by and through counsel, Claire G. Cardwell and Craig Mastantuono, and requests that this Court take the following information into consideration at the time of sentencing pursuant to *United States v. Booker*, 543 U.S. 220 (2005), *United States v. Hughes*, 396 F.3d 374 (4th Cir. 2005), and 18 U.S.C. § 3553(a).

Based on the discussion in the pre-sentence report, the Sentencing guidelines, the factors included in 18 U.S.C. § 3553(a), and for the reasons set forth below, Mr. Rosga respectfully requests that this Court sentence him within a guidelines range of 78 to 97 months of incarceration.

**Statement of Law and Argument**

The United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), stands for the proposition that the guidelines are advisory only and the sentencing court must "take account of the guidelines together with other sentencing goals" set forth in 18 U.S.C. § 3553(a). *Booker*, 543 U.S. at 224. Specifically, judges are required "to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed

1

[educational or vocational] training and medical care." *Id*. (citing 18 U.S.C. § 3553(a)(2)). Overall, a sentencing court must impose a sentence that comports with all of these factors and is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). *Rita v. United States*, 551 U.S. 338, 347 (2007); *Gall v. United States*, 552 U.S. 38, 49-50 (2007). *See also United States v. Hughes*, 396 F.3d 374 (4th Cir. 2005) (discussing the impact of *Booker* on sentencing courts, confirming the advisory nature of the guidelines, the necessity of the 18 U.S.C. § 3553(a) factors, and the minimum sufficient incarceration standard in criminal case sentencing). After *Booker*, the Federal Sentencing Guidelines remain in place, but are only one of seven sentencing factors set forth in 18 U.S.C. § 3553(a). Under the post-*Booker* sentencing regime, it is clear that sentencing courts should first apply the guidelines to determine the advisory sentencing range, second, determine if a traditional guideline departure applies, and third, determine if a non-guideline sentence or variance is appropriate based upon the § 3553(a) factors. *See Gall,* 552 U.S. at 50-51; *Rita*, 551 U.S. at 352-54. Further, a sentence based upon an improperly calculated guideline is procedurally unreasonable. *See Gall*, 552 U.S. at 50.

**Pre-Sentence Investigation Report and Federal Sentencing Guidelines Calculation**

Jack Rosga respectfully disputes the U.S. Probation Office's recommended guidelines range in the pre-sentence report (PSR), arguing that his adjusted offense level should be 28, resulting in a recommended guidelines range of 78 to 97 months. Mr. Rosga's objection to the PSR's recommended guidelines range was filed in this case on March 18th, 2011. Mr. Rosga argues that the cross reference to U.S.S.G. § 2A2.1, Attempted Murder, is not applicable in this case, and also argues that the event occurring in Minnieska, Minnesota, should not be considered as relevant conduct. For reasons previously stated in the defense objections to the PSR and

discussed further below, the defense asserts that cross referencing attempted murder, resulting in a 33 level increase of the adjusted offense level, is improperly calculated and procedurally unreasonable. The defense further argues, in the alternative, that if this Court determines that a cross referenced attempted murder is appropriately considered relevant conduct, the Court is free to disregard the cross reference should the Court determine that it results in a harsher sentence than necessary.

The facts alleged by the Government were disputed at length during two jury trials in this case, one resulting in a mistrial for failure to reach a verdict, and one resulting in conviction following lengthy jury deliberations lasting several days. During these trials, the defense litigated Mr. Rosga's objections to the facts alleged. Those objections are not re-tried here. However, pursuant U.S.S.G. § 6A1.1, Mr. Rosga objects to particular factual references/sentencing factors set forth in the PSR. Mr. Rosga objects to the PSR's references to his alleged involvement in ordering Mr. Watson's shooting, included in paragraphs 131, 181, and 182 of that report. To accept those references as findings of fact (and thus the cross reference), one must adopt the credibility of Michael Pedini, also known as "Madman." Mr. Pedini's testimony regarding Mr. Rosga's instructions to get him "two vests or a body" was rejected by the jury, despite the Government beginning its opening statement with reference to that testimony and despite focusing on that testimony when urging the jurors to "check the box for murder" during its closing argument. The jury declined to do so, and that testimony remains uncorroborated by any other witness testimony or direct evidence.[1]

The Government now urges this Court to adopt Mr. Pedini's testimony, cross reference

---

[1] While the Government has insisted that Thomas Benvie's comment that "Jack is all over Madman about this" during a phone conversation with Agent Grabman, it is clear from the testimony that Madman Pedini was again the sole source of that reference, rather than a conversation to which Benvie was a party. No direct evidence supporting Pedini's assertions was introduced.

3

the attempted murder in its final guidelines determination, and increase Mr. Rosga's offense level by 33 (resulting in an increased incarceration recommendation between 189 and 237 months) using a lower burden of proof for the sentencing hearing than that utilized by the jury at trial. However, the Government fails to demonstrate why a lower burden of proof makes Mr. Pedini more believable. Mr. Pedini's credibility was severely weakened at both trials: he claimed to hold national, state, and chapter leadership roles in the Outlaw Association that even the Government's own investigation failed to corroborate. Relatively new to the Outlaw organization, he bragged and boasted about his own background and activities. His insistence that he did not want to shoot Mr. Watson but was forced to do so, and that he even aimed high and jammed his own revolver so that Thomas Mayne would be responsible for the fatal wounds, was preposterous. Further, Mr. Pedini's ongoing violent and drug dealing activity in Maine – activity independent of any Outlaw association activity - made him an unreliable witness, to say the least, upon which to rest a factual determination so greatly affecting another's fate. The Government provided great incentive, through plea negotiation and consideration, for Mr. Pedini to claim that Mr. Rosga was responsible for his shooting of Mr. Watson, exacerbating the perilous step of adopting his testimony, a step declined by the jury, and now pitched by the Government to this Court.[2]

Any conclusion that Mr. Pedini's actions were foreseeable in furtherance of the conspiracy suffers the same flaw, in that it rests upon Mr. Pedini, who was clearly an unpredictable wild card, a "Madman." In addition to being an Outlaw member, he was a drug dealer. He testified that he was previously a Hells Angel member and that he knew Gary Watson.

---

[2] Mr. Pedini has now been sentenced to 63 months incarceration in this case, vastly lower than the incarceration recommended by a guidelines determination cross referencing his own attempted homicide, and awaits further consideration in his State prosecution in Maine for multiple counts of drug dealing, in the form of a concurrent sentence.

He testified that he gave himself his own SS bolts. In his statement to interviewing agents, he said that he was "world famous" in 1% circles. There was clearly nothing foreseeable or predictable about this man. Absent a conclusion that Mr. Rosga instructed him to shoot Mr. Watson, a conclusion declined by juries in two trials, Mr. Pedini's actions ought not be attributed to Mr. Rosga as foreseeable, and indeed belie the hierarchical top-down structure of this organization that the Government so adopts in other aspects of its prosecution. Also, it is unknown whether Mr. Pedini acted in relation to his drug dealing activity or prior dealings with Mr. Watson when he acted in shooting him. Moreover, the jury was instructed that the Government had "to establish sufficient knowledge, [] only requir[ing] that the defendant knew the general nature and common purpose of a conspiracy, and that the conspiracy extended beyond his individual role." Gov't Proposed JI No. 29, Docket No. 620. This instruction encompasses the reasonably foreseeable standard of U.S.S.G. § 1B1.3(a)(1)(B). So instructed, the jury declined to find Mr. Pedini's testimony credible to support a predicate offense of attempted murder for Mr. Rosga.

Clearly the cross reference to murder is not appropriate under these circumstances. Use of a lower quantum of evidence for proof of relevant conduct at sentencing is sufficient as long as the enhancement is not "'a tail which wags the dog of the substantive offense.'" *United States v. Montgomery*, 262 F.3d 233, 249 (4th Cir. 2001) (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986) (suggesting clear and convincing standard should be applied when considering acquitted conduct that would substantially increase sentence)). Under these circumstances, the cross reference urged by the Government so greatly multiplies the recommended guidelines sentence as to transform it altogether. This is precisely the type of sentence transformation or tail-wagging-the-dog situation that mandates the higher burden of proof referenced in

*Montgomery* and *McMillan*, and is only made more precarious by the highly suspect and twice-rejected nature of the evidence presented to support it. *See also United States v. Perry*, 560 F.3d 246, 259 (4th Cir. 2009) (recognizing that when exceptional circumstances dramatically increasing a sentence warrant it, relevant conduct must be considered utilizing a clear and convincing standard of proof). Under all of these circumstances, the defense respectfully urges this Court to reach the same conclusion as the jury at the second trial of this case, declining to find that Mr. Rosga conspired to attempt murder.

The defense also argues, in the alternative, that if this Court determines that attempted murder is appropriately cross referenced, the Court is free to disregard that cross reference should the Court determine that it results in a harsher sentence than necessary. *See Kimbrough v. United States*, 552 U.S. 85 (2007) (holding that the district court may find the guidelines crack/powder cocaine disparity yielded a sentence greater than necessary to achieve the purposes of sentencing). For the reasons stated below, the defense asserts that such a variance is warranted by the additional sentencing factors.

### The Sentencing Factors of Section 3553(a)

While none of the factors listed in § 3553(a) should be given any greater weight or consideration than another, Mr. Rosga submits the following information to support favorable consideration at his sentencing.

#### I. *§ 3553(a)(1): History and Characteristics of the Defendant*

At 54 years of age, this is Mr. Rosga's first criminal offense. He has no prior criminal history, including no juvenile adjudications, no adult criminal convictions and no traffic violations. (PSR ¶ 199-201). Of his 54 years, Mr. Rosga has worked all but a few. He dropped out of school as a teenager in order to begin working full time at a gas station. (PSR ¶ 208). This

work ethic first displayed at such a young age stayed with Mr. Rosga his entire life. By the time he was in his twenties, he had started his own moving and trucking company operating as an independent contractor with Coakley Brothers Trucking in Milwaukee, Wisconsin. (PSR ¶ 220). Mr. Rosga operated his company and maintained his relationship with Coakley Brothers for nearly 30 years before being incarcerated in this matter. As one of Mr. Rosga's moving industry peers put it in his letter to this Court, "His work ethic and organizational skills have helped him developed Rosga Trucking into a fleet of trucks and drivers that is well respected in the moving industry by all who know Jack and many who don't."

Other than the dedication to his work, Mr. Rosga's passion is directed towards his family. Mr. Rosga married his only wife at a young age and remained married for 30 years before she passed away in 2003. (PSR ¶ 210). He is the proud father of two sons, Joe and Jack, Jr., and a loving grandfather to his four grandchildren. (PSR ¶ 210). From another letter to the Court on his behalf, "Mr. Rosga is very proud of his family and has endeavored to be a major provider for his family. I have known him to love his kids and grandchildren with all his heart."

Beyond his family, Mr. Rosga has always demonstrated a remarkable sense of compassion and personal responsibility towards others in need. The character letters written on his behalf clearly reflect a man who has never missed the opportunity to offer a helping hand to others regardless of how well he knows them. For parents who desperately struggled with their son's drug addiction, Mr. Rosga offered their son guidance, support and assistance with finding a job. For an elderly couple and their neighbors who suffered devastating hurricane damage, he offered full days of uncompensated manual labor to clear their roads and repair their property. For hospitalized and disabled veterans, Mr. Rosga offered hospitality, a ride to the polls to vote and a sincere personal expression of thanks for their service to this country. He did all of these

things, and more, without ever being asked and without any expectation of any return benefit except the personal satisfaction of knowing he had helped other human beings in need. As Jack Rosga has travelled and lived through the years of his life, he has left countless individuals with the very real impression of a generous, kind and industrious man with a huge heart and a zest for life. Even the primary ATF agent who led the investigation in this matter reflected upon his feelings toward Mr. Rosga, stating "I like Jack." The agent went on to explain that in spite of his undercover status as a probate, the president of the club, Mr. Rosga, always treated him and the other probates with compassion and respect.

As the Court will discover through the plethora of letters submitted by friends and family on his behalf, those that know him the best know Jack as a hardworking, generous, fun loving family man. Mr. Rosga respectfully asks that this Court take into account all of the characterizations of him, not just those made at trial.

II. *§ 3553(a)(2)(C): The Need to Protect the Public from the Defendant's Future Conduct*

The guideline range for Mr. Rosga has been calculated as 324 to 405 months of incarceration with a statutorily authorized maximum sentence of 240 months for count one and 36 months for count two. It is Mr. Rosga's position that a sentence pursuant to these guidelines would be "greater than necessary" given his specific circumstances. The threat of facing any time in prison is a terrifying prospect for a person who has never a criminal conviction, let alone 23 years. Further, a sentence of 23 years would keep Mr. Rosga incarcerated until he was at least well into his seventies. Even a sentence of one half of the statutorily authorized maximum could effectively amount to a life sentence for Mr. Rosga and at the least, would mean that he would be imprisoned for the most vital years he has remaining. There is no question, in light of Mr. Rosga's complete lack of a criminal record and life long history of community service, that such

a sentence or, even something less, would adequately protect the public from any future criminal conduct by Mr. Rosga.

### III. *§ 3553(a)(6): The Need to Avoid Unwarranted Sentence Disparities Among Defendants*

As this Court is aware, a sentencing court takes into account the need to avoid unwarranted sentences of defendants with similar records who have been found guilty of similar cases. Due to the unique nature of this case and the Outlaws Motorcycle Club as a whole, it is most helpful to look at codefendants from this case when analyzing sentence disparities.

To date, the longest sentence imposed by this Court has been 110 months for defendant Les Werth. However, the recommended guidelines sentence of 276 months advanced for Mr. Rosga is nearly four times higher than Mr. Werth's imposed sentence. This would result in an unjustified disparity between two codefendants found guilty following trial in this case; such a disparity must be the kind § 3553(a)(6) seeks to eliminate. Mr. Werth and Mr. Rosga present similarly for consideration of sentence. As an active member of the Outlaws Motorcycle Club, Mr. Werth held multiple leadership positions, including Copper Region President, and was convicted of counts one and two of the indictment. Undisputed evidence introduced at trial demonstrated that Mr. Werth was directly involved in the ordering of assaults of Hells Angels and Desperados members. This includes Mr. Werth's declaration of war on the Hells Angels in a regional meeting while acting as region President.[3] Also, Mr. Werth and Mr. Rosga share a very limited to non-existent criminal history.

---

[3] The government introduced this testimony and argued that Mr. Werth acted upon the instructions of "the big table," or national meeting. However, Mr. Werth made no reference to the order coming from the national meeting during the recorded meeting where Mr. Werth advised his region of a war. In fact, Mr. Werth even referenced his instructions that his region's members take and get rid of Hells Angels patches during encounters as "my thing." Additionally, testimony by Red Region President Lawrence Barboza at the first trial was that no such instruction was given at a national meeting, and his notes, seized by the government and referenced in an attempt to impeach his testimony, contained no such reference. The Government did not indict Mr. Barboza as a co-conspirator. Lastly, no other regions of the national Outlaw Club erupted in violence as a result of this alleged war declared at a national meeting.

There are also distinctions between Mr. Rosga and Mr. Werth that oppose sentencing Mr. Rosga more harshly. Mr. Werth's statements evidencing his conduct were, generally, recorded and presented to the jury, unlike most of the evidence presented against Mr. Rosga, which was largely coconspirator statements attributing statements and actions to him. In addition to ordering assaults, noted above, undisputed evidence demonstrated that Mr. Werth directly participated in them (Cockades Bar, various hunting expeditions) in a leadership capacity. Mr. Rosga did not directly participate in any violent activity presented by evidence.

Additionally, if the Court sentences Mr. Rosga within the Guidelines, an even greater disparity would arise between his sentence and that of Mr. Pedini. Mr. Pedini plead guilty to counts one and two of the indictment, and was sentenced to 63 months in the District of Maine. Mr. Pedini's conduct, explored above, includes a leadership role as an enforcer of some kind, and recruiting another club member for murder, culminating in the shooting of Hells Angels member Gary Watson in Caanan, Maine. Assuming, *arguendo,* that Mr. Rosga is sentenced with a cross reference for attempted murder, both Mr. Pedini and Mr. Rosga would be sentenced at the same guidelines range, as each is sentenced for the same offenses and cross referenced to attempted murder. However, the Government seeks the maximum 276-month sentence for Mr. Rosga, while Mr. Pedini received just 63 months, again, an unjustified disparity discouraged by § 3553(a)(6). Further exacerbating the disparity, Mr. Pedini has a significant criminal record, including multiple pending State drug charges; this is clearly contrasted with Mr. Rosga's clean record. Certainly, Mr. Pedini should receive a greater sentence reflecting both his criminal history and his direct actions in shooting and trying to kill Mr. Watson. However, if the Government successfully achieves its recommended sentence, Mr. Rosga stands to receive an astronomically higher sentence than Mr. Pedini. Mr. Rosga submits that disparities such as this

do not serve the ends of justice and should be avoided when sentencing defendants found guilty of involvement in the same conduct.

**Conclusion**

WHEREFORE, given all of the information outlined in this Sentencing Memorandum and in the Presentence Investigation Report, Mr. Rosga requests calculation of the Federal Sentencing Guidelines consistent with his arguments herein, and, in the alternative, a downward variance from the recommended guideline range if this Court determines a cross reference for attempted murder. It is submitted that in Mr. Rosga's particular circumstances, such a sentence would be "sufficient, but not greater than necessary" to comply with appropriate sentencing purposes.

Respectfully submitted,

| /s/ | /s/ |
|---|---|
| Claire Cardwell | Craig Mastantuono |
| Attorney for Defendant | Attorney for Defendant |
| Virginia State Bar No. 23812 | Wisconsin State Bar No. 1020125 |
| Stone, Cardwell & Dinkin, PLC | Mastantuono Law Office, S.C. |
| 101 Shockoe Slip, Suite K | 817 North Marshall Street |
| Richmond, Virginia 23219 | Milwaukee, Wisconsin 53202 |
| Phone (804) 359-0000 | Phone (414) 276-8662 |
| Fax (804) 257-5555 | Fax (414) 276-8661 |
| claire@stonecardwell.com | cmast@mastantuono-law.com |

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of March, 2011, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to Peter S. Duffy, Assistant United States Attorney, Dennis M. Fitzpatrick, Assistant United States Attorney, and all other counsel of record.

_____/s/_____
Claire Cardwell
Attorney for Defendant
Virginia State Bar No. 23812
Stone, Cardwell & Dinkin, PLC
101 Shockoe Slip, Suite K
Richmond, Virginia 23219
Phone (804) 359-0000
Fax (804) 257-5555
claire@stonecardwell.com