```
 1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
 2                   Richmond Division

 3  UNITED STATES OF AMERICA      }
                                  }
 4  v.                           }    Criminal Case No.:
                                  }    3:10 CR 170
 5  JACK ROSGA, ET AL             }

 6                                    December 1, 2010

 7


 8  COMPLETE TRANSCRIPT OF TESTIMONY, MOTIONS, RULINGS OF
         THE COURT, AND JURY INSTRUCTIONS AT TRIAL
 9           BEFORE THE HONORABLE HENRY E. HUDSON
              UNITED STATES DISTRICT COURT JUDGE
10
    APPEARANCES:
11
    Dennis Fitzpatrick, Esquire
12  Peter S. Duffey, Esquire
    Theryn G. Gibbons, Esquire
13  OFFICE OF THE UNITED STATES ATTORNEY
         Counsel on behalf of the United States
14
    Claire G. Cardwell, Esquire
15  Craig A. Mastantuono, Esquire
         Counsel on behalf of Jack Rosga
16
    Angela D. Whitley, Esquire
17       Counsel on behalf of Mark Jason Fiel

18  Charles D. Lewis, Esquire
         Counsel on behalf of Harry R. McCall
19
    Ali J. Amirshahi, Esquire
20       Counsel on behalf of Christopher Timbers

21  John F. McGarvey, Esquire
         Counsel on behalf of Dennis Haldermann
22


23


24              KRISTA M. LISCIO, RMR
               OFFICIAL COURT REPORTER
25           UNITED STATES DISTRICT COURT
```

# E X A M I N A T I O N S

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Clifford Diggs | 4 | 21/22/22 | -- | -- |

**(Voir Dire was not requested to be transcribed**

**at this time.)**

THE COURT:  Ready for the jury?

MR. FITZPATRICK:  Yes, Your Honor.

THE COURT:  Marshal, bring the jury in.

(The jury is present in the courtroom.)

THE COURT:  Ms. Whitley on behalf of Mr. Fiel.

MS. WHITLEY:  Thank you, sir.

Good afternoon, ladies and gentlemen.

**(Opening statements were not requested to be**

**transcribed at this time.)**

THE COURT:  Mr. Fitzpatrick, are you prepared for your first witness?

MR. FITZPATRICK:  Yes, Your Honor.

THE COURT:  How long do you think that testimony will require?

MR. FITZPATRICK:  Your Honor, the direct examination, 25 to 30 minutes tops.

THE COURT:  All right.  That's fine.  Call your first witness.

MR. FITZPATRICK:  Clifford Diggs, Your Honor.

THE COURT:  Marshal, if you will bring Mr. Diggs in.

Mr. Diggs, if you would raise your right hand, sir, place your left hand on the Bible, and face the

1  Clerk of the Court.

2      THE CLERK:  You do solemnly swear that the

3  testimony which you are about to give, in this case,

4  before this Court, shall be the truth, the whole truth,

5  and nothing but the truth, so help you God?

6      MR. DIGGS:  I do.

7      THE COURT:  Have a seat on the witness stand, sir.

8          Whereupon, **Clifford Diggs**, having been

9  duly sworn in, testifies as follows:

10                 **DIRECT EXAMINATION**

11  BY MR. FITZPATRICK:

12  Q    Good afternoon, sir.

13  A    Good afternoon.

14  Q    I'm going to be asking you a series of questions.

15  I'm going to ask that you keep your voice up so

16  everyone in the room can hear your responses, is that

17  okay?

18  A    Yes.

19  Q    Please state your name.

20  A    Clifford Diggs.

21  Q    Sir, how old are you?

22  A    Forty-nine.

23  Q    Without telling us your exact address, where do

24  you live?

25  A    Spotsylvania.

1  Q    How long have you lived there?

2  A    Nineteen years.

3  Q    Sir, are you married?

4  A    Yes.

5  Q    How many children do you have?

6  A    Five.

7  Q    And what is your job?

8  A    I'm a postal worker.

9  Q    How long have you worked -- do you work for the

10 United States Postal Service?

11 A    Yes.

12 Q    How long have you worked there?

13 A    Almost 22 years.

14 Q    Have you served in the military?

15 A    Yes.

16 Q    When did you serve in the military?

17 A    '83 through '87.

18 Q    What branch of the military?

19 A    Marines.

20 Q    I want to direct your attention to November 20,

21 2008.  Do you recall that day?

22 A    Yes, sir.

23 Q    And directing your attention to the evening of

24 that day.  Did you visit an establishment near your

25 home?

1    A       Yes, sir.

2    Q       What is the name of the establishment?

3    A       Hard Times Cafe.

4    Q       And how far from your home is Hard Times Cafe?

5    A       About 10, 15 minutes at the most.  Probably about

6    10 minutes.

7    Q       And prior to November 20, 2008, did you -- did you

8    visit that place regularly?

9    A       Yes, sir.

10   Q       How often?

11   A       Probably, I'd say, about two to three times a

12   month.

13   Q       And why would you go there?

14   A       Watch games, shoot pool, associate with friends.

15   Q       After November 20, 2008, did you go there -- when

16   was the last time you went there?

17   A       I went there once, and that's probably been about

18   a month or two ago.

19   Q       So that would have been October or November of

20   2010?

21   A       Yes.

22   Q       So after November 20, 2008, until October 2010,

23   you didn't go there?

24   A       Never went in there again.

25   Q       Before you visited -- why did you go to the Hard

1  Times Cafe that night on November 20, 2008?

2  A     I was supposed to be meeting my daughter after I

3  left my mom's house, my daughter and her girlfriend, so

4  I stopped in there.  It was close to home, so I stopped

5  in there to meet them, basically.

6  Q     You had visited your mom before going there?

7  A     Yes.

8  Q     Where does she live?

9  A     Woodbridge.

10 Q     What time did you get to the Hard Times Cafe?

11 A     I'd say about 8:30, quarter to 9:00,

12 approximately.

13 Q     And when you entered the Hard Times Cafe, did you

14 enter alone?

15 A     Yes, sir.

16 Q     Were your daughters there yet?

17 A     No, sir.

18 Q     When you entered, where did you go?

19 A     I went to the bar.

20 Q     And did you order something at the bar?

21 A     I ordered a beer.

22 Q     And did you receive your beer?

23 A     I received a beer.

24 Q     What happened after you received your beer?

25 A     Once I received the beer -- well, after I received

1  the beer, I just went back to the table and started

2  lighting up a cigarette.

3  Q    And was there anyone -- did you go to your table?

4  A    I went to a table near the rails where I was close

5  to the bar.

6  Q    And did anything -- while you were at the bar and

7  you ordered your beer, did anything happen at the bar?

8  A    I was standing behind a gentleman, and he turned

9  around and he bumped into me, and I said, *"Excuse me.*

10 *I'm sorry."*

11 Q    Do you recall how busy or crowded the bar was that

12 night?

13 A    Only a couple people there at the bar at that

14 side.  There were several places where you could order

15 at that time.

16 Q    When you said you were at the bar and someone

17 bumped into you, do you recall what that person was

18 wearing?

19 A    I know it was a shirt and a vest.

20 Q    What kind of vest, do you recall?

21 A    A black vest.

22 Q    Do you recall any markings on the vest?

23 A    No, sir.

24 Q    What happened -- you stated you said, *"Excuse me"*?

25 A    Yes, sir.

1  Q     And what happened to the person that you bumped

2  with?  Did that person say anything?

3  A     No.  Just staring at me.

4  Q     Can you describe the stare?

5  A     It was more or less like a stare, like, get out of

6  my way.  You know, just more or less a stare like

7  you're staring a person down.

8  Q     What reaction did you have to that stare, if any?

9  A     I just said, *"Excuse me."*  I said, *"I'm sorry."*

10  Q     And after that, is that when you went to your

11  table?

12  A     Yes, sir.

13  Q     And when you went to your table, was there anyone

14  else at the table?

15  A     No, sir.

16  Q     What happened next?

17  A     Well, the table is where you -- it's like a

18  stand-up table where basically there's no chairs there.

19  So as I was standing there, I was lighting up a

20  cigarette, and the gentleman that was pretty much

21  directly across from me started waving me over.  So as

22  he was waving me over, I went over and it just so

23  happened to be the table that the gentleman that had

24  bumped into me.

25        So when I went to the table, and I was just

1  thinking, well, maybe he's going to call me over here

2  to apologize.  Say don't pay no attention to my friend,

3  my friend has been drinking, or whatever.  But when I

4  got to the table, he asked me if I wanted a light for

5  my cigarette, and I was already lighting up my

6  cigarette.  And I said, *"No, I'm already lighting up my*

7  *cigarette."*

8  Q    Let me ask you this.  The person that you bumped

9  into or bumped with you earlier, do you see that person

10 in the courtroom today?

11 A    Yes, sir.

12 Q    And where is that person?

13 A    Back there behind the lady.

14 Q    What is he wearing?

15 A    Wearing a white shirt.

16 Q    And can you describe his facial features?

17 A    He's got more or less a goatee mustache.

18     MR. FITZPATRICK:  Your Honor, if the record can

19 reflect the identification of Mr. Timbers.

20     THE COURT:  The record will so reflect.

21     MR. FITZPATRICK:  Thank you.

22     THE COURT:  Go ahead.  Next question.

23 Q    The person that you described called you over and

24 asked for a light, or asked if you needed a light for

25 your cigarette, do you see that person in the courtroom

1 today?

2 A    No, sir.  I don't recognize him.

3 Q    Okay.  When you walked over to the table, do you

4 recall how many people were at the table?

5 A    Yes, sir.  There was five people at the table.

6 Q    And the person that called you over, and that you

7 had -- regarding the cigarette, do you recall what that

8 person was dressed like?

9 A    I believe he had on a vest, but I can't recall so

10 I don't want to say that for sure or not.

11 Q    Okay.  And describe for the jury what happened

12 when you were called over and asked if you needed a

13 light.

14 A    We'll, he asked me did I need a light for my

15 cigarette.  And I explained to him, *"No, I'm already*

16 *lighting up my cigarette."*

17      And he proceeded to tell me to -- he asked me did

18 I have a problem with his friend.  And I said, *"What*

19 *friend?"*  And he pointed to the gentleman there.

20 Q    Who did he point to?

21 A    Mr. Timbers.

22 Q    Okay.  And what happened next?

23 A    After that, he asked me did I have a light -- did

24 I need a light for my cigarette, and I told him, *"No,*

25 *I'm already lighting my cigarette."*

1    And then he said you've got -- *"Do you have a*

2 *problem with my friend?"* I said, *"No."*

3    And he said, *"Keep your eye off my friend."* And I

4 said, *"Man, I didn't come in here for that, man."*

5 Q    Now, when he said, *"Keep your eye off my friend,"*

6 did he use any type of language when he said that?

7 A    Yes, sir.

8 Q    Now, it may be uncomfortable for you, but please

9 tell the jury exactly what you recall the man saying.

10 A    He said, *Keep your eye off my F'g friend.*

11 Q    How did you respond?

12 A    I said, *"I didn't come in here for that, man."*

13 And he proceeded to keep going on.  *"If you got a*

14 *problem with my friend, you got a problem with me."*

15 And he said*, "Keep your eye off my"* F'g *"friend."*

16    And when I went and I said, *"Look, man, I wasn't*

17 *looking at your friend.  If I was, you can look*

18 *anywhere you want."* At this point, he was starting to

19 get a little bit, you know, louder, you know, so.

20 Q    What happened next?  What do you recall?

21 A    After that, next thing I know, Mr. Timbers lunged

22 out of his chair from behind basically sitting on the

23 left of me, we were sitting basically to the right as

24 him and I was face-to-face pretty much, and he lunged.

25 And the next thing I know, I seen a black glove coming

1   and hitting me right in my face, and that's when I went

2   down.

3   Q     And do you recall how many times you were hit?

4   A     At least twice.

5   Q     And you said you went down.  Do you recall how you

6   went down?

7   A     I went down to my knee.  Went down to my knee.

8   Then as I think I got hit again, I braced myself with

9   my right hand.  I went down on my right knee pretty

10  much, and that's when, you know, I started to slump

11  down.  At that point, I don't know if I had kind of

12  lost consciousness or just basically, you know, you

13  become numb.  So that's what it was at that point.

14  Q     All right.  Now, did you walk into the bar that

15  night with a bandage on one of your hands?

16  A     Yes, sir.

17  Q     Why don't you describe that for the jury, please.

18  A     The bandage I had on my hand, I'd just had surgery

19  on my hand and I had like five stitches right here, so

20  I had my hand bandaged up, wrapped up.  So that night

21  when I went in there, I had my hand bandaged because I

22  had stitches in my hand.  I'd had surgery from my job.

23  I had a ruptured tendon in my hand.  So at that point,

24  you know --

25  Q     Was your bandage obvious to everyone?

1   A     Yes.  My whole hand was wrapped up because the cut

2   was right here in the palm of my hand.

3   Q     After -- after that you said you went down?

4   A     Yes.

5   Q     Do you recall what you did next?

6   A     At that point, I think some people started running

7   around, and I jumped up off the floor and I ran.

8   Q     And did you run out of the bar?

9   A     Yes.

10  Q     And did you go to your car?

11  A     Yes, I did.

12  Q     Now, from the time that you entered and ordered

13  your beer until you went -- until you got here and went

14  out to your car, how long were you inside that bar?

15  A     I'd say it wasn't even 15 minutes.  Wasn't 15

16  minutes.  Twenty minutes at the most.

17  Q     How many beers did you have?

18  A     I didn't even get the chance to drink that one.  I

19  started to take a sip and light my cigarette, and

20  that's when I was summoned over to the table by the

21  gentlemen.

22  Q     When you left in your car, did the police stop

23  you?

24  A     Yes, they did.

25  Q     And did the -- did you tell the police what had

1   happened?

2   A    Yes, I did.

3   Q    Now, as a result of that assault at that bar, did

4   you sustain some injuries?

5   A    Yes, I did.

6   Q    When did you first seek medical attention for

7   those injuries?

8   A    Well, my wife tried to get me to go that night,

9   but I thought that everything was going to be all

10  right.  The swelling got worse.  It was already bad,

11  but she was icing it and she seen that it wasn't going

12  down.  The bleeding got worse, and at that point I

13  didn't go until the next morning.

14  Q    Now, where were you getting the swelling that you

15  described?

16  A    Under the left side of my face, the eye, jaw, all

17  the way down, and everything down in here.

18  Q    You said you were bleeding.  Where were you

19  bleeding?

20  A    From the nose and mouth.

21  Q    So you went to the hospital the following day.

22  Would that be November 21st?

23  A    Yes, sir.

24  Q    And describe what kind of treatment you received

25  at the hospital.

1  A     Well, they took x-rays of my face, and they gave

2  me medication and they referred me to see a specialist

3  because my nose was broken, and my jaw was broken, and

4  my eye socket.

5  Q     What happened -- and when you went to see the

6  specialist, did you have some follow-up procedures?

7  A     Yes, I had to have sugary on my nose because it

8  was broken.  And the left side had collapsed right

9  here, so I couldn't breathe out that side.

10 Q     Now you pointed to the left side of your nose up

11 by your eye.

12 A     Yes, sir.

13 Q     Do you have any lasting effects from that assault?

14 A     Well, as far as just normal breathing, it's hard

15 to breathe.  And I have that.

16 Q     How about is there anything physically that's

17 different about your nose?

18 A     Yes.  Right here where they couldn't -- there's a

19 thing that I don't know if it's bone or cartilage.

20 That right here was basically more or less sunken in.

21 Q     I'd like to show you, if I could please, with the

22 assistance of the court security officer, I'm going to

23 begin with Government's Exhibit 612, and it will be

24 Exhibits 612-A through 612-D.

25      MR. FITZPATRICK:  Thank you, sir.

1  Q    I want to show you 612, the thick document there

2  beneath those photographs that you're looking at.  It's

3  the stack of documents in the sleeve.

4  A    612-C?

5  Q    No, sir.  There you go.

6  A    Yes.

7  Q    Do you recognize that document?

8  A    Yes, sir.

9  Q    Do you see your signature on that document?

10 A    Yes, sir.

11 Q    What is that document?

12 A    That's the document of when I went to the

13 emergency room at Mary Washington.

14 Q    Are those your medical records?

15 A    Yes, sir.

16      MR. FITZPATRICK:  Your Honor, move for admission

17 of Government's 612.

18      THE COURT:  Any objection?

19      MR. AMIRSHAHI:  No, sir.

20      MR. LEWIS:  No, sir.

21      THE COURT:  Be received without objection,

22 Government's 612.

23      Is it 612 or 613?

24      MR. FITZPATRICK:  It's 612.

25      THE COURT:  It's been admitted.

1    Q    Mr. Diggs, I'd like you to, if you could please,

2    take a look at 612-A through D, the four photographs

3    that we've given you.  If you can just look at those.

4    A    Yes, sir.

5    Q    And what are those photographs?

6    A    Those photograph are the injuries I sustained, my

7    cut hand, and the picture of my nose after I had the

8    surgery, and the bandages.

9         THE COURT:  Any objection to 612-A through D?

10        MR. AMIRSHAHI:  No, sir.

11        MS. WHITLEY:  No, sir.

12        MR. FITZPATRICK:  Thank you, Your Honor.

13        Your Honor, permission to publish 612-A.

14        THE COURT:  Exhibit 612-A, yes, sir, you may

15   publish it.  Go right ahead.

16   Q    Mr. Diggs, you have a screen in front of you, I

17   believe.  Do you see 612-A in front of you?

18   A    It's not lit up.

19        MR. FITZPATRICK:  Thank you, sir.

20   Q    The rest of the people in the courtroom can see

21   it.  You have the photograph in front of you.  Can you

22   describe what we're seeing here in this photograph?

23   A    Well, as you can see, my left eye is bruised up

24   under it, the whole side of my left face is swollen.

25        MR. FITZPATRICK:  If we can go to 612-B, please.

1   Q     And is this a picture of you, sir?

2   A     Yes.

3   Q     And is this after you've had a procedure?

4   A     That's after I had the -- they were trying to

5   repair the passage through my nasal from the broken

6   nose collapse.

7   Q     Now, the night that this happened, how is your

8   breathing that night when you got home?

9   A     Well, actually, I couldn't breathe.  I couldn't

10  actually see because there was a lot more swelling than

11  there was on these particular pictures.  My left eye

12  was almost completely closed.  My jaw was a lot bigger

13  than that, and my nasal was pretty much where I was

14  breathing out of my right side only.

15  Q     Did you also have some injuries on the inside of

16  your mouth?

17  A     They broke my tooth off where it cut into my gum,

18  and I had a hole in my mouth down here.  So that was

19  part of the sustainment that I received in that

20  incident.

21       MR. FITZPATRICK:  If we can see 612-C, please.

22  Q     Is this another closer up photograph of your

23  injuries?

24  A     Yes.

25       MR. FITZPATRICK:  If we can see 612-D, please.

1    Q    And why don't you describe what this is.

2    A    That's where I still had -- my hand was cut up

3    from the surgery from the job where I had the injury

4    when I went into the bar.  I was basically showing that

5    picture because I still had the stitches and bandage

6    around my hand at the time that I went into the

7    establishment.

8         MR. FITZPATRICK:  Thank you.

9    Q    Now, earlier you described, if you recall, a

10   glove.  Do you remember that testimony?

11   A    Yes.

12   Q    Who had the -- who do you recall having the glove

13   on their hand?

14   A    Mr. Timbers.

15   Q    Now, and I don't want you to tell us where you

16   were, but did you have an encounter with Mr. Timbers

17   several months later?

18   A    Yes, I did.

19   Q    And did he speak any words to you?

20   A    Mr. Timbers approached me after court, which was a

21   hearing, and he explained to me, he said at the back of

22   the court when it was over when they determined I guess

23   what they were going to charge him with, he spoke to me

24   and said he was sorry for what had happened and that,

25   you know, he wished it didn't happen.  And said he

1   wished that I could have got the right person.

2   Q    And how did you interpret that statement, that

3   last statement, from him?

4   A    Well, I basically told him I said, *"I do recall*

5   *you being the one that hit me, you being the one that*

6   *turned at the bar."* And I interpreted it basically as

7   that, you know, I don't know whether it was sincerity

8   or whether it was a threat, but I just took it as his

9   statement for what it was worth. I think he felt

10  awkward in approaching me at that time.

11  Q    And Mr. Diggs, the Hard Times Cafe, is that in

12  Fredericksburg, Virginia?

13  A    Yes.

14       MR. FITZPATRICK: Mr. Diggs, I have no further

15  questions for you. Please answer counsels' questions.

16       THE COURT: All right.

17       Cross-examination.

18       Ms. Cardwell, do you have any questions?

19       MS. CARDWELL: I do have one quick question.

20                    **CROSS-EXAMINATION**

21  BY MS. CARDWELL:

22  Q    Good afternoon, Mr. Diggs. My name is Claire

23  Cardwell, and I represent Mr. Rosga.

24       MS. CARDWELL: Mr. Rosga, can you stand up,

25  please.

1  Q    Have you ever seen or met him before anywhere in

2  Fredericksburg, Virginia?

3  A    I don't recall.

4       MS. CARDWELL:  Thank you.

5       THE COURT:  All right.

6       Ms. Whitley, questions of Mr. Diggs?

7       MS. WHITLEY:  We have no questions.  Thank you.

8       THE COURT:  Questions, Mr. Lewis?

9       MR. LEWIS:  One question.

10      THE COURT:  Yes, sir.

11                   **CROSS-EXAMINATION**

12 BY MR. LEWIS:

13 Q    How are you doing, Mr. Diggs?  My name is Charles

14 Lewis, and I represent Mr. Harry McCall.

15      MR. LEWIS:  Mr. McCall, could you stand up.

16 Q    Do you recall seeing him there that day?

17 A    No, sir, I don't.

18      MR. LEWIS:  That's all I have, Judge.

19      THE COURT:  Mr. Amirshahi?

20      MR. AMIRSHAHI:  Yes, Judge.

21                   **CROSS-EXAMINATION**

22 BY MR. AMIRSHAHI:

23 Q    Good afternoon, Mr. Diggs.  My name is Ali

24 Amirshahi, and I represent Mr. Timbers.  How are you?

25 A    How are you doing?

1   Q      Good.

2          Are you a member of a bike club by any chance?

3   A      No, sir.

4   Q      You're not a Hells Angels, or related to them in

5   any way?

6   A      No, sir.

7   Q      During this incident, was anything said to you

8   regarding a motorcycle club, or Outlaws, or Hells

9   Angels, or anything like that?

10  A      No, sir.

11  Q      The only things that were said to you essentially

12  were what you've already described?

13  A      Yeah.

14  Q      *"Do you need a light?"* that was one of the things

15  that was said, right?

16  A      Yes, sir.

17  Q      Now, your testimony is that you believe

18  Mr. Timbers is the one that the two of you bumped into

19  each other near the bar, right?

20  A      Yes, sir.

21  Q      Okay.  Nothing happened at this point, right?

22  Nothing physical happened?

23  A      Other than the stare, no, sir.

24  Q      And it's your testimony, or your best belief, that

25  one person struck you at this bar, is that what you

1  believe occurred?

2  A    At that time that I went down, I don't know who --

3  at that point, I went down to my knees, sir, so I have

4  no idea who else may have struck me.  I did sustain a

5  second hit, but as far as I know, that came from the

6  same person.

7  Q    Okay.  That's what you said earlier, right?  You

8  said Mr. Timbers struck you twice?

9  A    Yes, sir.

10 Q    That's what you said.  Is that -- do you believe

11 that to be true?

12 A    Yes, sir.

13 Q    Okay.  Are you sure about that?

14 A    Yes, sir.

15 Q    You are?

16 A    Yes, sir.

17 Q    Okay.

18      Now, and you don't recognize anyone else here as

19 being at the bar that night, correct?

20 A    No, sir.  It happened so fast at that point, sir.

21 Q    Were you ever asked to look at some photographs by

22 the government agents?

23 A    Yes, sir.

24 Q    Okay.  And in fact, you picked out a couple of

25 photographs, didn't you?

1  A     I believe so, sir.

2  Q     And you never picked out a photograph of

3  Mr. Timbers though, did you?

4  A     No, sir.  I don't know.  I just picked out a

5  couple of pictures.  They didn't say who was who, so I

6  can't tell you whether it was him or not.

7  Q     All right.  Well, we'll get to that.

8        You went to a hearing in another court in

9  Spotsylvania, correct?

10  A     Yes, sir.

11  Q     And at that point, Mr. Fitzpatrick was asking you

12  if you spoke to Mr. Timbers, or if Mr. Timbers spoke to

13  you at that point, correct?

14  A     Yes.

15  Q     And I thought I heard you say that he came up to

16  you and he apologized to you and he said he was sorry

17  for what had happened, is that right?

18  A     Yes.

19  Q     And he said something to the extent of he wished

20  that you had gotten the facts right, right?

21  A     Yes, sir.

22  Q     Okay.  And he said that, coupled with an apology,

23  is that right?

24  A     Yes, sir.

25        MR. AMIRSHAHI:  Thank you very much, Mr. Diggs.

1       THE COURT:  Mr. McGarvey?

2       MR. McGARVEY:  I have no questions.

3       THE COURT:  Any redirect?

4       MR. FITZPATRICK:  No, sir.

5       THE COURT:  May Mr. Diggs be excused?

6       MR. FITZPATRICK:  He may be excused, Your Honor.

7       THE COURT:  May Mr. Diggs be excused?

8       MR. MASTANTUONO:  Yes, sir.

9       MS. CARDWELL:  Yes, sir.

10      THE COURT:  Mr. Diggs, you're excused and free to

11  go.  Thank you for coming in today, sir.  We appreciate

12  your testimony.

13                      **WITNESS STOOD ASIDE**

14      THE COURT:  Who would be the government's next

15  witness, and how long will it take?

16      MR. FITZPATRICK:  Your Honor, it will be Special

17  Agent Grabman examined by Mr. Duffey.  And he'll take a

18  day, at least.

19      THE COURT:  All right.  Very well.

20      Ladies and gentlemen, I think probably rather than

21  begin Mr. Grabman's testimony this evening, we'll

22  recess until tomorrow morning at 9:00.  Can all of you

23  be here tomorrow morning at 9:00?  Excellent.

24      Now in the interim, keep in mind, do not discuss

25  this case with anyone else.  Avoid any contact with

1   anyone involved in the case.  Avoid any contact with

2   media reports, newspaper, television concerning this

3   case, or any related matter.

4       And more importantly, I know that it's tempting to

5   go home this evening and talk to your friends, your

6   neighbors, your spouse, et cetera, about the exciting

7   case you're hearing down at the courthouse.  You just

8   can't do that.  Keep your own counsel.  Keep your

9   thoughts to yourself.

10      Get a good night's rest, and we'll see you back

11  here tomorrow morning at 9:00.  You're excused until

12  then.

13      Everyone, please remain seated until the jury

14  leaves the courthouse.

15   (The jury is no longer present in the courtroom.)

16      THE COURT:  I think that the memorandum I issued

17  last night covers the majority of the motions in

18  limine, but if there are others related to that that

19  you wish to address, I'll give you the option that we

20  can either do it this evening, or if you would prefer

21  to do it tomorrow morning at 8:45, I'll do it then.  I

22  know all of you are tired.  We've had a long day.  What

23  are your thoughts?

24      MR. MASTANTUONO:  On behalf of Mr. Rosga, Your

25  Honor, just briefly.  I think the only issue we want to

1    clarify is that my understanding is that your

2    memorandum order did authorize disclosure of a

3    particular incident with regard to Special Agent

4    Ozbolt?

5         THE COURT:  Yes, sir.

6         MR. MASTANTUONO:  And I don't know what the

7    disclosure is from the order.  Are we to confer with

8    counsel with regard to that?

9         THE COURT:  Confer with Mr. Fitzpatrick or

10   Mr. Duffey, and they'll provide you with that

11   information.

12        MR. MASTANTUONO:  Okay.  Thank you, sir.

13        THE COURT:  All the other areas you covered in

14   your motion concerning Agent Ozbolt, I will not admit.

15        MR. MASTANTUONO:  Understood, sir.

16        THE COURT:  Yes, sir.

17        MR. MASTANTUONO:  And my understanding with the

18   Allman matter is that it may be revisited if a

19   foundation can be made.

20        THE COURT:  Correct.  That's correct.  The factual

21   foundation that's necessary was not proven at the time

22   it was presented to me.  I will afford you that

23   opportunity during the course of the trial.

24        MR. MASTANTUONO:  Thank you, Your Honor.

25        THE COURT:  And the other information concerning

Special Agent Grabman, I've ruled on that in my

memorandum opinion.

    MR. MASTANTUONO:  Understood.

    THE COURT:  All right, sir?

    MR. MASTANTUONO:  Yes, sir.  Thank you.

    THE COURT:  Are there other issues?

    MS. WHITLEY:  On behalf of Mr. Fiel, we prefer to

argue tomorrow morning.

    THE COURT:  Well, the only thing you have

remaining, I'm going to hear at the time the witness

testifies.

    MS. WHITLEY:  Yes, sir.  I appreciate that.  That

sounds good.

    THE COURT:  Because let me just tell you, it is

somewhat testimony-dependent.  If that testimony

arises, you feel it's objectionable, and if you have a

meritorious objection, raise it then and I'll rule on

it.

    MS. WHITLEY:  I'll do so, Judge.

    And, Judge, I did have one other issue.

    THE COURT:  Yes, ma'am.

    MS. WHITLEY:  And perhaps you can clarify this for

me.  First time I've had a client that has not been

able to wear a suit jacket.  I can understand security

justifications for a tie or a belt, and I've never had

1 that either, but a jacket -- I would like for my client

2 to be able to put on a suit that's proper for court

3 attire.

4     THE COURT: I'm not going to -- the Marshal

5 Service has their security requirements for their

6 presentation. All of the defendants are appropriately

7 dressed, and if the Marshal Service feels that there is

8 a security issue with respect to wearing a coat, I will

9 support their decision. Take it up with Deputy Marshal

10 Blackwood, okay?

11     MS. WHITLEY: Thank you, Judge.

12     MR. AMIRSHAHI: Your Honor, very briefly.

13     THE COURT: Yes, sir.

14     MR. AMIRSHAHI: On behalf of Mr. Timbers, the

15 government and I are in agreement on a new wrinkle to

16 Mr. Timbers' charges, and as you read the counts to the

17 jury, the government is in agreement that he was not a

18 convicted felon at the time of the Waterbury,

19 Connecticut --

20     THE COURT: And I did not mention that to the

21 jury.

22     MR. AMIRSHAHI: Absolutely. And I was grateful

23 for that.

24     I would just -- and I don't think the government

25 is going to attempt to elicit the fact that since that

1  time he is now a convicted felon, but not at the time

2  when the one time when they saw him with what appeared

3  to be a firearm.

4  THE COURT:  There is only one circumstance in

5  which you have relevance, and that would be should he

6  testify, then it's proper.

7  MR. AMIRSHAHI:  Yes, sir.

8  THE COURT:  Absent that, I don't believe it's

9  admissible.

10  MR. AMIRSHAHI:  Thank you, Judge.

11  THE COURT:  All right.

12  Anything else today?

13  MR. FITZPATRICK:  No, sir.

14  MR. McGARVEY:  Judge, I have two relatively minor

15  issues.

16  THE COURT:  Yes, sir, Mr. McGarvey.

17  MR. McGARVEY:  I didn't hear anyone invoke the

18  exclusionary rule, and I would so invoke that of

19  witnesses.

20  THE COURT:  You mean exclude the witnesses?  Well,

21  it was obvious there were no witnesses in the

22  courtroom.

23  MR. McGARVEY:  I understand.  But I wasn't sure of

24  that.

25  THE COURT:  All right.  I will instruct both court

1 security officers to be sure there are no witnesses in

2 the courtroom.

3      MR. McGARVEY:  And the second thing is can we

4 leave our stuff here, Judge?

5      THE COURT:  Yes, I don't see any reason why you

6 can't.  No one is going to be using the courtroom

7 between now and then.

8      MR. McGARVEY:  Thank you.

9      THE COURT:  Sure.  Go right ahead.  We'll lock it

10 up.

11      Anything else?

12      All right, then.  We'll recess until tomorrow

13 morning at 9:00.  I'll see you then.

14          (The proceeding concluded at 5:10 p.m.)

15                REPORTER'S CERTIFICATE

16          I, Krista M. Liscio, OCR, RMR, Notary

17 Public in and for the Commonwealth of Virginia at

18 large, and whose commission expires March 31, 2012,

19 Notary Registration Number 149462, do hereby certify

20 that the pages contained herein accurately reflect

21 the notes taken by me, to the best of my ability, in

22 the above-styled action.

23      Given under my hand this 3rd day of October, 2011.

24          _____

25              Krista M. Liscio, RMR
                 Official Court Reporter