1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF VIRGINIA
2                Richmond Division

3  UNITED STATES OF AMERICA      }
                                 }
4  v.                            }   Criminal Case No.:
                                 }   3:10 CR 170
5  JACK ROSGA, ET AL             }

6                                    December 14, 2010

7

8  **COMPLETE TRANSCRIPT OF TESTIMONY, MOTIONS, RULINGS OF
      THE COURT, AND JURY INSTRUCTIONS AT TRIAL**
9       **BEFORE THE HONORABLE HENRY E. HUDSON
          UNITED STATES DISTRICT COURT JUDGE**
10
   APPEARANCES:
11
   Dennis Fitzpatrick, Esquire
12 Peter S. Duffey, Esquire
   Theryn G. Gibbons, Esquire
13 OFFICE OF THE UNITED STATES ATTORNEY
        Counsel on behalf of the United States
14
   Claire G. Cardwell, Esquire
15 Craig A. Mastantuono, Esquire
        Counsel on behalf of Jack Rosga
16
   Angela D. Whitley, Esquire
17      Counsel on behalf of Mark Jason Fiel

18 Charles D. Lewis, Esquire
        Counsel on behalf of Harry R. McCall
19
   Ali J. Amirshahi, Esquire
20      Counsel on behalf of Christopher Timbers

21 John F. McGarvey, Esquire
        Counsel on behalf of Dennis Haldermann
22

23

24          KRISTA M. LISCIO, RMR
           OFFICIAL COURT REPORTER
25      UNITED STATES DISTRICT COURT

# E X A M I N A T I O N S

### DIRECT   CROSS   REDIRECT   RECROSS

1    (The proceeding commenced at 9:15 a.m.)

2    MR. DUFFEY:  Good morning.

3    THE COURT:  Are there any additional issues

4  concerning instructions?  Y'all have looked over the

5  modifications I have made.  Are there objections to the

6  modifications?

7    MS. CARDWELL:  No, sir.

8    McGARVEY:  No, sir.

9    THE COURT:  Yes, sir, Mr. Fitzpatrick.

10    MR. FITZPATRICK:  Judge, I want to raise with the

11  Court the issue that we ended with yesterday, which was

12  the Allman tape.

13    THE COURT:  Yes, sir.

14    MR. FITZPATRICK:  I would propose to the Court

15  that this is a piece of evidence that should be

16  stipulated to by the parties.  I think we're all in

17  agreement that the tape is authentic, and that it now

18  comes in.

19    I would offer to the Court that we ought to -- the

20  stipulation should come from the Court.  A neutral

21  party.  That the stipulation should simply say that

22  prior examination references were made to Allman

23  statements.  The parties now stipulate to the

24  admissibility of the Allman tape.  The Allman tape is

25  the best evidence of Mr. Allman's statements.  That's a

1  very neutral vanilla stipulation, and I think if it

2  comes from the Court it's on neutral ground.

3      I would propose that --

4      THE COURT:  Any objection to that?

5      MS. CARDWELL:  Well, Judge, I don't mind the

6  stipulation that it's authentic, but we're entitled to

7  introduce it as part of our case, not from the Court

8  introducing the evidence neutrally.  The government has

9  rested.

10     THE COURT:  I wouldn't be introducing it.  It's

11 clearly going to be a part of your case.  I think he

12 wants the predicate for it to be stipulated to.

13     MS. CARDWELL:  Well, what I intend to say before

14 offering the tape is that this is the recording that

15 was made of Joseph Allman speaking with Special Agent

16 Ozbolt, and his role as JD, at the Petersburg clubhouse

17 on October the 9th.  That's what I was going to say to

18 the jury.  But I'd like to introduce it as part of our

19 case.

20     MR. FITZPATRICK:  May I be heard on that?  Your

21 Honor, I think what the inference is going to be

22 created by that is somehow the government was trying to

23 hide something.  We weren't trying to hide anything.

24 We made a good faith argument under the law.  We made a

25 good faith argument under the law that it was

1  inadmissible.  Your Honor said it was a very close

2  call.

3       Had we known -- had we argued the issue earlier

4  and had a good faith argument, as the Court ruled, then

5  we would have offered it in our case.

6       THE COURT:  Well, Mr. Fitzpatrick, I cannot force

7  a stipulation.  If counsel wishes to put it on in her

8  case, I don't know that it's appropriate for me to

9  intercede in that.  Whether or not a stipulation would

10 be the best procedure is really not for me to comment

11 on.  If she wishes to do that, she's got every right to

12 do that, so I think I have to deny your motion and let

13 her go ahead and put it in however she wishes.

14      Let's get going.

15      MR. FITZPATRICK:  Your Honor, I think we're in

16 agreement on the stipulation.  The parties want to

17 stipulate.

18      THE COURT:  Okay.

19      MR. FITZPATRICK:  It's the vehicle by which the

20 stipulation gets in and how the evidence gets in.

21      THE COURT:  I understand.  She is going to be able

22 to put on her case how she wishes both substantively

23 and mechanically, so I'll let her go ahead and proceed.

24 If she wishes for me to read the stipulation, I will do

25 that.  If she does not, she can put it in however she

1    wishes.

2        We're going to proceed.  Thank you,

3    Mr. Fitzpatrick.

4        MR. FITZPATRICK:  Thank you.

5        THE COURT:  Are we ready to go?

6        MS. CARDWELL:  Yes, sir.  All right, Marshal,

7    bring the jury in.

8            (The jury is present in the courtroom.)

9        THE COURT:  Good morning, ladies and gentlemen.

10   We continue with the defense evidence.

11       Ms. Cardwell or Mr. Mastantuono, who'll be your

12   next witness?

13       MS. CARDWELL:  At this time, Your Honor -- we're

14   going to move to introduce, Your Honor, at this time

15   what's been previously marked as Defendant 29-A-JR,

16   which is a tape recording that we'd ask be admitted and

17   published for the jury.  I believe there are

18   transcripts available to pass to the jurors.

19       THE COURT:  That's the tape we had discussed

20   earlier, is that correct?

21       MS. CARDWELL:  Yes.

22       THE COURT:  All right.

23       MS. CARDWELL:  I'd move the introduction of the

24   tape as 29-A-JR as a recording made of Joseph Allman

25   speaking with Special Agent Ozbolt in his role as JD at

1  the Petersburg clubhouse on October 9th of 2009.  And

2  the government --

3      THE COURT:  Is this received over the government's

4  objection, or is there any objection to it coming in at

5  this point?

6      MR. FITZPATRICK:  No, Your Honor.  What she

7  stipulated -- what she stated is accurate.

8      THE COURT:  Thank you, sir.  It will come in

9  without objection.

10     All right, Ms. Cardwell, are you ready to publish

11 it to the jury?

12     MS. CARDWELL:  Yes.

13     THE COURT:  Everybody have a copy?

14     (The tape is being played at this time.)

15     MS. CARDWELL:  Thank you, Your Honor.

16     At this time, the defense calls Tony San Filippo,

17 please.

18     THE COURT:  Tony San Filippo?

19     MS. CARDWELL:  Yes, sir.

20     THE COURT:  All right.

21     Mr. San Filippo, if you would raise your right

22 hand, place your left hand on the Bible, and face the

23 Clerk of the Court.

24     THE CLERK:  You do solemnly swear that the

25 testimony which you are about to give, in this case,

1  before this Court, shall be the truth, the whole truth,

2  and nothing but the truth, so help you God?

3       MR. SAN FILIPPO:  I do.

4       THE COURT:  Have a seat on the witness stand, sir.

5       MR. MASTANTUONO:  Thank you, Your Honor.

6       Whereupon, **Tony San Filippo**, having been

7  duly sworn in, testifies as follows:

8                    **DIRECT EXAMINATION**

9  BY MR. MASTANTUONO:

10 Q    Sir, could you please state your name for the

11 jury.

12 A    Tony San Filippo.

13 Q    Where are you from?

14 A    Milwaukee.

15 Q    And how are you employed?

16 A    I am investigator for a law firm in Milwaukee.

17 Q    All right.  And in your capacity as an

18 investigator, what do you do for the law firm?

19 A    I investigate motorcycle accidents, and I also

20 work with the motorcycle community.

21 Q    Is your firm -- is your law firm a personal injury

22 firm?

23 A    Yes, sir.

24 Q    And do you specialize or focus on motorcycle

25 accident injuries?

1    A    The division I'm in does.  Yes.

2    Q    And how long have you been so employed?

3    A    Seventeen years.

4    Q    You referenced working with the motorcycle

5    community.  Was that regarding Wisconsin and the

6    greater Milwaukee area?

7    A    Primarily the Milwaukee area, but also nationwide

8    we do a lot of outreach on motorcycle rights and

9    motorcycle issues, including testimony in Washington,

10   D.C. on bills, and things like that.

11   Q    What is ABATE?

12   A    ABATE, it's a motorcycle rights organization that

13   I founded in Wisconsin in 1974.  It's a nationwide

14   organization.  Each chapter across the county is

15   individualized.  I just happened to organize the

16   Wisconsin chapter.

17        THE COURT:  Mr. San Filippo, how do you spell or

18   what phrase do you use for that organization?  Could

19   you repeat that again?

20        MR. SAN FILIPPO:  Sure.  It's A-B-A-T-E.  It's an

21   acronym for -- they have several names.  Our

22   organization kept the original name, which is A

23   Brotherhood Against Totalitarian Enactments.  And some

24   chapters across the country are called American Bikers

25   Aiming Towards Education.

1    THE COURT:  Okay.  Thank you, sir.

2    Go ahead.

3    Q    Does ABATE involve itself in the mandatory helmet

4    laws?

5    A    That was the primary reason we formed.  But for 36

6    years now, we're working -- we work on all types of

7    issues now.

8    Q    All right.  Do you know the defendant, Jack Rosga?

9    A    Yes, sir.

10    Q    And how long have you known Mr. Rosga?

11    A    Around 10 or 15 years.

12    Q    All right.  And do you know Mr. Rosga to be

13    employed?

14    A    Yes, sir.

15    Q    And how is he employed?

16    A    He owns his own company.  He has a trucking

17    company.  He also works for Coakley Brothers.  It's a

18    truck firm out of Wisconsin.

19    Q    Do you know also Mr. Rosga due to his

20    participation in the motorcycle community?

21    A    Yes, sir.

22    Q    And do you know that Mr. Rosga is an Outlaw member

23    and current leader?

24    A    Yes.

25    Q    And have you worked with Outlaw members locally in

1  a professional capacity?

2  A    Yes, I have.

3  Q    And could you give an example of that.

4  A    Well, we worked on a lot of legislation, and

5  specific to Milwaukee area on things like parking

6  restrictions, angle parking, confiscation of antique

7  motorcycles.

8       And also my wife and I have an organization called

9  Accident Scene Management, which is a 501c3 nonprofit.

10 We teach people what to do at the scene of a crash of a

11 motorcycle until professional help gets there.  And I

12 worked with the Outlaws and other clubs to provide

13 motorcyclists and motorcycles when we do training with

14 fire departments.

15 Q    All right.  Did you work with -- or did Mr. Rosga

16 work with you on that last issue you spoke of, the

17 accident scene management, to help you put on that

18 training effort?

19 A    Yes, he did.  He provided some members to bring

20 their motorcycles and to participate in some training

21 with the fire department.

22 Q    And why was it particular and specific that a 1%er

23 participate in that training?

24 A    Well, at the scene of a crash, some people

25 complained, some motorcyclists complained, that they

1   were treated differently than people in cars, for

2   instance.  So we do sensitivity training with the fire

3   department and police personnel.  And we explain first

4   to the bikers why professionals act the way they do at

5   the scene, and then we talk to professionals and tell

6   them why bikers act the way they do at the scene.

7          And in particular when you're dealing with clubs,

8   there's property issues that are involved with

9   motorcycles, colors, their patches, rings, and jewelry.

10  Those belong to the club and not the individual, so we

11  explain to them that it's okay to hand those items over

12  to somebody in the club.  Because our training is

13  normally you send any belongings with the person to the

14  hospital.

15  Q    And so did the Outlaw members -- was this within

16  the past five years, by the way?

17  A    Yes.

18  Q    And the Outlaw members that participated in that

19  training, did they help put on the lecture with the

20  firefighters or first responders?

21  A    Yes, they did.  They spoke and explained their

22  issues, and they explained that despite some myth or

23  some rumors that motorcyclists or patch-holders in

24  particular were going to fight with emergency personnel

25  at the scene, or give them a hard time, they confirmed

1  what we told them, and that's they want their person

2  taken care of just as much as anybody else does.

3  Q    As a local leader in the motorcycle community,

4  have you participated with the Outlaws' association

5  locally at charity events?

6  A    I have.

7  Q    Could you give an example?

8  A    There's been different events over the years.  The

9  ones that come to mind most strongly are some

10  fundraising bike rides and poker runs that benefited

11  Sojourner House, which is a shelter for women, and

12  Hunger Task Force, which is a food pantry in Milwaukee.

13  Q    And were these events that Mr. Rosga in his

14  leadership capacity participated in?

15  A    I think they actually organized the one for the

16  Hunger Task Force.

17  Q    What is Allied Clubs of America?

18  A    Allied Clubs of America is a group of

19  motorcyclists and clubs in Wisconsin.  Has probably

20  about 40 or 44 clubs that belong.

21  Q    Who was the founder?

22  A    Actually, I was asked to help formulate that

23  organization, along with members of the Outlaws, and

24  members of the Road Runners, and members of I believe

25  the Saints, and we got together.  And there was another

1    organization at the time in Wisconsin, and there wasn't

2    any -- bikers down that path that was beneficial to

3    them.  It was kind of getting off course.  And what the

4    clubs wanted was an association that they could get

5    together, socialize, and plan a calendar so they

6    wouldn't cross over each other's runs or organizations

7    or parties, or whatever.

8    Q    All right.  And how many clubs now belong to that

9    organization, approximately?

10   A    It's about 40 or 44.

11   Q    Does the American Outlaw Association Motorcycle

12   Club participate in that -- what do you call it?

13   A    Allied Clubs of America.

14   Q    Okay.  Do the Outlaws participate in that?

15   A    Yes.  Each representative club sends two members

16   to a meeting, and each club then has two votes if we're

17   voting on something.  Like if we're going to do a

18   certain party or a run, or if we want to be involved in

19   a certain legislation that has come down the pike that

20   they want to get involved in.

21   Q    Do you have specific knowledge as to Mr. Rosga's

22   participation or interaction with other motorcycle

23   clubs in Wisconsin to participate in that organization?

24   A    Yes.  He urged his club to belong and participate,

25   and he urged other clubs to also belong and participate

1  because it was a chance for the clubs to get together

2  and, like I say, work out their calendars.  And it was

3  also a chance to socialize and get to know each other.

4  Q    Now, in addition to the social efforts that Allied

5  Clubs of America makes to coordinate calendars and such

6  for events, do you also work on legislative or advocacy

7  issues as well?

8  A    Yes.  In fact, on February 22nd we have another

9  lobby day coming up.  It's organized through ABATE, but

10  the clubs, Allied Clubs, send members.  And last year

11  we had 500 motorcyclists attend our Capital Day Lobby

12  Day.  We've been doing this for three years in a row

13  now.

14  Q    Mr. San Filippo, approximately how many motorcycle

15  clubs in your estimation -- do you feel that you have a

16  good knowledge of how many motorcycle clubs exist in

17  Wisconsin?

18  A    I think there's probably around 60 to 80.  There's

19  some of these really small clubs that you don't hear

20  much about and they don't socialize or participate with

21  other clubs, so there's a few that we're probably

22  missing.  But I'd say between 60 and 80.

23  Q    And how many do you think wear the -- or do you

24  have knowledge of how many approximately wear the

25  American Outlaw Association Motorcycle Club support

1  patches?

2  A    Or affiliated patch, or something?

3  Q    Yes.

4  A    I'm aware of two or three that do.

5  Q    All right.  Are you aware of the Outlaws

6  Association Club forcing other clubs to do anything, or

7  making efforts to do so?

8  A    No, sir.

9  Q    Have you had occasion to visit the Outlaws'

10  clubhouse in Milwaukee?

11  A    Yes.

12  Q    On approximately how many occasions?

13  A    I go there probably at least a dozen or more times

14  a year.  And I think I just went to a party there a

15  couple weeks ago -- a week ago.

16  Q    So are some of the purposes that you go there

17  social?

18  A    Basically the only reason I go there is social.

19  Q    Okay.  And have you had occasion while there to

20  see Mr. Rosga's efforts to work with other clubs

21  locally in Milwaukee?

22  A    Yes.  About a year ago, there was some new sport

23  club bikes -- bike club riding clubs organized in

24  Milwaukee.  And I don't remember the names of them, but

25  they were young inner-city youths that we term as crash

1  rockets.  They're sport bikes or high performance

2  bikes.  And they were invited to come down to the

3  clubhouse to meet people.

4      And Jack was there and introduced them to other

5  clubs that were there.  And he kind of told them that

6  when you're in the city, we have got a lot of problems

7  with EPA and noise regulations and these bikes have a

8  real high whining sound, and he just reminded these

9  guys that he doesn't want them riding around the city

10 raising all kinds of issues with noise and doing stunts

11 because it draws interest to the motorcycle community,

12 and we all pay for that.

13 Q    And did he threaten them or pressure them?

14 A    No.  It was very congenial.

15 Q    And was that during a Wednesday social night?

16 A    Yes, it was.

17 Q    Have you seen drug use at the Outlaws' clubhouse?

18 A    Not since the '70s.

19 Q    Are you familiar with Mr. Rosga's views with

20 regard to drug use and drug transactions?

21 A    I've had many conversations with him about that,

22 and he's absolutely adamant that he doesn't want

23 anybody using or taking drugs into the clubhouse.

24 Q    Mr. San Filippo, are you aware of the longtime or

25 standing history of rivalry between the Outlaws and the

1   Hells Angels?

2   A    Yes.

3   Q    Are there Hells Angels' chapters that you're aware

4   of in Wisconsin?

5   A    No, sir.

6   Q    And is there a protocol that you're familiar with

7   that exists between the 1% clubs regarding territory?

8   A    I've been around the clubs since they started in

9   Milwaukee since '66, '67.  Somewhere in the '70s, they

10  came to an understanding that they were going to be in

11  certain areas and there was a protocol set up.  And to

12  avoid clashes or conflicts, they just recognize certain

13  territories or states that they were dominant in, and

14  it was a just a matter of protocol or agreement that

15  other clubs wouldn't come in there without notice, or

16  whatever.

17       In fact, I know of -- I was privy to some

18  conversations where other clubs were on the way to a

19  funeral or some other event, and would call ahead and

20  let the other club know they're coming through.  It was

21  a courtesy call.  And that's the way things were done.

22  Q    Are you familiar with Mr. Rosga's efforts to

23  participate with other clubs along those lines?

24  A    Yes, sir.  You know that the other organization

25  that I was talking about that was in Wisconsin that

1   Allied Clubs kind of formed because they were going the

2   wrong way, that was NCOM.  And they would have these

3   national conferences, and Jack always sent people to

4   these national conferences because instead of just

5   everybody going there for national rights, the clubs

6   also got together and would have their own separate

7   meetings at these NCOM conventions where they would

8   talk about those types of situations.

9   Q    Are you aware of Mr. Rosga opening lines of

10  communication with local police on funeral runs?

11  A    Yes.  There's several memorial runs, one in

12  particular that I've been participating in since 1977,

13  and it was always a very -- sort of like running the

14  gauntlet.  We never got a lot of police protection or

15  cooperation with funeral escorts or memorial escorts.

16  Jack actually opened lines of communication with the

17  Second Precinct police, and for the first time in 30

18  some years, the last several years, we were getting

19  police escorts and they were blocking intersections.

20  And then the sheriff's department picked us up on the

21  freeways.  That's because he just simply called and

22  asked.

23  Q    Have you formed in your -- I'm sorry.  Do you know

24  how long the Outlaws' chapter clubhouse in Milwaukee

25  has been there?

1  A    In its present location?

2  Q    Yes, sir.

3  A    Since I think around 1988.

4  Q    Do you know how it came to be there?

5  A    Well, it used to be on a -- their clubhouse used

6  to be in a place closer to downtown, and the city

7  bought that property and was going to redo it and make

8  a park, or something there.  So the city relocated them

9  and paid for the club to be moved, and paid all the

10  moving expenses, and they relocated on 2nd Street where

11  their current location is.

12  Q    Is that primarily a residential neighborhood?

13  A    Yes, sir.

14  Q    Do you know whether the clubhouse has good

15  neighborly relations?

16      MR. FITZPATRICK:  Objection.  Based on hearsay, if

17  he does.

18      THE COURT:  I'll sustain the objection.  You need

19  to lay a foundation for how he has firsthand knowledge.

20  The objection will stand.

21      MR. MASTANTUONO:  Okay.

22  Q    Have you on your previous occasions that you've

23  referenced on going to the current location of the

24  Outlaws Association clubhouse, had a chance to view

25  interactions between the clubhouse as a whole and the

1  members within it, and the neighborhood itself?

2  A    Yes.  On the top of the hill, the corner is Dennon

3  Street, a one block street.  On the top is an old tire

4  factory that they redid into a high-rise luxury condo

5  complex.  And I had conversations with some of the

6  tenants in that complex saying that they liked the fact

7  that they felt safe in walking their dogs down the hill

8  towards the clubhouse rather than walking around a

9  corner on Maple Street.

10     And I did have a conversation with a lady last

11 year that asked me if I knew who plowed the street for

12 the Outlaws because their -- somebody from the club or

13 some friend of the club plowed that street at 7:00 in

14 the morning when it snowed, and the condo complex had

15 somebody coming in at 9:00, and that was after these

16 people had to leave for work and they wanted to contact

17 who was plowing for them and see if they would plow the

18 complex for them.

19 Q    Given your efforts in the motorcycling community

20 largely in Milwaukee, and beyond, have you formed an

21 opinion as to whether Mr. Rosga is a positive leader

22 within the motorcycle community?

23     MR. FITZPATRICK:  Objection.  There is no basis

24 for that opinion.

25     MR. MASTANTUONO:  I laid the foundation through

1    the testimony, Your Honor.

2        THE COURT:  Objection is overruled.  Go ahead.

3    Q    Have you formed such an opinion, Mr. San Filippo?

4    A    Yes, sir.

5    Q    What is that opinion?

6    A    I think Jack's a hardworking honest guy, and very

7    loyal.  And he's not a person that I can see as a

8    violent person.  He's very, very accommodating.

9        MR. MASTANTUONO:  I have nothing further.  Thank

10   you.

11       THE COURT:  All right.

12       Cross-examination, Mr. Fitzpatrick.

13       MR. FITZPATRICK:  Thank you, Judge.

14                    **CROSS-EXAMINATION**

15   BY MR. FITZPATRICK:

16   Q    Mr. San Filippo, you said that the primary focus

17   of your work is to address accident scenes and accident

18   scene safety, is that correct?

19   A    Yes, sir.

20   Q    But one of the organizations that you were

21   involved in very early on you don't believe in wearing

22   helmets, is that correct?

23   A    We don't believe in the government telling us we

24   have to wear helmets.  We believe it's a choice issue.

25   Q    Okay.  And your choice is you would choose not to

1  do that?

2  A    I personally choose not to wear one, and I'm an

3  EMT.

4  Q    And you would advise other motorcyclist not to

5  wear one?

6  A    No, sir.  I don't advise anybody to wear one or

7  not wear one.

8  Q    Okay.  With respect to your -- are you affiliated

9  with a motorcycle club?

10 A    I belong to the Lawmakers.

11 Q    The Lawmakers?

12 A    Yes.  It's founded by Senator Campbell.

13 Q    And you -- do you affiliate with the Outlaws?

14 A    I don't know what you mean by *"affiliate."*  I come

15 to parties when I'm invited.

16 Q    I'm just using a term that you used in your direct

17 examination.  So however you define the term.

18 A    Well, I affiliate with all motorcycle clubs in my

19 capacity as working on motorcycle rights.  The

20 Lawmakers, the club itself, doesn't affiliate with

21 anybody or with everybody, however you want to

22 interpret it.

23 Q    And do you consider the Lawmakers -- it's not a

24 1%er club, correct?

25 A    No, sir.

1  Q    And you're familiar with the term *"1%er"*?

2  A    Yes.

3  Q    And the term 1%er in the motorcycle club world,

4  they're the 1% who don't abide by laws, don't abide by

5  the norms of society, is that correct?

6  A    Well, 1% was a name given to them by the American

7  Motorcycle Association back in the '40s.  They --

8  Q    But they --

9       THE COURT:  Let him finish his answer.

10 A    They didn't adopt that name.  That's the term or

11 name that was given to them by the American Motorcycle

12 Association that was trying to explain or tell their

13 members that there's a certain element that don't abide

14 by the race rules, the national races going on in

15 California that were racing without sanctions, and

16 that's where that got that term.

17 Q    You would agree based on your experience with the

18 Outlaws that the 1%er creed is a common thread

19 throughout the Outlaws Motorcycle Club, wouldn't you?

20 A    Repeat that.

21 Q    The 1%er creed that you described, it has been

22 used by the Outlaws, and it's a common thread

23 throughout their national organization?

24      MR. MASTANTUONO:  Objection, Your Honor.  I don't

25 think that the witness has described a 1%er creed in

1  his testimony.

2  THE COURT:  Well, he may not have, but I think

3  it's a legitimate question.  It's overruled.

4  You may answer, sir.

5  A    I still don't quite get what you're trying to ask

6  me.

7  Q    Well, in addition to knowing the origin of the

8  term 1%er, are you familiar with something called the

9  1%er creed?  Have you seen that before?

10  A    I have not seen it.

11  Q    Have you heard based on your many years of knowing

12  people in the Outlaws, and affiliating with it, have

13  you heard discussions about what it means to be a 1%er?

14  A    Well, in general terms in the motorcycle

15  community, they consider 1%ers a group of individuals

16  that don't conform to all the normal rules, if you want

17  to put it that way.  They live within their own

18  culture.  That's again -- that's common knowledge or a

19  common myth.  I don't know if it's a myth or American

20  culture or motorcyclists, or whatever you want to call

21  it.  I don't see that with any particular interactions

22  with them personally.

23  Q    And in addition to the Milwaukee clubhouse, have

24  you visited other Outlaw clubhouses throughout the

25  country?

1  A    The only other clubhouse I've ever been to was in

2  Daytona, and I just went there to pick up my

3  motorcycle.  Jack was gracious enough to ship my

4  motorcycle with one of his trucks.  He was hauling

5  other bikes down there for other customers, and he

6  offered to take my bike down for me.  I went by the

7  club and picked it up.  That's the only other clubhouse

8  I've visited.

9  Q    Well, have you seen -- is it your testimony that

10  you've never seen the 1%er creed in any Outlaws'

11  clubhouse, a poster?

12  A    I don't remember seeing anything like that.  There

13  may be something like that, but I haven't paid

14  attention to that.

15  Q    And you describe Defendant Rosga as having a

16  trucking company, and he was even good enough to

17  deliver your bike to Florida, is that what he did?

18  A    Yes.  Mine and my wife's bike.

19  Q    And are you familiar that Defendant Rosga's

20  trucking business, does he use that in conjunction with

21  his role as the leader of the Outlaws Motorcycle Club?

22  A    I don't know.  He was hauling bikes down there,

23  and he offered to take mine with him.

24  Q    But he travels across the country, and would you

25  agree that having clubhouses throughout the country is

1    convenient in his line of work?

2    A    I wouldn't know.

3    Q    And in your direct testimony, you did describe him

4    as the leader of the Outlaws Motorcycle Association.

5    What other terms are used to describe the leader?

6    A    Well, I knew him as the president of Milwaukee.

7    Other than that, leader, national leader.

8    Q    Do you know him as the national leader?

9    A    I've heard that, yes.

10   Q    Well, you've testified that you're very close to

11   him.  Have you heard that or have you discussed that

12   with him?

13   A    Yes, I know he's the national leader.

14   Q    So you know that he's the national leader?

15   A    Yes.  But I don't know what his direct title is,

16   if that's what you're asking.

17   Q    So you know he's the national leader, so it's more

18   than you've just heard that he's the national leader,

19   is that correct?

20   A    Yes.

21   Q    Do you have an explanation why earlier you said

22   *"I've heard"* rather than you know?

23   A    No, sir.

24   Q    With respect to again the terminology that's used

25   within this group, are you familiar with the term

1   *"boss"*?

2   A     Yes, sir.

3   Q     Okay.  And is that the term that is used within

4   the Outlaws Motorcycle Association?

5   A     I've heard that used.  Yes.

6   Q     And is the national leader also referred to within

7   the club, not by the government but within the club, as

8   the national boss?

9   A     You mean me?  I've never heard him referred to

10  that way, and I don't refer to him as that.

11  Q     But you have heard the term?

12  A     I've heard the term.

13  Q     Is it -- do you choose not to use that term?

14  A     In the context that I've heard it, they are

15  usually talking about a local chapter or maybe a

16  regional boss.

17  Q     But say that -- it's your testimony that the

18  national leader is not called the national boss?

19  A     I don't know what they call the national leader.

20  I know they call regional people bosses.

21  Q     With respect to the establishment of the Outlaws

22  in Wisconsin, you would agree that the Outlaws are the

23  dominant 1%er club in the State of Wisconsin, correct?

24  A     Yes, sir.

25  Q     And in addition to that, and as that role, they

1   are dominant over not only 1%er clubs, but all other

2   motorcycle clubs, isn't that correct?

3   A     Well, it's the dominant club.  I don't know what

4   your definition of dominant means.  But it's the only

5   1%er club in Wisconsin.  They don't -- they don't -- if

6   you're referring to the fact that they issue orders or

7   edicts or commands to other clubs, I'm not aware of

8   that.  I don't believe that.

9   Q     All right.  You're a member of the Lawmakers.  Is

10  that considered an outlaw -- it's not a 1%er club,

11  correct?

12  A     No, sir.

13  Q     Is it considered an outlaw motorcycle club?

14  A     No, sir.

15  Q     All right.  So you're sort of in this third

16  category.  Would you be a 99%er?

17  A     Well, we're not even what you consider in the

18  hierarchy or the protocol of clubs, we're not

19  considered a club because we have a two-piece patch.

20  We have a top rocker that says Lawmakers, and then we

21  have a seal of -- looks like the seal of the United

22  States.  We don't wear a bottom rocker.  We just wear a

23  little patch of the state that we're in.

24  Q     That's a good point.  And what distinguishes sort

25  of the cream of the crop in the motorcycle world is the

1  three-piece patch, correct?

2  A    I don't know if you call it cream.  There's

3  different types.  There's motorcycle clubs, there's

4  motorcycle riding organizations, and they differ on how

5  they wear their patch.

6  Q    Based on your knowledge of the Outlaws, the

7  three-piece patch is significant to the Outlaws

8  Motorcycle Association, correct?

9  A    No.  Many clubs wear three-piece patches.

10 Q    I agree with that.  But within the motorcycle

11 world, a three-piece patch has a unique significance,

12 do you agree with this?

13 A    Within a -- yes.

14 Q    So if you're riding with a two-piece patch, it's

15 very likely that they are not going to have an issue

16 with you, isn't that correct?

17 A    They haven't had an issue with me yet.

18 Q    Right.  And that's a choice that you make.  You

19 don't want any issues with the Outlaws, so you wear a

20 two-piece patch, correct?

21 A    I wear a two-piece patch because that's the way

22 that Senator designed our club.

23 Q    Are you a leader in the local chapter?

24 A    There's no real leader in each chapter.  Just so

25 you know, the Lawmakers is made up of mostly state

1 legislators across the country that ride motorcycles.

2 Q    Are you in the state legislature?

3 A    I'm not a state legislator, but because I've

4 influenced so many state laws, I was given an honorary

5 membership.

6 Q    And if you were to get together with your local

7 chapter and say I want to ride with a three-piece

8 patch, wouldn't you have to go to Jack Rosga to get

9 permission to ride with a three-piece patch?

10 A    I don't know.  I'd have to go to the Lawmakers and

11 ask them for a change to the patch.  I don't know about

12 going to the Outlaws.

13 Q    All right.  If you decide you want to ride with a

14 three-piece patch and you went to the Lawmakers and

15 they said okay, after that you'd have to go to Jack

16 Rosga to get his permission?

17 A    I don't know if it's a matter of permission.  I

18 think the club as a whole in Wisconsin, not only the

19 Outlaws, all the clubs want to know what new clubs are

20 coming up.  I see that with other clubs that I deal

21 with.

22 Q    You wouldn't do it unilaterally?  In other words,

23 you wouldn't do it on your own choice, correct?  You

24 wouldn't ride with a three-piece patch?

25 A    I wouldn't, but there are -- there have been clubs

1  that have done it.

2  Q    If you did do that, if you don't have your

3  personal relationship with him and you ride with a

4  three-piece patch and you were caught out, you would

5  get jumped, beaten, and have the patch taken from you,

6  wouldn't you?

7       MR. MASTANTUONO:  Objection, Your Honor, as to the

8  speculation that this question calls for.

9       THE COURT:  Objection is overruled.

10      If you know.

11      MR. SAN FILIPPO:  I have no knowledge of that

12  happening.

13      THE COURT:  He doesn't know.

14  Q    Have you ever been to -- is there an event in

15  Columbus, Ohio called the Easyrider Expo, or something

16  like that?

17  A    Easyrider Rodeo?

18  Q    Well, it's a motorcycle event called the Easyrider

19  in Columbus, Ohio.  Are you familiar of that happening

20  yearly?

21  A    If it's the one in Cocofe, I know about it through

22  the magazine.  I've never attended it.

23      MR. FITZPATRICK:  All right.  Your Honor, if you

24  would indulge me for one moment?

25      THE COURT:  Yes, sir.

1   Q     Are you familiar with an event that occurs along

2   the Wisconsin/Minnesota boarder called the Flood Run?

3   A     Yes, sir.

4   Q     Does that occur every year?

5   A     Yes, sir.

6   Q     And --

7   A     For the last few.  I don't know how long they've

8   been doing it.  It's probably been going on five or ten

9   years.

10  Q     And Minnesota -- Minnesota is not on Outlaw state,

11  correct?

12  A     Correct.

13  Q     And are you familiar with an event that happened

14  this year in Minneiska, Minnesota, specifically at the

15  Eagles Nest tavern?

16  A     I'm aware of something that happened there just

17  through newspaper articles.

18  Q     So you've never had an opportunity to speak with

19  Jack Rosga about what happened at the Eagles Nest

20  tavern?

21  A     No, sir.

22  Q     You've never had any conversation whatsoever with

23  him?

24  A     No, sir.

25  Q     So you're not familiar that Outlaws marched into a

1  bar and beat up a Hells Angel member and took his vest?

2     MR. MASTANTUONO:  Objection, Your Honor.

3     THE COURT:  Objection sustained.  If he doesn't

4  know anything about it, he doesn't know anything about

5  it.

6     MR. FITZPATRICK:  All right.  Thank you, Your

7  Honor.  No further questions.

8     THE COURT:  Any redirect?

9     MR. MASTANTUONO:  No redirect.

10    THE COURT:  May Mr. San Filippo be excused?

11    MR. MASTANTUONO:  Yes, sir.

12    THE COURT:  Mr. San Filippo, you're excused and

13 free to go, sir.  Thank you very much for coming.  We

14 appreciate your testimony.

15    MR. SAN FILIPPO:  Thank you.

16                **WITNESS STOOD ASIDE**

17    THE COURT:  Next witness.

18    MS. CARDWELL:  Dr. William Dulaney.

19    THE COURT:  Dr. Dulaney, If you would raise your

20 right hand, place your left hand on the Bible, and face

21 the Clerk of the Court.

22    THE CLERK:  You do solemnly swear that the

23 testimony which you are about to give, in this case,

24 before this Court, shall be the truth, the whole truth,

25 and nothing but the truth, so help you God?

1    DR. DULANEY:  I do.

2    THE COURT:  Have a seat on the witness stand, sir.

3        Whereupon, **Dr. William Dulaney**, having been

4  duly sworn in, testifies as follows:

5                    **DIRECT EXAMINATION**

6  BY MS. CARDWELL:

7  Q    Good morning, Dr. Dulaney.

8  A    Good morning.

9  Q    Could you spell your last name for the court

10  reporter, please.

11  A    Sure.  It's D-U-L-A-N-E-Y.

12  Q    And Dr. Dulaney, are you a Ph.D.?

13  A    Yes, ma'am.

14  Q    And what do you have your doctorate in?

15  A    I hold a Ph.D. in communication theory and

16  research from Florida State University.

17  Q    Let me back up a little bit.  Where are you from?

18  A    I'm from western Carolina.  North Carolina.

19  Q    Did you get snow yesterday?

20  A    Yes, ma'am.

21  Q    Had a long time getting here?

22  A    It was an adventure.

23  Q    Tell us again what your Ph.D. is in.

24  A    Communication theory and research.

25  Q    Okay.  And what did you do your dissertation on?

1   A    I studied the way symbols and patches are used in

2   an outlaws motorcycle club to create a sense of

3   organization identity.

4   Q    More generally, would you describe that as

5   clothing and artifacts as organizational symbols?

6   A    Absolutely.

7   Q    Within that area, and these are kind of strange

8   terms for those of us that haven't studied what you've

9   studied, but within that area, can you tell the ladies

10  and gentlemen of the jury what content analysis is?

11  A    Yes, ma'am.  Content analysis is a very highly

12  regarded social scientific research method where one

13  can objectively analyze the content of a medium.  That

14  medium can be anything from a book, a poster, a movie,

15  music, clothing, organizational symbols.  The list goes

16  on.

17  Q    Can it involve some sort of comparative analysis?

18  A    Absolutely.  The step in content analysis is

19  description.  And this is a quantitative descriptive

20  analysis where one can define one article and then

21  another, and then make a direct comparison side by

22  side.

23  Q    Is there a specific way that you do that that

24  you're trained to do that in your research background?

25  A    Absolutely.  There are two ways:  Quantitative and

1    qualitative.  Quantitative is just a fancy way of

2    saying how we can measure something.  And qualitative

3    is the description or the story behind it.

4        And for the purposes of this analysis, would you

5    like me to go into detail?

6    Q    Well, let me ask you what were you asked to do in

7    this particular case?

8    A    I was asked to analyze a series of photographs

9    that the government produced which are pictures of

10   patches, motorcycle club patches, from Jack Rosga's

11   residence, and then compare them against known

12   photographs of motorcycle club colors, patches.

13   Q    Now, I'm going to ask to you take a look at what's

14   been marked by the defense as 30-JR.

15        MS. CARDWELL:  And, Your Honor, just for the

16   record, this is a photograph that's already been

17   admitted by the government, but I'm calling it by the

18   defense identification number.  I don't know the

19   government's number.  But I'll just have them

20   authenticate it.

21        THE COURT:  Do you know the number?

22        THE CLERK:  I already have it in as 30-JR.

23   Exhibit 30-JR has been admitted previously.

24        MS. CARDWELL:  I didn't know we did that.  Thank

25   you.

1   Q    Let's take a look at 30-JR.  Now, the group of

2   patches that you've mentioned that you were asked to

3   look at, or actually the photo of them, is this the

4   group that you were informed was actually from the

5   possessions or the personal space of Mr. Rosga?

6   A    Yes, ma'am.

7   Q    And did you actually use the photograph in your

8   analysis?

9   A    I did.  The photograph could be used in any

10  content analysis because one can enlarge it, you can

11  look at it under magnification in a much better and

12  easier way than if you had the patches in your

13  possession.  But also for future research, other

14  researches can replicate your methods and make sure you

15  do it right.

16  Q    So if you were handed say, for example, this top

17  Hells Angels' rocker, as they call it, you would in

18  your first step actually take a photograph of it for

19  your comparative purpose, isn't that right?

20  A    Yes, ma'am.

21  Q    And then the comparison would be done using the

22  photograph itself?

23  A    Yes, ma'am.

24  Q    So you've had a chance to look at this photograph

25  carefully, isn't that correct?

1  A    Yes, ma'am.

2  Q    And then what was the next step in trying -- you

3  were asked to determine whether or not this appeared --

4  these appear to be authentic Hells Angels' patches,

5  correct?

6  A    I was asked to analyze them and compare them

7  against known authentic Hells Angels' patches.  What I

8  did next was --

9  Q    Let me back up for just a moment.

10 A    Sorry.

11 Q    With regard to all these little guys, these extra

12 funny shaped smaller ones, you weren't really asked to

13 look at those for comparison purposes, right?

14 A    No, I was not.

15 Q    So you were asked to look at the top rocker that

16 says *"Hells Angels,"* the middle one that we'll call a

17 *"death's head"*, and this bottom rocker that says

18 *"Wisconsin,"* is that correct?

19 A    Yes, ma'am.

20 Q    Okay.  So what did you do to get hold of a known

21 authentic Hells Angels' patch, or photo of one?

22 A    What I did first was went to the Hells Angels

23 Motorcycle Club world website to look at a variety of

24 different countries that the Hells Angels have charters

25 in.  And what I did was I selected pictures of the back

1    of the patch, we call them the club colors, that had

2    the best clarity so I could enlarge it and it didn't

3    distort the image.  And I looked at well over 30, 36,

4    32, I can't remember off the top of my head, to verify

5    that there was indeed zero variability between the

6    different countries.  Meaning they are standardized.

7    Q    To your knowledge, are the Hells Angels' patches

8    copyrighted?

9    A    Yes.  They are trademarked and copyrighted.

10   Q    And upon observing similarity between these 30 to

11   36 photos that you looked at, what did you do next?

12   A    Well, once I reached the point of saturation where

13   I could say as a scientist there's no difference

14   between these, regardless of whether it's Sweden,

15   Liechtenstein, or California, then I compared -- it's a

16   side-by-side comparison where you can put a grid over

17   each of the photographs.  Like a death's head, for

18   example, you enlarge each of the images to the same

19   exact size and then you overlay a grid.

20        If you've used Microsoft Excel, the spreadsheets,

21   it's just like a transparent one of those were across

22   the top there are columns that we label by alpha,

23   A,B,C, and across the side are rows.  And those are

24   labeled numerically, 1,2,3, and so on.  So every one of

25   those little squares now we call a cell has a name.

1  And you do a side-by-side comparison of each of the

2  cells.  Like for the first one would be A-1, and then

3  so on and so forth.

4  Q    Now, did you do that against all 30 that you found

5  on the website, or did you find a way to isolate down

6  to use one representative of the ones that you looked

7  at on the Web site?

8  A    I chose one of the images from France because it

9  had the highest degree of clarity, it was the best

10  picture, biggest, largest back patch.

11  Q    And did your observations reveal that the one that

12  you selected from France was, as best you can tell,

13  identical to all the rest of the ones off the website?

14  A    Absolutely.  I actually chose five images, and of

15  the five, the one from France was the best.  There's

16  zero degrees of variance, meaning they are the same.

17  When you talk about the font, style, the size, the

18  proportions, they're the same.

19  Q    So once you isolated France as the best example or

20  the clearest picture that you can get of a real Hells

21  Angels' set of patches, what did you do next?

22  A    Well, then, like I said, I overlaid the grid and

23  then I did a side-by-side comparison of each segment of

24  each of those patches.

25  Q    So if you did a grid and you named the cells

1  A,B,C,D across the top, you would take the A cell from

2  this patch and the A cell from this patch in the same

3  location and make a very detailed comparison, is that

4  fair to say?

5  A    Yes, ma'am.  And we call it describing the

6  morphology, which is really a fancy way of saying form

7  and structure.  You measure it and you make detailed

8  notes as to the color, the shapes, what is present in

9  one, and what is present in the other, and then you

10 compare to see if it's the same.  Sometimes things are

11 different, sometimes things are missing.

12 Q    Let's take a look at 34-JR, which I believe has

13 previously been admitted.

14      THE COURT:  34-JR?

15      MS. CARDWELL:  Yes, sir.

16 Q    Now, this would be a close-up of the patch that

17 appeared in the middle of that group of patches in the

18 last exhibit, is that right?

19 A    Yes, ma'am.

20 Q    And just for purposes of reference, we'll call

21 this the death's head, is that fair enough?

22      THE COURT:  Exhibit 34 is in evidence, is it not?

23      THE CLERK:  I do not show it in evidence.

24      THE COURT:  Any objection, Mr. Fitzpatrick?

25      MR. FITZPATRICK:  No, sir.

1      THE COURT:  It will be received.

2      MS. CARDWELL:  Thank you.

3      Could we publish it at this time?

4 Q    So this is the patch that was taken from

5 Mr. Rosga's possessions; you understood that?

6 A    Yes.

7 Q    And you took that and compared that to the France

8 photo that you selected as the best representative, is

9 that right?

10 A   Yes, ma'am.

11 Q   And could you tell the ladies and gentlemen some

12 of the things that you noted based upon your detailed

13 comparison?

14 A    The first thing we do in content analysis is look

15 at similarities, because that's the thing to find.  And

16 what I found similar to the known Hells Angels' death's

17 head and the government's exhibit was the proportion in

18 size is identical, but that's where the similarities

19 end.

20 Q    I'll stop you just a moment because I need to show

21 the jury the other photo.  Take a look at 48-JR for me,

22 and tell us is that a photograph that you selected as

23 the best representative of an authentic Hells Angels'

24 three-part patch?

25 A    Yes, ma'am.

1  Q    And so as you're talking about this, you're

2  talking about looking at this death's head and the

3  death's head we just saw a moment ago?

4  A    Yes, ma'am.

5  Q    Which would you want to start with in talking

6  about the comparison?

7  A    Well, since this is up, I can start with this.

8  Q    Okay.

9  A    There are a number of --

10       MS. CARDWELL:  I'm sorry.  I need to move to

11  introduce 48-JR at this time.

12       THE COURT:  48-JR?

13       MS. CARDWELL:  Yes, sir.

14       THE COURT:  Any objection, Mr. Fitzpatrick?

15       MR. FITZPATRICK:  No, Your Honor.

16       THE COURT:  Received.

17  A    There are differences between the government's

18  exhibit and this genuine Hells Angels' patch,

19  specifically the embroidery pattern.  Let me touch

20  this.  Right where I'm showing there, there's a very

21  distinct helical pattern to the embroidery, and that's

22  just a fancy way of saying like a curved line pattern.

23  And you can see that.  There we go.

24  Q    Are you talking about the kind of wave if you look

25  in the yellow part on the Hells Angels'?

1   A     Yes, ma'am.  I'll call this the leading edge of

2   the patch.  And you can see where it's a radia helical

3   pattern where everything spreads out as if spokes of a

4   bicycle and then are curved.  And if we can look at the

5   other.

6   Q     Right there we're looking at the authentic patch?

7   A     This is the authentic one.

8         MS. CARDWELL:  And if we could look back at 34-JR

9   at this time.

10  A     You'll notice that that pattern is not displayed

11  -- this pattern here is absolutely a linear 45-degree

12  angle pattern that is not consistent.

13  Q     So that these lines appear to be all parallel one

14  to the other rather than spiraling out like the spokes

15  of a bicycle?

16  A     Correct.

17  Q     Can you tell us any other observations you made

18  between the known and the -- the known Hells Angels'

19  patch and the one found in Mr. Rosga's possession?

20  A     Another distinct difference is the line right here

21  on this government exhibit, there should be a very

22  distinct line along where I'm pointing here

23  distinguishing two separate feathers, if you will.

24        MS. CARDWELL:  Could we look back at the France

25  Hells Angels' patch.

1  A    Yes, right there we can see very distinctly the

2  lines.  And so we would say that there's a missing

3  feather in the government exhibit.

4  Q    And any other inconsistencies that you noted

5  between the two patches?

6  A    Yes, ma'am, there are a few more.  Keeping with

7  this image, if we could have it enlarged again.  There

8  we go.  There's a herringbone pattern displayed in the

9  golden feathers of the known Hells Angels' symbol where

10 the thread count is at least two-thirds higher than the

11 government's exhibit.  When I say thread count, what

12 I'm talking about is number of squares per square inch.

13 And it's very, very detailed and very, very high

14 quality.

15 Q    And how did you determine that?

16 A    I enlarged the image to the point where I could

17 count individual threads.  And I wasn't able to count

18 every thread, but I was able to count two-thirds more

19 thread on this exhibit, the genuine Hells Angels'

20 patch, as opposed to the government's exhibit.

21 Q    And so is that similar to the difference in thread

22 count in sheets?

23 A    Yes, ma'am.  Like if you were to buy a 650 thread

24 count sheet, the difference would be -- that would be

25 the Hells Angels' patch shown here compared to 150

1  thread count sheet.  That would be absolutely the

2  difference.

3  Q     So to the extent that more thread means higher

4  quality, the authentic patch was higher quality?

5  A     Yes, ma'am.

6  Q     Any other inconsistencies that you found in your

7  comparisons?

8  A     Yes, ma'am.  If we can zoom out.  Or actually, if

9  you would like to show the other image.

10 Q     Going back to 34-JR.

11 A     You can see that that herringbone pattern is not

12 exhibited throughout the yellow feathers.

13 Q     But here it's more of a lined pattern?

14 A     Here again it's a linear pattern.  And again the

15 thread count is much lower.  These were easier to count

16 because of fewer threads.

17 Q     Any other inconsistencies you noted between the

18 two death's head patches?

19 A     Yes, ma'am.

20       DR. DULANEY:  If we could zoom back on this image.

21 A little bit more.  Okay.  Thank you.

22 A     I'm going to try to -- there is a horizontal line,

23 about a 45-degree angle that would make kind of the

24 chin line on the skeleton here.  And I can't get the

25 computer to put it where I want it.  Directly to the

1  left of that image is a 45-degree angled line that's

2  going up from where there would be a lip line.  Right

3  there.  Right there.

4  Q    So the line that's going up from the dent above

5  the chin going up toward what looks like teeth?

6  A    Correct.  The government's exhibit, this line is

7  at a 45-degree angle.  And if we could look at the

8  Hells Angels' patch.  The line is horizontal from the

9  ground as it is worn.

10 Q    Any other inconsistencies that you noticed between

11 the patches?

12 A    Yes, ma'am.  The colors.  The colors scheme of the

13 entire patch on the government is much too bright.  And

14 the Hells Angels' colors are standardized.  They are

15 copyrighted and trademarked.  And as an organization,

16 it's actually incorporated.  It's just like Coca-Cola.

17 It doesn't matter where it comes from, it will look

18 exactly the same regardless.  So what we see here are

19 golden feathers, a deep rich red hew, and a darker

20 grayish metallic line between all of the feathers.  And

21 now we can compare that.

22      MS. CARDWELL:  Could we possibly have that

23 side-by-side or up and down so we can see the colors

24 together?

25 Q    So are you saying that even the shade of the color

1  is copyrighted and trademarked?

2  A     Yes, ma'am.  Very much so.  And what we can see

3  here very clearly is that the feathers where they

4  should be a rich gold, and the government display are

5  pale yellow, and the red in the death's head helmet and

6  the feathers.  Also again, the government's display is

7  too bright as compared to the known colors, as well as

8  the silver as opposed to a very light gray.

9       And then also the background.  The matting we'll

10  call it of the death's head is a plain flat white on

11  the government display as opposed to on the Hells

12  Angels' picture, kind of a sateen.  It's shiny.  It has

13  a very almost silver luminescence to it.

14       And finally there was one last distinction.  On

15  the edges of the death's head of the Hells Angel, that

16  is what is called a marrowed edge.  It means that it's

17  similarly embroidered on both the front and the back.

18  Q     Could you spell marrowed?

19  A     M-A-R-R-O-W-E-D.

20       Whereas on the government's display, it's only

21  embroidered on the one side and it does not have that

22  high quality marrowed edge.

23  Q     Thank you very much.  Now, let's move on and let's

24  go to the patch in 34-JR alone, please.

25       I'm sorry.  I'd like to move on to the top rocker,

1  which means we need to go back to the group photo.

2  This would be 30-JR.  And you were also asked to

3  compare the top and bottom rocker, the Hells Angels'

4  top rocker, and the bottom Wisconsin rocker, correct?

5  A    Yes, ma'am.

6  Q    Can you tell us first beginning with the Hells

7  Angels' top rocker that was obtained from Mr. Rosga's

8  residence, did you compare that to the one in the

9  France photo that you identified?

10  A    Yes, ma'am.

11  Q    Did you note any consistencies or inconsistencies?

12  A    The consistencies are, again, proportions appear

13  to be correct, the size appears to be correct.  And

14  we're talking here about this image here.  But then

15  that's where the differences end.  We'll start with the

16  marrowed edge, if I may?

17  Q    Yes.

18  A    Because we just talked about that.  Again, this

19  image does not display that high quality marrowed edge.

20  It's not sewn on both sides.  And it doesn't have the

21  darker threading associated with it.

22  Q    Could we look back at the France photo, which is

23  30 -- I'm sorry, 48-JR.  What are you talking about in

24  looking at the known photo?

25  A    Again, right there the marrowed edge, you can see

1  that it's a distinctly darker embroidery color.  And

2  that it is much more pronounced.  Just the marrowed

3  edge.

4  Q    Thank you.  And going back to 20-JR.  What other

5  consistencies or inconsistencies did you note?

6  A    Again, the background, the matting.  Where we can

7  see right through here, it doesn't display that sateen

8  luminescence.  It's a flat white.

9       DR. DULANEY:  If we can compare that is the other

10 photo.

11      MS. CARDWELL:  Exhibit 48-JR, please.

12 A    And you can see very clearly from the camera's

13 flash that sateen pattern where it looks a little

14 shiny.

15 Q    And I think we'll go in the reverse.  Was there

16 something else that you noted in the known that you

17 notice different was in the one from Mr. Rosga's

18 possession?

19 A    Most pronounced is the difference in the font, the

20 style of lettering.  Again, here we have a darker color

21 in the original Hells Angels' picture then we do in the

22 government's exhibit.  But more importantly, the

23 thickness of the letters on the government exhibit is

24 too thin.  When we look at this, we see a specific

25 width on each of these letters.

1      DR. DULANEY:  And if we can compare that to the

2  government exhibit.  Is it possible to zoom in on that

3  some?  Thank you.

4  A    You can see here very clearly that the skinny

5  parts of the letter, if you will, are too thin.

6      Additionally, the cerros, and that's the pointed

7  squiggly things on the letters, the cerros on the

8  government's exhibit are not merely as pronounced.  And

9  when you zoom in very closely, you can see that the

10 thread count is very low on the government's exhibit,

11 and it does not conform to the same stitching pattern

12 as noticed in the Hells Angels' patch.

13     DR. DULANEY:  If we could go back to that.

14     MS. CARDWELL:  Go back to the known, please.

15 A    And this it where it would be very helpful to have

16 it side-by-side.  Especially the letter H, that, I

17 think, shows distinctly the difference in the quality

18 and the size and the thickness of the letters.  But

19 looking at the cerros on these letters, you can see

20 that they are much more pronounced, much more

21 *curvaceous* and pointed.

22 Q    And that's the comparison of the top rocker?

23 A    It does.

24 Q    Now, if we can talk about your comparison to the

25 bottom rocker, this Wisconsin red and white rocker that

1  was found in the possession of Mr. Rosga, compared to

2  the known sample.

3  A     Yes, ma'am.

4  Q     First, let's look at the known.

5  A     Okay, the known we have absolutely the same size

6  font and color of letters as we do in the top rocker,

7  which dictates how big it is.  So we can see here the

8  letters France, which they come out to a comparison

9  right there.  You can get a sense of how wide it should

10  be per letter.  This was not consistent with the

11  government's display.

12        DR. DULANEY:  If we could see that now.

13  A     Here we see Wisconsin has many more letters than

14  the word France, and look how much smaller than it is

15  proportionally.  So right off the bat we don't have the

16  size and proportion similarities that we did with the

17  other patches because it's much too small.

18        Further, the background color of the Wisconsin

19  bottom rocker is an off-white with a very distinctive

20  white sewn edge as compared to --

21        DR. DULANEY:  If we can get the other image.

22  A     We see again that sateen silvery background, and

23  the nice displayed marrowed edge with the very

24  distinctive color.  Those things were not seen.

25        DR. DULANEY:  Can we go back to the Wisconsin

1  patch now, please.

2  A    And finally the colors are not consistent even

3  within this group.  This is a much darker color than it

4  is for the Hells Angels in the government's display.

5  But more importantly, the type of font in the Wisconsin

6  lettering is not consistent.  That's an entirely

7  different font style than with the known Hells Angels.

8       DR. DULANEY:  If we could see the other front

9  image real quick.

10  A    We can see how the cerros that are in the middle

11  are absent in the Wisconsin patch.  Again, the cerros

12  are just the pointy things.

13  Q    And does that complete your comparison of the

14  bottom rocker?

15  A    Yes, ma'am.

16       MS. CARDWELL:  Thank you.  That's all the

17  questions I have.

18       THE COURT:  Cross-examination, Mr. Fitzpatrick?

19       MS. CARDWELL:  I'm sorry.  Mr. Mastantuono wants

20  to talk to me.

21       THE COURT:  Okay.

22       MS. CARDWELL:  I ask that the witness be allowed

23  to see 56-JR, please.

24       THE COURT:  Did you say 46 or 56?

25       MS. CARDWELL:  It was 46.  I was wrong.

1      THE COURT:  I assume this is in evidence,

2  Ms. Cardwell?

3      MS. CARDWELL:  It's not.  I'm going to have him

4  authenticate it.

5      THE COURT:  Any objection to it, Mr. Fitzpatrick?

6      MR. FITZPATRICK:  No.

7      THE COURT:  It will go in.

8      MS. CARDWELL:  So it's going in, Your Honor?

9      THE COURT:  Yes, ma'am.

10  Q    Have you had an occasion to look at this photo?

11  If you will look at this photo, see if it's consistent

12  or appears to be consist with those that you pulled off

13  the website as authentic Hells Angels' patches.

14  A    Yes, ma'am, I have.

15      MS. CARDWELL:  And I'm sorry.  Excuse me just a

16  moment, Your Honor.

17  Q    And in terms of font, size, color, do you notice

18  the same inconsistences between the group of patches

19  and the government's exhibits taken from Mr. Rosga's

20  possession?

21  A    Yes, ma'am.  And this actually shows very

22  distinctly how big the bottom rocker should be for a

23  word like Wisconsin.  And this patch is absolutely

24  consistent with the other images that I used in content

25  analysis.

1    MS. CARDWELL:  Thank you very much.

2    DR. DULANEY:  You're welcome.

3    THE COURT:  You go right ahead, Mr. Fitzpatrick.

4    MR. FITZPATRICK:  Thank you, Your Honor.

5                      **CROSS-EXAMINATION**

6    BY MR. FITZPATRICK:

7    Q    Dr. Dulaney, the last photograph that you were

8    shown, that was something that you pulled off the

9    Internet, is that how I understand you?

10   A    Yes, sir.

11   Q    So you've -- throughout your testimony, you've

12   characterized these items as authentic and genuine.

13   The way we know that is you've told us so, correct?

14   A    I've established it scientifically through content

15   analysis.

16   Q    And you've established it scientifically.  And

17   you've characterized yourself as a scientist, is that

18   correct?

19   A    I am a social scientist.

20   Q    Fair enough.  And there's -- you're a social

21   scientist, and you have a degree and doctor of

22   philosophy in communication, theory, and research,

23   correct?

24   A    Yes, sir.

25   Q    And you have a cognate in cultural anthropology?

1   A      Correct.

2   Q      And that's generally considered a soft science,

3   correct?

4   A      Cultural anthropology?

5   Q      Your doctorate, however you characterize yourself,

6   you're in the soft sciences?

7   A      You would have to define *"soft sciences,"* sir.

8   I'm quantitatively trained in a number of research

9   methods that include statistical analysis.  Content

10  analysis is absolutely a quantitative scientific

11  methodology.  I wouldn't call that soft at all.

12         Soft meaning lack of empirical data would be maybe

13  a story told under -- excuse me, ethnography, which is

14  cultural anthropology.  Yes.

15  Q      So earlier in your testimony in your response to

16  Ms. Cardwell's questions, you said you compared what

17  you call a known Hells Angels' patch and what you call

18  the government's patch, and these are photographs

19  you're looking at, correct?

20  A      Correct.

21  Q      And you did a -- you said that you compared it to

22  sheets that you get in the store, and you said that the

23  comparison is 650 thread count versus 150.  What

24  statistical model did you employ to couple with that

25  conclusion?

1    A      That's an analogy.

2    Q      That's an analogy?

3    A      Correct.

4    Q      You testified in this Court that your conclusion

5    was it was a 650 thread count to 150.  How is that an

6    analogy?

7    A      No, I said that the thread count was on the

8    government's exhibit at least two-thirds fewer threads

9    than in the known Hells Angels' patches.

10   Q      You said in response to my initial questions that

11   you are a hard scientist, you have a background in

12   statistics, statistical modeling.  You didn't employ it

13   in this opinion that you offer?

14   A      That would be a debatable point, sir.

15   Q      How is it debatable?  You said it was an analogy.

16   A      It's an analogy that further explicates one's

17   initial statement.

18   Q      It's an analogy -- okay, so now we're adding it's

19   an analogy that further explicate -- say that again.  I

20   can't say it.

21   A      Further explicates.

22   Q      Explicates.  Good.  One's what?

23   A      Research findings.

24   Q      Okay.  Why didn't you use a statistical model?

25   Why weren't you thorough?

1  A     Well, I don't know that that's a fair question.

2  What I did was try to clarify for the audience

3  something that's otherwise very, very quantitative, not

4  a lay person's -- not something one would understand,

5  perhaps.

6  Q    Okay.  So you're telling us that this audience

7  can't understand sheet thread counts?  That's beneath

8  us?

9  A     That's why I used sheet thread counts, sir.

10 Q    Okay.  Okay.  I understand.  But you didn't take

11 the step to run it through a statistical model which

12 you say you're trained in?

13 A     Yes, I did.

14 Q    No, you didn't.  You said it was an analogy.

15     MS. CARDWELL:  I believe he's being argumentative,

16 and I object.

17     THE COURT:  Go ahead.  It's cross-examination.

18 Q    I said it was an analogy.

19 A     An analogy of a research finding, which is

20 commonplace in all sciences to present the data and

21 then you provide a description of the data.

22 Q    Do you agree that you didn't run it through a

23 statistical model?

24 A     Define statistical model.

25 Q    It's your line of work.  You define it.

1  A    Okay.  I did run it through a statistical model,

2  and it's called Basic Descriptive Statistics where

3  one --

4  Q    But the --

5       THE COURT:  Wait.  Let him finish his answer.

6       Doctor, you may finish your answer.

7  A    Where one counts the threads of each of the

8  exhibits and then makes a comparison.  It's called an

9  odds ratio.  There is your statistical model, sir.

10 Q    And that is all based on your pen and your

11 notepad?  There is no computer that you run this

12 information into?

13 A    No.  It's based on a computer program that can

14 magnify such that one can count individual threads.

15 And under this methodology, one is called a coder who

16 does that.  And I do it, and then I have a separate

17 person do it as well, and we compare our findings.  And

18 it's called inter-coder reliability.  And I did do that

19 statistic, and it's called Mikron Beck's Alfa so that

20 you can determine the degree of which you're missing it

21 or you're getting it.  And Mikron Beck's Alfa was .95.

22 Zero to one, one meaning perfect, zero meaning a

23 complete miss.  .95 is well above the accepted range.

24 Q    That's very enlightening for us.  And the computer

25 model that you put this data into, is it also called

1  Photoshop?

2  A    No, actually, it's not.

3  Q    Okay.  Now, you didn't take the actual patches and

4  compare them.  You just used photographs, correct?

5  A    Correct.

6  Q    And you would take the photographs and enlarge

7  them and put them under a microscope.  But wouldn't it

8  be better -- wouldn't the best evidence be just to

9  compare actual patches?

10 A    No.  Actually, we would take photographs of the

11 primary artifact.  The primary artifact being the

12 actual patches.  In a perfect world, one would think

13 that, yes, you compare those two.  But actually what

14 you want are photographs, very high quality

15 photographs, so that you can standardize both

16 magnification at the same time.  And this is standard

17 practice in research.

18 Q    Okay.  And you received your high quality

19 photographs off of the Internet?

20 A    Correct.

21 Q    And so you determined that they were high quality

22 photographs?

23 A    High quality is defined as the number of pixels

24 that is such that as you enlarge the image, it doesn't

25 pixilate.  It doesn't distort.

1  Q     And the photographs that -- the photograph of the

2  Hells Angels' patch that you always described as the

3  government's patch, you don't know where that patch

4  came from, do you?

5  A     No, sir.

6  Q     You haven't been told where that patch came from?

7  A     Other than it came from Mr. Rosga's possessions.

8  No.

9  Q     So you were told where it came from?

10  A     I was told it came from Mr. Rosga's residence.

11  Q     Okay.  Okay.  Fair enough.  And you didn't want to

12  look at the actual patch?

13  A     It's not necessary.

14  Q     It's not necessary to look at the actual patch?

15  A     For the --

16  Q     Even to satisfy --

17         THE COURT:  Let him finish his answer, then you

18  may ask the next question.

19  A     For the research methodology, it's not necessary.

20  Q     All right.  And when you compared the patches,

21  you're looking at photographs like you've explained, is

22  that the extent -- what you've seen today, what you've

23  explained today, is that the extent of your comparison?

24  A     Yes, sir.

25  Q     Okay.  And in a shorthand for us lay people, in a

1  shorthand way to describe your expertise in this area

2  is you compare things?

3  A    That's fair.

4  Q    You've learned how to take one sheet, look at

5  another sheet, and to compare the two sheets?

6  A    Correct.

7       MR. FITZPATRICK:  If we could put up, please,

8  Government's Exhibit 71.

9       THE COURT:  I assume it's already in evidence?

10      MR. FITZPATRICK:  It is, sir.

11 Q    Do you see that in front of you?

12 A    I do.

13 Q    And the -- would you characterize -- that is a

14 Hells Angels' patch, is that correct?

15 A    It appears to be.

16 Q    Would you have any doubt about that?

17 A    Without having a much more enlarged photograph to

18 make the comparison that I did before, I wouldn't want

19 to say conclusively.

20 Q    Would you walk up to that fellow and say, hey,

21 you're not wearing a real Hells Angels' patch, I'm

22 taking it?

23 A    Of course not.

24 Q    Okay.  If you look at that, the yellow in that

25 patch, just everyone here with their naked eye looking

1   at that, that is a lighter shade of yellow than the

2   France patch that you pulled off the Internet, correct?

3   A     I don't think you can make that claim, sir.  No.

4   Q     And the threads throughout the yellow feathers

5   there, do they appear white to you?

6   A     I'm sorry.  Could you restate that?

7   Q     Do the threads between the yellow feathers, do

8   they appear white to you?

9   A     One can't determine from this photo.  The quality

10  is very lacking.  But I would say no, those appear to

11  be grayish.

12  Q     Okay.

13  A     And again, one should also note the difference in

14  lighting.  The pictures that we used for comparison

15  were tungsten, lighting from inside.  This is ambient

16  solar lighting.  You can't do a comparison that way.

17  Q     But you could take this patch and compare it under

18  your microscope and your computer model and make a good

19  comparison?

20  A     Yeah.  If the image quality is sufficient enough

21  to enlarge it, absolutely.

22       MR. FITZPATRICK:  Exhibit 74, if we could take a

23  look at that, please.

24       THE COURT:  Is this in evidence?

25       MR. FITZPATRICK:  It is, sir.

1  Q    Based on your expertise and looking at this, can

2  you say if that's a authentic Hells Angels' patch?

3  A    Again, without having the blown-up image to do a

4  very detailed analysis, I would have to say it appears

5  to be legitimate.  It appears to be correct.

6        MR. FITZPATRICK:  If we can go to Government's

7  Exhibit 73, please.

8  A    Uh-huh.

9  Q    Based on your expertise, is this a legitimate

10  Hells Angels' patch?

11  A    This would look more -- from the images you've

12  shown, this looks most legitimate because of the sateen

13  in the -- right here.  Yes.  It has a shiny background

14  color.

15        MR. FITZPATRICK:  If we can go to 469, please.

16        THE COURT:  Exhibit 469?

17        MR. FITZPATRICK:  Yes, sir.  This is also

18  admitted.

19        THE COURT:  Okay.

20  Q    Do you see that Hells Angels' Minnesota patch?

21  Would you consider that to be an authentic Hells

22  Angels' Minnesota patch?

23  A    The image is so poor I wouldn't want to make a

24  claim on that.

25  Q    So you're not going to take the leap looking at

1    that patch on that individual under these circumstances

2    and say it's an authentic Hells Angels' patch?

3    A    No, sir.  One can't even read what's on the top

4    rocker, let alone the entire bottom.

5    Q    You deny that it says *"Hells Angels"* on the top

6    rocker?

7    A    I'm not denying anything, sir.  I can't see the

8    distinction.

9    Q    What do you think it says?

10   A    What I think it's says is *"Hells Angels."*  But as

11   a scientist, that could say something other than Hells

12   Angels.  It's not definitive.

13   Q    So in your world, in your laboratory, it's

14   possible that that says something other than Hells

15   Angels?

16   A    If the image I'm seeing here is anymore distorted

17   as one looks at it, yeah, you can't determine what it

18   says as a scientist.  Now, common sense says through

19   context it's probably the Hells Angels' patch.  Yes.

20   Q    Thank you very much for that answer.  And your --

21   you previously described your expertise as content

22   analysis, the comparing things as content analysis,

23   correct?

24   A    It's one of the tools of which I'm trained.

25   Q    And you also characterize it unprompted as highly

1  regarded?

2  A    Yes, sir.

3  Q    And you can compare you said books, music,

4  clothing, anything?  You have this unique expertise

5  where you can compare anything in the world?

6  A    No, sir, I don't.  Content analysis allows one to.

7  Any medium.  Medium meaning a billboard.  Anything that

8  one can displace symbols for another.

9  Q    In your earlier testimony, you stated that it's

10  your belief, it's your understanding, that the Hells

11  Angels have standardized their copyright, and that

12  their patch is trademarked right down to the colors,

13  correct?

14  A    Correct.

15  Q    And where -- have you researched this through the

16  Federal Trade Commission, through the Patent and

17  Trademark Office?

18  A    It's on the Hells Angels World website.

19  Q    So you went to the Hells Angels World website as

20  part of your scientific analysis of this case and

21  determined based on that review that their patch is

22  copyright and trademarked?

23  A    It's properly noted as such, yes, sir.

24  Q    *"It's properly noted as such."*  Characterize

25  *"properly noted"* on the Hells Angels' website.

1  A     It shows the trademark number, and it's all --

2  it's an incorporated organization.

3  Q     Okay.  And you're familiar with the Patent and

4  Trademark Offices in Washington or suburban Virginia?

5  A     Define *"familiar,"* sir.

6  Q     Do you know it exists?

7  A     Yes, sir.

8  Q     Okay.  And you know what you can get there?

9  A     Yes, sir.

10  Q     And did you get the trademark or copyright

11  paperwork from that information that you got off the

12  Hells Angels' website?

13  A     No.

14  Q     Do you agree that that would have assisted you in

15  coming up with scientific conclusions in this matter?

16  A     Absolutely not.

17  Q     So you disagree that verifying information that

18  you learned off the Hells Angels' website is useful to

19  you; you disagree with that?

20  A     No, that's not what I said at all.  What I said is

21  that the trademark information from the content

22  analysis perspective is immaterial.  One has to verify

23  empirically that a broad cross-section of logos and

24  images of the organization are similar.  One can have a

25  trademark and it says X, Y, and Z.  But if one doesn't

1  enforce it through the manufacturing process and it's

2  not standardized, then that information is immaterial

3  scientifically.

4      Legally that information is very significant, but

5  not for content analysis, sir.

6  Q    Okay.  You also stated in your direct examination

7  that the shade of the color is copyrighted and

8  trademarked?

9  A    The color would be.  Yes, sir.

10 Q    *"The color would be"*?

11 A    Yes, sir.

12 Q    But not a particular shade within the color range?

13 A    No, there would be a number associated with the

14 color.

15 Q    And you learned that also off the Hells Angels'

16 website?

17 A    No.  That's common sense.  Once one has

18 established empirically that across the world all of

19 the images are the same exact color, then one can make

20 the logical conclusion that the trademark is

21 standardized such that all trademarks are standardized.

22 For example, Coca-Cola red is Coca-Cola red regardless

23 where you go.

24 Q    Okay.  So earlier in direct examination when you

25 answered Ms. Cardwell's questions that the shade of the

1  color is copyright and trademarked, that's based on

2  your common sense?  There's not an actual copyright or

3  trademark for the shade of the color?

4  A    I can't speak to that, sir.

5  Q    So is it fair to say that your prior testimony on

6  that point was inaccurate?

7  A    No, I don't think that's fair at all.

8  Q    But you stated previously that the shade of the

9  color is copyrighted and trademarked.  You know that

10 has a specific meaning?

11 A    Yes.

12 Q    Why isn't that inaccurate?

13 A    What you're asking me to define is what the color

14 number is that's registered with the trademark.  That's

15 beyond the scope of the research methodology, and it's

16 immaterial for the finding.

17 Q    All right.  Now, with respect to some of your

18 background, this field of examining biker gang or biker

19 organization paraphernalia, you have prior and current

20 affiliations with biker organizations, isn't that

21 correct?

22 A    Yes, sir.

23 Q    And were you formally part of a motorcycle

24 organization in Florida?

25 A    I was.

1    Q    And what was the name of that organization?

2    A    The Legacy Vets Motorcycle Club.

3    Q    And is that an organization you rode in in

4    Florida?

5    A    In and around Florida, and across the nation in

6    fact.

7    Q    And Florida is a -- is controlled by the Outlaws,

8    correct?

9    A    Can you define *"controlled by the Outlaws."*

10   Q    The Outlaws are the dominant motorcycle

11   organization in Florida.

12   A    I would say that's a debatable point.  But, yes, I

13   would agree with that.

14   Q    And in order for you to -- the patch that you wore

15   as part of the Legacy Vets, is it a two-piece patch or

16   a three-piece patch?

17   A    A three-piece patch.

18   Q    And you are not a 1%er organization, correct?

19   A    No, we were not.

20   Q    You did consider yourself an outlaw motorcycle

21   organization?

22   A    Yes.  But one has to define what outlaws means.

23   Q    I understand that.  In order for you to fly your

24   three-piece patch in Florida as an outlaw motorcycle

25   club, you required the sanction and the permission of

1    the Outlaws, correct?

2    A    We sought -- well, sanction and permission means

3    that one has displayed certain abilities to operate

4    within the motorcycle club subculture, meaning what is

5    and what is not appropriate.  It's all about governing

6    behavior.  It's all about -- just like any other

7    subculture that you would find.  To become a mason, you

8    don't just wear the stuff.  You have to know what it

9    means.  So in that context, I would say that we were

10   given permission by the Outlaws as the dominant club.

11   Q    You would not have flown your three-piece patch

12   without first getting the approval of the Outlaws

13   Motorcycle Association, correct?

14   A    Actually, we did until we were -- we had a

15   meeting.  There's no such structure that one person can

16   call up another real quick to get these kinds of things

17   going.  So for about a year and a half, we did fly our

18   colors without official sanction.  You used the word

19   *"sanction."*  Agreement is what we would use.

20   Q    And Mr. Dulaney, as part of your development in

21   this field and you developing your expertise, you've

22   written on the subject of outlaw motorcycle clubs,

23   isn't that correct?

24   A    Yes, sir.

25   Q    You have your dissertation from was it Florida

1  State University?

2  A    Yes, sir.

3  Q    It's entitled, *Over the Edge and Into the Abyss:*

4  *The Communication of Organizational Identity in an*

5  *Outlaw Motorcycle Club.*

6  A    Yes, sir.

7  Q    So your content analysis that you've described,

8  and you've compared these patches, is you developed

9  that expertise at the Florida State University while

10  you were writing your dissertation on outlaw motorcycle

11  clubs, correct?

12  A    No, sir.

13  Q    That's not correct?

14  A    No.  The way one earns a Ph.D. is one first takes

15  courses.  This is where one learns one's craft.  And

16  then you take tests to make sure that you actually did

17  learn something and you didn't just get good grades.

18  And they verify you as absolutely competent to go out

19  in the field and conduct your first research project.

20  The dissertation is your first crack at doing research

21  by one's self.

22  Q    Fair enough.  Fair enough.

23  A    Yes, sir.

24  Q    And when you wrote your dissertation, when you

25  published it, you acknowledge in your dissertation that

1  your conclusions on this subject matter suffer from a

2  bias, isn't that correct?

3  A     Yes.

4  Q     And on Page 165 of your dissertation, you stated,

5  *"During the course of this study, while transcribing*

6  *field notes, I find myself painting the events that*

7  *transpired in an overly innocent or even romantic*

8  *light."*  Those are your words, correct?

9  A     Yes, sir.

10 Q     And that subject matter was on organizational

11 identity in the Outlaw Motorcycle Club world, isn't

12 that correct?

13 A     Yes.

14 Q     And that is very similar to what your testimony is

15 today, correct?

16 A     Absolutely not.

17 Q     Okay.  And again, those are your words, "overly

18 innocent and romantic light," correct?

19 A     Yes.  But in order to understand those words, one

20 must understand that that is part of writing in

21 ethnography.  That's part of the methodology when one

22 is done presenting your findings, then you try to give

23 the reader insight into your biases such that the

24 reader can say, okay, I'm going to take that into

25 consideration when reading what you've got, and I'll

1  try to make sure that I'm aware of that.  That is

2  absolutely standard in the field.

3  Q    Okay, but isn't it also true that in light of your

4  own words that within this subject matter you see

5  things as you hope them to be rather than how they

6  actually are?

7        MS. CARDWELL:  Objection.  The question is very

8  vague.  *"This subject matter."*  He's gone into

9  something that's --

10        THE COURT:  I'm going to have to sustain the

11  objection, Mr. Fitzpatrick.  I think you're getting a

12  little far afield here.

13        MR. FITZPATRICK:  Can I rephrase the question,

14  Your Honor?

15        THE COURT:  Please do so.  And try to focus it

16  more on the case at hand, if you would.

17        MR. FITZPATRICK:  All right.

18  Q    With respect to -- in your Ph.D. dissertation,

19  which was on organizational identity and how it relates

20  to the Outlaws Motorcycle Club, isn't that correct?

21  A    Yes, sir.

22  Q    And your expert testimony today in comparing

23  patches is in the same context, organization identity,

24  Hells Angels' patches, correct?

25  A    No, sir.  It's not at all.  We're talking about

1  apples and oranges.  My dissertation is an apple, and

2  what I'm presenting here today is an orange.  You

3  cannot make the generalization from one's findings in

4  that study to this.  They are totally separate.

5      The research methodologies are not the same.  What

6  I did for my dissertation was qualitative and

7  interpretative.  What I'm doing here today in this

8  courtroom is quantitative and empirical.  My opinions

9  and feelings having nothing to do with content

10  analysis.  There is why that methodology is so highly

11  regarded in the social sciences because of its

12  objectivity, sir.

13  Q    You said your analysis is quantitative, right, and

14  empirical?

15  A    Absolutely.

16  Q    Earlier you said when you did your comparison to

17  the sheets, you said that was only by analogy.

18  A    That is a furthering of one's explanation.  It is

19  commonplace in journalism and in research you make a

20  statement and then to help people understand it you

21  give an analogy that folks would have a tie to rather

22  than pure numbers, sir.

23      THE COURT:  Mr. Fitzpatrick, I think you're

24  getting very, very close to exhausting this line of

25  examination.

1          MR. FITZPATRICK:  Just one more.

2          THE COURT:  One more question, and that's going to

3   be it.

4   Q     With respect to Hells Angels' patches, the Hells

5   Angels identify themselves as an organization by their

6   patches, correct?

7   A     Yes, sir.

8   Q     And you were asked to compare patches of the Hells

9   Angels, correct?

10  A     I was asked to compare a government exhibit

11  against known photographs of Hells Angels' colors.

12  Q     Known photographs because you say that they're

13  known, correct?

14  A     Because the Hells Angels Motorcycle Club says they

15  are.  And in the case of the Minnesota patch, that was

16  taken by a very regarded Hells Angel photographer named

17  Scott Olson for getting images.  Getting images is

18  among the highest regarded source for news,

19  photographs, and videotape in the world.  So I'd say

20  that --

21  Q     You have prior experience with getting images?

22  A     Yes, I do, as a matter of fact.

23  Q     Off the Internet?

24  A     No.  Doing research, and also in my writings.

25          THE COURT:  I think you've just about exhausted

1   this line of examination, Mr. Fitzpatrick.

2       MR. FITZPATRICK:  Right.  I'll move on, Your

3   Honor.  Thank you.

4   Q    You've since left Florida and you went to North

5   Carolina, correct?

6   A    I've been a few places in between.

7   Q    Okay.  But you're currently residing in North

8   Carolina?

9   A    Yes, sir.

10  Q    And you ride with a new motorcycle organization,

11  correct?

12  A    Yes sir.

13  Q    And what's the name of that?

14  A    The Hell on Wheels Motorcycle Club.

15  Q    Okay.  And that's not a 1%er organization?

16  A    No, sir.

17  Q    Is it an outlaw motorcycle club?

18  A    Yes, sir.

19  Q    And is the dominant club in North Carolina is the

20  Outlaws, correct?

21  A    Yes, sir.

22  Q    And do you fly a three-piece patch with the Hell

23  on Wheels?

24  A    Yes.

25  Q    And did you receive permission from the Outlaws to

1  fly that patch?

2  A    Yes, we did.

3  Q    I want to direct your attention to on or about

4  May 10, 2010.  Do you recall testifying in a hearing in

5  the Southern District of West Virginia?

6  A    I sat for a Debear hearing, but I never sat before

7  a jury to provide testimony.  Yes.

8  Q    I believe my question was did you sit in front of

9  a hearing.  And your answer is what?

10  A    Yes.

11  Q    All right.  And you recall that that was a rather

12  contentious hearing, would you agree with that?

13  A    Yes, it was.

14  Q    At the conclusion of that hearing, Judge Johnson

15  asked you a question.  Do you recall a series of

16  questions the Judge asked you?

17  A    I don't remember specifically, but he did ask a

18  number of questions though.

19  Q    And do you recall Judge Johnson asking you, *"Do

20  you consider yourself a club member or a citizen?"*  Do

21  you recall that question?

22  A    I really don't, sir.

23  Q    Do you recall answering --

24       MS. CARDWELL:  Judge, I think the foundation

25  hasn't been laid.  He said he didn't remember being

1    asked the question.

2         THE COURT:  I think what you need to do is ask him

3    do you recall being asked the following question, and

4    give him the following answer.

5         MR. FITZPATRICK:  Okay.  I'll do that, Your Honor.

6    Q    I'll state the entire question and answer.  Do you

7    recall being asked, *"Do you consider yourself a club*

8    *member of a citizen?"*

9         And you responding, *"I consider myself a club*

10   *member."*  Do you recall that answer?

11   A    I honestly don't recall it, but that sounds

12   consistent.

13   Q    Okay.  Do you also recall that to be a 1%er it's

14   tantamount to being a Navy Seal?

15   A    Yes.  It's something I say often.

16        MR. FITZPATRICK:  Your Honor, if you would indulge

17   me for one second?

18        THE COURT:  Yes, sir.

19        MR. FITZPATRICK:  Last thing, Your Honor.

20        I want to show if I could please, with the Court's

21   permission, Government's Exhibits 343, first?

22        THE COURT:  Exhibit 343?

23        MR. FITZPATRICK:  Yes, sir.  This was previously

24   admitted.

25

1      THE COURT:  All right.

2  Q    Do you recognize that patch?

3  A    Yes, I do.

4  Q    And is that an Outlaw three-piece patch?

5  A    It appears to be.

6  Q    And is it authentic?

7  A    I can't make that statement off this photograph,

8  sir.

9      MR. FITZPATRICK:  If we can have 344, please.

10 Q    Do you recognize that?

11 A    I do.

12 Q    Is that an authentic Outlaws North Carolina patch?

13 A    Again, I can't make that statement based on just a

14 photograph.

15 Q    But you would acknowledge just by looking at the

16 screen that 343 and 344 -- and for the sake of this

17 argument, I'll tell you that these came out of the same

18 location.  You would agree that the white coloring are

19 different shades, correct?

20 A    This one appears to be darkened due to road debris

21 from riding, and that it's consistent with a wear

22 pattern, yes.

23 Q    And finally, in your comparison of the patches and

24 the color hews and how these patches are made, you did

25 no investigation regarding international standards with

1  respect to colors verses domestic standards, is that

2  correct?

3  A    Absolutely I did.  I looked at at least 30

4  different bottom rockers, 30 different charters, if you

5  will, in dozens of countries.

6  Q    What I'm asking you are government regulations

7  with respect to, you know, paint content and things

8  like that, how you process inks.

9  A    I'm not aware of any such government regulation on

10 colors, sir, but that's also beyond the scope of this

11 study.

12       MR. FITZPATRICK:  Thank you, Your Honor.

13       THE COURT:  Yes, sir.

14       Any redirect?

15       MS. CARDWELL:  Very briefly, Your Honor.

16       THE COURT:  Yes, ma'am.

17                  **REDIRECT EXAMINATION**

18 BY MS. CARDWELL:

19 Q    Dr. Dulaney, Mr. Fitzpatrick did not give you an

20 opportunity to explain your statement that a 1%er is

21 tantamount to a Navy Seal.  Could you explain what you

22 meant by that?

23 A    Yes.  Just like many American endeavors, Americans

24 tend to try to aspire to the top, to the pinnacle.

25 Like in the military, and I have a military background,

1  the Navy Seals are arguably the pinnacle of the special

2  forces.  So in the motorcycle club world, 1%ers are

3  seen as the pinnacle.  They have the highest commitment

4  to the culture, the highest degree of commitment to one

5  another, and therein lies the analogy of Navy Seal to a

6  1%er.

7  Q    So you didn't mean to imply that 1%ers are better

8  than military or Navy Seals?

9  A    Absolutely not.

10 Q    Now, did you Photoshop the photos that you showed

11 the ladies and gentlemen of the jury?

12 A    No, sir.  No, ma'am.  I'm sorry.

13 Q    Did you alter them other than to enlarge them in

14 any way?

15 A    No, ma'am.

16 Q    In offering the physical differences that you

17 noted for the ladies and gentlemen of the jury, did you

18 romanticize your conclusions?

19 A    Absolutely not.

20 Q    And based upon the experience that Mr. Fitzpatrick

21 asked you about with regard to motorcycle clubs and

22 1%ers, do patches get sewn on or glued on?

23 A    Patches are sewn on.

24      MS. CARDWELL:  Thank you.

25      THE COURT:  May the doctor be excused at this

1    point, Ms. Cardwell?

2         MS. CARDWELL:  Yes.

3         THE COURT:  Mr. Fitzpatrick?

4         MR. FITZPATRICK:  Fine, Your Honor.

5         THE COURT:  Dr. Dulaney, you're excused and free

6    to go.  Thank you for coming in, sir.  We appreciate

7    your testimony.

8                    **WITNESS STOOD ASIDE**

9         THE COURT:  Ladies and gentlemen, at this point

10   we're going to take a 10 minute recess.  We'll come

11   back and hopefully get the defense side of the case

12   wrapped up as soon we can.

13     (The jury is no longer present in the courtroom.)

14        THE COURT:  Ms. Cardwell, how many more witnesses

15   do you have?

16        MR. MASTANTUONO:  Your Honor, we have four.  And

17   they're all short.

18        THE COURT:  Okay.  All right.  Thank you, sir.

19        We'll stand in recess 10 minutes.

20                    (Recess taken.)

21        THE COURT:  Ready for the jury?

22        MR. FITZPATRICK:  Yes, Your Honor.

23        THE COURT:  Marshal, bring the jury in.

24          (The jury is present in the courtroom.)

25        THE COURT:  Who'll be your next witness?

1        MR. MASTANTUONO:  Mr. Marcus Ruiz, Your Honor.

2        THE COURT:  Mr. Ruiz, come forward.  If you would

3   raise your right hand, place your left hand on the

4   Bible, and face the Clerk of the Court.

5        THE CLERK:  You do solemnly swear that the

6   testimony which you are about to give, in this case,

7   before this Court, shall be the truth, the whole truth,

8   and nothing but the truth, so help you God?

9        MR. RUIZ:  I do.

10       THE COURT:  Have a seat on the witness stand, sir.

11       MR. MASTANTUONO:  Thank you, Your Honor.

12            Whereupon, **Marcus Ruiz,** having been

13   duly sworn in, testifies as follows:

14                    **DIRECT EXAMINATION**

15   BY MR. MASTANTUONO:

16   Q    Mr. Ruiz, could you please state your full name

17   for the jury.

18   A    Marcus Ruiz.

19   Q    And where are you from, sir?

20   A    Milwaukee, Wisconsin.

21   Q    And how are you employed?

22   A    I'm a full-time student at the University of

23   Wisconsin in Milwaukee, and I work part-time at the

24   Mastantuono Law Office.

25   Q    My office?

1   A     Yes.

2   Q     And as a part-time intern, do you perform

3   investigative and other clerical duties?

4   A     Yes, I do.

5   Q     And what did you do prior to work with our office

6   and your student -- and as a full-time student?

7   A     I served six years in the United States Marine

8   Corp infantry.

9   Q     Were you deployed?

10  A     Yes.  I went to Iraq twice, Africa, South America.

11  Q     Okay.  Are you now finishing up your studies?

12  A     Yes.

13  Q     As part of your investigate duties at Mastantuono

14  Law Office, did you work on the case of *United States*

15  *v. Rosga, et a*l?

16  A     Yes, I did.

17  Q     All right.  And what did your investigation

18  consist of, sir?

19  A     I was given photos from the government discovery

20  of patches that were seized from the Milwaukee

21  clubhouse, and just asked to see if they were available

22  to the public.

23  Q     All right.  So did you do a visual inspection of

24  what the photo described, and then looked for those

25  patches on the Internet?

1   A    Yes.

2   Q    Was this the limit of investigative duties?

3   A    Yes.

4   Q    All right.  I'm going to show you what's been

5   previously admitted as Defense Exhibit 30-JR.  If you

6   can take a look at that and tell me if you recognize

7   it.  Do you recognize that photo?

8   A    Yes, I do.

9   Q    And is that the group photo of patches from the

10  government's discovery that was given to you?

11  A    Yes, it is.

12  Q    All right.  And what did you -- I'm sorry.  And so

13  were these the patches you looked for on the Internet?

14  A    Yes, it was.

15  Q    All right.  And did you find some of those patches

16  for sale on the Internet?

17  A    Yes, I did.

18  Q    All right.  And did you find some of those patches

19  not for sale on the Internet?

20  A    Yes.

21  Q    Okay.  And what were the patches you did not find

22  for sale on the Internet?

23  A    I didn't find the top one that says *"Hells*

24  *Angels,"* and I didn't find the middle one, which is a

25  skull like with wings.  And I didn't find the Wisconsin

1  patch.

2  Q    All right.  I'm going to show you Defense Exhibit

3  31-JR.  Do you recognize that?

4  A    Yes, I do.

5  Q    What is it?

6  A    It's a Hells Angels 188 Airborne patch.

7  Q    Okay.  And was that part of the discovery photos

8  that you were asked to review?

9  A    Yes it was.

10    MR. MASTANTUONO:  I'm going to move the admission,

11  and ask to publish, Your Honor.

12    MR. FITZPATRICK:  No objection.

13    THE COURT:  Be received.  Go right ahead.

14  Q    And did you conduct an Internet search to see

15  whether that patch was available to the public?

16  A    Yes, I did.

17  Q    And did you find whether it was?

18  A    Yes.

19  Q    I'm going to show you what's been marked as

20  Defense Exhibit 35-JR.

21    THE COURT:  Excuse me.  What was the number of the

22  last one?

23    MR. MASTANTUONO:  I apologize, Your Honor.

24  Exhibit 31-JR.

25    THE COURT:  It's received.  Go ahead.

1    Q    I'm showing you what's been marked as 35-JR.  Do

2    you recognize that, Mr. Ruiz?

3    A    Yes, I do.

4    Q    What is it?

5    A    It's a screen shot that I took of a military

6    website that sells the Hells Angels 188 Airborne

7    patch.

8    Q    Does that appear to be the same patch from the

9    government's discovery in the previous exhibit?

10   A    Yes, it does.

11        MR. MASTANTUONO:  I'm going to move the admission,

12   and ask to publish, Your Honor.

13        THE COURT:  Be received.  Yes, sir, you may

14   publish it.

15   Q    All right, and I'm going to show you what's been

16   marked as Defense Exhibit 32-JR.  Do you recognize

17   that, sir?

18   A    Yes, I do.

19   Q    So that a photo from the government discovery of a

20   patch seized that's part of that group photo?

21   A    Yes, it is.

22   Q    And did you conduct an Internet search to see --

23   and what is the patch?

24   A    It's a 1%er NRCA with the flaming skull in it,

25   diamond shaped.

1  Q    Did you conduct an Internet search to see whether

2  that patch was available to the public?

3  A    Yes, I did.

4  Q    Did you find that it was?

5  A    Yes.

6  Q    I'm going to show you what's been marked as

7  Defense Exhibit 36-JR.  Do you recognize that,

8  Mr. Ruiz?

9  A    Yes.  It's a Website screen shot that I took of a

10 Website that sells that patch.

11 Q    All right.  And does that patch that you found for

12 sale on the Internet appear to be the same as the patch

13 from the government exhibit?

14 A    Yes, it does.

15      MR. MASTANTUONO:  I'm going to move the admission,

16 and ask to publish, Your Honor.

17      THE COURT:  Yes, sir.  Received.

18      MR. FITZPATRICK:  What number was that number?

19      MR. MASTANTUONO:  I'm sorry.  36-JR.

20      MR. FITZPATRICK:  No objection.

21 Q    I'm going to show you again Defense Exhibit 30-JR.

22 Previously admitted.  I'll going to point your

23 attention to what appears to be a Los Banos patch.  And

24 I think as you see it, it would be in the lower left.

25 Do you see that patch?

1  A    Yes.

2  Q    If you touch it, it will highlight it on the

3  screen.

4  A    (Witness complies.)

5  Q    And did you conduct an Internet search for that

6  patch, sir?

7  A    Yes, I did.

8  Q    I'm going to show you what's been marked as

9  Defense Exhibit 37-JR.  And if you touch the lower

10 right, I think it clears the screen.  Yes.  Do you

11 recognize that exhibit?

12 A    Yes, I do.

13 Q    What is it?

14 A    It's a screen shot that I took of eBay selling the

15 Los Banos Hells Angels' patch.

16 Q    Does it appear to be the same patch from the

17 government's exhibit?

18 A    Yes, it does.

19      MR. MASTANTUONO:  I'm going to move the admission,

20 and ask to publish 37-JR, Your Honor.

21      THE COURT:  Be received without objection.

22 Q    I'm going to show you what's been previously

23 admitted as 30-JR, the group shot again.  I'm going to

24 point your attention to what appears to be a Big Red

25 Machine Long Island flaming skull patch.  I think it's

1   on the left side as you view it.  Could you highlight

2   that?

3   A    (Witness complies.)

4   Q    And did you conduct an Internet search to see if

5   that patch was available for sale on the Internet?

6   A    Yes, I did.

7   Q    I'm going to show you what's been previously

8   marked as Defense Exhibit 38-JR.  Do you recognize

9   that, sir?

10  A    Yes, I do.

11  Q    What is it?

12  A    It's a screen shot of eBay that I took that sells

13  the Big Red Machine Long Island patch.

14       MR. MASTANTUONO:  I'm going to move the admission

15  of 38-JR, and ask to publish.

16       THE COURT:  Received without objection.

17       MR. MASTANTUONO:  Thank you.

18  Q    And does it appear from that eBay screen shot that

19  that patch is available -- or did you find that that

20  patch was available on the Internet?

21  A    Yes, I did.

22  Q    I'm going to show you the group photo again,

23  30-JR.  And I'm going to point your attention to what's

24  been -- or what appears to be a Nomads 81 Get It Right

25  Because It's Red & White patch.  Is that it?

1  A    Yes.

2  Q    And did you conduct an Internet search for that

3  patch?

4  A    Yes, I did.

5  Q    And I'm going to show you what's been marked as

6  Defense Exhibit 39-JR.  Do you recognize that, sir?

7  A    Yes, I do.

8  Q    What is that?

9  A    A screen shot of the Website eBay that's selling

10 the Hells Angels Get It Right Because It's Red & White

11 patch.

12     MR. MASTANTUONO:  Move for admission, and ask to

13 publish, Your Honor.

14     THE COURT:  What's the number?

15     MR. MASTANTUONO:  I'm sorry.  39-JR.

16     THE COURT:  That's not the Nomads 81, is it?

17     MR. MASTANTUONO:  Yes.

18 Q    Is that the previously described patch from --

19 A    Yes, it is.

20     THE COURT:  Fine.  Received without objection.

21     MR. MASTANTUONO:  Thank you, Your Honor.

22 Q    And Defense Exhibit 30-JR, again.  I'm going to

23 point your attention to what appears to be a Big Red

24 Machine skull on a motorcycle patch.  I think that's

25 right of center.  All right.  And did you conduct an

1  Internet search for that patch?

2  A    Yes, I did.

3  Q    Did you find it?

4  A    Yes, I did.

5  Q    I'm going to find you -- show you Defense Exhibit

6  40-JR.  And do you recognize that exhibit?

7  A    Yes, I do.

8  Q    What is that?

9  A    That's a screen shot that I took of eBay selling

10 the Big Red Machine patch.

11     MR. MASTANTUONO:  Move for admission, and ask to

12 publish, Your Honor, as 40-JR.

13     THE COURT:  Received.

14 Q    Defense Exhibit 30-JR, again.  The group photo.

15 From the government's photo, I'm going to point your

16 attention to what appears to be a Flaming Wings support

17 patch.  I think it's on the lower right.  Did you

18 conduct an Internet search for that patch?

19 A    Yes, I did.

20 Q    Did you find it?

21 A    Yes, I did.

22 Q    I'm going to show you what's been previously

23 marked as Defense Exhibit 41-JR.  Do you recognize that

24 exhibit, sir?

25 A    Yes, I do.

1    Q    What is it?

2    A    A screen shot of Ebay selling the Support Nomads

3    Nevada Red & White skull with the flames coming out the

4    side of the patch.

5         MR. MASTANTUONO:  Move admission, and ask to

6    publish, Your Honor, 41-JR.

7         THE COURT:  Any objection?  Received.

8    Q    I'm going to show you Defense Exhibit 42-JR.  Do

9    you recognize that, Mr. Ruiz?

10   A    Yes, I do.

11   Q    And what is that?

12   A    It's a screen shot that I took of a Website

13   WorthPoint.  And basically it's just showing that

14   grouping down there of patches was just sold through

15   the Internet to a private buyer.

16   Q    Okay.  And do those appear to be patches

17   consistent with patches from the government's group

18   photo 30-JR?

19   A    Yes, they do.

20   Q    And I'm going to show you --

21        MR. MASTANTUONO:  I'll move the admission, and ask

22   to publish.

23        THE COURT:  Any objection to 42?

24        MR. FITZPATRICK:  Exhibit 42, no, Your Honor.

25        THE COURT:  Received.  You may publish.

1  Q    I'm going to show you Defense Exhibit 43-JR.  Do

2  you recognize that?

3  A    Yes.

4  Q    What is it?

5  A    It's just a blow-up of the screen before of the

6  patches that were sold.

7  Q    Did you make that blow-up?

8  A    Yes.

9  Q    And screen shot?

10 A    Yes.

11      MR. MASTANTUONO:  And I'm going to move admission

12 of 43-JR.

13      THE COURT:  Any objection?

14      MR. FITZPATRICK:  No, sir.

15      THE COURT:  Be received without objection.

16 Q    All right.  I'm going to show Defense Exhibit

17 44-JR.  And do you recognize that, Mr. Ruiz?

18 A    Yes, I do.

19 Q    And what is that?

20 A    It's a screen shot that I took of eBay showing the

21 Support Your Local United States 81 patch.

22 Q    Okay.  And I'm going to ask, did you find that and

23 take that screen shot?

24 A    Yes, I did.

25      MR. MASTANTUONO:  I'm going to move for admission,

1    and ask to publish.

2         THE COURT:  Any objection?

3         MR. FITZPATRICK:  No, sir.

4         THE COURT:  Exhibit 44 is received.

5         MR. MASTANTUONO:  I have no further questions,

6    Mr. Ruiz.  Thank you.

7         THE COURT:  Cross-examination?

8         MR. FITZPATRICK:  Thank you, Judge.

9                    **CROSS-EXAMINATION**

10   BY MR. FITZPATRICK:

11   Q    Good morning, Mr. Ruiz.

12   A    Good morning.

13   Q    You stated you're employed by Mr. Mastantuono?

14   A    Yes, I am.

15   Q    And what's your title there?

16   A    I'm an investigator.

17   Q    And in response to counsel's questions, you stated

18   that you had some investigative duties in this matter?

19   A    Yes.

20   Q    And that you conducted an investigation?

21   A    Yes.

22   Q    And the extent of your investigation was going

23   onto the Internet and researching Hells Angels'

24   patches, is that correct?

25   A    Not necessarily researching.  Just finding if they

1  were for sale on the Internet.

2  Q    Okay.  Just finding if these patches were for sale

3  on the Internet?

4  A    Basically.

5  Q    That was the extent of your investigation?

6  A    Basically.

7  Q    Do you have prior investigation experience in the

8  Marine Corp?

9  A    Well, in the Marine Corp infantry, I did SASO

10 Operations in Iraq.  So all I did was intel,

11 interrogative stuff.

12 Q    So you're familiar with various investigative

13 techniques?

14 A    Surveillance.  Things like that.  Yeah.

15 Q    Very good.  When you were going through the

16 Internet conducting your investigation, I believe 36 --

17      MR. FITZPATRICK:  Can we have 36-JR?  Thank you

18 very much.

19 Q    Do you see 36-JR in front of you?

20 A    Yes, I do.

21 Q    And you said you found this on the Internet and

22 you compared it with what was recovered.  Did you know

23 that the actual patch that was produced to you in

24 discovery, this was recovered from Mr. Rosga's

25 clubhouse, did you know that?

1   A    Yes.

2   Q    So you had some background of what you were doing?

3   A    Yes.

4   Q    And do you realize that this Hells Angels'

5   supporter patch is for a club called the Red Devils?

6   A    No, I did not.

7   Q    Your investigation didn't go that far?

8   A    No.

9   Q    And are you familiar that the Red Devils is in

10  fact a supporter club for the Hells Angels?

11  A    No, I did not.

12  Q    You didn't know that?

13  A    No.

14  Q    And when you looked it up on the Internet, this is

15  accurate, it says, *"This patch can be ironed or sew*

16  *on."*  Is that what it says?

17  A    Where are you reading that?

18  Q    Right smack in the middle of the screen.  This

19  patch.

20  A    Oh, yeah.  Yes.  That's what it says.

21  Q    And did you purchase any of these patches when you

22  were working on the Internet?

23  A    No.

24       MR. FITZPATRICK:  If we could have 42, please.

25  Mr. Rosga's 42.

1   Q    And you found this collection on the Internet, is

2   that correct?

3   A    Yes, I did.

4   Q    At the very bottom there, it says, *"These are*

5   *patches, all sew-on or iron-on"*?

6   A    Yes.  That's what it says.

7        MR. FITZPATRICK:  Mr. Ruiz, thank you very much.

8        Your Honor, thank you.

9        THE COURT:  Any redirect?

10       MR. MASTANTUONO:  No redirect, Your Honor.  Thank

11  you.

12       THE COURT:  May Mr. Ruiz be excused at this point?

13       MR. MASTANTUONO:  Yes, Your Honor.

14       THE COURT:  Mr. Ruiz, you're excused and free to

15  go.  Thank you for coming in today, sir.

16                    **WITNESS STOOD ASIDE**

17       THE COURT:  Next witness.

18       MR. MASTANTUONO:  Defense calls Mr. Eric Roberson.

19       THE COURT:  Eric Roberson.

20       Mr. Roberson, if you would raise your right hand,

21  sir, place your left hand on the Bible, and face the

22  Clerk of the Court.

23       THE CLERK:  You do solemnly swear that the

24  testimony which you are about to give, in this case,

25  before this Court, shall be the truth, the whole truth,

1    and nothing but the truth, so help you God?

2         MR. ROBERSON:  I do.

3         THE COURT:  Have a seat on the witness stand, sir.

4         Whereupon, **Eric Roberson**, having been

5    duly sworn in, testifies as follows:

6                    **DIRECT EXAMINATION**

7    BY MR. MASTANTUONO:

8    Q    Good morning, Mr. Roberson.  Please state your

9    name for the jury.

10   A    Sure.  Eric Elgen Roberson.

11   Q    Where are you from, sir?

12   A    Milwaukee, Wisconsin.

13   Q    And how were you employed, or are you employed?

14   A    Currently I'm retired.

15   Q    And what job are you retired from, sir?

16   A    I was a deputy sheriff with Milwaukee County.

17   Q    Okay.  With the Milwaukee County Sheriff's

18   Department?

19   A    Yes, sir.

20   Q    And how long did you work with the Milwaukee

21   County Sheriff's Department, sir?

22   A    Approximately, 27 years.

23   Q    When did you retire, sir?

24   A    September of 2002.

25   Q    What was your rank when you retired?

1  A    I was captain.

2  Q    Could you just give a brief overview of your

3  history with the sheriff's department?

4  A    I spent approximately 27 years with the Milwaukee

5  County Sheriff's Department.  The first 14 of those I

6  spent as a deputy sheriff assigned to the bureaus,

7  attention services, expressway patrol, courts.  I was

8  promoted to sergeant during which time I again worked

9  in the various bureaus of the department.  I spent

10 approximately six years as a sergeant before being

11 promoted to a captain where I spent six years as a

12 captain assigned to detention services bureau as a

13 number two man in charge of the jail.  And I retired as

14 a captain in the detective bureau.

15 Q    Thank you, sir.  Do you know my client, Mr. Jack

16 Rosga?

17 A    Yes, I do.

18 Q    And how do you know Jack Rosga, Mr. Roberson?

19 A    Jack is a personal friend.  I've know Jack for

20 over 30 years.

21 Q    How did you meet Mr. Rosga?

22 A    Jack and I used to work together at a moving

23 company in Milwaukee called Allied Van Lines.

24 Q    All right.  And was there a local agent for the

25 line that you worked for?

1   A     Yes.

2   Q     Who was that?

3   A     Cokely Brothers.

4   Q     So about when did you being working with

5   Mr. Rosga?

6   A     Shortly after I graduated from high school.

7   Q     All right.  And did you become movers together?

8   A     Yes.  We became movers, very good friends.  Jack

9   actually taught me how to drive a semi.  He also taught

10  me how to load furniture.

11  Q     And which of you became a driver first then, you?

12  A     I did.  Yes.

13  Q     And did you become over-the-road drivers together?

14  A     No.  No.  Again, when I started at the company,

15  Jack was one of the local drivers.  He taught me how to

16  drive a truck.  I shortly after became a local driver

17  as well.  The company and one of the dispatchers

18  convinced me to become a operator for them to drive

19  over the road when I turned 21.  I did.  I began

20  driving over the road at that time.

21  Q     All right.  And did Mr. Rosga eventually become an

22  over-the-road driver?

23  A     Yes.  After I had driven over-the-road for a few

24  months for them, I spoke to Jack about it and kind of

25  convinced him that it was something that he needed to

1  do.

2  Q    All right.  And did he begin to do that upon your

3  recommendation?

4  A    I don't think it was just my recommendation.  He

5  obviously had family members and friends and

6  acquaintances that drove over-the-road.  I just think I

7  helped convince him that he had the ability to do the

8  job.  I know he had some concerns about it, but he and

9  I had become close enough and comfortable enough that

10  when I talked to him and told him I felt comfortable

11  that he could do the job, he did it.

12  Q    All right.  Did you leave your employment, full

13  time, with Cokely Brothers?

14  A    Yes.

15  Q    Is that when you entered into law enforcement?

16  A    I actually left Cokely Brothers before I entered

17  law enforcement.  But shortly after leaving Cokely,

18  approximately six to eight months after leaving Cokely,

19  I took the position with the sheriff's office.

20  Q    And during your career in law enforcement, did you

21  continue to, first of all, keep in contact with

22  Mr. Rosga over the years?

23  A    Yes.  Yes.

24  Q    And did you continue your sometimes employment

25  with Cokely Brothers Movers?

1   A     Yes, on a part-time basis.

2   Q     Did you get to know Mr. Rosga's family?

3   A     Oh, I knew Jack's family very well before I even

4   became a deputy sheriff.

5   Q     Did you go to his home, for example?

6   A     On numerous occasions I've been to Jack's house

7   with him or his wife, Lydia, the kids.  I've spent

8   evenings or a night over there on several occasions

9   where we had a job, for instance, in the morning that

10  we had to both go on and that we had to be up very

11  early.  Sometimes it would be easier to stay at Jack's

12  house then it would be to come from my house on the

13  north side.

14  Q     Okay.  Did you -- did you know that Jack became a

15  member of an outlaw motorcycle club?

16  A     Several years after I became a deputy sheriff,

17  yes.

18  Q     And have you become a member of motorcycle clubs

19  over the years?

20  A     Yes.

21  Q     Okay.  And who taught you how to ride a

22  motorcycle?

23  A     Jack.

24  Q     What motorcycle club are you currently a member

25  of, sir?

1   A    Currently I belong to a motorcycle club called the

2   Patriots MC.

3   Q    And how long have you been a member of the

4   Patriots MC?

5   A    I've been with the Patriots now for approximately

6   six years.

7   Q    And were you previously a member of a club prior

8   to that?

9   A    Yes.

10  Q    And what was that?

11  A    The Renegade Pigs.

12  Q    And is the patriots MC a Milwaukee area club?

13  A    There is a chapter in Milwaukee, yes.

14  Q    Is that the chapter you belong to?

15  A    Correct.

16  Q    And what is its focus or emphasis membership-wise,

17  I mean?

18  A    The Patriots is a motorcycle club compromised of

19  law enforcement officers, firefighters, active

20  military, or retired military professionals, public

21  service officer.

22  Q    Do you have a sergeant-at-arms?

23  A    Yes.

24  Q    And have you seen Jack in your capacity as a

25  motorcycle club member and Jack's capacity as a

1  motorcycle club member?

2  A    We have crossed paths on occasion at various biker

3  functions.

4  Q    Okay.  And for example, various biker functions

5  like what one?

6  A    Years ago I ran into Jack at the Milwaukee Rally.

7  It's a local motorcycle rally put on by the local

8  Harley Davidson dealerships.  In passing I was walking

9  through, and I ran into his son, Joey, and told me Jack

10 was there, and shortly thereafter I saw him.

11 Q    To your knowledge, has your motorcycle club had

12 any problems with the Outlaws Motorcycle Club?

13 A    No.  Not that I'm aware of.

14 Q    Are you sanctioned or affiliated with the Outlaws

15 Motorcycle Club at all?

16 A    No.

17 Q    And given your position -- I'm sorry.  Have you

18 ever felt the need over the years of employment to hide

19 your friendship with Jack, sir?

20 A    No.  No.  I've always made it known that I knew

21 Jack.

22 Q    And has -- have you, given your friendship with

23 Jack -- I'm sorry.  Are you familiar with Jack's views,

24 through your friendship with him, what his views are on

25 drug use?

1   A    Very familiar with it.

2   Q    What are they?

3   A    Jack won't tolerate it.  He absolutely won't

4   tolerate it.  Even before I became a deputy sheriff,

5   when Jack and I worked at the moving company together,

6   it was very apparent that Jack did not abide drugs,

7   wouldn't tolerate someone who used drugs.  There were

8   occasions where if we found out somebody that was

9   working with us on a particular job had drugs on a

10  trailer, they were history.  They were gone.  We didn't

11  want them with us.

12  Q    And was it your impression that Jack ever hid his

13  being an Outlaw Motorcycle Club member from you?

14  A    No.

15  Q    Given what you know about your friend,

16  Mr. Roberson, do you have an opinion or have you formed

17  an opinion as to whether Jack is an honest and

18  law-abiding person?

19  A    In the 30 years that I've known Jack, I've found

20  him to be nothing more than an honest and law-abiding

21  person.  He's --

22       MR. FITZPATRICK:  Objection.  That's the answer.

23       MR. MASTANTUONO:  I can ask another question, Your

24  Honor.

25       THE COURT:  Okay.  Ask your follow-up question.

1  Q     Have you formed an opinion as to whether Jack is a

2  hardworking person?

3  A     Extremely hardworking individual.  I mean, again,

4  in the 30 years that I've know him, when I was at the

5  moving company with him, Jack and I spent large amounts

6  of time together working together.  We became a pretty,

7  I would have to say, dynamic team for Cokely Brothers.

8  They would often, often put us together to go do what

9  they considered major moves or large accounts because

10 we did so well at what we did that they had that kind

11 of faith and trust in us.

12      And I can't tell you, you know, how many times

13 something came up and something had to be moved, and

14 there was a gentleman or someone working with us that,

15 again, drug issue, or whatever the problem may be, Jack

16 would put them off the truck, and he and I would finish

17 the jobs by ourself.

18 Q     Have you formed an opinion about whether Jack is a

19 funny and gregarious person from your experience?

20 A     Jack can be a card.  Yes.

21      MR. FITZPATRICK:  Objection, Your Honor.  I'm not

22 so sure that's a --

23      THE COURT:  If it's a serious objection, I will

24 sustain it.  Is it a serious objection?

25      MR. FITZPATRICK:  Objection, Your Honor.

1    THE COURT:  Okay.  Sustained.

2    MR. MASTANTUONO:  I have nothing further for you,

3  Mr. Roberson.  Thank you very much.

4    THE COURT:  Cross-examination?

5    MR. FITZPATRICK:  Thank you, Your Honor.

6                    **CROSS-EXAMINATION**

7  BY MR. FITZPATRICK:

8  Q    Sir, the current club that you're run with, the

9  Patriots MC, is it a three-piece patch club?

10 A    Yes.

11 Q    And you would agree that the Outlaws are the

12 dominant club in the State of Wisconsin?

13 A    No, not necessarily.

14 Q    Do you know what I mean when I say *"dominant*

15 *club"*?

16 A    I guess you mean by dominant through membership?

17 Like their actual total members?

18 Q    No.  I mean their control over the motorcycle club

19 territory in Wisconsin.

20 A    No, I wouldn't say that I agree with that.

21 Q    Okay.  The Patriots MC, you're not a 1%er club, is

22 that correct?

23 A    I don't know what you mean by *"1%er club."*

24 Q    Okay.  Do you consider yourself an outlaw

25 motorcycle club?

1  A    Again, I would say no.  I mean, if you're

2  referring to outlaws as a criminal element, I don't --

3  no.

4  Q    It's not a trick question, sir.  I'm just asking

5  you how you consider yourself as a member of the

6  Patriots MC.  Do you consider yourself as an outlaw

7  motorcycle club?

8  A    We consider ourselves a law enforcement motorcycle

9  club.

10  Q    And when you were running with the Renegade Pigs,

11  is that also called a cop club?

12  A    LE or law enforcement club?

13  Q    Yes.

14  A    Yes.

15  Q    And how long -- and was that a three-piece patch

16  club?

17  A    Yes.

18  Q    And isn't it accurate in your experience with

19  these two clubs that you need to seek permission or the

20  authority of the Outlaws Motorcycle Organization in

21  order to ride with the three-piece patch?

22  A    We never had sought the permission or

23  authorization from the Outlaws to ride with a

24  three-piece patch, no.

25  Q    When you were a member of the Patriots MC, did you

1   hold a leadership position within that club?

2   A     Yes, sir.

3   Q     And what was that leadership position?

4   A     I was the president of Chapter 2.

5   Q     And when you were with the Renegade Pigs, were you

6   a leader?

7   A     Yes.

8   Q     What was your position?

9   A     I was vice-president.

10  Q     With respect to your prior -- comments respecting

11  Defendant Rosga's views on drugs and the moving company

12  profession, it is a requirement to the moving company

13  profession to maintain your license to remain drug

14  free, isn't that correct?

15  A     It's a requirement of the federal government to

16  drive over the road, yes.

17  Q     Well, in order to maintain your proper licensing,

18  you have to remain drug free, correct?

19  A     To work for a moving company locally, no.

20  Q     So in Wisconsin, local moving companies can hire

21  drug users as drivers?

22  A     In Wisconsin?

23  Q     Yes.

24  A     They may have hired someone who's using drugs as a

25  driver.

1  Q    And it's fair to say you know nothing of sort of

2  the internal workings of the Outlaws Motorcycle

3  Organization, is that correct?  The Outlaws?

4  A    Correct.

5  Q    You've never been to a church meeting, is that

6  correct, for the Outlaws?

7  A    No.

8  Q    Do you know what a church meeting is?

9  A    I have an idea what a church meeting is but,

10 again, that's --

11 Q    Within your organization, within the Patriots MC

12 or within the Renegade Pigs, is that a term that was

13 used within your organization, *"church"*?

14 A    No.

15 Q    Okay.  Fair enough.  And you stated that you

16 retired from the sheriff's department, is that correct?

17 A    Correct.

18 Q    And did you retire sooner than you had initially

19 hoped?

20 A    That's kind of a hard question.

21 Q    Well, your retirement from the department, was it

22 a negotiated retirement?

23 A    Yes.

24 Q    And have there been some difficulties that you

25 were in while you were out riding with a three-piece

1    patch in the community?

2    A    No.

3    Q    Had you been witness to a particular assault prior

4    to your retirement?

5    A    I had not been a witness to it, no.

6    Q    But you were familiar with it?

7    A    Yes.

8    Q    And to be fair to you, there's no evidence that

9    you assaulted anybody, correct?

10   A    Correct.

11   Q    But you were with people who were wearing similar

12   patches who assaulted a citizen, is that correct?

13   A    I don't know if that's the correct analogy.  No.

14   Q    Are you familiar with when you were out one

15   evening with people who were wearing similar patches

16   that someone was assaulted?

17   A    I'm aware of an incident that occurred one evening

18   at a bar involving members of the club that were

19   off-duty officers that restrained an individual.  Later

20   there was an allegation of an assault.

21   Q    Okay.  And soon after that, you retired from the

22   sheriff's department?

23   A    It was approximately two years, I believe, before

24   I retired after that.  Yeah.

25   Q    After a series of hearings and proceedings

1   regarding that event that evening?

2   A     Yes.

3        MR. FITZPATRICK:  Thank you very much.  Thank you,

4   Your Honor.

5        THE COURT:  All right.

6        Mr. Mastantuono, any redirect?

7        MR. MASTANTUONO:  No, sir.  Thank you.

8        THE COURT:  Mr. Roberson, you're excused and free

9   to go.  Thank you for coming in, sir.  We appreciate

10   your testimony.

11                    **WITNESS STOOD ASIDE**

12        THE COURT:  Who's next?

13        MR. MASTANTUONO:  I'm sorry, Your Honor.

14   Mr. Henry Miller.

15        THE COURT:  Mr. Miller, if you would raise your

16   right hand, place your left hand on the Bible, and face

17   the Clerk of the Court, please.

18        THE CLERK:  You do solemnly swear that the

19   testimony which you are about to give, in this case,

20   before this Court, shall be the truth, the whole truth,

21   and nothing but the truth, so help you God?

22        MR. MILLER:  I do.

23        THE COURT:  Have a seat on the witness stand.

24        Whereupon, **Henry J. Miller**, having been

25   duly sworn in, testifies as follows:

**DIRECT EXAMINATION**

BY MR. MASTANTUONO:

Q    Mr. Miller?

A    Yes, sir.

Q    If you could state your full name for the jury, please.

A    Henry Joseph Miller.

Q    Where do you live, sir?

A    Milwaukee, Wisconsin.

Q    Where were you employed when you were working full-time, sir?

A    Yes.

Q    What did you do?

A    I was a sewer mason for the City of Milwaukee for 33 years.

       THE COURT:  You were what, sir?

       MR. MILLER:  A sewer mason.  A brick layer.

       THE COURT:  Okay.

Q    And have you retired from your employment with the City of Milwaukee?

A    Yes, I have.

Q    Do you know Mr. Rosga, sir?

A    Yes, I do.

Q    How do you know Mr. Rosga?

A    He's my brother-in-law.

1  Q    All right.  Was he married to your sister?

2  A    Yes.

3  Q    Is your sister Lydia?

4  A    Yes.

5  Q    And is Lydia now deceased?

6  A    Yes.

7  Q    And did you raise your families together?  And I

8  mean you and your family and Mr. Rosga and his family.

9  A    Yes.

10 Q    Did you live near each other?

11 A    Yeah.  Within about a few blocks.

12 Q    I'm sorry?

13 A    Within a few blocks of one another.

14 Q    All right.  And is Candy your wife?

15 A    Yes.

16 Q    Have you stayed in touch with Jack since you were

17 young?

18 A    Yes.

19 Q    And continue to do so?

20 A    Yes.

21 Q    All right.  And when and where had -- in current

22 years since Lydia passed away, where would you see

23 Jack?

24 A    I see him, you know, at least once every two

25 weeks.  Usually we get together.  On a Sunday, I take

1   ham and rolls down by his house or he'd come on over to

2   our house.  But I'd see him, you know, weekly whenever

3   he's in town.  My wife would pay a lot of bills for

4   him, and I'd have to take stuff for him to sign or to

5   look at.

6   Q    All right.  When you say *"down by his house,"* are

7   you referring to the clubhouse in Milwaukee?

8   A    Yes, sir.

9   Q    Have you been by there?

10  A    Yes, sir.

11  Q    Are you an Outlaw Motorcycle Club member,

12  Mr. Miller?

13  A    No, sir.

14  Q    All right.  And do you feel comfortable going by

15  there?

16  A    Yes, sir.

17  Q    Does Candy help him perform banking and taxes?

18  A    Yes, she does.

19  Q    Is Jack not the best reader or with numbers?

20  A    No.  Jack has a hard time with reading and writing

21  and math.

22  Q    And is it -- what's your understanding of how long

23  he's worked as a mover and driver?

24  A    I've known him over 35 years, and he's always

25  worked most of the time.  I'd say at least 33, 34, 35

1  years he's been in the moving business.

2  Q    Do you call Jack, Milwaukee Jack?

3  A    No.  I call him Jack.

4  Q    All right.  I'm going to show you Defense Exhibit

5  50-JR.

6       THE COURT:  Exhibit 50?

7       MR. MASTANTUONO:  Yes.  I'm sorry, Your Honor, 50.

8  Q    Do you recognize that photo, Mr. Miller?

9  A    Yes.  That's my sister and Jack.

10      MR. MASTANTUONO:  I'd like to move its admission,

11 and publish, Your Honor.

12      THE COURT:  Any objection?

13      MR. FITZPATRICK:  No, Your Honor.

14      THE COURT:  Be received.

15 Q    And I'm going to ask to show you 51-JR.  Do you

16 recognize that photo, Mr. Miller?

17 A    Yes.  That's my nephew, Joey, Jack, and I.

18      MR. MASTANTUONO:  I'm going to move its admission,

19 and ask to publish.

20      THE COURT:  Any objection?

21      MR. FITZPATRICK:  No, sir.

22      THE COURT:  Be received.

23 Q    How many children does Jack have?

24 A    Two.

25 Q    And grandchildren?

1    A    Two.

2    Q    All right.  And Mr. Miller, in the 37 years that

3    you have known Jack Rosga, have you come to form an

4    opinion as to whether he's an honest person?

5    A    Yes.

6    Q    What is that opinion, Mr. Miller?

7    A    He's a very honest person.

8    Q    And in the 37 years that you have known Mr. Rosga,

9    have you come to form an opinion to whether he's a

10   hardworking person?

11   A    Yes.

12   Q    And what is that opinion, Mr. Miller?

13   A    He's a very hard worker.  Always been.

14        MR. MASTANTUONO:  Thank you, sir.

15        I have no further questions.

16        THE COURT:  Cross-examination of Mr. Miller?

17        MR. FITZPATRICK:  Very briefly, Your Honor.

18                    **CROSS-EXAMINATION**

19   BY MR. FITZPATRICK:

20   Q    Mr. Miller, you have known Jack Rosga for 35

21   years, correct?

22   A    Better than 35, yes, sir.

23   Q    More than 35 years.  But you've known him in sort

24   of your family life, is that correct?

25   A    Yes.

1   Q    So you don't know him as part of the Outlaws

2   motorcycle gang or Outlaw Motorcycle Club life?

3   A    I know he's a member.

4   Q    Do you know that he's the national leader?

5   A    No.

6   Q    I'm sorry?

7   A    I didn't know he was the national leader, no.  I

8   mean, I know now, but at the time I didn't.

9   Q    And you've kept yourself -- that's a life that you

10  chose not to get involved with, isn't that correct?

11  A    Yes.

12  Q    And in your discussions with Defendant Rosga, they

13  didn't go to that subject area of the Outlaws, correct?

14  A    Correct.

15       MR. FITZPATRICK:  Thank you very much, Your Honor.

16       THE COURT:  Any redirect?

17       MR. MASTANTUONO:  No redirect, Your Honor.  Thank

18  you.

19       THE COURT:  Mr. Miller, you're excused and free to

20  go.  Thank you for coming in today.

21                  **WITNESS STOOD ASIDE**

22       MR. MASTANTUONO:  Mr. Tim Dixon will be our last

23  witness, Your Honor.

24       THE COURT:  All right.

25       Bring Mr. Dixon in, Marshal.

1       Mr. Dixon, if you would raise your right hand,

2  place your left hand on the Bible, and face the Clerk

3  of the Court.

4       THE CLERK:  You do solemnly swear that the

5  testimony which you are about to give, in this case,

6  before this Court, shall be the truth, the whole truth,

7  and nothing but the truth, so help you God?

8       MR. DIXON:  Yes.

9       THE COURT:  Have a seat on the witness stand, sir.

10       Whereupon, **Timothy J. Dixon**, having been

11  duly sworn in, testifies as follows:

12                    **DIRECT EXAMINATION**

13  BY MR. MASTANTUONO:

14  Q    Mr. Dixon, would you please state your name for

15  the jury.

16  A    Timothy James Dixon.

17  Q    Mr. Dixon, where do you live, sir?

18  A    Milwaukee, Wisconsin.

19  Q    And how are you employed, sir?

20  A    I'm a developer.  A real estate developer.

21  Q    All right.  And what type of properties do you

22  develop?

23  A    I've developed everything from condos, apartments,

24  strip malls, commercial property.  And my most recent

25  is the Iron Horse Hotel in Milwaukee.

1  Q     Do you know my client, Mr. Jack Rosga?

2  A     I do very well.

3  Q     How did you come to know Mr. Rosga?

4  A     In the process of developing the hotel, we

5  acquired another building for staging of the -- of the

6  construction of the hotel as well as storage and

7  parking.  Wisconsin has cold, cold weather, and I was

8  called by the family that I bought the building from

9  and asked if I could help out one of their best

10  employees, Jack Rosga.  Jack had multiple trailers and

11  the winter was coming on, and they asked if I would

12  consider renting space to him.

13  Q     And did you do so?

14  A     I did.

15  Q     And so did Mr. Rosga become your tenant?

16  A     Jack was my tenant.  Later on as I got to know

17  Jack, he did a lot of services for us.  He runs a

18  trucking company, and we buy -- we bought a lot of

19  equipment and a lot of furnishings all over the United

20  States.  And we hired Jack's firm, and Jack personally,

21  to pick up fixtures and furniture.

22  Q     Okay.  Let me ask you a couple of questions

23  related to that.  First of all, related to his

24  relationship with you as a tenant, what was he storing

25  in your facility?

1  A    Tractor-trailers.

2  Q    All right.  And when you came to hire him as a

3  contractor, was that in relation to your development of

4  the Iron Horse Hotel?

5  A    Yes, it was.

6  Q    I'm going to show you Defense Exhibit 59-JR, and

7  ask you if you recognize that photo, Mr. Dixon?

8  A    That is my hotel.

9       MR. MASTANTUONO:  I'd ask to move admission, and

10  publish to the jury, Your Honor.

11      THE COURT:  Any objection to 59?

12      MR. FITZPATRICK:  No, Your Honor.

13      THE COURT:  Be received.

14  Q    Now, was the Iron Horse Hotel a renovation from an

15  existing warehouse property?

16  A    Yes, it was.

17  Q    And so some of the moving you were referring to

18  back and forth was involved in the gutting of the

19  building and then replacing fixtures?

20  A    There was heavy lifting in moving things from

21  timbers that we'd taken out and brought back, to buying

22  antique furniture in the restoration of the property.

23  And Jack and his company were involved the entire time.

24  Q    I'm going to show you what's been marked as

25  Defense Exhibit 50-JR.  Do you recognize that, sir?

1  A     That is the lobby of my hotel.

2        MR. MASTANTUONO:  Move admission, and ask to

3  publish.

4        THE COURT:  Any objection?

5        MR. FITZPATRICK:  No, sir.

6        THE COURT:  Be received.

7  Q     First of all, with regard to the Iron Horse Hotel,

8  are you focusing on a niche market for hotel goers, I

9  mean?

10 A     Well, we are the first electric boutique that

11 accommodates the motorcycle enthusiasts.  There's about

12 20 million of them in America alone.  And with

13 Milwaukee being the headquarters of the Harley-Davidson

14 factory where we manufacture and then ultimately have

15 the Harley-Davidson museum, we had to recognize that

16 they were -- that they were going to be here.  So we

17 accommodate motorcycle enthusiasts.  We aren't a themed

18 motorcycle motel.

19 Q     Is your hotel indeed situated near the

20 Harley-Davidson museum?

21 A     The $76 million museum is in my back yard.

22 Q     And is your hotel also situated near the Outlaw

23 Milwaukee chapter clubhouse?

24 A     The clubhouse is probably six to eight blocks

25 southeast of the hotel.

1  Q    All right.  And is that the extent of your

2  relationship with the Outlaws and the chapter

3  themselves, or do you have any type of formal

4  relationship with them?

5  A    No, that is the extent of my relationship with the

6  Outlaws.

7  Q    Now, with regard to the fixtures in this

8  photograph, and furniture, are these some of the

9  antique things that you referred to in your comments

10 regarding Mr. Rosga?

11 A    Actually, this is all custom furniture.  The

12 antiques are in other places.  But, yes, Jack, I

13 believe, picked up all of these in North Carolina.

14 Either Jack or one of his truck drivers.

15 Q    The -- since your time working with Jack, is it

16 fair to say you formed a friendship with Jack?

17 A    Very much so.

18 Q    And in your -- well, first of all, as a tenant,

19 did he pay his rent?

20 A    Yes, he did.

21 Q    In your time working with him as a subcontractor

22 of yours, did you work with both him and his associates

23 or fellow movers and drivers?

24 A    Jack was my main contact, but of course there were

25 other associates of his that I worked with.

1  Q    All right.  And did you come to form an opinion as

2  to whether Jack as a subcontractor for you was a

3  reliable and efficient one?

4  A    He was extremely reliable.  We started with just

5  little things, and he became one of our main vendors.

6  He was our go to guy.  We would send him anywhere.

7  Anywhere he was licensed, his trucks would go and get

8  our stuff for us.

9  Q    Did you come to form an opinion with him both as a

10  subcontractor and as a friend as to whether he's an

11  honest person?

12  A    He's a very honest person.  He actually bends over

13  backwards for us.  He's panicked if he's on the road

14  and does not pay his rent.

15       MR. MASTANTUONO:  Thank you, sir.  I have no

16  further questions.

17       THE COURT:  Cross-examination of Mr. Dixon?

18                    **CROSS-EXAMINATION**

19  BY MR. FITZPATRICK:

20  Q    Sir, how long have you been in this business

21  relationship with Mr. Rosga?

22  A    I opened the hotel in September 2008.  Jack had

23  become a tenant of mine prior to that for six months.

24  Yes, it had to be about six months.  About two and a

25  half years.

1  Q    And do you provide discounted rent to him?

2  A    No.  No.

3  Q    And with respect to the items that are in your

4  hotel, you said that he and his other workers would

5  bring them to you, is that what you said?

6  A    They would pick them up all over the United

7  States.  A lot of the furniture we bought was on the

8  east coast.  They would get it, they would truck it

9  back, and they would actually physically bring it into

10 the hotel or store it in one of our warehouses.

11 Q    And with respect to your familiarity with the

12 Outlaws Motorcycle Club, are you familiar with

13 Mr. Rosga's role within that organization?

14 A    Only later did I find out that Jack was the leader

15 of the Outlaws Club.

16 Q    So in your relationship with him, that was just a

17 subject matter that you didn't go to, is that fair to

18 say?

19 A    It didn't make a difference to me.

20 Q    Okay.  It didn't make a difference to you, but it

21 was also something that you just cared not to discuss

22 with him, would that be fair to say?

23 A    Sure.

24 Q    And you have no personal familiarity with the

25 Outlaws Motorcycle Club, do you?

1  A     No.

2  Q     And you have no familiarity with a violent rivalry

3  between the Outlaws and the Hells Angels?

4  A     No.

5  Q     Nor Mr. Rosga's views with respect to that

6  rivalry?

7  A     No.

8       MR. FITZPATRICK:  Thank you very much, Mr. Dixon.

9       Thank you, Your Honor.

10      THE COURT:  Any redirect?

11      MR. MASTANTUONO:  Just one or two, Your Honor,

12  briefly.

13                    **REDIRECT EXAMINATION**

14  BY MR. MASTANTUONO:

15  Q     Mr. Dixon, did it ever become your impression that

16  Mr. Rosga in any way tried to hide his membership or

17  relationship to the Outlaws Motorcycle Club from you?

18  A     Not at all.

19  Q     Have you indeed been by the Outlaws motorcycle

20  clubhouse?

21  A     I have been now five times.  I was recently there

22  for the Pearl Harbor party.

23  Q     And were you there as an invited guest?

24  A     Yes, I was.

25      MR. MASTANTUONO:  Nothing further.

1      THE COURT:  May Mr. Dixon be excused?

2      MR. MASTANTUONO:  Yes, sir.

3      THE COURT:  Mr. Dixon, you're excused and free to

4  go.  Thank you for coming in today, sir.  We appreciate

5  your testimony.

6      MR. DIXON:  Thank you, Your Honor.

7                    **WITNESS STOOD ASIDE**

8      THE COURT:  Any additional evidence?

9      MR. MASTANTUONO:  No further witnesses, Your

10  Honor.  And subject to perhaps moving admission of an

11  exhibit or two that has been overlooked, the defense

12  rests for Mr. Rosga.

13      THE COURT:  All right.

14      Evidence on behalf of the United States in

15  rebuttal?

16      MR. FITZPATRICK:  Yes, Your Honor.

17      Detective Mark Lovett, please.

18      THE COURT:  Mark Lovett.

19      MR. MASTANTUONO:  Your Honor, may we approach?

20      THE COURT:  I'm going to go ahead and swear the

21  witness.

22      Detective, if you would raise your right hand,

23  place your left hand on the Bible, and face the Clerk

24  of the Court.

25      THE CLERK:  You do solemnly swear that the

1  testimony which you are about to give, in this case,

2  before this Court, shall be the truth, the whole truth,

3  and nothing but the truth, so help you God?

4      DETECTIVE LOVETT:  I do.

5      THE COURT:  Have a seat the witness stand,

6  detective.

7      Counsel, come on up to the Bench.

8    (Bench conference held outside the hearing of the

9                          jury.)

10     MR. MASTANTUONO:  Your Honor, as it relates to

11 Mr. Rosga, I made the objection -- or asked for the

12 sidebar.  I'm not familiar with the witness, and I just

13 want to ensure prior to the evidence coming before the

14 jury that he's offered for impeachment purposes, and

15 for which purpose he's offered.

16     THE COURT:  If not, I'll certainly hold them to

17 it.  I'm sure Mr. Fitzpatrick knows that.

18     MR. FITZPATRICK:  Your Honor, I can proffer if you

19 would like.  It's for rebuttal purposes.  There are two

20 things.  One, there's been some confusion put on by the

21 defense case as to when Mr. Rosga became the national

22 president.  And we'll put on through this witness that

23 Mr. Rosga told him it was November 2006.

24     Additionally through their witness, I believe it's

25 Captain Roberson, they presented the evidence that

1  Defendant Rosga has a favorable impression of law

2  enforcement clubs.  This witness will say that

3  Mr. Rosga said unfavorable things about law enforcement

4  clubs.

5      MR. MASTANTUONO:  I don't think that we presented

6  any evidence that he has an unfavorable impression

7  toward law enforcement clubs.

8      THE COURT:  He had a favorable relationship and a

9  favorable interface with law enforcement?

10     MR. MASTANTUONO:  With his club.

11     THE COURT:  Okay.

12     Hold on one second.

13     Ms. Whitley.  Ms. Whitley, during the close of

14 your cross-examination of an FBI special agent, you had

15 a number of items you wanted to put into evidence, and

16 I told you that it wasn't appropriate through this

17 witness and we would allow you an additional

18 opportunity.  You haven't put those in.  I assume

19 you're going to abandon that?

20     MS. WHITLEY:  Let me doublecheck.  I thought there

21 was only one more.

22     THE COURT:  Maybe so.  But I promised you the

23 opportunity, and I want to make sure you have it.

24     MS. WHITLEY:  I think my issue is the photos.

25     THE COURT:  You check your notes, all right?

1    MS. WHITLEY:  Thank you.

2    THE COURT:  Anything further?

3    MR. MASTANTUONO:  No, sir.

4    THE COURT:  Okay.

5            (Bench conference concluded.)

6    THE COURT:  You may begin your examination,

7  Mr. Fitzpatrick.

8    MR. FITZPATRICK:  Thank you, Your Honor.

9        Whereupon, **Detective Mark Lovett**, having been

10  duly sworn in, testifies as follows:

11                     **DIRECT EXAMINATION**

12  BY MR. FITZPATRICK:

13  Q    Good morning, sir.  Please state your name.

14  A    I'm Mark Lovett.  L-O-V-E-T-T.

15  Q    And how are you employed?

16  A    I'm a detective with the Columbus Ohio Division of

17  Police.

18  Q    And how long have you been with the Columbus Ohio

19  Division of Police?

20  A    I've been a police officer for 20 years.

21  Q    And what's your current position?

22  A    I'm a detective in what's called the criminal

23  information unit, which is technically our gang and

24  intelligence unit.

25  Q    How long have you been in the gang and

1  intelligence unit?

2  A    Seven years.

3  Q    Why don't you just give us a summary of your 20

4  years of law enforcement experience.

5  A    I started out in uniform patrol walking beats.  I

6  worked in a marked police cruiser.  I went into the

7  detective bureau where I worked homicide, assault,

8  investigating nonfatal stabbings, shootings, and

9  beatings for about seven years.  And then in the last

10 seven years, I've been involved with the intelligence

11 unit.

12 Q    And is that sort of commonly known as the gang

13 unit?

14 A    Yes, sir, it is.

15 Q    And do you investigate primarily OMGs?

16 A    I started out just doing street gangs.  Almost

17 immediately I was thrown into investigating and

18 collecting intelligence and information on outlaw

19 motorcycle gangs.

20 Q    And are you familiar with the Outlaws Motorcycle

21 Organization?

22 A    The Outlaws Motorcycle Club?  Yes, sir.

23 Q    And is there a chapter in Columbus Ohio?

24 A    Yes, sir.  There's a Columbus chapter.

25 Q    And how many members are in the Columbus, Ohio

1  chapter?

2  A     Currently, there are about eight or nine members.

3  Q     And are you familiar with an organization called

4  the Black Pistons?

5  A     Yes, sir, I am.

6  Q     What are the Black Pistons?

7  A     The Black Pistons are the Outlaws's official

8  support clubs.  The first chapter in the United States

9  was in Columbus, Ohio.

10  Q     And is there currently a Black Pistons' chapter in

11  Columbus?

12  A     Yes, sir, there is.

13  Q     I want to direct your attention to on or about

14  February 13, 2009.  Do you have a recollection of that

15  date?

16  A     Yes, I do.  It was during the Easyriders Bike

17  Show.  We routinely cover that event to monitor for

18  outlaw motorcycle gang activity.

19  Q     And is that a yearly event?

20  A     Yes, sir.  It's every February.

21  Q     How long have you been monitoring that event?

22  A     Since about 2002, 2003.

23  Q     And did there come a point in time when you were

24  monitoring that event when you had interaction with

25  Jack Rosga?

1    A    Yes, sir.

2    Q    And did you know who Jack Rosga was at the time?

3    A    I knew who he was through seeing pictures of him

4    and him being identified as a member of the Outlaws.

5    Q    Had you ever had an interaction with him before?

6    A    No, sir, I had not.

7    Q    Can you describe how you had your initial

8    reaction -- your initial interaction with him on

9    February 13, 2009?

10    A    It was sometime during the afternoon, early

11    evening hours.  I think it was about 6:00 to 6:30.

12    Routinely we go in in plainclothes.  I'm usually

13    wearing a t-shirt and jeans, maybe a jacket in

14    semi-covert status.  I usually go in and take pictures

15    of the Outlaw motorcycle gang members who are there to

16    help identify who they are.  I was doing this at a

17    merchandising booth that the Columbus Outlaws had set

18    up inside the exhibit hall.

19        The Easyriders Bike Show is basically a large show

20    for custom bike builders and merchandisers, so I just

21    go in and take picture of the Outlaws there.

22    Q    And while you're taking pictures, did you see Jack

23    Rosga?

24    A    Yes, sir.  I was taking pictures from across the

25    exhibit hall toward the Outlaws' booth, and I

1    recognized Jack Rosga from photographs I'd seen of him

2    before.  I'd also identified several of our local

3    members of the club that he was interacting with.

4    Q    And when -- did there come a point in time when

5    had you a conversation with him?

6    A    I was taking pictures.  And, again, I'm in

7    plainclothes.  No one really knows who I am unless

8    they're familiar with me from the certain clubs that I

9    deal with.  Mr. Rosga looked at me, we made eye

10   contact.  I was taking pictures toward him.  He got

11   kind of like an upset look on his face like why are you

12   taking a picture of me, and he started to walk toward

13   me.

14        And this is about 20, 25 feet away.  And I put my

15   hand up like a wait a minute gesture.  I pulled my

16   badge out from my jacket and showed him.  He gave a

17   depreciating gesture like, okay, I understand, and he

18   finished his conversation, maybe 20 seconds at the

19   most, and then approached me to talk to me.

20   Q    And when he approached, what initially did he say

21   to you, if anything?

22   A    He stated he wanted to make sure that I wasn't

23   with the other team, which I took to mean the Hells

24   Angels who sometimes they send people down to the venue

25   from the motorcycle club just to see what the Outlaws

1  were doing.

2  Q    And did he say anything about your role as a

3  police officer?

4  A    Basically just stated he wanted to make sure that

5  I wasn't a journalist, I wasn't a member of another

6  outlaw motorcycle club collecting intelligence on them,

7  taking pictures of them.  He wanted to make sure that I

8  was just another police officer.

9  Q    Did the conversation turn to what are called *"cop*

10 *clubs"*?

11 A    Yes.  Again, I'd never spoken with Mr. Rosga in

12 the past.  I speak with my local Outlaws on a regular

13 basis, the members from our local club.  I've never

14 really had a conversation about the police officer law

15 enforcement-based motorcycle clubs, and almost

16 immediately Mr. Rosga asked me about, you know, what

17 was the problem with the police officers being in the

18 1%er type clubs, and the clubs that wear a three-piece

19 patch.

20 Q    And did he describe for you a law enforcement club

21 in Kentucky that we was familiar with?

22 A    He did not name the club, but he stated there was

23 a club in Kentucky that the Outlaws were having

24 problems with.  And it was almost like he was asking me

25 a question about why is this happening.

1   Q     And what was the nature of that three-piece patch

2   club in Kentucky?

3   A     It was my understanding that they were just

4   having -- I don't know what kind of problems.  He

5   didn't really go into the details.  I just knew he was

6   upset that police officers were wearing a three-piece

7   patch configuration on their patches on the back of

8   their jackets when most clubs just wear a single patch

9   or a two-piece patch that signifies that they're not an

10  outlaw club.

11  Q     In that conversation, did he make a comparison

12  between the cops and the bikers, if you recall?

13  A     Yeah.  He basically stated he wanted to know why

14  police officers were riding around with three-pieces

15  patches on their back.  Police officers should act like

16  police officers and not get into the biker world.

17  Q     Do you recall him making a statement to you about

18  crossing the line?

19  A     Generally.  Basically, his exact statement -- let

20  me make sure I get this correct was, *"Cops should be*

21  *cops and bikers should be bikers.  And they shouldn't*

22  *cross over that line.  They shouldn't mix the two."*

23  Obviously, one is a law enforcement-based application,

24  and my understanding from what he was saying is the

25  Outlaws were a criminal organization.

1   Q    Did Mr. Rosga recount for you a specific encounter

2   he had with a law enforcement biker club?

3   A    Yes.  That was later in the evening.  I actually

4   left the venue where the bike show was happening, and I

5   went to the Black Pistons' clubhouse.  It was later

6   that night.  It was actually early the next morning

7   about 1:00 a.m. where again I go in and I write down

8   license plates, take pictures, interact with some of

9   the members who are there just to find out what's going

10  on.

11       When I pulled up in front of the Black Pistons'

12  clubhouse, Mr. Rosga was standing out front with one of

13  our local members, and one of the members from New York

14  that I knew.

15  Q    Who was that member?

16  A    The local member was Shane Shafer, who they call

17  Hap or Happy.  And the other member was, I believe,

18  Tommy Orman, or Tommy O.

19  Q    And when you encountered these individuals at the

20  location, did you have a conversation with Mr. Rosga?

21  A    Yes, I did.  He approached my vehicle and leaned

22  into the open passenger side window, and we talked

23  across the seats.

24  Q    What, if anything, did he say about cop clubs?

25  A    He became -- we talked about numerous things for

1  several minutes.  At one point I got out of the car and

2  stood outside and talked with him in front of the

3  clubhouse.  And he basically wanted to know what the

4  problem was with law enforcement officers basically

5  intruding into the Outlaws' bikers subculture of

6  wearing three-piece patches, riding motorcycles, and

7  going to the same places they were.

8  Q    And did he tell you an episode he'd had recently

9  regarding some smoke?

10  A    Yes, sir.  He referred back to an incident that

11  had happened, he said back in his home state of

12  Wisconsin, where he was at a bar with about 10 of his

13  fellow club members from Outlaws, and there was a

14  quote, unquote cop club, or law enforcement motorcycle

15  club there.  He stated that one of the members was dog

16  eyeing him, which I kind of asked him to explain that.

17  But he was basically looking at him intently and, you

18  know, basically challenging him with a look.  That's

19  kind of what I got from Mr. Rosga.

20       So Mr. Rosga eventually approached this individual

21  to talk to him about, you know, why he was looking at

22  him so sternly.

23  Q    And who's telling you this?

24  A    Mr. Rosga is telling me this.

25  Q    And what did he tell you next?

1    A     Mr. Rosga stated that they were talking.  At one

2    point, the gentleman he was talking to was apparently

3    the leader, is what I took from this law enforcement

4    motorcycle club, took a cigar out of his mouth and blew

5    smoke in his face.

6    Q     And what, if anything, did Mr. Rosga tell you

7    about that?

8    A     Mr. Rosga explained that they were involved in an

9    argument.  He was very upset.  He thought that was

10   extremely disrespectful.  And he stated basically if it

11   hadn't been a law enforcement motorcycle club, there

12   would have been a violent incident that night.  And I

13   took that to mean that there would have been a fight,

14   at least.

15   Q     Did your conversation turn to his leadership in

16   the Outlaws Motorcycle Club?

17   A     Yes, sir.  When I first pulled up to the Black

18   Pistons' clubhouse, I called him by his first name.  He

19   was obviously surprised, and he asked, *"How do you know*

20   *my name?"*

21        I want like, *"Well, you're Milwaukee Jack,*

22   *correct?"*  I said, *"You're the national boss of the*

23   *Outlaws."*  And he made a depreciating gesture kind of

24   like, no, that's not me, and he mentioned someone else

25   in the club.  And I was like *"No.  I was down there.  I*

1  *was down there during your election."*

2      I actually traveled down to Lexington, Kentucky

3  that year to follow my members down there.  And he was

4  actually kind of surprised that I was there during his

5  election.

6  Q    And when was the election?

7  A    I believe it was 2007, 2006.  I can't recall right

8  off the bat.

9  Q    And did he -- when he -- did he state to you what

10 his role was in the national organization?

11 A    He stated that he was the national president of

12 the Outlaws.

13     MR. FITZPATRICK:  Thank you very much, Your Honor.

14     THE COURT:  Cross-examination of the detective?

15     MR. MASTANTUONO:  Yes, sir.

16                   **CROSS-EXAMINATION**

17 BY MR. MASTANTUONO:

18 Q    Good morning, detective.

19 A    Good morning.

20 Q    You wrote a report regarding this incident,

21 correct?

22 A    Yes, sir, I did.

23 Q    And with regard to your observations in Columbus,

24 it was, correct?

25 A    Yes, sir.

1  Q    Regarding Mr. Rosga, is it fair to say it was

2  limited to what you spoke with Mr. Rosga about,

3  correct?

4  A    Yes, sir, it is.

5  Q    You made no arrests of Mr. Rosga, correct?

6  A    No, sir.

7  Q    Nor saw him directly committing any unlawful

8  activities, is that fair to say?

9  A    That is fair to say.  That's correct.

10 Q    And had you done so you would have noted it and

11 taken action appropriately?

12 A    Yes, sir.

13 Q    And when you -- and you didn't make any such

14 arrest, or anything like that, in relation to

15 Mr. Rosga's activity with the event that evening, is

16 that fair to say?

17 A    That is fair to say.  Correct.

18 Q    With regard to your taking of photographs, you

19 said you were undercover essentially, or not officially

20 dressed, right?

21 A    Yes.

22 Q    So when you're standing there focusing on somebody

23 taking photos, as you were with Mr. Rosga in this

24 incident, you're taking several photographs of him,

25 correct?

1  A    Correct.

2  Q    And you said nobody could tell that you were

3  either law enforcement, or a citizen, or otherwise,

4  right?

5  A    Correct.

6  Q    And when you had the discussion with Mr. Rosga,

7  when he approached you he didn't threaten you, correct?

8  A    No, sir.

9  Q    And during your discussion both initially at the

10 event and then later at the clubhouse, was it your

11 impression that Mr. Rosga was telling you that other

12 law enforcement clubs act intimidating, and then due to

13 their role or to their profession as law enforcement

14 officers, essentially are able to act threatening

15 without being threatening?

16 A    Yeah.  Mr. Rosga, he made the comment that he was

17 upset that police officers can go out and blow smoke in

18 his face and then pull their badge out, saying you

19 can't do anything because I'm a police officer.

20 Q    And the instance or conduct that he told you

21 about, this was essentially kind of illustrative of one

22 of those instances, was that your understanding?

23 A    Yeah.  It seemed to be a specific incident for

24 him.

25 Q    And it was about a fight that he didn't get into

1  right?

2  A    Correct.

3       MR. MASTANTUONO:  Nothing further, Your Honor.

4       THE COURT:  Any redirect?

5       MR. FITZPATRICK:  No, Your Honor.

6       THE COURT:  May Detective Lovett be excused?

7       MR. FITZPATRICK:  Yes, sir, he may.

8       MR. MASTANTUONO:  Yes, sir.

9       THE COURT:  Detective, you're excused and free to

10 go.  Thank you very much for coming in today, sir.

11      DETECTIVE LOVETT:  Yes, sir.

12                    **WITNESS STOOD ASIDE**

13      THE COURT:  Who's next?

14      MR. FITZPATRICK:  Agent Ozbolt.

15      THE COURT:  All right.  Agent Ozbolt.

16      He's already been sworn.

17      All right, you may inquire.

18      MR. FITZPATRICK:  Thank you, Your Honor.

19          Whereupon, **Agent Daniel Ozbolt**, having been

20 previously duly sworn in, testifies as follows:

21                    **DIRECT EXAMINATION**

22 BY MR. FITZPATRICK:

23 Q    Good afternoon, sir.

24 A    Good afternoon.

25 Q    Please reintroduce yourself to the jury.

1    A    I'm Daniel Ozbolt.  I'm an ATF special agent.

2    Q    And you've previously been sworn, and you

3    understand you're still under the oath to tell the

4    truth, is that correct?

5    A    I do.

6    Q    I want to show you beginning with Government

7    Exhibit 627.

8         MR. FITZPATRICK:  Your Honor, we don't have these

9    in our program.  We're going ask to use the ELMO, if

10   that's all right?

11        THE COURT:  Yes, sir.  What's the number?

12        MR. FITZPATRICK:  This is 627.

13        THE COURT:  Is this in evidence?

14        MR. FITZPATRICK:  It's not yet, Your Honor.

15        THE COURT:  All right.

16        MR. FITZPATRICK:  Exhibits 627, 628, 629, and 630.

17   Q    Agent Ozbolt, do you have 627 in front of you?

18   A    I can't read the exhibit number, but I see a

19   photograph.

20        MR. FITZPATRICK:  Show him the exhibit.

21   A    I do.  It's 627.

22   Q    And do you recognize what's shown in this

23   photograph?

24   A    That's a depiction of the bay area of the

25   Petersburg clubhouse.

1        THE COURT:  The what?

2        AGENT OZBOLT:  The bay.  The bay area.

3        THE COURT:  The bay area.

4   Q    Why don't you describe the bay area in

5   relationship to the main part of the clubhouse.

6   A    The bay area was in the back portion of the

7   clubhouse.  It was an area that was accessible by two

8   large overhead doors, like garage doors.  And in that

9   area, there was a lot of -- as you can see, there was a

10  pool table eventually kept there, and some junk and

11  debris, and things of that nature.

12  Q    How many restrooms or bathrooms did the clubhouse

13  have?

14  A    One.

15  Q    And can you --

16       MR. FITZPATRICK:  Perhaps for the sake of

17  efficiency, I'll move into evidence 627, 628, 629, and

18  30.

19       THE COURT:  Any objection to the photographs?

20       MR. McGARVEY:  No, sir.

21       THE COURT:  They'll be received without objection.

22  You may publish them as necessary.

23       MR. FITZPATRICK:  Thank you.

24       Can we publish this to the jurors.

25  Q    Can you describe in 627 where the location of the

1  bathroom is in the clubhouse?

2  A    Yes.  To the left of the ladder that's leaning

3  against the wall, there's a set of steps, five steps

4  leading up to a deck.  As you walk up, there's a water

5  heater immediately in front of you.  You have to take a

6  quick right turn, a quick left turn, and then the

7  bathroom door is on your immediate left to enter the

8  bathroom.

9  Q    And so this sits up off the ground of the bay, is

10 that correct?

11 A    Yes.  The deck probably sits at least three feet

12 off the ground at a minimum, and then there's a wall, a

13 partial wall, going around the entire area of the deck.

14 And then as I mentioned before, entrance into the

15 bathroom is through a door that sits on top of that

16 deck.

17    MR. FITZPATRICK:  If we can go to 628, please.

18 Thank you.

19 Q    What are we looking at in 628?

20 A    That's a different angle of the previous picture.

21 Again, you can see the hot water tank that you would

22 observe as you're walking up the steps.  And then as

23 you go to the right -- now, the bathroom is kind of cut

24 out in the corner of this deck, as you can see.

25    You go up the steps, you make a quick right, and a

1  quick left, and then another left into the door of the

2  bathroom.  So on the right-hand corner, upper portion

3  of the photograph, you can see the bathroom door and

4  then part of the inside of the bathroom.

5       MR. FITZPATRICK:  And 629, please.

6  Q    Where is the bathroom in relationship to this

7  photograph?

8  A    In that photograph, it's kind of the upper left.

9  You can see the door leading into the bathroom.

10      MR. FITZPATRICK:  And now 630, please.

11 Q    What are we seeing here?

12 A    That's a straight on view of the bathroom from the

13 deck.  You can see the deck, the wall that's built up

14 along the deck, and then the entrance to the bathroom.

15 Q    Now, Agent Ozbolt, in your undercover work in this

16 case, did you come to know an individual by the name of

17 Stratton?

18 A    Stephen Stratton.  Yes.

19 Q    And did Stephen Stratton have a nickname?

20 A    Yes.  He went by Jester.

21 Q    And do you recall when -- did he start hanging

22 around with you?

23 A    Yes.

24 Q    Do you recall when that was?

25 A    You know, we would run into him periodically.  As

1  far as him actually hanging around, I don't know

2  exactly when.  I know he started as a probate.

3  Q    And when was that?

4  A    The first event he went to with us was

5  February 14th of 2009.

6  Q    Did you ever during the course of this

7  investigation ingest cocaine?

8  A    No.  Absolutely not.

9  Q    And you previously testified that you were subject

10 to random drug testing as a course of your employment?

11 A    Yes.

12 Q    With the ATF?

13 A    That's correct.

14 Q    And have -- were you ever tested positive for any

15 type of illegal substance?

16 A    Never.

17 Q    And were you drug tested during the course of this

18 investigation?

19 A    I was.  And those results were negative.

20 Q    And what would happen to your employment if you

21 were to test positive?

22 A    I assume termination.

23 Q    Did Stephen Stratton, also known as Jester, did he

24 ever witness you --

25      MR. McGARVEY:  Judge, objection to what Stephen

1  Stratton witnessed.  He's denied it.

2      THE COURT:  Objection sustained.  Rephrase your

3  question.

4      MR. FITZPATRICK:  Thank you.

5      THE COURT:  Approach it differently.

6  Q    Did you ever ingest cocaine with Stephen Stratton

7  present?

8  A    Absolutely not.

9      MR. McGARVEY:  Asked and answered, Judge.  He's

10 already testified he's never ingested cocaine.

11     THE COURT:  He said he never ingested cocaine.

12     MR. FITZPATRICK:  All right.

13 Q    With respect to Stephen Stratton or Jester's

14 introduction into your Outlaws chapter, did he provide

15 any material for the Petersburg clubhouse?

16 A    Yes, he did.

17 Q    And what material did he provide for the

18 Petersburg clubhouse?

19 A    He provided some bar signs, and some flags, and

20 some Nazi flags.

21 Q    And did you have any of these Nazi flags prior to

22 Stephen Stratton becoming --

23     MR. McGARVEY:  Judge, I'm going to object to the

24 relevance.  These are not contraband items.

25     THE COURT:  Where are you going with this,

1  Mr. Fitzpatrick?

2       MR. FITZPATRICK:  Your Honor, I think it goes to

3  this person how, you know, they wanted to be in a

4  certain life and why they're now, I would say, lying

5  about the agents.

6       MR. McGARVEY:  Judge, I object to that conclusion

7  and --

8       THE COURT:  Objection sustained.  I don't think --

9  hold on.  Hold on.

10       MR. McGARVEY:  Yes, sir.

11       THE COURT:  Objection sustained.  I don't think it

12  logically follows.  Move on.

13       MR. FITZPATRICK:  Thank you.

14       MR. McGARVEY:  Excuse me, Judge.

15  Q    After --

16       MR. FITZPATRICK:  Your Honor, if you would indulge

17  me for one moment?

18       THE COURT:  Yes, sir.

19       MR. FITZPATRICK:  With respect to the description,

20  if we can go to -- if we can put 630 up again, please.

21  Q    And you previously testified this is looking at a

22  straight on shot of the bathroom in the Petersburg

23  clubhouse, is that correct?

24  A    Correct.

25  Q    And can you describe where the sink is in this

1  bathroom?

2  A    The sink is as you walk into the door.  Pretty

3  much straight on.

4  Q    What's the height of the sink in the bathroom, if

5  you recall?

6  A    Probably about the normal height of a sink.  I'd

7  said at the minimum, a foot to a foot and a half below

8  that area where I just marked, at the minimum.

9      MR. FITZPATRICK:  Your Honor, I have no further

10  questions at this time.  Thank you.

11      MR. McGARVEY:  May I ask if you can keep 30 up,

12  please.

13                    **CROSS-EXAMINATION**

14  BY MR. McGARVEY:

15  Q    Good morning.  Or good afternoon, Agent Ozbolt.

16  A    Good afternoon.

17  Q    Who took these photographs, do you know?

18  A    No.

19  Q    Do you know when they were taken?

20  A    No.

21  Q    Did it always look this way?  Was the pool table

22  always where it is?

23  A    No.  The pool table was brought back there, I want

24  to say, probably in the latter portion of the

25  investigation.  I don't remember exactly when.

1  Q    Okay.  There are no cameras back there, are there?

2  A    Yes.

3  Q    Where is the camera located in relation to the

4  bathroom, sir?

5  A    I think it is on the --

6  Q    Can you point to it in the photo you have up

7  there?

8  A    I believe the camera is on this wall somewhere,

9  but I don't think there's one at that angle.

10  Q    I'm sorry?

11  A    Or on that wall there, on the wall that's being

12  depicted in that picture.  I believe it's on an

13  adjacent wall, but I'm not positive offhand.  I haven't

14  looked at those videos of the bay area in quite some

15  time, so I'm not positive exactly which wall.

16  Q    Yes, sir.  Now, this particular picture, J-30, I

17  want you to look into the bathroom right there.

18  A    Uh-huh.

19  Q    You can see the entrance to the bathroom, can you

20  not?

21  A    You can.

22  Q    And in the left-hand corner, that's a roll of

23  toilet paper, isn't it?

24  A    I can't tell what's in the left-hand corner.

25       MR. McGARVEY:  Judge, may I ask that I can publish

1  the photo to the jury so they can pass it around and

2  see what I'm talking about.  It's hard to see.

3       THE COURT:  Is that the same photograph that's up

4  there?

5       MR. McGARVEY:  It's the same photograph that's up

6  there.

7       THE COURT:  If there's no objection, go right

8  ahead.  No objection, right?

9       MR. FITZPATRICK:  No, sir.

10      THE COURT:  Go right ahead.  Yes, sir.  The

11 Marshal will take care of it.  We'll circulate it to

12 the jury.

13      What are you drawing their attention to,

14 Mr. McGarvey?

15      MR. McGARVEY:  I'm going to explain.  Thank you,

16 Judge.

17 Q    If you look directly ahead, you see the entrance

18 to the bathroom, is that correct?

19 A    Yes.  And you're talking about to the left?

20 Q    Yes.  And all the way to the left in the bottom

21 left corner, it appears to be a roll of toilet paper.

22 A    That might be a soap dispenser.  I'm not sure.

23 There may have been a shelf there, or something, that

24 with the soap dispenser or cleaning products, or

25 something like, was put on.

1  Q     Okay.  Well, is there any doubt that what you see

2  below that white object is a countertop?

3  A     No, that's not a countertop at all.  There is no

4  countertop in that bathroom.  There's a small porcelain

5  sink.

6  Q     I understand that.  Is that the porcelain sink?

7  It's porcelain, is it not?  I can see it shining, sir.

8  A     No.  If anything, that is a strip of tile or a

9  small shelf.  I remember there was some cleaning

10  products on a shelf.  The sink was much lower than

11  that, and it was made of porcelain, and it was a single

12  standing sink without a countertop.

13  Q     All right.  Let me ask you this.  In your

14  experience, the toilet paper dispenser is accessible to

15  person on the toilet, is it not?

16  A     Yes.

17  Q     Okay.  Would you concede then, if that is toilet

18  paper, it would be -- if it's toilet paper, it would be

19  accessible to the person who's sitting on the toilet?

20  A     Generally.  I mean, there was rolls of toilet

21  paper in there, there was a large container of toilet

22  paper.  I don't even remember if there was a toilet

23  paper dispenser roll.  I almost think there wasn't.

24  But the toilet was more on the lower right-hand portion

25  going into the door.

1  Q    Let me go back to the porcelain fixture, whatever

2  it is.  Are you saying that's a cornice at the bottom

3  of the --

4  A    That is definitely not a countertop.

5  Q    All right.  This picture was taken from ground

6  level, was it not?  It appears to have been taken from

7  ground level.

8  A    It appears that it was taken by someone standing

9  in the bay area.

10  Q    And is it fair to say --

11  A    But ground level is not accurate at all.

12  Q    In the bay area?

13  A    It appears that it was taken at a normal height of

14  someone standing there taking a photograph.

15  Q    Yeah.  That's my point.  It was taken at the

16  lowest level in the garage, correct?

17  A    The lowest level in the garage would be on the

18  ground.

19  Q    If somebody were standing on that, they would have

20  this view?  That's how they took this picture, correct?

21  A    Yeah.  It looks as if someone was standing there

22  with a camera to their face and snapped a picture.

23  Q    Okay.  Is it safe to say that generally this room

24  is private?

25  A    I'm sorry?

1  Q    The rest of the members are out in the bar area.

2  If you've got to go to the bathroom, usually you don't

3  go two at a time, do you?

4  A    Well, it depends.  I mean, there's been people

5  in -- there's been people in that bathroom area waiting

6  in line to use the bathroom.  Because as I mentioned,

7  there was only one restroom in that entire building.

8  Q    I understand, sir.  How often did that happen?

9  A    Occasionally.  Depending on how many people were

10 there.

11 Q    Is it your custom to go with two people to the

12 bathroom?  Or is that what you're telling this jury?

13 A    No.  I mean, I've seen more than one person go to

14 that area of the restroom at a time and then wait for

15 one person to use the facility and then another person

16 does.

17 Q    But you're acting as if that happened all the

18 time.  That was a rare event, was it not?

19 A    No.  I mean, if we had a number of people there, I

20 would say it was fairly common.  I mean, I didn't

21 necessarily monitor the bathroom activity of the people

22 that were there.  But I have seen people waiting in

23 line when people were at the clubhouse.

24 Q    You've seen them not waiting in line too, right?

25 A    Sure.

1   Q    Have you ever been in the bathroom by yourself?

2   A    Yes.

3        MR. McGARVEY:  No further questions.

4        THE COURT:  Any other counsel have questions of

5   the agent?

6        MR. MASTANTUONO:  No, Your Honor.

7        MR. AMIRSHAHI:  No, sir.

8        THE COURT:  Mr. Fitzpatrick, redirect?

9        MR. FITZPATRICK:  Thank you.  Your Honor, can I

10  show the witness the same hard copy that counsel

11  distributed to the jury?

12       THE COURT:  Yes, sir.

13       MR. FITZPATRICK:  Thank you.

14                    **REDIRECT EXAMINATION**

15  BY MR. FITZPATRICK:

16  Q    Agent Ozbolt, you have 630, the hard copy in front

17  of you?

18  A    I do.  I do.

19  Q    The wall that you see there that blocks the

20  bathroom, was that wall there the entire time that you

21  were in the clubhouse?

22  A    It was.

23  Q    And approximately how high is that wall?

24  A    That's at least six feet.  From the floor to the

25  top, from this photograph, I'd say six to six and a

1  half feet, at least.

2  Q    And the item, the roll there that Mr. McGarvey was

3  pointing your attention to, is that a paper towel

4  dispenser?

5  A    Yes.  In this photograph I can tell that's a paper

6  towel dispenser.

7       MR. FITZPATRICK:  Thank you very much.

8       Thank you, Your Honor.

9       THE COURT:  May Agent Ozbolt now be excused?

10      MR. FITZPATRICK:  Yes, sir.

11      THE COURT:  Agent, you're excused and free to go.

12  Thank you again.

13      AGENT OZBOLT:  Thank you.

14                    **WITNESS STOOD ASIDE**

15      MR. FITZPATRICK:  Your Honor, that concludes the

16  government's rebuttal evidence.

17      THE COURT:  All right.

18      Ladies and gentlemen, at this point we're going to

19  recess for lunch for one hour.  We will come back and

20  proceed with the instructions and the final arguments

21  in the case.  So you may now retire to the jury room

22  for lunch for one hour.

23      MR. McGARVEY:  Judge, may it please the Court.

24      THE COURT:  Yes, sir.

25      MR. McGARVEY:  I just wanted to make sure that

1   everybody got an opportunity to see the picture.

2       THE COURT:  I think they did.

3       Marshal Creekmore, did they not?

4       MARSHAL CREEKMORE:  Yes, sir.

5       MR. McGARVEY:  Thank you.

6       THE COURT:  Thank you.

7    (The jury is no longer present in the courtroom.)

8       THE COURT:  What I propose that we do is we'll

9    come back at 1:30.  I'll allow you to renew your

10   motions, and then do you want me to instruct first and

11   then allow you to argue, or vice versa.  I'll do it

12   either way counsel wishes.

13       Sometimes it's better for them to have the

14   instructions first so they know the legal yardstick

15   they use to measure the evidence by.

16       MR. McGARVEY:  I vote for instructing first.

17       THE COURT:  All right.

18       MS. CARDWELL:  We agree.

19       THE COURT:  Is that okay with the government?

20       MR. DUFFEY:  We agree.

21       THE COURT:  And there is no other concern with

22   respect to the instructions, is that right?  We have

23   been through all that, and everybody is satisfied with

24   the jury charge?

25       MR. FITZPATRICK:  Yes, sir.

1    MR. AMIRSHAHI:  Yes, sir.

2    THE COURT:  All right.

3    Now, Ms. Cardwell, I know you object to the

4    standard instruction I give to the jury about the fact

5    that they should discuss the evidence before they take

6    a vote.  If you want to put your --

7    MS. CARDWELL:  I'm sorry.  Respectfully, my

8    objection was that it was that you gave directions on

9    how they should deliberate.

10    THE COURT:  Okay.  I'm going to give the same

11    instruction that I've always given.  It's been given in

12    Virginia since time and memorial, so your objection is

13    on the record again.

14    MS. CARDWELL:  Thank you.

15    MS. WHITLEY:  Judge, there's one other issue –

16    THE COURT:  Yes, ma'am.

17    MS. WHITLEY:  – that Your Honor let me address

18    after checking my notes.  You had indicated that if I

19    had photos when the FBI agent was on the stand, the

20    only photos that I had that were not seized by the

21    government, they were found in 2010 when they went to

22    arrest Jason Fiel.

23    THE COURT:  Yes.

24    MS. WHITLEY:  When they went to execute the search

25    warrant, they didn't seize the actual family photos.

1  And I met with the prosecution, and they're going to

2  object to relevancy.  But that's where the photos that

3  we tried to introduce yesterday were seized.

4      THE COURT:  All right.  Okay.

5      MS. WHITLEY:  And so those would be the only ones

6  that I would admit.  And I'd ask for admission of

7  those.

8      THE COURT:  I think they're really irrelevant as

9  offered.  Photographs of the soccer teams, and things

10 like that, no.  The fact that he is a soccer coach, and

11 all that, is in evidence.  That really is, I think,

12 irrelevant.

13     MS. WHITLEY:  Judge, it also went to him and his

14 family.  And we just saw Mr. Rosga and his family, so

15 I'm not really understanding why --

16     THE COURT:  Was there any one of those photos that

17 as a strictly family photo?

18     MS. WHITLEY:  Yes, sir.

19     THE COURT:  Which one was that?

20     MS. WHITLEY:  Exhibit 54.  I'm not sure if it's

21 A,B,C, or D.

22     THE COURT:  Let's have a look at it.

23     MS. WHITLEY:  One page we specifically limited to

24 him, his brother, his nieces, and his daughter.

25     THE COURT:  Ms. Pizzini, do you have that actual

1  photo?

2      MS. WHITLEY:  You were asking me about our photos,

3  is that right, Judge?

4      THE CLERK:  I don't have 54, Your Honor.

5      MS. WHITLEY:  If I can look at the rejected ones I

6  can tell you.

7      THE COURT:  Go ahead.  Thank you.

8      MS. WHITLEY:  And I stand corrected, Judge.  It

9  was 36-B-JF and 36-C-JF.

10      THE COURT:  Let me have a look.

11      Is there any objection to 36-C-JF?  One

12  photograph.

13      MR. FITZPATRICK:  Can I look at that?

14      THE COURT:  Yes, sir.

15      I'll go back and revisit my decision on that.

16      MS. WHITLEY:  Thank you, Judge.

17      THE COURT:  You're other one, 36-C, I'm not going

18  to let in.  That's not a family photograph.

19      MR. FITZPATRICK:  No objection.

20      THE COURT:  It will be received without objection.

21      MS. WHITLEY:  Thank you, sir.

22      THE COURT:  Okay.  Is that all?

23      Then we'll recess for lunch at this time.

24      MR. FITZPATRICK:  Thank you.

25      THE COURT:  Stand in recess for one hour.

1                    (Recess taken.)

2        THE COURT:  All right, the first order of business

3   will be renewal of Rule 29 motions.

4        Ms. Cardwell, do you want to go first?

5        MS. CARDWELL:  Judge, we renew our motion pursuant

6   to Rule 29 on behalf of Mr. Rosga, and resubmit the

7   arguments that we previously made.

8        THE COURT:  All right.  Thank you very much.

9        For the reasons previously articulated by this

10  Court at an earlier stage, that motion will be denied.

11  I think there is sufficient evidence that if believed

12  prove the elements of the two charges against Mr. Rosga

13  beyond a reasonable doubt.  The jury's job is to

14  determine the weight and value of the evidence, and

15  also the credibility of the witnesses.  And whether or

16  not they find that evidence to be believable is

17  strictly within the province of the jury.  That motion

18  will be denied.

19        Ms. Whitley.

20        MS. WHITLEY:  Yes, sir.  On behalf of Jason Fiel,

21  Your Honor, we renew our arguments.  And in addition,

22  we would like to reiterate in regard to Count 2 that

23  there was no conspiracy to committee a violent act with

24  a deadly weapon, or an act that resulted in serious

25  bodily injury by Jason Fiel.  And in particular, that

1  even if there were any discussions regarding these

2  violent acts, that there was no evidence that he had a

3  general purpose of enhancing his position in that club.

4       THE COURT:  Once again, there is evidence in the

5  record, if believed, that would support proof of all

6  the elements of Counts 1 and 2.  And once again, the

7  decision as to the weight and value of the evidence and

8  the credibility of the witnesses is within the province

9  of the jury.  So I think it's sufficient at this point

10 to deny the motion, and it will be denied.

11      MS. WHITLEY:  Thank you, Judge.

12      THE COURT:  Mr. Lewis.

13      MR. LEWIS:  Judge, on behalf of Mr. McCall, we

14 would renew our motion for judgment of acquittal

15 according to Rule 9 for the reasons previously stated

16 on the record.

17      THE COURT:  All right.  And my ruling will be the

18 same as it was before.  I think the evidence is

19 sufficient for a trier of fact to find beyond a

20 reasonable doubt all the elements of Counts 1 through

21 4.  Once again, it turns on the credibility of

22 witnesses, and that is purely a jury issue.

23      Mr. Amirshahi.

24      MR. AMIRSHAHI:  Thank you, Judge.

25      On behalf of Mr. Timbers, Judge, I renew my motion

1  pursuant to Rule 29, and particularly emphasize Counts

2  3 and 4.  That he did not participate in any way in the

3  events that unfolded outside in the parking lot

4  afterwards where the firearms were brandished.  And

5  again, of course he did not have a firearm in his

6  possession whatsoever.

7       And we'll readopt our previously submitted

8  arguments, Judge.

9       THE COURT:  All right.  And once again my ruling

10 would be the same with respect to Counts 1 through 4.

11      Count 7 was previously dismissed.

12      MR. AMIRSHAHI:  Yes, sir.  Thank you, Judge.

13      THE COURT:  All right.

14      Mr. McGarvey.

15      MR. McGARVEY:  Thank you, Judge.  May it please

16 the Court.

17      I ask you to renew my Rule 29 motion, and ask you

18 to adopt my previous arguments.  And just as the Court

19 well knows, the standard is a little different at this

20 point, and I would renew my motions.

21      THE COURT:  I think even under the higher

22 standard, if the jury chooses to believe the evidence

23 presented through the government's witnesses, that it

24 is sufficient to support a conviction on Count 3.

25      MR. McGARVEY:  Thank you, Your Honor.

1          THE COURT:  All right.

2      I will at that point go ahead and bring the jury

3  in and instruct, and then we'll proceed with the

4  closing arguments.  How much time do you want to argue

5  the case?

6      **(Jury instructions and closing arguments were not**

7          **requested to be transcribed at this time.)**

8

9                  REPORTER'S CERTIFICATE

10          I, Krista M. Liscio, OCR, RMR, Notary
   Public in and for the Commonwealth of Virginia at
11  large, and whose commission expires March 31, 2012,
   Notary Registration Number 149462, do hereby certify
12  that the pages contained herein accurately reflect
   the notes taken by me, to the best of my ability, in
13  the above-styled action.
           Given under my hand this 3rd day of October, 2011.
14          _____
                   Krista M. Liscio, RMR
15                 Official Court Reporter

16

17

18

19

20

21

22

23

24

25