```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                   Richmond Division


 3


 4
    UNITED STATES OF AMERICA        }
 5                                  }
    v.                              }    Criminal Case No.:
 6                                  }    3:10 CR 170
    JACK ROSGA, ET AL               }
 7

 8                                       April 8, 2011

 9

10          COMPLETE TRANSCRIPT OF SENTENCING
          BEFORE THE HONORABLE HENRY E. HUDSON
11           UNITED STATES DISTRICT COURT JUDGE

12

13  APPEARANCES:

14  Dennis Fitzpatrick, Esquire
    Peter S. Duffey, Esquire
15  OFFICE OF THE UNITED STATES ATTORNEY
         Counsel on behalf of the United States
16

17  Claire G. Cardwell, Esquire
    Craig A. Mastantuono, Esquire
18       Counsel on behalf of Jack Rosga

19

20

21

22

23

24              KRISTA M. LISCIO, RMR
              OFFICIAL COURT REPORTER
25          UNITED STATES DISTRICT COURT
```

1          (The proceeding commenced at 9:32 a.m.)

2     THE COURT:  Good morning.

3     MR. DUFFEY:  Good morning.

4     MR. FITZPATRICK:  Good morning, Judge.

5     MS. CARDWELL:  Good morning, Your Honor.

6     THE COURT:  All right, call our first case this

7  morning, Ms. Pizzini.

8     THE CLERK:  Case Number 10 CR 170.  *United States*

9  *of America v. Jack Rosga.*

10     Mr. Dennis Fitzpatrick and Mr. Peter S. Duffey

11  represent the United States.

12     Ms. Claire G. Cardwell and Mr. Craig A.

13  Mastantuono represent the defendant.

14     Are counsel ready to proceed?

15     MR. FITZPATRICK:  Yes, Your Honor.

16     MS. CARDWELL:  Ready for Mr. Rosga, Your Honor.

17     THE COURT:  The matter is before the Court this

18  morning for sentencing.

19     Ms. Cardwell, have you received a copy of the

20  presentence report, and a copy of the officer's

21  computation of the Guidelines?

22     MS. CARDWELL:  Yes, sir, we have.

23     THE COURT:  And have you had ample opportunity to

24  go over both of those with your client?

25     MS. CARDWELL:  Yes, sir, we have.

1        THE COURT:  Are there any objections or

2    corrections you want to make to the text of the report?

3    I realize there are guideline issues.  I'll handle

4    those separately.

5        MS. CARDWELL:  Not to the text of the report.  No,

6    sir.

7        THE COURT:  All right.

8        Mr. Fitzpatrick, any issues concerns the report

9    itself?

10        MR. FITZPATRICK:  No, Your Honor.

11        THE COURT:  All right.  The report will be ordered

12    filed, made a part of the record in the case, and this

13    Court will adopt the officer's factual findings and

14    conclusions.

15        Turning to the Guidelines in this case, the

16    officer determined that this defendant has a Total

17    Offense Level of 41; he's in Criminal History Category

18    I.  On Count 1, that yields a restricted range of 240

19    months.  And on Count 2, also a restricted range of 34

20    months.

21        Now you believe, Ms. Cardwell, that the Guidelines

22    are improperly calculated, is that right, ma'am?

23        MS. CARDWELL:  That's correct.  As we noted in our

24    sentencing memo.

25        THE COURT:  All right.  I'll hear from you now.

1  Go right ahead.

2      MS. CARDWELL:  Thank you, Your Honor.

3      THE COURT:  And you believe the Guidelines have

4  been properly calculated, is that right,

5  Mr. Fitzpatrick?

6      MR. FITZPATRICK:  That's correct, Your Honor.

7      THE COURT:  Okay.

8      Go right ahead, Ms. Cardwell.

9      MS. CARDWELL:  Your Honor, the government has

10  noted, and I assume that the probation officer has

11  taken the position, that when a person is acquitted or

12  when a jury finds that there's sufficient evidence to

13  find an overt act, that is not in any way binding on

14  the Court in terms of whether the Court may find --

15      THE COURT:  I think not only the probation

16  officer, I think the U.S. Supreme Court and the Fourth

17  Circuit have pretty clearly said that.

18      MS. CARDWELL:  I'm conceding, Your Honor, that

19  that's the case.

20      THE COURT:  Okay.  That's fine.

21      MS. CARDWELL:  And even -- my point is that even

22  under a lower burden of proof, a preponderance of the

23  evidence, there must be evidence to support it which is

24  reliable, believable, and worthy of the trust of this

25  Court.

1           This is my 26th year of practicing criminal law.

2    And as the Court knows, I've been on both sides of the

3    courtroom, and I've argued the standard of beyond a

4    reasonable doubt – and I don't mean to be so personal

5    in my comments – but on both sides, and on a weekly

6    basis.  And it occurred to me last night that because

7    of --

8           THE COURT:  Well, I think you know in this case as

9    I understand it drawing on *Perry* and *Montgomery*, you're

10   urging me to adopt a clear and convincing standard

11   because of the amount of elevation of guideline range

12   based upon this particular enhancement, is that right?

13          MS. CARDWELL:  That's true.  But my point at this

14   moment, Your Honor, is that assuming the Court follows

15   the preponderance of the evidence standard, as the case

16   law possibly directs you to do in the Fourth Circuit,

17   even under that standard my point is that the evidence

18   must be reliable.  And my point in discussing proof

19   beyond a reasonable doubt in that standard, and in fact

20   as a criminal lawyer it's what I'm used to, it occurred

21   to me last night that the standard of preponderance of

22   the evidence is -- is not really an unimportant

23   standard.

24          And by that I mean it occurred to me, and my

25   co-counsel and I talked about this, it's the standard

1   in all civil cases.  It's the standard that this Court
2   applies in civil cases.  It's the standard that a
3   doctor who is sued by one of his patients depends upon
4   for the Court to reach a just verdict.  It's the
5   standard that a young driver who may have no insurance
6   but has a college savings account depends upon for a
7   just verdict.  It may be a lower burden of proof, but
8   it's a very important burden of proof.
9        In thinking about the difference in civil and
10  criminal cases, I thought about the age of Mr. Rosga.
11  He's 54 years old.  I'm 53.  And I thought about what
12  -- how you put a monitary value on the next 10, 20, 23
13  years of a person's life.  For me it would be at least
14  $100 million.  At least.  In a $100 million civil suit,
15  would the word of the likes of Michael Pedini, even
16  with some circumstantial evidence to support him, be
17  enough to award that verdict?
18       Mr. Fitzpatrick in his response on behalf of the
19  government indicated that we had asserted in our
20  position that Mr. Pedini was uncorroborated.  That's
21  not exactly what we said.  What we said in our memo was
22  that there was no direct evidence supporting it.  And
23  what we meant by that was there were no witnesses to
24  this alleged direction, or instruction, or order that
25  he claimed to have received from Mr. Rosga to do the

1  shooting.

2       THE COURT:  But does the law require that?  As I

3  read the law governing this particular enhancement, all

4  that needs to be demonstrated is that the act of

5  violence, the attempted murder, was done in connection

6  with the unlawful enterprise, and that it was

7  reasonably foreseeable.  That is all that's necessary.

8  It's a low threshold to trigger this enhancement.

9       MS. CARDWELL:  Yes, sir.  But I'm not talking so

10 much about the level of the threshold, but the quality

11 of the evidence for this Court to evaluate.

12      THE COURT:  Okay.  All right.  Go right ahead.

13      MS. CARDWELL:  Without any corroboration of a

14 person like Michael Pedini -- well, there are

15 corroborating circumstances.  There's no question about

16 that.  One of them that is offered as such a strong

17 corroborating circumstance is the fact that Mr. Rosga

18 and Mr. Pedini happened to attend one of the national

19 club functions.  And that's offered as a very strong

20 corroborating circumstance.  He was there at the same

21 place.

22      What's lacking in the evidence is any indication

23 that anyone ever saw them together.  It's not out

24 standing that he was there for a short period of time,

25 or traveled many miles to get there.  That's what these

1   club members do.  They ride bikes, they ride across the

2   country.  They sometimes stay for one night with their

3   brothers.  And to make that a corroborating

4   circumstance that this order came down, and to support

5   a guy like Michael Pedini with that circumstance, is

6   not very persuasive.

7   　　　Certainly no one heard Mr. Rosga give the

8   instructions, not even Mr. Benvie who was recorded

9   commenting on it.  And what really was revealed in the

10  evidence is that his entire source that that had

11  happened was Mr. Pedini himself.  So it all goes back

12  to the credibility of this one individual.

13  　　　Mr. Pedini is the guy who told two sets of 12

14  citizens that he was ordered to do this shooting, and

15  apparently was not believed.  The government argues

16  take his word for it and impose 23 years, or something

17  worth $100 million, on the word of this character – a

18  drug dealer, a guy who also claimed to have been

19  affiliated with the Hells Angels, as well as the

20  Outlaws.  A guy who claimed that he was a chapter, a

21  regional, and a national enforcer all at the same time.

22  　　　This was testimony that was entirely inconsistent

23  with the hierarchy experience as described by the

24  undercover agents in this case.  And he was not

25  corroborated by any witness, including the agents who

1   offered extremely detailed descriptions of the culture
2   and organization of the Outlaws.  But we don't have to
3   stop there.
4        Mr. Pedini claimed that he was a specially
5   assigned enforcer who was assigned to protect
6   Mr. Rosga.  He failed to explain why he'd be selected
7   for that role, or how he would be expected to fill that
8   role while Mr. Rosga resided in Milwaukee and he
9   resided in Maine.
10       He also failed to explain why a relatively new
11  member like him, I think it was under two years, would
12  be given such a special top secret assignment by the
13  president of the association.  In fact, he told 24
14  citizens in two juries who heard his claim that he was
15  *World famous in the 1%er world."*
16       He told the juries that he purposely tried to jam
17  his revolver.  He used -- the one that he used to shoot
18  Mr. Watson, and that he aimed high so that the fatal
19  bullet would be from Thomas Mayne's gun and not his.
20  He told -- and neither jury bought Mr. Pedini's game
21  because basically I think they recognized that he does
22  aim high.  He claims that he's doing the bosses'
23  special assignments when he's desperately trying to
24  impress those around him.  He aims high when he's
25  confronted with his own acts and tries to buy his way

1  out of 23 years.

2      The sad irony is that in light of the government's

3  acceptance of Mr. Pedini's game, and the sentence that

4  Mr. Pedini received for almost killing a man, it seems

5  like Madman had a pretty good aim.  He got the

6  notoriety he so desperately sought, and he only had to

7  do a little over five years for it.

8      Even under a lower standard to prove the evidence,

9  the government needs to meet that burden with reliable

10  and trustworthy evidence.  When you're talking about

11  raising the potential sentence by double-digits,

12  there's no case where the Court should be more diligent

13  in holding the government to that burden.  It's frankly

14  difficult to believe that this Court, and I say this

15  with respect, could find that Michael Pedini

16  sufficiently meets that burden.

17      I'd like to -- I'm sorry.  The rest of my argument

18  has to do with sentencing, Your Honor.  That would be

19  my argument as to the cross-reference.

20      THE COURT:  All right.  Thank you very much,

21  Ms. Cardwell.

22      Mr. Fitzpatrick.

23      MR. FITZPATRICK:  Thank you.

24      THE COURT:  Let me say for the record, I have

25  reviewed the memoranda filled by both sides.

1          MR. FITZPATRICK:  Thank you, Your Honor.  And I'll

2   make my argument very brief.

3          Your Honor, I would like to point out to you some

4   evidence that was elicited at the trial.  Importantly,

5   Your Honor, when we go to the issue of in furtherance

6   of, or more importantly, reasonable foreseeability,

7   what could this defendant think was going to happen

8   within his organization he's at the top of?  And it's

9   not -- it's an organization that has, I think the

10  evidence was, at least 500, certainly no more than

11  1,000, people.  Ms. Cardwell is correct, it's a

12  hierarchal structure, but it's hierarchal in a way in

13  which information flows very well.  That was the

14  evidence in the case.  He knows what's going on within

15  his organization.

16         One piece of evidence, and we had over 600 pieces

17  of evidence in this case, is Government's Exhibit 269.

18  I'd just like to draw it to the Court's attention, if I

19  could.  I apologize, Your Honor, I was incorrect.  It's

20  Government's Exhibit 289.

21         This was seized on June 15, 2010.  It was above

22  Mr. Rosga's bed in his bedroom in the Milwaukee

23  clubhouse.  It depicts a bloody battle between the

24  Outlaws and the Hells Angels.  And, Your Honor, if the

25  Court wishes, I can hand it up and you can take a look

1   at it.

2       THE COURT:  That's okay, Mr. Fitzpatrick.  I've

3   seen it.

4       MR. FITZPATRICK:  Thank you, sir.  In the middle

5   of the picture, there's an Outlaw member that has

6   *"Outlaws"* on the front of his t-shirt.  He's firing a

7   gun across the way, strikes a Hells Angels' member.

8   Right next to that person is another member wearing a

9   t-shirt, and it says, *"Kill crazy." "Kill crazy."*  And

10  it depicts a shootout between the Outlaws and the Hells

11  Angels in Los Angeles at a place called the Double Moon

12  Bar.

13      It's absolutely foreseeable for this defendant,

14  based on that alone, that he knows that his people are

15  out there shooting at the Hells Angels.  The picture

16  depicts someone that says, *"Kill crazy."*

17      Michael Madman Pedini, there doesn't come a time

18  when he's not characterized as Madman Pedini.  That is

19  his nickname.  It's his guy.  It's absolutely his guy.

20      In our pleading, I characterized him as an

21  unsavory, mean, and violent person.  It's because he

22  is.  He also happens to be a member of an unsavory,

23  mean, and violent organization for which this man is

24  the top -- at the top.

25      So, Your Honor, based on that, I would argue to

1  the Court I don't know how we escape that.  I don't

2  know how we escape that picture, and then all the other

3  evidence in the case, and find that it's not

4  foreseeable to him that shootings are going to occur.

5       On July 5, 2009, he said shoot.  Three undercover

6  agents who were present with him for an entire day

7  testified that the defendant was promoting violence

8  against a rival gang.  That's three months prior to the

9  shooting.

10       Thank you, Your Honor.

11       THE COURT:  Thank you, Mr. Fitzpatrick.

12       Do you have my rejoinder, Ms. Cardwell?

13       MS. CARDWELL:  No, sir.  Thank you.

14       THE COURT:  All right.  Very well.

15       Before the Court is the defendant's objections to

16  the U.S. probation officer's cross-reference to

17  attempted murder in calculating the Guideline for Count

18  1, a conspiracy to commit R.I.C.O.  The United States

19  probation officer has relied upon two theories or bases

20  to apply the Guideline for attempted murder under U.S.

21  Sentencing Guideline 2A2.1.

22       First, U.S. Sentencing Guideline 2B3.2 pertains to

23  extortion by force, or threat of injury, or serious

24  damage provides for a cross-reference if the offense

25  was tantamount to attempted murder, and instructs to

1  apply Section 2A2.1, which is assault with the intent

2  to commit murder or attempted murder.

3      This Court finds as a matter of law that the

4  shooting of another individual with a firearm

5  deliberately constitutes attempted murder.  Under

6  Section 2B3.2(c)(2), alternatively, this -- the

7  probation officer has also relied upon U.S. Sentencing

8  Guideline 1B1.3(a)(1)(B), which enables a base level

9  cross-reference to Chapter 2 which is where you find

10 the attempted murder enhancement.

11     "In the case of a jointly undertaken criminal

12 activity," which they described as "a criminal plan,

13 scheme, endeavor, or enterprise undertaken by the

14 defendant in concert with others, whether or not

15 charged as a conspiracy," Count 1 was such a criminal

16 charge of a criminal plan or a joint undertaking.

17     And it's further said that, "all reasonably

18 foreseeable acts and omissions of the others in

19 furtherance of the jointly undertaken criminal

20 activity, that occurred during the commission of the

21 offense of conviction," that they are responsible for

22 those acts under U.S. Sentencing Guideline

23 1B1.3(a)(1)(B).

24     Moreover, Section 1B1.3(a)(3) specifically

25 provides that all harm that resulted from the acts and

1   omissions specified in U.S. Sentencing Guideline

2   1B1.3(a)(1)(B) are considered to be relevant conduct

3   for guideline purposes.

4        So under either theory, the probation officer

5   could, if the facts support it, apply the enhancement

6   for attempted murder under the legal framework of this

7   case.

8        Now, the defendant urges the Court to adopt a

9   clear and convincing standard in reviewing the

10  evidence.  Now, neither the U.S. Supreme Court nor the

11  Fourth Circuit have specifically embraced this

12  standard, but it has been strongly suggested in cases

13  that where the adoption of relevant conduct or

14  cross-reference substantially increases the defendant's

15  potential sentence, and that's *United States v.*

16  *Moreland* and *United States v. Montgomery*, both Fourth

17  Circuit cases, the Fourth Circuit has urged out of an

18  abundance of caution that the Court employ a standard

19  of clear and convincing evidence.  And given the

20  enhancement in this case, this Court will review the

21  evidence out of an abundance of caution under a clear

22  and convincing standard.

23       Now, the defendant's contention that the failure

24  of the jury to unanimously find beyond a reasonable

25  doubt that the attempted murder of Gary Watson was an

1   act of racketeering committed by the enterprise does

2   not preclude this Court from considering such act as

3   relevant conduct, or as a basis for cross-reference.

4   In *United States v. Montgomery*, the Fourth Circuit

5   joined guidance from *United States v. Watts* stated,

6   *"The jury's acquittal of the defendant on the count of*

7   *the indictment charging murder does not prevent the*

8   *sentencing court from considering conduct underlying*

9   *the charged crime so long as such conduct has been*

10  *proved."*

11       In *United States v. Perry*, the Fourth Circuit also

12  observed that the Supreme Court's decision in *United*

13  *States v. Booker* does not suggest that the

14  consideration of acquitted conduct violates the Sixth

15  Amendment as long as the judge does not impose a

16  sentence that exceeds that which is authorized by the

17  jury verdict.

18       Now, whether this Court relies upon a

19  cross-reference under U.S. Sentencing Guideline 2A2.1,

20  or relevant conduct under U.S. Sentencing Guideline

21  1B1.3(a)(1)(B), both of the analytical routes and the

22  result are the same.  In determining their application,

23  the Court considers the following conduct:

24       During the two weeks of evidence heard by the

25  Court and the jury in this case, a dominant theme

conveyed by a clear majority of the witnesses was that those chapters of the American Motorcycle Association on trial cultivated and promoted a culture of violence, robbery, and territorial control.  Acts of retaliatory violence were a common theme discussed among members in the clubhouses.

The evidence demonstrated that shows of force and territorial exclusion of rival clubs was more than mere idle chatter.  On numerous occasions, the evidence disclosed that the Outlaws went hunting or sought out rival clubs, often with firearms.

The evidence is undisputed that Jack Rosga became the national president of the Outlaws in November of 2006.  David Lowry, a longtime member of the Outlaws and the copper region president, testified that president Rosga controlled the Outlaws, and that others took orders from him.

In June of 2007 when a member of the Outlaws was assaulted by a member of the Renegades, Mr. Rosga, according to the evidence, gave the green light to retaliate and assault against the Renegades.

According to the testimony of Special Agent Grabman of the Bureau of Alcohol, Tobacco, Firearms and Explosives who infiltrated the Outlaws in an undercover capacity on July 5, 2009, at the Petersburg clubhouse,

1  Rosga instructed Grabman, and other Outlaw members, to

2  shoot Hells Angels' members and support club members if

3  necessary.  Mr. Rosga, gesturing with his finger in the

4  form of a pistol, said the best way to stop them is to

5  put a cap in them.

6      Rosga also told Special Agent Grabman that he knew

7  he was eventually going to go to jail for hostile

8  actions against rival club members.

9      In September of 2009, two members of the Florida

10 region of the Outlaws were assaulted by members of the

11 Hells Angels.  Michael Pedini testified that he met

12 with Rosga at a national Outlaws' event in Arkansas on

13 September 27, 2009.  Pedini testified that during his

14 conversation with Rosga, Rosga told him that he wanted,

15 Mr. Rosga wanted, two vests or a body.  Pedini took

16 this to mean that Rosga had directed him to either

17 forcibly take two vests from members of the Hells

18 Angels or kill one.

19     And I might note parenthetically that this Court

20 receives and weighs Mr. Pedini's testimony with great

21 care and caution.

22     In a recorded conversation played in open court,

23 Thomas Benvie, president of the Maine chapter of the

24 Outlaws, told Special Agent Grabman that Mr. Rosga was

25 all over Pedini about the shooting in Connecticut –

1  that shooting being the one in which two Outlaws were

2  assaulted by members of the Hells Angels.

3      On October 5, 2009, at the Outlaws clubhouse in

4  Petersburg, Joseph Allman, a member of the Maine

5  chapter of the Outlaws, had a discussion with Special

6  Agent Grabman about the assault on two Outlaws by

7  members of the Hells Angels.  Allman told Grabman he

8  was waiting for members of the Outlaws to finish taking

9  care of business, and that he was a very patient

10  person.

11      On October 8, 2009, Pedini, and another Outlaw

12  from Maine, shot Gary Watson, a member of the Hells

13  Angels at the Hells Angels' clubhouse in Maine.  Watson

14  sustained a serious injury.  This Court finds that that

15  act of shooting was a clearly premeditated act with the

16  intent to kill Watson.

17      On October 31, 2009, Michael Mariaca, president of

18  the Rock Hill, South Carolina chapter and regional

19  enforcer, mentioned during a conversation with an

20  undercover agent of the Bureau of Alcohol, Tobacco

21  Firearms and Explosives, that the national president of

22  the Outlaws had declared war on the Hells Angels.

23      Previously on October 3, 2009, at a meeting of the

24  copper region bosses, Les Werth also announced that

25  Rosga had declared war on the Hells Angels during the

1  national bosses' meeting.  Special Agent Grabman was

2  present during that conversation.

3      David Lowry testified that on January 20, 2010, he

4  contacted Rosga to secure permission to deploy

5  additional Outlaws to Charlotte, North Carolina to

6  confront Hells Angels at the Easyrider Bike Expo.

7  Rosga authorized approximately 100 Outlaws to travel to

8  North Carolina -- to Charlotte, North Carolina for that

9  purpose.

10      Based on the collective evidence deduced at trial,

11  the Court finds that the shooting of Hells Angels'

12  member Gary Watson by Michael Pedini and Thomas Mayne

13  was an act committed in furtherance of the conspiracy

14  charged in Count 1, and a part of the criminal

15  enterprise known as the American Outlaws Association.

16      The Court further finds by clear and convincing

17  evidence that Rosga promoted, encouraged, and directed

18  violence against the Hells Angels Motorcycle Club

19  members, and therefore the shooting of Gary Watson was

20  reasonably foreseeable.  Therefore, the Court concludes

21  that the evidence clearly and convincingly supports the

22  cross-reference under U.S. Sentencing Guideline 2A2.1,

23  the attempted murder as measured by the standard set

24  forth in *United States v. Pauley.*

25      For those reasons, the objection is overruled.

1    Your exception is noted.

2         Are there any other issues concerning the

3    Guidelines, Ms. Cardwell, you want to bring to my

4    attention this morning?

5         MS. CARDWELL:  Other than arguing the other

6    sentencing factors, no, sir.

7         THE COURT:  Okay.

8         And you had no objection to the Guidelines?

9         MR. FITZPATRICK:  No, Your Honor.

10        THE COURT:  Either side have any evidence you want

11   to put on this morning in connection with this hearing?

12        MR. DUFFEY:  No, Your Honor.

13        THE COURT:  Any evidence, Ms. Cardwell?

14        MS. CARDWELL:  No evidence.

15        THE COURT:  I have reviewed all the letters that

16   were sent in on Mr. Rosga's behalf, and they've been

17   made a part of the record in the case.  Do you want to

18   make them a part of the court's sealed record or a part

19   of the public record?

20        MS. CARDWELL:  We have no objection to them being

21   public, Your Honor.

22        THE COURT:  They will be.  They'll be made a part

23   of the court record.

24        All right, if there are no further objections to

25   the Guidelines, the Guidelines having been properly

1   computed in this case, Mr. Fitzpatrick, I'll hear from

2   you, sir.

3        MR. FITZPATRICK:  Thank you, Your Honor.

4        Your Honor, I'm not going to belabor the

5   government's argument.  I know the Court has heard two

6   trials in this matter, probably has occupied a month of

7   the Court's docket.  We're not going to go much longer

8   than today, Your Honor.  I would ask the Court to

9   impose a sentence of 276 months for the following

10  reasons:

11       One, Your Honor, as Your Honor has found, the

12  Guidelines in this case would exceed the statutory

13  maximum sentence.  So under the baseline, sort of the

14  benchmark in this case, wherein 324 to 405 months, so

15  the government's statutory maximum is some 48 months

16  below the low end of the Guidelines.

17       More importantly, however, Your Honor, the 3553(a)

18  factors ably and substantially support that sentence.

19  You will look at the first characteristic, the offense

20  and the offender characteristics, the Court heard daily

21  during trial, evidence of violence, actual acts of

22  violence, and then the promotion of violence as the

23  Court noted in its ruling just a minute ago.  I called

24  it the celebration of violence.

25       This case has always been driven from the

1   government's side as an issue of safety and public

2   safety.  And messages do matter.  This organization has

3   a detrimental harm and effect on the public safety of

4   the citizens not only in Virginia, but as the Court has

5   seen across the eastern seaboard into the midwest.

6   You've seen innocent citizens in Virginia, in -- in

7   Minnesota who were witness to some acts of violence

8   against rival clubs.  This organization threatens

9   innocent people, not just rival gangs, but innocent

10  people.

11      I would draw the Court's attention again under the

12  3553(a) framework of the assault on Clifford Diggs.

13  And, again, we're not seeking any vulnerable victim or

14  any enhancement like that.  But as a 3553(a) factor,

15  two members of this man's organization just selected a

16  person in a bar and decided to send him, and everyone

17  else, a message.  That speaks volumes regarding the

18  offense conviction here, and the offender

19  characteristics.  It's his organization.

20      Likewise, Your Honor, is that shooting of Curtis

21  Marshall.  Again, a very nuance event.  Law enforcement

22  early in the morning going to arrest someone, but

23  they're announcing their presence.  And a month prior

24  to that, Thomas Mayne, a man in his organization, said

25  first one to the door I'm shooting.  Lo and behold, a

1   month later, first one at the door he shoots.  That was

2   compelling evidence.  That's this organization.

3        Those facts illuminate this organization.  That's

4   the -- the light at the top of the Christmas tree.

5   That's what drives them.

6        So, Your Honor, I think that sending the

7   appropriate message in terms of deterrence, respect for

8   the law, if there was ever a case where a substantial

9   sentence would promote the respect for the law, I

10  submit respectfully it would be this one.  This is an

11  organization who lacks all respect for the law, so,

12  Your Honor, we ask the Court to impose a 276 month

13  sentence.

14       THE COURT:  Thank you, Mr. Fitzpatrick.

15       Ms. Cardwell.

16       MS. CARDWELL:  Your Honor, we have addressed the

17  3553(a) factors in our sentencing position.  There are

18  two of those factors that I would like to add

19  additional comments to, the first being the 3553(a)(6)

20  factor of the need to avoid unwarranted disparities in

21  sentencing.  The government has argued to this Court

22  that this Court should impose a sentence of nearly

23  three times higher than the highest sentence received

24  in this case thus far.  Mr. Werth received 110 months,

25  and the government has recommended 276 months for

1   Mr. Rosga, well above the national statutory sentence

2   that the Court is allowed to impose.

3        We have already addressed the similarities between

4   Mr. Werth and Mr. Rosga in our position paper, but it's

5   worth repeating that the government continues to

6   display a pretty transparent attempt to treat Mr. Rosga

7   differently from other defendants and other citizens.

8   For example, in Mr. Fitzpatrick's response, he

9   curiously argues that since the jury in Mr. Werth's

10   case failed to find sufficient proof of an overt act of

11   extortion, it's reasonable for his sentence to be

12   considerably lower than Mr. Rosga's.  This argument

13   flies in the face of the very same argument offered by

14   the government in support of why the cross-reference

15   should be adopted in Mr. Rosga's case.

16        When the defense attempted to draw a mitigating

17   argument of the failure of the jury to hold Mr. Rosga

18   responsible for conspiracy to commit murder, the

19   government dismissed that argument as inappropriate and

20   inapplicable, claiming that it had no import in the

21   Court's sentencing decision.  It seems the government's

22   eyes and their rules are different for Mr. Rosga.

23        Mr. Werth was a regional president.  He was a

24   voting member of the big table.  And with all due

25   respect, Your Honor, I don't believe the evidence was

1   that anyone said that Mr. Rosga declared war.  The

2   testimony on the tape from Mr. Werth was a question was

3   asked whether it came down from the big table, and

4   there was no answer to that question on the tape.

5   Mr. Rosga's name was never used in that portion of the

6   evidence.

7        Mr. Werth was a part of allegedly that big table

8   meeting, and he was not cross-referenced for any of the

9   other conduct for which he was not charged that

10  occurred in the country that was allegedly related to

11  this declaration of war.  He was not cross-referenced

12  for the attempted murder of Gary Watson, which under

13  the foreseeability standard, very well could have

14  applied.  Wouldn't that have been an act of furtherance

15  of the declaration of war that the big table declared?

16       The other defendants in this case, and I'm not

17  going to go in too much detail, but if the Court would

18  just consider for a moment -- and I know the Court

19  always goes to great lengths in determining what the

20  appropriate sentence is, and has done so with the

21  previous defendants.  Mark Lester, also known as Ivan,

22  was the president of the gray region.  He would have

23  been present at that big table meeting of the

24  declaration of war.  He was present for a show of

25  force, I think more than one show of force, and he was

1  the one who on tape abducted a Knoxville, Tennessee
2  sheriff.  And I didn't hear the tape, but I heard it
3  was pretty ugly.  He received 27 months.
4      Mark Fiel, also known as Snuff, was the president,
5  a leader in the organization of the Manassas chapter.
6  He intimidated witnesses to lie to law enforcement.  He
7  specifically directed the undercover agents to shoot a
8  specific Hells Angel, and directed how to accomplish it
9  by shooting from the back of a truck, directing that he
10  owned a tattoo parlor, where he was located, and how it
11  might be accomplished.  He was not cross-referenced for
12  conspiracy to commit murder.
13      Mr. David Lowry -- and I understand Mr. Lowry of
14  course got a sentence reduction.  I don't know what it
15  was, I don't know what the percentage was, and that's
16  something that we have no control over, and is
17  appropriate in certain circumstances.  But just looking
18  at the person that he was, he was president of the
19  copper region.  He had multiple felonies on his record,
20  from my understanding.  He was convicted of -- or pled
21  guilty to the conspiracy, and he had a prior
22  racketeering conviction.
23      Now, assuming that 51 months that he received
24  reflects a significant sentence reduction for his
25  testimony and cooperation, even if he got - and I have

1  to speculate – even if he got a 50% reduction, that

2  would be a 10 year sentence for a second time convict

3  for racketeering.

4      Michael Smith, who never took the stand, but I

5  know the Court is familiar with history and reputation,

6  and frankly I am too because I was prepared to

7  cross-examine him but he never hit the box, but he was

8  a fascinating person.  He built bombs and demonstrated

9  them for the undercover agents in this case.  He told

10  them how to make these explosives.  He was there for

11  the Cockades assault on the Desperados.  He sold large

12  quantities of marijuana, and he planned to expand with

13  others, and get others to join.  And he received 42

14  months presumably for cooperation.  He also got a

15  reduction.  But still, that kind of person got 42

16  months.

17      And finally, I've already talked about Mr. Werth,

18  but Michael Pedini.  Now, the government has argued

19  that it is not appropriate, and the argument is not

20  available to the defense regarding Mr. Pedini to argue

21  disparity because he was a cooperating individual, but

22  the case law – and I've already noted that and

23  addressed that in our reply to the government's

24  response – is not applicable under these circumstances.

25  The argument that we're making is that ultimately in a

1  sentence that this Court imposes, and the discretion

2  that this Court exercises, the disparity should not be

3  so great between the actual shooter who almost killed a

4  man, who ambushed a person that only he apparently

5  knew, would be that much lower than the person who

6  allegedly told him to do it.  His sentence was 63

7  months for Counts 1 and 2.  And again, even if that

8  reflects a 50% reduction, that would mean that his

9  starting sentence was approximately 10 years.  And I

10 can only speculate on that.

11     THE COURT:  You know, Ms. Cardwell, I'm not privy,

12 and maybe you are, to what the Court's rationale was in

13 Maine.  Do you know what the sentencing judge

14 articulated as his or her rationale?

15     MS. CARDWELL:  I don't know that.

16     THE COURT:  That makes it difficult for me to

17 weigh the two.

18     MS. CARDWELL:  I understand that, Judge.  From

19 what we could get, and everything was sealed, all I can

20 tell is there was a 5K motion at the time of

21 sentencing, so he has received his reduction.  And I

22 have to assume it was based upon his cooperation and

23 testimony in this case.

24     But I think it's a very valid point that a 50%

25 reduction is a reasonable thing that should happen for

1  someone who actually testifies in a case.  And if it

2  was 50%, he started with a 10-year sentence, and he was

3  the shooter in this cross-reference attempted murder.

4      So based upon those arguments, Your Honor, I would

5  ask the Court to give great consideration to that

6  particular factor because it is such an important one

7  among the defendants in this case, and among other

8  similarly situated defendants across the country.

9      I'd like to move on to the 3553(a)(1) factor of

10  the characteristic of the defendant, Mr. Rosga.  The

11  Court heard the testimony of numerous witnesses who

12  came from Milwaukee and Florida and testified about

13  Mr. Rosga's character and his conduct.  And you heard,

14  and the jury heard, from Eric Roberson, a retired

15  Milwaukee County Sheriff.  He described Mr. Rosga as a

16  trusted friend.  He'd been in law enforcement for any

17  number of years, worked with him, trusted him, ate at

18  his house, and had nothing but positive things to say

19  about the way Mr. Rosga has led his life.

20      You heard from Henry Miller, also known as Uncle

21  Hanka, who was brother of Mr. Rosga's deceased wife.

22  He described him as hardworking, honest, reliable,

23  peaceful, and a dedicated family man.

24      Tony San Filippo was a motorcycle club activist

25  who was doing wonderfully positive things in the

1  community of Milwaukee, and at any turn could get Mr.

2  Rosga's help in accomplishing those things, including

3  helping law enforcement learn how to deal with

4  motorcycle club culture.

5      Mr. Dixon was a local business owner and had

6  business dealings with Mr. Rosga, and said he also paid

7  his rent on time.  He was a completely reliable person

8  and a wonderful friend to him.

9      And then finally, this Court heard from A.J. Ford

10  who was a well-known retired Richmond detective who

11  worked narcotics and all sorts of vice cases for many

12  years for the City of Richmond.  And he came from

13  Florida to testify on behalf of Mr. Rosga attesting to

14  his character, attesting to his intolerance for drug

15  use, and his overall good character as a person.

16      I'd ask the Court to recall those people, and the

17  effort they went to bring before this Court the

18  information that they know about Jack Rosga.  In

19  cross-examining those witnesses, the government's

20  approach was to imply that there were two Jack

21  Rosga's - the hardworking trucker who loved his family

22  and friends, and went out of his way to help his

23  community, and then the one who was the president of

24  the Outlaws.

25      To the extent that this Court or the jury believed

1   that there are two different people, the regular Jack

2   Rosga and the Outlaw Jack Rosga, there's only one man

3   here today to be sentenced.   And you must,

4   respectfully, Your Honor, fashion a sentence that

5   addresses that whole person.   You will sentence one man

6   today, the man who so loved and supported his family;

7   the man who built a business after many, many years of

8   hard labor; the man who has served his community and

9   friends so selflessly and consistently that they'll

10  miss him every day of the sentence that you give him.

11         Respectfully, what you don't know about Mr. Rosga,

12  Your Honor, from the government's case is that he's a

13  funny, good-natured person, he's a big-hearted person,

14  he's generous, and he's an enormously faithful human

15  being.  Mr. Rosga has no criminal history.

16         Since the date of his arrest and detention, you've

17  not heard that he's given the folks at the regional

18  jail a moment's problem.   He's conducted himself in and

19  out of this courtroom through two jury trials since

20  this case started in the same peaceful and respectful

21  manner he has lived his entire life, and I ask you to

22  recognize that in the sentence.

23         The government's gone to great lengths in

24  approaching this case, and its pleadings to convince

25  the Court that the Guidelines should be elevated as

1  high as possible, applying the cross-reference, and

2  insisting that Mr. Rosga deserves the maximum sentence

3  in this case.

4      I read a quote from a former chief judge of the

5  U.S. Supreme Court this week, and it was that *"It is

6  not the letter of the law, but the spirit of the law,

7  that leads to justice."* Even if this Court rules that

8  the cross-reference applies, and you have, and

9  Mr. Rosga's guidelines exceed the maximum statutory

10  sentence, you should impose a sentence in line with the

11  other defendants in this case in the spirit of justice.

12      Mr. Rosga's a very proud man and he does not want

13  me to beg for him, but if I knew or believed it would

14  get him a logical and just sentence in light of all the

15  sentences thus far imposed, I would do that for him.

16      Thank you, Your Honor.

17      THE COURT:  Thank you, Ms. Cardwell.

18      All right, Mr. Rosga, if you would come forward,

19  sir, with your attorneys.

20      Mr. Rosga, obviously I have heard all the evidence

21  in this case on two occasions.  I have also heard many

22  folks testify on your behalf, and I've reviewed the

23  stack of letters that Ms. Cardwell and Mr. Mastantuono

24  filed from friends and relatives or yours.  All that is

25  being factored in.  I think the sentencing process is

1  weighing everything in the case, and I do so in

2  opposing sentence this morning.  But first I'd like to

3  hear from you.  Is there anything you'd like to tell

4  me, sir, before I decide what sentence is appropriate?

5      MR. ROSGA:  I really have nothing to say, Your

6  Honor.

7      THE COURT:  All right.

8      Well, Mr. Rosga, the reason your sentencing

9  category is slightly different from the others is that

10 you were the president of this organization.  And as

11 such, you were kind of over the years the architect of

12 the culture of violence that many chapters of the

13 American Outlaw Association had.  In addition, like

14 many people who are kind of at the apex of criminal

15 networks, you did not personally participate in a lot

16 of violent activity, but you counseled your

17 subordinates to do so.

18     And in this case, I found very clearly that you

19 declared war on the Hells Angels, that you suggested

20 violent retaliatory actions, and that other members of

21 that organization spread that message down to the

22 chapters and individuals.  And it's for that, sir,

23 you're being held accountable today.

24     Mr. Rosga, I've reviewed the U.S. Sentencing

25 Guidelines as advisory only, and I've considered all

1   the factors set forth in 18, United States Code,

2   Section 3553(a).  And I look to the nature and scope of

3   the organization, what it was all about and your role.

4   I look at what type of sentence would promote respect

5   for the law, provide for deterrence, and protect the

6   community.  In having done so, this Court believes that

7   a sentence that is adequate, but not longer than

8   necessary, would be commitment to the U.S. Bureau of

9   Prisons for a term of 240 months.  That will consist of

10  240 months on Count 1, and 36 months on Count 2.

11      I am going to run the time on Count 2 concurrent

12  with the time on Count 1.  And the reason I'm doing

13  that is two-fold.  First of all, you have no prior

14  record.  And secondly, I do give credit to those people

15  who have come forward and spoken about the positive

16  side of you.  It's an important factor for me to

17  consider, and I do so.  Even though I have the

18  authority to impose 36 months of consecutive

19  incarceration, I think that the positive side of you

20  merits some consideration, and I do so.  So I oppose

21  that 36 months concurrent.

22      Upon your release from confinement, you will be

23  placed on supervised release for a term of three years.

24  That will consist of three years on each count.  Those

25  periods of supervision will be served concurrently.

1    Within 72 hours of your release from the Bureau of
2  Prisons wherever you may be, you will be required to
3  report to the probation office in that district.  Your
4  supervised release begins at that time.  It is for
5  three years.  The U.S. probation officer will go over
6  with you in detail all the terms and conditions of
7  supervised release.  And you will sign that form, and
8  you will be required to strictly abide by it.

9    While you're on supervised release, you may not
10 violate any federal, state, or local law.  You can't
11 have in your possession any kind of firearm or
12 dangerous destructive device, nor any kind of narcotic
13 drug or controlled substances without a valid
14 prescription issued by a licensed doctor.

15   Now, at the inception of your supervised release,
16 if the U.S. probation officer feels that any special
17 conditions are necessary, he or she can apply to this
18 Court to modify the judgment and commitment order to
19 reflect those.  And I will consider them, and amend the
20 commitment order if necessary.

21   I've reviewed your net worth, your earning
22 capacity, and the sentence you're receiving.  I don't
23 think that you're capable of paying a fine.  I further
24 find that no fine is appropriate in this case, but you
25 are required by law to pay a special assessment of $100

1   on each count, which I do impose for a total of $200.

2        Your special assessment is due and payable today.

3   If it's not paid by the time you complete your period

4   of confinement, it will be paid as a special condition

5   of your supervised release in an amount of not less

6   than $25 per month beginning 60 days after your

7   supervised release begins until it is paid in full.

8        Any forfeiture order previously entered in this

9   case will become a part of the final judgment and

10  commitment order.

11       Now, Mr. Rosga, during the course of this case,

12  this Court has made many, many decisions, and you have

13  a right to appeal all the decisions I have made in this

14  case, including the sentence you've received, to the

15  U.S. Court of Appeals for the Fourth Circuit.  If you

16  wish to appeal, that appeal must be noted within 14

17  days of today.  So I suggest that you immediately begin

18  consulting with your attorneys to decide whether you

19  wish to appeal because if you wish to do so, they must

20  put that process in motion immediately.

21       Mr. Fitzpatrick, the original indictment in this

22  case, is there a motion to dismiss?

23       MR. FITZPATRICK:  Yes, Your Honor.  I'll make it

24  orally.  I don't have an order.

25       THE COURT:  That's okay.  Your oral motion will be

1    fine.   That motion will be granted.

2         Ms. Cardwell and Mr. Mastantuono, is there

3    anything further this morning?

4         MS. CARDWELL:  No, sir.

5         MR. MASTANTUONO:  No, sir.

6         THE COURT:  Anything further today,

7    Mr. Fitzpatrick?

8         MR. FITZPATRICK:  No, sir.

9         THE COURT:  All right.

10        Mr. Rosga, you're remanded to the custody of the

11   United States Marshal to serve your sentence, sir.

12        This Court will stand in recess.

13          (The proceeding concluded at 10:17 a.m.)

14                  REPORTER'S CERTIFICATE
            I, Krista M. Liscio, OCR, RMR, Notary
15   Public in and for the Commonwealth of Virginia at
     large, and whose commission expires March 31, 2012,
16   Notary Registration Number 149462, do hereby certify
     that the pages contained herein accurately reflect
17   the notes taken by me, to the best of my ability, in
     the above-styled action.
18        Given under my hand this 3rd day of October, 2011.

19                    _____
                      Krista M. Liscio, RMR
20                    Official Court Reporter

21

22

23

24

25