## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:11-cr-170-1 |
| | ) | |
| JACK ROSGA, | ) | Honorable Henry E. Hudson |
| | ) | |
| | ) | |
| *Defendant.* | ) | |

### GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

The novel coronavirus is spreading broadly among the U.S. population, including among members of the public, health-providers, law-enforcement officers, people who produce and deliver essential products, and those who carry out the functions of the federal, state, and local government. Against that backdrop, defendant seeks to be released from prison under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i) as a means to control the spread of the coronavirus within prison.[1]

The defendant's health conditions may present an "extraordinary and compelling reason" that could otherwise warrant compassionate release. But merely establishing the existence of those conditions is not sufficient to justify a sentence reduction for this defendant. Using compassionate release in his case would fail to satisfy the standards in § 3582(c)(1)(A), including the required finding

---

[1] The defendant's projected release date is **July 27, 2027**.

that the defendant is not a danger to the safety of any other person or to the community. For the reasons discussed below, this Court should deny the defendant's motion.

## Background

Inveterate motorcycle gang member and undisputed leader of the American Outlaw Association, Jack Rosga, was named in two counts of a of a twelve-count indictment charging him with conspiracy to violate the RICO Act, 18 U.S.C. § 1962(d) (Count One), and conspiracy to commit violence in aid of racketeering, 18 U.S.C. § 1959(a)(6) (Count Two). *See* Presentence Investigation Report (PSR), at 3-4. On December 21, 2010, a jury returned guilty verdicts on both counts as to Rosga.

At sentencing, Rosga had a total offense level of 41. PSR at 49. He received a base offense level of 33 under U.S.S.G. § 2A2.1(a)(1) for the attempted murder of Hell's Angel gang member Gary Watson, who was shot in the back in Maine. *Id.* at 14-15, 43, and Worksheet A (Count 1(a) and Count 2). Rosga received 4 additional points under U.S.S.G. § 2A2.1(b)(1)(A) because the victim sustained permanent and life-threatening bodily injuries. *Id.* And Rosga received a 4-level leadership enhancement under U.S.S.G. § 3B1.1(a). *Id.* at 43. . With a criminal history category I, Rosga had a guideline range of 324 - 405 months, but that range was capped at the statutory maximum of 240 months and 36 months respectively for counts 1 and 2 under U.S.S.G. § 5G1.1(a). *Id.* at 49. The district court ultimately imposed 240 months' imprisonment on count 1 and a concurrent sentence of 36

months on count 2, as well as three years of supervised release and a special assessment of $200. ECF 822.

Defendant's current motion was filed on September 29, 2020. The government now responds and opposes Defendant's request.

## RESPONSE

### I. Defendant's Request for Compassionate Release Must be Evaluated Against a Practical and Legal Backdrop.

The Federal Bureau of Prisons is actively working on the critical problem of containing the spread of the coronavirus within prisons. BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, begun providing masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act. This last step carries special importance for defendant's request for compassionate release.

#### 1. *BOP's Use of Home Confinement to Mitigate the Spread of Disease During the Pandemic*

Since March 26, 2020, BOP has placed an additional **7,975** prisoners on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp) (last visited **November 16, 2020**), focusing on, among other factors, the vulnerability of the inmates, the prisons most at risk, and the dangers posed by the inmates if release. Inmates do not have to apply to be considered for home confinement.

BOP's decision to release an inmate to home confinement must take into account several factors, including among others: 1) whether a home is available

where the inmate could be confined; 2) whether the inmate could receive appropriate food and medical care there; 3) the comparative risk to the inmate in home confinement in the identified location versus remaining in prison; 4) the inmate's risk to the public through recidivism; and 5) the availability of supervision during home confinement or risk to the public if supervision is lacking.

BOP also seeks to ensure that the inmates it releases to home confinement are not already ill and therefore spreading infection to others—including spreading illness to the individuals who would be needed to make home confinement successful. To help accomplish that goal, BOP is requiring a 14-day period of quarantine before any inmate is released to home confinement. By having BOP control the 14-day period of quarantine—rather than leaving inmates to conduct their own quarantines after release—BOP can ensure the effectiveness of the quarantine and evaluate the appropriateness of any determination that the inmate is not a carrier of the coronavirus.

Rather than relying on BOP to address what both Congress and the Attorney General have determined is a time-sensitive, rapidly evolving emergency—and after Congress placed a specifically targeted tool in the hands of BOP via § 12003(b)(2) of the CARES Act—defendant envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to replicate, and potentially override, BOP's efforts. And critically, under defendant's approach, courts must attempt to assess facts that can change within days—if not hours—

when many of the changing circumstances could nullify the intended goal of any court order.

Under the present circumstances, courts are not well positioned to evaluate a range of quickly changing facts:

- *Safety of place of home detention.* An inmate's proposed residence after release from prison should be a place where no person is infected or soon to be infected.

- *Avoiding recidivism.* The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12. New arrests not only endanger the public and return an inmate to prison, but also increase the dangers to arresting officers and supervising probation officers.

- *Protecting the public from infection.* Any release should include measure to assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- *Avoiding misallocation of testing resources.* Any request by an inmate should appropriately triage the use of available testing by medical need, not by an unsystematic series of court orders.

- *Addressing the need for food, housing, medical care, transportation, employment, and other necessities.* Any release order should evaluate whether a released inmate could find—during a pandemic—food, medical care, housing, safe (often interstate) transportation needed to relocate from prison to the inmate's home, and employment during a time when an extraordinarily large number of people are losing their jobs.

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.* Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in one of the 30 BOP facilities and 6

    residential reentry centers that BOP is monitoring for coronavirus infections, *See* https://www.bop.gov/coronavirus/;

- *Assessing how much release would affect the particular inmate's health.* To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health.

- *Making release decisions fast enough and accurately enough to make a difference.* An inmate's release request requires a court to determine accurately, with appropriate records, how great a danger the inmate poses to the public and make that determination on a time scale needed to respond to disease transmission within a prison.

- *Appropriately prioritizing supervision resources.* The Probation Office's resources to supervise released inmates are necessarily limited, and any inmate's release should be assessed against the comparative advantages that another inmate might receive from those same supervisory resources.

    This list is not exhaustive and, indeed, could include many additional considerations. For example, to avoid a mass release of inmates that has a serious, negative effect on public welfare, the Court should also take into account the risk to probation officers, police officers, and others who must immediately cope with and supervise released inmates.

    The point is that the factors cited above illustrate a general truth—there are no known examples of effectively litigating out of a crisis by taking up thousands of cases simultaneously in hundreds of courtrooms across the country and attempting to have the judicial process evaluate prisoner releases in a pandemic that changes daily and even hourly. A more systematic remedy than individual litigation in court is needed, and Congress provided a means for arriving at a more systematic response by amending § 3624(c)(2) to give BOP greater latitude to release inmates to home confinement while the pandemic is ongoing.

### *2. BOP's Response to Minimize the Spread of COVID-19 in Prison Facilities.*

As mentioned above, BOP is undertaking extensive measures to address the spread of coronavirus within prison facilities. In addition to prioritizing home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act, BOP has taken a number of steps to prioritize the health and safety of inmates. In February 2020, BOP began extensive planning for its COVID-19 response and instituted a comprehensive management approach for oversight of the situation. https://www.bop.gov/coronavirus/overview.jsp#bop_covid-19_response.

BOP has also implemented a modified operations plan to mitigate the spread of the coronavirus. https://www.bop.gov/coronavirus/covid19_status.jsp. Under this plan, all social visits and inmate internal movements have been suspended, with the exception of movements required by the federal judicial system or needed to maintain the health and safety of inmates by, for example, limiting overcrowding. *Id.* In-person legal visits have been temporarily suspended, with allowances for confidential legal calls. *Id.* Inmates have also been given an additional 500 telephone minutes per calendar month to facilitate safe social contact. *Id.* BOP has implemented screening measures for staff, inmates, and contractors performing essential services and maintenance and has adopted a "modified operations plan to maximize social distancing in [its] facilities, as much as practicable." *Id.* For example, modified operations can included staggered meal and recreation times designed "to limit congregate gatherings." *Id.* BOP has also suspended all non-essential staff training and all staff travel, excepting relocation travel. *Id.*

7

In addition, BOP is monitoring and reporting daily on COVID-19 cases identified in its facilities. Numbers with regard to COVID-19 cases at BOP facilities are found at https://www.bop.gov/coronavirus/index.jsp, which BOP updates daily at 3:00 p.m. As of **November 16, 2020**, BOP has **125,375** federal inmates in BOP-managed institutions and **14,097** in community-based facilities. (These two numbers—i.e., inmates in BOP institutions versus inmates in community-based facilities—have moved steadily in opposite directions since the start of the COVID-19 pandemic.) The BOP staff complement is approximately **36,000**. Nationwide there are **3,121** federal inmates and **1,049** BOP staff who are confirmed as currently positive for COVID-19. There are **17,168** inmates and **1,605** staff who have recovered from the disease. There have been **137** federal inmate deaths[2] and **2** BOP staff member deaths attributed to the coronavirus.

BOP has implemented significant protective measures and, through increased use of home confinement and continued evaluation of compassionate release, is actively seeking to remove the most vulnerable and least dangerous to safer alternative settings. Regardless of whether a particular inmate is released under these programs, BOP's efforts to curb the spread of disease will only serve to better protect the health of all federal inmates to the extent reasonably possible amid this pandemic.

---

[2] Of these inmate deaths, four occurred on home confinement.

8

## II. Defendant Has Satisfied the "Exhaustion" Requirement.

Section 3582(c)(1)(A) requires a defendant to first submit an administrative request for compassionate release to the warden of the facility where he or she is incarcerated, and that BOP be given 30 days to evaluate the defendant's request, before he may seek compassionate release from the court. This 30-day time is commonly referred to as the "exhaustion" period.

The defendant has satisfied the exhaustion requirement here. On July 11, 2020, the defendant filed his request for compassionate release (ECF No. 1214-1), his request was denied on August 12, 2020, by Warden Kathy Lane at FCC Coleman. Rosga filed an appeal of this decision on the next day, and that appeal was denied on August 20, 2020. ECF No. 1214-3 and 4.

## III. The Defendant Has Apparently Established "Extraordinary and Compelling Reasons" that Could Warrant a Reduction.

### 1. "Extraordinary and Compelling Reasons" Generally.

A § 3582(c)(1)(A) sentencing-reduction motion is not a flexible equitable remedy equivalent to clemency or parole. Instead, Congress has created a narrow statutory framework in which defendants, the Bureau of Prisons, and the Sentencing Commission all play a relevant part.

To that end, Congress has not itself delineated the universe of "extraordinary and compelling reasons" that could warrant compassionate release. Instead, it has delegated that responsibility to the Sentencing Commission through several statutory provisions. For instance, in 28 U.S.C. § 994(a)(2)(C), Congress directed the Sentencing Commission to adopt policy statements regarding "the appropriate

use of . . . the sentence modification provisions set forth in section [] . . . 3582(c) of title 18." Section 994(t) further advised that "[t]he Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In its instructions to the Sentencing Commission, however, Congress made clear that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id.*

Pursuant to Congress's instructions, the Sentencing Commission adopted a conforming policy statement that creates three requirements for compassionate release under § 3582(c)(1)(A). U.S.S.G. § 1B1.13. First, a court must conclude that "[e]xtraordinary and compelling reasons warrant the reduction." *Id.* § 1B1.13(1)(A).[3] Second, the court must conclude that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.* § 1B1.13(2). Third, the court must conclude that "[t]he reduction is consistent with this policy statement." *Id.* § 1B1.13(3).

The Sentencing Commission has also identified four categories of extraordinary and compelling reasons:

---

[3] The statement alternatively provides that absent extraordinary and compelling reasons, a court may find that a defendant is at least 70 years old and has served at least 30 years on his conviction. *See* U.S.S.G. § 1B.13(1)(B).

>    (A)   Medical Condition of the Defendant;
>
>    (B)   Age of the Defendant;
>
>    (C)   Family Circumstances; and
>
>    (D)   Other Reasons.

U.S.S.G. § 1B1.13, cmt. n.1. Commentary to § 1B1.13, in turn, clarifies that the open-ended provision—labeled "Other Reasons"—only authorizes compassionate release if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.*

Consistent with subdivision (D), the Bureau of Prisons has identified several nonexclusive factors for determining whether "other" extraordinary and compelling reasons exist. These include the defendant's criminal and personal history, the nature of his offense, disciplinary infractions, length of sentence and amount of time served, current age and age at the time of offense and sentencing, release plans, and "[w]hether release would minimize the severity of the offense." BOP Program Statement 5050.50 (Jan. 17, 2019), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. The Program Statement explains that the Bureau of Prisons authorizes compassionate release under § 3582(c)(1)(A) in "particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing." *Id.* at 1.

Courts have properly concluded that a risk of being infected by the coronavirus fails by itself to justify compassionate release. [I]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, No. 2:07CR150, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, No. 3:19CR112, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).

Ultimately, it is the defendant's burden to prove that he is entitled to compassionate release under § 3582(c)(1)(A)(i). *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019); *see generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise, . . . we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.").

### 2. *The Defendant's Medical Conditions Do Satisfy the Standard for an "Extraordinary and Compelling Reason" for Compassionate Release.*

A review of the defendant's medical records indicate that he stands 6 feet tall, and weighs 290 pounds, resulting in a Body Mass Index of 39.5. *See* https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm. The defendant also suffers from high blood pressure, but according to his medical records, is receiving treatment for that. In any event, the defendant is clearly obese

and accordingly, he has demonstrated a particularized susceptibility to contracting a severe case of COVID-19 should he be exposed to the disease.[4]

In the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a *particularized* susceptibility to the disease and a *particularized* risk of contracting the disease at his prison facility. *Compare United States v. Dungee*, 2020 WL 1666470, at *2 (W.D. Va. Apr. 4, 2020) (denying motion for compassionate release, because the defendant failed to show that his "individual conditions of confinement — as opposed to those conditions that the inmates generally are subject to — are such as to justify relief"); *with United States v. Edwards*, —— F.Supp.3d ——, ——, 2020 WL 1650406, at *5 (W.D. Va. Apr. 2, 2020) (finding that immunocompromised inmate with brain cancer housed at a facility with confirmed COVID-19 cases had shown compelling reasons for release). Notably, "the *fear* of contracting a communicable disease" proves insufficient to justify a sentence modification. *United States v. Clark*, ——F. Supp. 3d ——, ——, 2020 WL 1557397, at *4 (M.D. La. Apr. 1, 2020) (emphasis in original).

The defendant's place of incarceration is FCI Coleman (Low), which according to the BOP website, appears to have suffered moderate effects from the Covid-19 pandemic. A check of the BOP website as of November 16, 2020, shows 18 positive

---

[4] The defendant makes various claims regarding high cholesterol, enlarged prostrate, acid reflux disease, and a bone spur in his ankle. These claims are speculative at best and the defendant provides no documentation that any of these ailments, even if true, places the defendant at increased risk from severe illness should he contract Covid-19.

inmate cases currently at this facility. (Out of a total of 1,889 inmates, according to the BOP inmate locater). There has been 1 inmate death associated with FCI Coleman (Low), but as the website notes, 210 inmates have recovered from Covid-19 infection. *See* https://www.bop.gov/coronavirus/index.jsp. This is hardly the "staggering" circumstances portrayed in the defendant's motion. Thus, these statistics do not reasonably establish that the defendant has a particularized risk of contracting the disease at his prison facility.

Moreover, the defendant has not shown that his release plan reduces his risk of contracting COVID-19. In light of the risks posed by his release, the defendant does not, as he claims, have a viable release plan. Indeed, defendant's "plan" is very sparse, including only his unspecified "return to reside with Catherine Thomas" in Florida. ECF 1214 at 15.

As explained above, defendant's release will increase the risk of exposure for defendant, his family, and anyone with whom they come into contact, including court employees, like probation officers, who will be required immediately interact with and supervise defendant under demanding conditions, likely for an extended period of time. *See*:

- *United States v. Feiling*, — F. Supp. 3d —, 2020 WL 1821457, at *8 (E.D. Va. Apr. 10, 2020) ("Defendant's release on home confinement presents its own risks to Defendant's health, the health of his family and public safety.").

- *United States v. White*, No. 3:18-CR-61 (HEH), 2020 WL 3442171, at *6 (E.D. Va. June 23, 2020) ("[I]t is not clear to this Court that Defendant would be safer from the virus on home confinement.").

- *United States v. Brady*, No. 18-CR-316 (PAC), 2020 WL

14

 2512100, at *4 (S.D.N.Y. May 15, 2020) (denying compassionate release because releasing the defendant "from prison may be to simply take him out of the proverbial frying pan and place him into the fire, as the general public continues to suffer from COVID-19 as well.").

- *United States v. Chappell*, No. 16-CR-512 (LTS), 2020 WL 3415229, at *3 (S.D.N.Y. June 22, 2020) ("The record also demonstrates that Mr. Chappell is regularly receiving appropriate medical care at his facility, and Mr. Chappell has provided no indication that he will have ready access to the requisite medical care for his serious health concerns if his request for immediate home confinement or transfer to a halfway house is granted.").

- *Brown v. United States*, No. 4:18-CR-96 (RAJ), 2020 WL 3129573, at *2 (E.D. Va. June 12, 2020) (denying compassionate release where defendant's weight and blood pressure improved while in BOP custody).

- *United States v. Rodriguez*, — F. Supp. 3d —, 2020 WL 1866040, at *4 (S.D.N.Y. Apr. 14, 2020) ("Rodriguez has also not explained how he would be safer outside of prison, where authorities could not enforce isolation and quarantines ….").

### 3. *In the exercise of its discretion, the Court should deny compassionate release in light of the statutory sentencing factors.*

Compassionate release is only appropriate where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). That statute instructs the court to consider several factors, including whether the underlying offenses constitute crimes of violence, whether the offenses involved firearms, and the defendant's criminal record. At the same time, § 3582(c)(1)(A) expressly directs the Court to consider the statutory sentencing factors under 18 U.S.C. § 3553(a) in adjudicating

15

a compassionate-release motion. Here, these factors counsel against granting a reduction in the defendant's sentence.

### 1. Nature and Circumstances of the Offense:

The seriousness of the defendant's underlying charges for violations of RICO is simply undeniable. Here, the defendant was the undisputed president of a criminal organization for years, and engaged in violent acts, extortion, drug dealing, maintaining drug involved premises, and interstate travel in aid of racketeering. *See* PSR 36-43. As president of the Outlaws, Rosga declared "war" of rival gangs, including the Hell's Angels, and ordered the shooting of a Hell's Angel member in Maine (Gary Watson). Rosga also directed other Outlaws members to "clean house" and kill any member they thought might be cooperating with law enforcement. *Id*. at 43.

As the PSR also shows, the defendant's position as national president was an elected position placing him in charge of a vast criminal organization. *Id*.[5]

### 2. Weight of the Evidence:

The weight of the evidence against the defendant is overwhelming as the defendant was convicted by a jury for violating the RICO act as alleged in Counts One and Two of the superseding indictment.

---

[5] For a complete summary of the defendant's complicity in this organization, see the Governments' Position on Sentencing. ECF 804.

16

### 3. Defendant's History and Characteristics:

Although the defendant was a Criminal History Category I, he was held accountable by the jury (beyond a reasonable doubt) for multiple counts of extortion, interstate travel in aid of racketeering, and maintaining drug houses. *See* PSR at 8, and Worksheet A's. His participation in a criminal organization is outlined above and in the PSR, and clearly shows someone who was extremely dangerous to the Eastern District of Virginia community. Moreover, the defendant is not without any disciplinary incidents while incarcerated: July 26, 2016 (being unsanitary), and November 23, 2019 (fighting with another person). *See* Government's Exhibit 1.

To his credit, the defendant has completed numerous education courses while incarcerated, but has completed no drug education (apparently none was required). *See* Government's Exhibit 2, Program Review Report.

### *4. Nature and Seriousness of the Danger Posed by Release:*

When one considers the nature of defendant's offense, it does not appear to be a close call to conclude that the defendant's risk of reoffending is high. Taken as a whole, the 18 U.S.C. § 3142(g) factors all weigh towards a finding that the defendant poses a danger to the community. Thus, under the terms of the Policy Statement, the defendant is ineligible for compassionate release, and his motion should be denied. *See* U.S.S.G. § 1B1.13(2).

### IV. Reduction of the Defendant's Sentence Would be Inconsistent with the Sentencing Commission's Policy Statement

Prisoners also are not eligible for compassionate release unless the reduction is consistent with the Sentencing Commission's Policy Statement. U.S.S.G.

§ 1B1.13(3). As set forth above, the defendant is a danger to the community. As such, he is not eligible for compassionate release because a reduction of his sentence would be inconsistent with the Policy Statement. *See id.* His motion should be denied.

## CONCLUSION

For the reasons discussed, the defendant's request should be denied. Simply having a condition that presents the potential for an elevated risk associated with COVID-19 is insufficient as the defendant presents a risk to the community if released.

Finally, if this Court were to disagree with the United States' position above, any order that this Court issues that grants a defendant compassionate release should require defendant to undergo a 14-day quarantine that BOP controls before any release.

                                            Respectfully submitted,

                                            G. ZACHARY TERWILLIGER
                                            UNITED STATES ATTORNEY

By:   /s/
      Peter S. Duffey
      Assistant United States Attorney
      United States Attorney's Office
      919 East Main Street, Suite 1900
      Richmond, VA 23219
      Telephone: (804) 819-5400
      Email: peter.duffey@usdoj.gov